# EXHIBIT A

K2d1phic

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    THE PHILLIES, a Pennsylvania
     limited partnership,
4
                      Plaintiff,
5
                 v.                          19 Civ. 7239 (VM)(SN)
6
     HARRISON/ERICKSON,
7    INCORPORATED, et al.,

8                    Defendants.             Telephone Conference

9    ------------------------------x
                                             New York, N.Y.
10                                           February 13, 2020
                                             4:35 p.m.
11
     Before:
12
                         HON. SARAH NETBURN,
13
                                             Magistrate Judge
14
                              APPEARANCES
15                          (Via Telephone)

16   DUANE MORRIS, LLP
          Attorneys for Plaintiff
17   BY:  DAVID J. WOLFSOHN, ESQ.
          TYLER R. MARANDOLA, ESQ.
18
     MITCHELL SILBERBERG & KNUPP LLP
19        Attorneys for Defendants
     BY:  PAUL D. MONTCLARE, ESQ.
20        MATTHEW D. WILLIAMS, ESQ.

21

22

23

24

25

K2d1phic

1        THE COURT:  Hi.  This is Judge Netburn.  Who do I have

2   on the phone?

3        MR. WOLFSOHN:  Hi, your Honor.  David Wolfsohn and

4   Tyler Marandola for plaintiff the Phillies.  How are you.

5        THE COURT:  Thank you.

6        MR. MONTCLARE:  Good afternoon, your Honor.  Paul

7   Montclare.  I am here for Harrison/Erickson.  I'm with Matt

8   Williams from my firm.

9        THE COURT:  Thank you.

10        We're here with a court reporter so you can order the

11   transcript at the conclusion of these proceedings.

12        So we are here on the letter filed by the defendants

13   on February 7th.  The plaintiffs responded the same day, and

14   then the defendants filed a letter yesterday responding, in

15   part, to the Phillies letter.

16        I understand that the two primary issues that need

17   resolution are where the depositions of Phillies employees

18   should be taken and then the scope of topics for the 30(b)(6).

19   Is that correct?

20        ALL COUNSEL:  Yes, your Honor.

21        THE COURT:  I forgot to give my preliminary speech,

22   which is, we're doing it by phone as a convenience to you all,

23   and so I hope you appreciate the courtesy, and your

24   appreciation can be shown by not speaking over one another and

25   by always identifying yourself.  It's hard to tell who is

K2d1phic

```
1   speaking, so if you can always identify yourselves before you

2   speak so that the court reporter can properly attribute your

3   statements to the right person.  Okay?

4              UNIDENTIFIED SPEAKER:  Okay.

5              THE COURT:  So why don't I hear first from

6   Mr. Montclare on the issue about locations.

7              MR. MONTCLARE:  Thank you, your Honor.  It's really

8   not a big issue.  I just want to say at the beginning of this,

9   Mr. Wolfsohn and I have really tried to be courteous to one

10  another and we're trying to get this worked out in terms of

11  location.  We've already scheduled two depositions of employees

12  of the Phillies in Philadelphia for convenience of the Phillies

13  personnel.  And we did that because we thought it was the right

14  thing to do under the circumstances.  One person was a little

15  older; and the other person had to go down for spring training,

16  and that deposition was held today.  The remaining people who

17  are employees that we want to have in New York are really only

18  two other people now.  It's Dave Buck's, who actually came up

19  the other day when our client's deposition was taken here; and

20  Scott Brandreth, who is an employee who I thought was going to

21  also attend the depositions up here that we took of our clients

22  last Friday and this Monday.

23             THE COURT:  Sorry.  Can you spell Scott Brandreth's

24  last name.

25             MR. MONTCLARE:  Yes.  B-R-A-N-D-R-E-T-H.  And he's the
```

K2d1phic

marketing fellow over at the Phillies.  And Dave Buck has also

been involved in settlement negotiations and has been involved

in this case.  I'm not sure what his title is today.  I think

it just changed recently.

        In addition to that, we are going to be in Philly for

the depositions of nonemployees, all of whom really have agreed

to appear, with the assistance of Mr. Wolfsohn, who accepted

service on their behalf.  But they are not employees.  So we

are going to take those depositions down in Philadelphia.

        The one thing I should -- I mean, the general rule is

pretty clear, I think, that, having decided to bring this case

in the Southern District, the plaintiff really, and its

employees, should appear here.  There aren't too many reasons

for that not to happen.  It's only an hour and a half away.

There's no inconvenience.  They certainly have the money.  It

may be that they don't want to, but, you know, I don't

necessarily want to go down to Philly either, especially when

you're taking depositions, if your Honor may be aware, because

you have all these documents to carry around.

        The only other situs issue would have to do with the

30(b)(6) deposition, which should also be here, I think, for

the same reason.  They're a party.  And I don't know really --

I didn't see in any of the responsive papers anything that

amounts to any kind of burden or special circumstances that

should take us out of the normal rule that the party who starts

K2d1phic

1    the litigation in one place, in one forum, has to produce

2    witnesses in that forum.  This court has held, and the Second

3    Circuit has affirmed, people come from as far away as Japan for

4    litigation in the Southern District.  I'm not sure -- we have a

5    lovely office.  We'll extend courtesies to Mr. Wolfsohn and his

6    clients.  And I don't think it's an imposition.  I just think

7    it may be inconvenient, but they started a very extensive

8    lawsuit and, you know, that comes with the territory of

9    starting a litigation.

10            THE COURT:  Okay.  Mr. Wolfsohn?

11            MR. WOLFSOHN:  Thank you, your Honor.  David Wolfsohn

12    for plaintiff the Phillies.

13            A couple of things, your Honor.  When we discussed the

14    situs of the depositions for the two defendants, the two

15    personal defendants, I discussed it, we noticed them for

16    Philadelphia because our client wanted to attend.  And

17    Mr. Montclare said it was a burden for them because they were

18    flying in from Florida and they didn't want to spend a weekend

19    in Philly and it was too hard, they wanted to be together, and,

20    you know, all this sort of stuff.  So I agreed to take them in

21    New York, even though I had to schlep all the T-shirts and

22    dolls and documents up to New York for those depositions.  And

23    Mr. Montclare agreed to do the Phillies depositions in

24    Philadelphia.  So I thought we had resolved that issue.  So now

25    I've taken those two depositions in New York, and now I think

K2d1phic

1    he's changing the rules of the game.

2              In his letter -- he didn't mention on the phone, your

3    Honor, but in his letter to the Court, he said that it's a

4    burden for his clients to travel to Philadelphia.  When we

5    discussed the timing of their depositions, he said they weren't

6    going to be in New York other than for a couple of days, so

7    that's why I took those depositions last week.  And that they

8    are in Florida.  So if they want to come up for the

9    depositions, that's a little bit closer to come to Philly, and

10   definitely easier to get from the Philadelphia airport to our

11   offices than from, say, La Guardia or JFK to Manhattan.

12             So the bigger issue, your Honor, relates to the other

13   issue we're going to talk about today, and that's the 30(b)(6).

14   I don't know what your Honor's ruling is going to be, I don't

15   know what we'll be able to work out on that, but the way it is

16   right now, there's probably six or seven witnesses for those

17   topics.  If I really am going to have to prepare somebody on

18   all of those 17 or 18 topics, it's going to be like six or

19   seven witnesses.  And each one is going to testify for, I don't

20   know, half hour, 20 minutes, 45 minutes.  I really don't want

21   to have to do seven separate 30(b)(6) depositions with each

22   person taking off a full day in New York or have seven people

23   take off two days to be in New York, not knowing how long the

24   examination is going to take for each one of them.  So

25   especially, your Honor, for the 30(b)(6), that really should be

K2d1phic

in Philadelphia; unless it turns out that they don't do the

30(b)(6) at all, in which case it doesn't matter where it is

because it won't take place.

So in terms of our filing in New York, we spent a lot

of time figuring out where to file this case.  I would have

preferred to file it in Philadelphia for any number of reasons.

Obviously I live here, so it's more convenient, and more

convenient for my client.  We determined we didn't have

personal jurisdiction here, so we filed the case in the

Southern District of New York because we thought that this

either should be in the Southern District, potentially the

Eastern District, and so, you know, that's a good thing for the

defendants.  They're in their home, or at least close.  They

live in Brooklyn and Brooklyn Heights so they're pretty close,

so that's great.  And I already took their deposition in

Manhattan.

And I'm not going to pretend, your Honor, that it's a

huge burden, but for the 30(b)(6), it really would be a huge

burden, and being a lot of people would have to take time off.

And the other thing is, you know, today, we had a deposition of

the current Phillies Phanatic, and it was like less than two

hours of questioning, you know, so, you know, we're going to go

up to New York, have people take off an entire day for like two

hours of questioning.  I really think those depositions, since

we've done the depositions of the defendants in New York,

K2d1phic

1   should be in Philadelphia, but especially the 30(b)(6).

2            THE COURT:  Okay.

3            MR. MONTCLARE:  Your Honor, this is Paul Montclare.

4   Can I just respond quickly, your Honor.

5            It's not a big deal, except he really sort of

6   misstated a couple of things, probably unintentionally.

7            I never said we would take all the depositions of

8   Phillies people in Philadelphia.  In fact, he was insisting on

9   taking these two people who are elderly -- one is blind -- in

10  Philadelphia.  They were in Florida.  They live in Brooklyn.

11  They came to Brooklyn, and we then went to the deposition.  And

12  now they're here.  So I don't know where he comes up with this

13  issue that he came up with.

14           With regard to, you know -- I said I would try to

15  accommodate some of his people.  Bill Giles, who's a principal

16  witness in this case, is also elderly.  I don't want him to

17  come up here unnecessarily.  And that's a full day, and we'll

18  go a full day down there.

19           In terms of, you know, Dave Buck, the employee, he

20  came up to New York for the negotiations.  These are very

21  sophisticated businessmen.  This is an hour-and-a-half trip.

22           THE COURT:  Okay.  Okay.  I think I've heard enough.

23           First, I want to commend you all for working

24  cooperatively, to the extent you have.  That is really the best

25  way to practice, certainly before me, but I think generally.

K2d1phic

1    So I'm glad that you've been able to compromise your positions

2    and reach agreements.  That is how you should continue.  If you

3    are unable to continue with that practice, then the depositions

4    of the plaintiffs and its employees will be in New York.  I

5    don't think it's such a burden to come up to New York from

6    Philadelphia.  This is an incredibly important case to the

7    plaintiffs, and the case is pending in the Southern District of

8    New York.

9              So let's turn to the topics now.  The list of topics

10   that I am looking at has 27 topics, and it was attached to the

11   defendant's February 7th letter, I believe.  Is that the most

12   recent list?

13             ALL COUNSEL:  Yes, your Honor.

14             THE COURT:  Okay.  So let's go through these as

15   quickly as we can.

16             I think part of the problem is, you know, in the

17   effort to be comprehensive, there is a fair complaint that you

18   are overinclusive, and so I think that the plaintiff is correct

19   that topics that request information about agreements, those

20   agreements can certainly be produced if they haven't already

21   been produced.  So that includes topic 1, topic 2.  I think

22   those are the ones that deal with agreements.

23             I'm going to put topic 1 and topic 2 together.  They

24   seem to be about sort of relationships generally, a

25   relationship between the Phillies and MLB Properties and Major

K2d1phic

1    League Baseball generally.  I think that relationship

2    concerning intellectual property rights writ large is too

3    broad, but certainly concerning the Phanatic is a reasonable

4    request.  So I think so long as one is narrowed to be a focus

5    just on intellectual property rights concerning the Phanatic,

6    then topic 1 is a fair area of questioning.

7         With respect to topic 2, again, I think questions

8    about relationships with other agents, to the extent that there

9    are any, concerning the intellectual property rights in the

10   Phanatic is a fair area of questioning.  To the extent there

11   are questions about other agreements, those should simply be

12   produced.

13        Question No. 3 asks for a lot of questions about

14   math -- revenue, receipts, profits, and totals earned.  That

15   seems to me an area of discovery that is much better satisfied

16   through document production.  Do the defendants not feel that

17   they've received adequate documentation responsive to No. 3?

18        MR. MONTCLARE:  Yes.  This is Paul Montclare.  I don't

19   think we have received any information from the plaintiffs that

20   articulate for us the information that we've requested, the

21   total receipts, revenues, and profits by year.

22        And that really goes to another question, your Honor,

23   is that we have received no information -- no factual

24   discovery, at least -- that is tied to specifically their

25   damages claim, and we're getting towards the end of fact

K2d1phic

discovery here, and I know Mr. Wolfsohn is telling me that, you

know, he thinks this is all going to come in through experts,

but experts, you know, rely on facts, unless they don't, in

which case we have a *Daubert* problem.  But I think my problem

is, I don't want to be in a position at the end of fact

discovery where I have no information tied to the damages

claims that allows me to prepare my experts.

           The second part of that is that this information goes

directly to allegations in the complaint.  They have said that

we asked for way too much money in settlement negotiations.

They've brought this whole settlement issue into this case.  I

gave Mr. Wolfsohn an opportunity to withdraw all the

allegations relating to the settlement, and he said he didn't

want to do that.  As a part of that, and we take the

position -- and it goes directly to the story in their case,

the allegations, and our response that, you know, they're

saying that this thing -- they said in settlement negotiations,

for example, that they made $135,000 last year.  I have a right

to test that.  I don't believe it.  Not because I don't believe

Mr. Wolfsohn.  I just think whatever he was told, I need to

talk to his clients too and to Major League Baseball about

this.  I don't think you can have a 34-page complaint saying

you spent millions of dollars, and this is the most famous

mascot in the world, and that we are trying to essentially

extort them for an amount of money that, you know, the

K2d1phic

Phanatic's not worth, and then just say, oh, I'm not going to

give you anything on these revenues, and by the way, I'm also

going to represent my agent, Major League Baseball, and they're

not going to give you anything.  That's a complete stonewall on

an issue that I think is important.

            THE COURT:  Mr. Wolfsohn, you should be turning over

these documents.  What's going on?

            MR. WOLFSOHN:  Your Honor, profits and revenues are

not relevant to this case.  There's no claim by either party

for damages, either party, based on the revenues of either

party or the profits.  And certainly the profits -- we have no

claim for lost profits.  Our damages claim is solely based,

your Honor, on unjust enrichment theory, that we thought we

were getting the right to this intellectual property for the

full term of the copyright, not for only 35 years, so we say we

should get a prorated amount back -- if the Court rules against

us on some of these grounds, we should get back a prorated

amount of what we paid to the defendants.  So our revenues are

not relevant.  Our profits are not relevant.  If we talked

about how much we made in merchandising in the settlement

negotiations, we don't allege that in the complaint, they don't

make any allegation in their answer or counterclaims about it,

then it's not relevant to the case.  Just because we may have

talked about something in negotiations for settlement, doesn't

make it relevant to the claims or defenses that have been pled

K2d1phic

1    by either party.  And that's why we haven't turned it over.  We

2    objected to turning them over because we said they were not

3    relevant.

4              THE COURT:  So Mr. Wolfsohn, if ultimately the Court

5    concludes that the termination notice was valid and you no

6    longer have the right to use the Phanatic, you're going to

7    seek, you know, half as much back from the defendants that you

8    paid them back in the '80s?

9              MR. WOLFSOHN:  That would be a proportion.  I don't

10   know if it's exactly 50 percent, your Honor, but a proportion

11   of the $215,000 plus, depending on the Court's ruling.  We've

12   paid them, over the last 40 years, in nominal dollars, about a

13   million dollars, the nominal, nonadjusted.  So I don't know,

14   your Honor, I don't know that it's 50 percent, but some

15   percentage of what was paid.  And that's it.  That's the only

16   theory.  There's nothing else.  You can hold me to it.  The

17   court reporter is taking it down.  That's it.

18             MR. MONTCLARE:  Your Honor, may I respond very

19   briefly.  It's Paul Montclare.

20             THE COURT:  Sure.

21             MR. MONTCLARE:  Yeah, I mean, it's kind of

22   interesting.  They could have pled the case exactly that way.

23   They didn't plead the case that way.  They didn't tell us what

24   the damages are going to be.  Now he's saying this is the way

25   he's going to prove damages.  I really think that it's probably

K2d1phic

1    not even -- it's not a valid measure of damages.  But to say

2    that in determining the value that was sold in 1984, you can't

3    look at the income stream that actually happened between 1984

4    and the time of their suit would be a novel way to approach a

5    damages analysis from any kind of, you know, regression

6    analysis that economists do.  So I don't know what he's

7    thinking, and I'm not sure how he's going to calculate whether

8    it's 50 percent or 40 percent or 20 percent.  And I just --

9    that's the first thing.

10         The second thing:  He makes a claim in this case that

11   my client is going to go out and compete against him and he has

12   a Lanham Act claim, trademark claim.  In that trademark claim,

13   he suggests that my client, in this same settlement

14   discussion -- he brought it up.  I would have never brought it

15   up, your Honor.  I don't think it was appropriate.  I

16   understand Mr. Wolfsohn has a different point of view, and I

17   respect him, and his point of view, but the bottom line is, he

18   brought up this settlement discussion, and in response to

19   Mr. Buck's comment that they only make $135,000 a year, she

20   quipped back, well, then maybe we should make him the free

21   agent.  And without the context of all of this stuff, it really

22   seems to me you can't say on the one hand that, you know, we've

23   paid more than we were supposed to get and then not figure out

24   how much they made over the last 30-some-odd years with this

25   product.  It just -- and really, to me, I don't know why they

K2d1phic

would resist that.  This is discovery at this point.  I'd be

happy to keep that confidential.  But he's sort of taking away

a part of the narrative that he introduced into the case.

There's many, many, many parts of this complaint that talks

about how we were asking for exorbitant amounts and how they

spent millions of dollars on this, that, and the other thing,

all of which I have a right, I believe, to contest, and if they

send me the information on a spreadsheet, that would be good.

THE COURT:  Okay.  But Mr. Wolfsohn is saying right

now that he is only going to seek damages that are based on

some percentage of monies that the Phillies have paid to the

defendants, and that's it, that he's not looking for any money

whatsoever for the value of the Phanatic and the type of income

stream it's generated.  And so if he's prepared to accept that,

which he tells me he is, then I think that does make

paragraph 3 or topic 3 irrelevant.

MR. MONTCLARE:  I don't want to beat a dead horse, and

if the Court's going the other way, I'm certainly going to

respect the Court's decision.  It just seems to me that that is

a very open-ended sort of commitment that really doesn't have a

lot of information in it for me to contradict.  If his idea is,

we paid them a million dollars but we should have only paid

them 50 cents on the dollar, how is he going to calculate that?

He hasn't told you that.  How is he going to calculate that?

THE COURT:  I think what he said is it's going to be

K2d1phic

prorated, because what he said to me was, he believes that when

he paid however much money he paid to your client, it was to

have the rights for the entirety of their life, and if it's

being cut off prematurely, then he should have only paid you

for the rights that he got, and so by definition, he's capped

at some percentage of what he paid your client.

MR. MONTCLARE:  I understand that, your Honor.  I just

don't think -- how do you take a pro rata percentage of

forever?  I mean, it's a circular argument.

More important than that, you know, he also alleges

that our clients were properly compensated back in 1984, and

he's trying to say that as a matter of law, the Copyright Act

doesn't permit terminations under those circumstances.  We

certainly don't agree with that.  There's nothing -- it may be

in the legislative history as to what generated the statute.

There's nothing in the statute that talks about that, but

that's what he alleges.  In fact, in his first count, his

declaratory judgment count, he says, "At the time of the

negotiation of the 1984 assignment, H/E had full knowledge of

the market value of the work at issue."  Well, in order to

really understand the market value of the work at issue, in

most cases, if we were going to prove what market value was at

the time, you would have to -- especially over a period of

years, you would have to test it against actual results.  And

he's taking that out of the case as well.  I would like to have

K2d1phic

1    him limit it as much as he can on the damages.  We don't think

2    they're worth anything.  But this idea that he can sort of, at

3    this point, before we get to arguing any of these damages

4    issues points or expert opinion points, he somehow doesn't want

5    us to know how much they made, sounds to me if it wasn't

6    important, he would probably not object to it.

7            THE COURT:  Okay.  I'm going to cut you off, because

8    we've already gone a half an hour and we're running out of

9    time.

10           MR. MONTCLARE:  Sure.

11           THE COURT:  So I'm going to strike topic 3 as a topic

12   for 30(b)(6) deposition.  Mr. Montclare, if you want to put

13   something in writing to persuade me that you should be entitled

14   to those documents, I'm happy to entertain that request, but as

15   far as a 30(b)(6) witness, it's going to be stricken.  So let's

16   move on.

17           No. 4 talks about authorship and co-authorship and

18   ownership of the Phanatic and any creative contributions that

19   have been made.  That seems like a reasonable topic.  What's

20   the objection?

21           MR. WOLFSOHN:  Your Honor, so the issue under -- the

22   derivative work issue is the one that we quoted the language

23   for in our letter, which is under Section 203(b)(1) of the

24   Copyright Act, and the language there says that the Phillies,

25   after June 15, 2020, may continue to utilize derivative work

K2d1phic

prepared before June 15, 2020.  So there is an issue about

which are the derivative works.  The defendants submitted some

good law from the Second Circuit on what constitutes a

derivative work.  It has to be more than a trivial addition to

the original work, that has some modicum of creativity.  And we

have submitted 399 pictures of things that we think are either

derivative or they're actually just completely so different

from the original Phanatic that they wouldn't be infringing,

even if the rights do revert to the plaintiff.  Most of those

399 were artwork done by the defendants, by Ms. Erickson.  So

that we're not having to educate somebody on 399 pieces of art,

what I've asked Mr. Montclare to do is to identify for me the

ones that he thinks are at issue.  I don't think he's

contending that his own client didn't do something original

vis-à-vis the artwork.  So that feels to me like a big waste of

time and money to try to have somebody at the Phillies explain

the originality of his client's artwork.

THE COURT:  Mr. Montclare, can you accommodate that?

MR. MONTCLARE:  Pardon me?

THE COURT:  Can you accommodate that?

MR. MONTCLARE:  Well, not really.  And I'll tell you

why in a minute.  But he's changing what he offered in his

letter to the Court.  He offered to provide a witness to

testify, to the extent known, to the author of the derivative

work that he's put in his 399 documents, and the work, if any,

K2d1phic

1    on which the derivative was based.  He offered to do that.

2    It's in topics 4 and 7 in his email.  Now he's saying he

3    doesn't want to do that.  I don't know -- I certainly know what

4    my own client did, so I'm not asking him to tell me, you know,

5    what my own client did to create their own work.  I am asking

6    them to tell me who created -- I want a witness to testify,

7    under oath, as to who created these derivative works and so

8    that he can identify them.

9            We've also asked, just so you know --

10           THE COURT:  Why can't you identify the derivative

11   works that you're focused on?

12           MR. MONTCLARE:  Well, I don't know which ones that

13   they're really -- I mean, they're seeking a declaratory

14   judgment on 399 works.  If they're not important, then he

15   doesn't have to worry about them.  But if they're important, we

16   need to have some discovery on them.  He even put -- I'm sorry.

17   Go ahead.

18           MR. WOLFSOHN:  Thank you, Paul.  Dave Wolfsohn again

19   for the plaintiffs.

20           Your Honor, if your Honor had a chance to read the

21   *Durham Industries* case, *Durham v. Tomy*, 630 F.2d 905, your

22   Honor will see that when it comes to visual art, visual work,

23   like what we're talking about here -- we're not talking about

24   music, where you have experts and stuff like that -- the Second

25   Circuit typically says it's basically, I know it when I see it.

K2d1phic

1   The Second Circuit and -- the district court and the Second

2   Circuit will look and compare the work and consider, okay, in

3   what's purported to be the derivative work, is there anything

4   original there that's significant that's been added to the

5   first work?  And so all I'm asking Mr. Montclare to do is to

6   tell me, you know, which ones he thinks that he has a question

7   about.

8           Your Honor, I didn't have a chance -- maybe I should

9   have done this, and I apologize.  I should have sent your Honor

10  an example of what we're talking about.  But there's a

11  distinguished artist in the Philadelphia area who Paul's

12  client's said she totally [inaudible], and he did, you know,

13  dozens of drawings and paintings of the Phanatic in different

14  positions, different contexts, many of them humorous, of

15  course, and, you know, he's a good artist.  It's original

16  artwork.  It may not be Leonardo da Vinci, but it's definitely

17  adding some originality.  I just don't think there's a dispute

18  as to that.  Some of them, maybe Mr. Montclare thinks that

19  they're very close or identical to something else, and for

20  those, if he could just narrow it down, you know, we would

21  present a witness or -- if we have one.  If we have somebody

22  and we can find artists, we will present a witness to talk

23  about what they think is original that they've added to it.

24          THE COURT:  Okay.  Well, you know, we're already

25  closing in on 40 minutes, which exceeds what I normally do for

K2d1phic

 1   a phone call, and we have another 20 topics to go.  I think

 2   what we're going to have to end up doing is adjourning this

 3   conference, because I don't have the time to go through it one

 4   by one with you all now.  It does seem to me that you all could

 5   do more work to have more conversations about the scope of the

 6   derivative claim so that we can narrow it, at least, because

 7   even if it's all 399, that's too much for a deposition, and it

 8   seems like it undermines the value of the inquiry.

 9           MR. WOLFSOHN:  Okay.  Your Honor, Dave Wolfsohn for

10   the plaintiffs.  I was also going to suggest, it seems to me

11   that, you know, they're taking seven depositions of lay

12   witnesses.  They're going to have the guy who's the head of

13   merchandising, taking his dep, that's Mr. Brandreth; they're

14   taking his deposition.  They're going to take Dave Buck's

15   deposition.  He's the executive vice president.  They're going

16   to take the former creative person, who retired, but she was

17   the -- contributed a lot of creative ideas to the Phanatic and

18   promotions, and they're taking her deposition.  So they're

19   taking all those depositions.  And what I would propose, your

20   Honor -- Paul and I will continue to work on this, but what I

21   would propose is that they get through those depositions and

22   then see where they are, see what information they're lacking,

23   and hopefully at that point they can pare these down, and I

24   would understand, yeah, you're right, Paul, you know, the seven

25   lay witnesses knew a lot of stuff, and you got a lot of

K2d1phic

1    answers, but as to these three, four, five topics, there's some

2    information missing, I'll find you a witness on that.  So if we

3    could do something like that just with the understanding, you

4    know, I'm not waiving any of my rights, he's not waiving any of

5    his rights, I think we should be able to get rid of a lot of

6    the stuff here and not have to burden the Court with it.

7              MR. MONTCLARE:  Yes.  This is Paul Montclare.  I'm

8    happy to talk to David about this.  And I know the Court

9    doesn't have the time.  So I think that would be best for us to

10   do in any event, and sorry to burden the Court so much with all

11   of this.  But we will try to get through that.  And if we can't

12   resolve it, we should probably schedule another conference call

13   with your Honor, if you have time, because I would really like

14   to have this resolved, because we're running out of time on the

15   discovery.

16             THE COURT:  That's what I'm trying to look up right

17   now.  What's the close of fact discovery?

18             MR. MONTCLARE:  March 9th, and I was --

19             MR. WOLFSOHN:  Excuse me.  Dave Wolfsohn for the

20   plaintiff.  And I have not had a chance to discuss this with

21   Paul, but I was thinking, given everybody's schedules and the

22   depositions we have to do, if we could move the whole calendar

23   out two weeks, I think we need that.  I think that's probably

24   enough.  I haven't discussed it with Mr. Montclare so I don't

25   know if he's okay with that, your Honor.

K2d1phic

1          MR. MONTCLARE:  I certainly have no objection.  We're

2    running up against deadlines, and we've all been working very

3    hard.  It's just that we have to get this thing ended.  So yes,

4    I have no objection to that.

5          THE COURT:  Okay.  Then I'll extend the deadline.

6    I'll give you a little more than two weeks.  I'll give you till

7    March 27th, which is a Friday.  So --

8          MR. WOLFSOHN:  Great.  Thank you, your Honor.

9          MR. MONTCLARE:  And while we're at it, your Honor,

10   then could we move the expert date out a little bit, because

11   right now it's a day after the close of fact discovery, and

12   that's on for March 10th that we have to start filing expert

13   disclosures.

14         THE COURT:  What do you propose?

15         MR. WILLIAMS:  That's what I was about to say.  Thank

16   you.

17         MR. WOLFSOHN:  Dave Wolfsohn again for the plaintiffs.

18   I agree.  I wouldn't mind moving the expert disclosures to like

19   a week after March 27th.

20         THE COURT:  Can I ask that you all, after this phone

21   call, have a conversation and then file a letter tomorrow with

22   a proposed date.  I'll give you till the 27th for fact

23   discovery, and if you can just give me a reasonable schedule

24   for expert discovery.

25         MR. WOLFSOHN:  Yes, your Honor, we'll do that.

K2d1phic

1          THE COURT:  So before I let you go, let me tell you

2     when I can see you again.  The soonest I could see you in

3     court, in person, would be probably the 27th of February, but

4     better for me would be the 4th of March.

5          MR. MONTCLARE:  Just a second.  I'm looking at my

6     calendar, your Honor.  Paul Montclare.

7          Yeah, I think it's all right with me, your Honor.

8     This is Paul Montclare.

9          MR. WILLIAMS:  The 4th would be fine.

10          THE COURT:  Okay.  So let's adjourn the conference.

11     We will reconvene on the question of the scope of the 30(b)(6)

12     topics.  That will give you an opportunity to take a few more

13     depositions.  I do think that's a good idea, to learn a little

14     bit more.  Then you all can probably work to narrow the

15     disputes.  If you have narrowed the disputes, you can write to

16     me and say that you want to adjourn the conference.  Again, you

17     do seem like you're working well together generally, but if

18     we're going forward with the conference on March 4th, then I

19     would ask you to file a letter for me on March 2nd letting me

20     know the topics that remain in dispute.

21          MR. MONTCLARE:  Fair enough.

22          THE COURT:  Okay?

23          ALL COUNSEL:  Thank you very much, your Honor.

24          THE COURT:  Okay.  Thank you.

25                              o0o