# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

THE PHILLIES, a Pennsylvania limited partnership,

Plaintiff,

vs.

HARRISON/ERICKSON, INCORPORATED, a New York corporation, HARRISON ERICKSON, a partnership, and WAYDE HARRISON and BONNIE ERICKSON,

Defendants.

Civil Action No. 19-7239

1

****CONFIDENTIAL****

VIDEOTAPED-TELEPHONIC 30(b)(6) DEPOSITION

TAKEN REMOTELY VIA

VIDEOCONFERENCE AND TELECONFERENCE

OF

DAVID RAYMOND

Thursday, May 7, 2020

Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 179894

May 7, 2020

3:45 p.m.

CONFIDENTIAL videotaped deposition of DAVID RAYMOND, pursuant to Federal Rule of Civil Procedure 30(b)(6), before Francis X. Frederick, a Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

(All Counsel and Participants present via videoconference and teleconference in compliance with COVID-1 restrictions.)

DUANE MORRIS
Attorneys for Plaintiff
30 South 17th Street
Philadelphia, Pennsylvania 19103
BY: TYLER MARANDOLA, ESQ.
DAVID WOLFSON, ESQ.

MITCHELL SILBERBERG & KNUPP
437 Madison Avenue
New York, New York 10022
BY: PAUL MONTCLARE, ESQ.
LEO LICHTMAN, ESQ.
- and -
MITCHELL SILBERBERG & KNUPP
1818 N Street NW
Washington, DC 20036
BY: MATTHEW WILLIAMS, ESQ.

A P P E A R A N C E S: (Cont'd.)

ALSO PRESENT:
PHIL RIZZUTI, Videographer

THE VIDEOGRAPHER: Good afternoon. My name -- one second.

My name is Phil Rizzuti. I am the legal videographer in association with TSG Reporting, Inc. Due to the severity of the COVID-19 and following the practice of social distancing I will not be in the same room as the witness. Instead I will record this videotaped deposition remotely. The reporter, Francis Frederick, also will not be in the same room and will swear the witness remotely.

Do all parties stipulate to the validity of this video recording and remote swearing and that it will be admissible in the courtroom as if it had been taken following Rule 30 of the Federal Rules of Civil Procedure and the state's rules where this case is pending?

MR. MONTCLARE: So stipulated on behalf of the defense.

MR. MARANDOLA: Tyler Marandola

the character of the Phanatic was fully formed by October 31st, 1984?

A. I'm sorry. Give me the date again.

Q. October 31st, 1984 which is the date of the assignment?

A. I'd surely think by -- in four years, we -- you know, when I went out as the Phanatic I understood who he was and how the respond and react and certainly feel it was pretty fully formed by then. But, you know, with different pop culture in different parts, you know, of things that were going on, the Phanatic pulled from those and certainly continued to use his personality, you know, to develop routines and skits and things like that to reflect current pop culture.

But understanding those types of changes. But his personality certainly in the first year was formed and well into the second year. So I would say yes.

Q. And is it the Phillies' understanding that Harrison/Erickson had the right to improve anyone who played the role of

the Phanatic in the costume?

MR. MARANDOLA: Objection. Outside the scope of the 30(b)(6) topics. You can answer to your personal knowledge if you have any.

A. The only authority for selecting the performer was with the Philadelphia Phillies.

Q. How do you know that?

A. Because I was there during all many time. And we didn't -- we did not consult with Harrison/Erickson for who would be in the costume. They were not a definitive voice in that process.

Q. Do you know whether there was a contractual obligation to get the approval for the Phanatic performer from Harrison/Erickson?

MR. MARANDOLA: Objection. Outside the scope of the 30(b)(6) topics. You can answer in your personal capacity if you know.

A. I was not privy to the agreement. I was just privy to being involved in selecting the performers. And we never had to

receive that approval during that process. To my knowledge, we did not.

Q. I'm not asking really for your knowledge. Did you do any investigation as part of your appearing here to testify as a representative -- as a designated representative of The Phillies as to whether or not there were any contractual obligations between The Phillies and the Harrison/Erickson people as to who selected the performer?

MR. MARANDOLA: Objection outside the scope of the 30(b)(6) topics. You can answer in your personal capacity.

MR. MONTCLARE: I just asked if he did any investigation.

A. I haven't seen any of those documents. Nor did we discuss those documents or whether they were in place or not.

Q. Okay. And my question was really did you do an investigation relating to that topic.

A. No. I did not.

Q. How did The Phillies pick you to be a Phanatic performer?

A. Well, in 1976 and 1977 I was an intern in the promotions office headed by Frank Sullivan. And when 1970 came up he contacted me while I was still on campus at the University of Delaware I was a student, an undergraduate student and he asked me if I would continue with my intern position in 1978 and wanted me to also state for the games and then they described that they needed me to get fitted for a costume and that I would be wearing this costume during the games.

Q. Okay. Was anybody present at your fitting in 1978?

MR. MARANDOLA: Objection. Outside the scope of the 30(b)(6) topics. You can answer in your personal capacity.

MR. MONTCLARE: He just testified to that. I'm asking him a question -- never mind.

Q. Just answer the question. Thank you.

A. I was by myself during that visit to New York to the studio.

between you on the one hand and The Phillies on the other hand concerning any copyright rights in the Phanatic character up through November 26, 1979?

MR. MARANDOLA: Objection, outside the scope of the 30(b)(6) notice.

You can answer as an individual, Mr. Raymond.

A. So when you're talking about copyrighted character, you're talking about the personality?

Q. Is there any writing between you and The Phillies concerning the copyrighting of character the Phanatic up through November 26, 1979?

MR. MARANDOLA: Objection, outside the scope of the 30(b)(6) notice. Objection calls for a legal conclusion.

You can answer as an individual.

A. Yeah. I just want to be clear when you're talking -- the character obviously means a couple different things. So your question, is it regarding my writings to The Phillies, so my -- you're asking me if I had

something written between me and The Phillies about what the Phanatic's personality was. Is that what you're asking?

Q. Yes.

A. There was nothing in writing. It was all in my head.

Q. To your knowledge, did The Phillies, as of November 26, 1979, register any copyrights for the Phanatic character?

MR. MARANDOLA: Objection. Outside the scope of the 30(b)(6) notice. Mr. Raymond you can answer if you know.

A. Again, I have not -- I was not privy or involved in any of those documents or discussions or -- nor did I have any knowledge about the legal portions of Phanatic's personality.

Q. So I just want to get this straight. Is it your testimony you created the character or that the Phillies created the character that you described earlier?

A. I was employed by the Philadelphia Phillies. So my understanding is that any of

the work product that I was creating would be part of The Phillies' ownership and control.

I will say this. One of the best decisions The Phillies made was that they allowed me the freedom and room to develop the personality on my own with limited direction. I worked closely with Bill Giles throughout the first number of months with the Phanatic about thinking about where in the stadium I could go, where I would be most effective, and we would collaborate on that. And then if I did something that Bill and I, in our discussions liked, we kept doing.

Occasionally, Bill might suggest to me that something was not necessarily what he would like. We'd discuss it. And many times he would agree to my focus and there were times when he said, Well, let's stop doing those things but let's do these things instead. So I had the freedom to do whatever I wanted to do as long as it was G-rated and for the most part I was allowed to continue to do that.

Q. Do you have any recollection of

the specific conversations that you had with Mr. Giles that just testified about?

A. Well, there was -- do you have a time frame in mind that you want to know about --

Q. Well, you just -- I'm just following up owner testimony you said it was collaborative. You spoke with him. You shared ideas, blah-di-de-blah. Yeah, when -- do you have any specific information about those conversations? Like where they were, when they were there, who was there.

A. Well, I can give you one very specific. I had created a routine where the Phanatic would come out in the fifth inning and, based on the team we were playing, there would be a song -- so, for instance, the Mets. Frank Sinatra not would be singing New York New York. I would come out. I'd line up three of the novelty -- the plastic novelty helmets that were the Mets helmets. And I would smash them with a ground crew instrument to the tune of New York New York. And Bill called me in one day and said that there was a