# EXHIBIT G



NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

*FIRM and AFFILIATE OFFICES*

DAVID J. WOLFSOHN
DIRECT DIAL: +1 215 979 1866
PERSONAL FAX: +1 215 689 2739
*E-MAIL:* DJWolfsohn@duanemorris.com

*www.duanemorris.com*

July 27, 2020

The Honorable Victor Marrero
USDC, Southern District of New York
Daniel Patrick Moynihan Courthouse
New York, NY 10007

Re:     *The Phillies v. Harrison/Erickson, Inc., et al.*, C.A. No. 19-7239-VM-SN

Dear Judge Marrero:

Pursuant to Section II.A. of the Court's individual practices, The Phillies hereby requests a pre-motion conference regarding the filing of an opposed motion for partial summary judgment on two issues that can be determined as a matter of law.

By way of background, in March 1978, The Phillies hired defendants to construct a costume pursuant to The Phillies' design specifications for use as the team mascot, the Phillie Phanatic. The first Phanatic was Dave Raymond, who debuted in April 1978 and whom defendants described as having "created a fun and sensitive character." As performed by Raymond, the Phanatic was instantly "wildly popular" according to defendant Erickson, generating about $2 million in revenue in the first couple of years.

In May 1979, defendants registered the costume with the Copyright Office, fraudulently describing it as an "artistic sculpture" because that office at that time would not have registered a costume. The deposit was a black-and-white photo of the "sculpture." Exh. A. (Defendants contend that the five color photos in Exhibit B comprise the deposit. For purposes of a summary judgment motion only, The Phillies is willing to assume *arguendo* that that was the case.) Based on the registration, a couple of weeks later, defendants sued plaintiff in this district for, *inter alia*, copyright infringement. The Phillies paid defendants $150,000 to settle that litigation.

In 1984, The Phillies paid defendants another $215,000 for assignment—which was supposed to last "forever"—of all rights to the costume ("the 1984 Assignment"). During the next 34 years, The Phillies paid defendants more than $30,000 for rights to use certain style guides and artwork to create Phanatic-related products and for other purposes ("the Style Guide Transactions"). Those transactions are memorialized in correspondence, invoices, and payments.

In June 2018, defendants sent The Phillies a notice pursuant to 17 U.S.C. § 203 stating that the 1984 Assignment would terminate effective June 15, 2020. After lengthy negotiations

The Honorable Victor Marrero
July 27, 2020
Page 2

proved unfruitful, plaintiff filed this lawsuit last summer seeking, *inter alia*, a declaratory judgment that defendants do not have the right to terminate the 1984 Assignment because, *inter alia*, the Club is a coauthor of the costume and author of the Phanatic's character, but that, even if they do, plaintiff's rights to the derivative works prepared before June 15, 2020 do not revert to defendants, including rights to continue to use a redesigned Phanatic that debuted at Spring Training this February. The Phillies also asserts that defendants cannot sue The Phillies for copyright infringement under the fraudulent registration.

### Issue 1: The Redesigned Phanatic and a Related Style Guide Are Derivative Works Under 17 U.S.C. § 203(b)(1)

The purpose of the termination provisions of the Copyright Act is to give authors a chance to renegotiate contracts executed when "their bargaining power [was] weak and their prospects for success uncertain," which is certainly not the case here. *Penguin Group v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). In any event, Section 203(b)(1) provides an important mechanism to protect an assignee/licensee's investment in the work that may be subject to the terminated transfer. This mechanism is particularly important in this case where the whole point of a mascot is to act as a symbol of the team, and to promote brand identity and goodwill, and where The Phillies have spent many millions over 40 years promoting the Phanatic. Section 203(b)(1) provides: "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination . . . ." Thus, to be subject to the derivative work exception, the redesigned Phanatic and a related style guide must be (1) prepared before June 15, 2020, (2) prepared under authority of the 1984 Assignment, and (3) a derivative work. There is no dispute that the redesigned Phanatic and new style guide were prepared before June 15, 2020, when the 1984 Assignment was still in effect, so the only disputed issue is whether the redesigned Phanatic and style guide are derivative works.

A derivative work must add "some substantial, not merely trivial, originality" to the original work. *L. Batlin & Sons, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976). A work that makes nontrivial contributions to the original work constitutes a derivative work even though "it retains the 'same aesthetic appeal.'" *Eden Toys, Inc. v. Florelee Undergarment Co., Inc*., 697 F.2d 27, 34 (2d Cir. 1982). "By its very nature, a 'derivative' work . . . borrows substantially from existing works . . . .." *Id.* "In this Circuit, the requisite level of 'originality' is not difficult to attain; it has been described as 'modest, minimal, and as establishing a low threshold.'" *J&J Fabrics, Inc. v. India Garments Inc.,* 1993 WL 330463, * 3 (S.D.N.Y. Aug. 24, 1993), *quoting Durham Inds., Inc. v. Tomy Corp.,* 630 F.2d 905, 910 (2d Cir. 1980); *American Greetings Corp. v. Kleinfab Corp.*, 400 F. Supp. 28, 232-33 (S.D.N.Y. 1975) (adding inscription "Put on a Happy Face" to illustration qualifies it as a derivative work).

In determining whether a visual work is a derivative work, the Second Circuit and district courts typically engage in a "visual comparison." *Eden Toys,* 697 F.2d at 35 ("Since the factual question here depends on a visual comparison of exhibits, we are in as good a position as the district court to judge the originality of the work in question."); *Durham Ind*., 630 F.2d at 908-909, 910 (toys based on Disney characters were not derivative works because of "mute testimony of Mickey, Donald and Pluto themselves"; "One look at Tomy's figures" reveals lack of

The Honorable Victor Marrero
July 27, 2020
Page 3

originality); *J&J Fabrics,* 1993 WL 330463, * 3-4 (granting summary judgment based on visual comparison of fabric patterns); *Godinger Silver Art Co., v. Int'l Silver Art Co.*, 1995 WL 702357, * 3 (S.D.N.Y. Nov. 28, 1995) ("visual comparison" of "Baroque" silverware designs); *Silberstein v. Fox Entm't Grp., Inc*, 424 F. Supp. 2d 616, 622, 629 & n.8 (S.D.N.Y. 2004) (visual comparisons of drawings), *aff'd* 242 F. App'x 720 (2d Cir. 2007); *Modern Pub. v. Landoll, Inc*., 841 F. Supp. 129 (S.D.N.Y. 1994) (visual comparison of trolls and drawings). Two of the drawings at issue in *Eden Toys* are attached hereto as Exh. C. The Court in *Eden Toys* held as a matter of law that the drawing on the right was a copyrightable derivative work when compared to the drawing on the left.

The Phillies seeks a ruling from this Court regarding the newly designed costume (Exh. D) as well as the new style guide (Exh. E). Considered in their totality, the many changes in the new costume and style guide as compared to defendants' 1979 deposit far exceed the "modest" or "minimal" changes required by the pertinent authorities for a work to be considered "derivative." Accordingly, partial summary judgment should be entered with regard to The Phillies' right to continue to utilize the newly designed costume and style guide.

### Issue 2: The Phillies' Rights Obtained in the Post-1984 Style Guide Transactions to Use the Style Guides Purchased from Defendants Have not Been Terminated.

Beginning in 1989 and up to 2018, in a series of transactions, The Phillies paid defendants for drawings and designs, including various "style guides." An example is attached as Exhibit F. In deposition testimony, defendants have admitted that they understood that the style guides would be used by The Phillies, Major League Baseball, and their licensees to design and manufacture Phanatic-related products. Defendants have further admitted that they put no temporal or usage restrictions on how these guides and artwork could be used, or for how long. As such, separately and apart from the 1984 Assignment, The Phillies have licenses to continue to use these style guides, whether for preparing new designs or using old designs.

To the extent that defendants would argue that the rights in these style guides terminated along with the "grant" embodied in the 1984 Assignment, defendants would be incorrect as a matter of law. The June 2018 termination notice only lists the 1984 Assignment, not any of the Style Guide Transactions or rights acquired thereunder. Moreover, the minimum time period for terminating the grants subject to the Style Guide Transactions has not yet occurred: The earliest of these transactions was in 1989; the most recent in 2018. The 1989 transaction cannot therefore be terminated until 2024; the one dating from 2018, not until 2053. 17 U.S.C. § 203(a)(3) (earliest termination can be accomplished after 35 years). Accordingly, partial summary judgment in favor of The Phillies would be appropriate with regard to its rights to continue to design and manufacture Phanatic-related products using the style guides.

Respectfully,
*/s/David J. Wolfsohn*
David J. Wolfsohn

DJW
cc:     All counsel of record (by ECF)

# EXHIBIT A

(SEAL IMPRESSED HERE)

This certificate, issued under the seal of the Copyright Office in accordance with the provisions of section 410(a) of title 17, United States Code, attests that copyright registration has been made for the work identified below. The information in this certificate has been made a part of the Copyright Office records.

*Barbara Ringer*

*Register of Copyrights*
*United States of America*

| REGISTRATION NUMBER | |
|---|---|
| VA | 23-748 |
| VA | VAU |

EFFECTIVE DATE OF REGISTRATION

MAY 4 1979
Month / Day / Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM VA/CON)**

**(1) Title**

TITLE OF THIS WORK:

PHILLIE PHANATIC

NATURE OF THIS WORK: (See Instructions)

Artistic Sculpture

Previous or Alternative Titles: ...............

PUBLICATION AS A CONTRIBUTION: (If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.)

Title of Collective Work: .......... Vol. ... No. ... Date ........ Pages ..........

**(2) Author(s)**

IMPORTANT: Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). If any part of this work was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates blank.

**1**

NAME OF AUTHOR:

WAYDE HARRISON

Was this author's contribution to the work a "work made for hire"? Yes ...... No.. X

DATES OF BIRTH AND DEATH:
Born .......... Died ..........
(Year) / (Year)

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of .. United States .. or { Domiciled in .................
(Name of Country) / (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)
CO-AUTHOR ARTISTIC SCULPTURE .

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous? Yes ...... No.. X
Pseudonymous? Yes ...... No.. X
If the answer to either of these questions is "Yes," see detailed instructions attached.

**2**

NAME OF AUTHOR:

BONNIE ERICKSON

Was this author's contribution to the work a "work made for hire"? Yes ...... No.. X

DATES OF BIRTH AND DEATH:
Born .......... Died ..........
(Year) / (Year)

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of .. United States .. or { Domiciled in .................
(Name of Country) / (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)
CO-AUTHOR ARTISTIC SCULPTURE

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous? Yes ...... No.. X
Pseudonymous? Yes ...... No.. X
If the answer to either of these questions is "Yes," see detailed instructions attached.

**3**

NAME OF AUTHOR:

Was this author's contribution to the work a "work made for hire"? Yes ...... No ......

DATES OF BIRTH AND DEATH:
Born .......... Died ..........
(Year) / (Year)

AUTHOR'S NATIONALITY OR DOMICILE:

Citizen of ........... } or { Domiciled in .................
(Name of Country) / (Name of Country)

AUTHOR OF: (Briefly describe nature of this author's contribution)

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK:
Anonymous? Yes ...... No ......
Pseudonymous? Yes ...... No ......
If the answer to either of these questions is "Yes," see detailed instructions attached.

**(3) Creation and Publication**

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED:

Year... 1978.

(This information must be given in all cases.)

DATE AND NATION OF FIRST PUBLICATION:

Date. April 18 1978
(Month) (Day) (Year)

Nation .. United States ..........
(Name of Country)

(Complete this block ONLY if this work has been published.)

**(4) Claimant(s)**

NAME(S) AND ADDRESS(ES) OF COPYRIGHT CLAIMANT(S):

WAYDE HARRISON and BONNIE ERICKSON, doing business as HARRISON ERICKSON, 95 Fifth Avenue, New York, New York 10003

TRANSFER: (If the copyright claimant(s) named here in space 4 are different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright.)

EXHIBIT 1

- Complete all applicable spaces (numbers 5-9) on the reverse side of this page
- Follow detailed instructions attached

DO NOT WRITE HERE
Page 1 of .. 2 .. pages

* Assigned Copyright Office deposit
account number:   DA028657

VA  23-748

EXAMINED BY: ...

CHECKED BY: ...    MAY 25 1979    APPLICATION RECEIVED:

CORRESPONDENCE:    DEPOSIT RECEIVED:
☐ Yes              MAY 4 1979

DEPOSIT ACCOUNT    REMITTANCE NUMBER AND DATE:
FUNDS USED:
☒

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED ADDITIONAL SPACE, USE CONTINUATION SHEET (FORM VA/CON)**

**PREVIOUS REGISTRATION:**

- Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office? Yes........No... X...

- If your answer is "Yes," why is another registration being sought? (Check appropriate box)
  ☐ This is the first published edition of a work previously registered in unpublished form.
  ☐ This is the first application submitted by this author as copyright claimant.
  ☐ This is a changed version of the work, as shown by line 6 of the application.

- If your answer is "Yes," give: Previous Registration Number...........................Year of Registration........................

**5**
Previous
Registra-
tion

**COMPILATION OR DERIVATIVE WORK:** (See Instructions)

PREEXISTING MATERIAL: (Identify any preexisting work or works that this work is based on or incorporates.)
..................................................................................
..................................................................................
..................................................................................
..................................................................................

MATERIAL ADDED TO THIS WORK: (Give a brief, general statement of the material that has been added to this work and in which copy
right is claimed.)
..................................................................................
..................................................................................
..................................................................................
..................................................................................

**6**
Compilation
or
Derivative
Work

**DEPOSIT ACCOUNT:** (If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.)

Name: Abeles, Clark and Osterberg

Account Number:  * 4503

**CORRESPONDENCE:** (Give name and address to which correspondence about this application should be sent.)

Name: Abeles Clark & Osterberg
Address: 4 East 52nd Street
                                                    (Apt.)
New York, New York    10022
(City)                (State)              (ZIP)

**7**
Fee and
Correspond-
ence

**CERTIFICATION:** * I, the undersigned, hereby certify that I am the: (Check one)
☐ author ☐ other copyright claimant ☐ owner of exclusive right(s) ☒ authorized agent of: HARRISON ERICKSON
                                                              (Name of author or other copyright claimant, or owner of exclusive right(s))
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Handwritten signature: (X) [signature]
Typed or printed name: ROBERT C. OSTERBERG    Date: May 24, 1979

**8**
Certification
(Application
must be
signed)

JOHN S. CLARK

ABELES CLARK AND OSTERBERG
(Name)

4 East 52nd Street
(Number, Street and Apartment Number)

New York, New York 10022
(City)    (State)    (ZIP code)

**MAIL
CERTIFICATE
TO**

**25 MAY 1979**
(Certificate will
be mailed in
window envelope)

**9**
Address
For Return
of
Certificate

* 17 U S C § 506(e) FALSE REPRESENTATION—Any person who knowingly makes a false representation of a material fact in the application for copyright registration pro-
vided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.



© 1978 MARRISON, BC

# EXHIBIT 1 A

# EXHIBIT B



copyright photo #97    page 29 of 39

PLAINTIFF'S
EXHIBIT
P 6
2/7/20

HE000012



copyright photo #97 Page 29 of 59

#97  page 29 of 39

Copyright photo



copyright photo #97 page 29 of 59



Copyright photo #97 pag 29 of 59

HE000016

# EXHIBIT C

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 34 (2d Cir. 1982)

 

# EXHIBIT D

















# EXHIBIT E

**Phanatic PMS Colors (2020)**

**Light Green PMS 361** – Body & Mid-Snout

**Dark Green PMS 347** – Snout Rings

**Red PMS 200** – Cap, Jersey Pinstripes, Phillies Script, Blower (Tongue), Leg Stripes, Back Lettering, Shoes

**Blue PMS 288 –** Cap Button, Legs, Phillies Script Stars

**Pink PMS 231** – Eyelashes

**Powder Blue PMS 284** – Eyebrows, Tail

**Black** - Outline, Pupils



# EXHIBIT F



PLAINTIFF'S
EXHIBIT
27
2/7/20 NA
PENGAD 800-631-6989

PHAN0010690

## PHILADELPHIA PHILLIES OFFICIAL MASCOT DESIGNS

### COLORS

**For Philadelphia Phillies Mascot Red**
Use PANTONE® 200
Use process simulation: 0%C, 100%M, 63%Y, 0%K
Use textile color: PANTONE 19-1664 TPX

**For Philadelphia Phillies Mascot Blue**
Use PANTONE 287
Use process simulation: 100%C, 68%M, 0%Y, 12%K
Use textile color: PANTONE 19-4057 TPX

**For Philadelphia Phillies Mascot Orange**
Use PANTONE 165
Use process simulation: 0%C, 59%M, 96%Y, 0%K
Use textile color: PANTONE 17-1464 TPX

**For Philadelphia Phillies Mascot Purple**
Use PANTONE 240
Use process simulation: 18%C, 94%M, 0%Y, 0%K
Use textile color: PANTONE 18-2333 TPX

**For Philadelphia Phillies Mascot Dark Green**
Use PANTONE 347
Use process simulation: 100%C, 0%M, 86%Y, 3%K
Use textile color: PANTONE 17-6153 TPX

**For Philadelphia Phillies Mascot Green**
Use PANTONE 361
Use process simulation: 76%C, 0%M, 91%Y, 0%K
Use textile color: PANTONE 16-6339 TPX

**For Philadelphia Phillies Mascot Dark Blue**
Use PANTONE 655
Use process simulation: 100%C, 70%M, 0%Y, 50%K
Use textile color: PANTONE 19-3815 TPX

**For Philadelphia Phillies Mascot Teal**
Use PANTONE 340
Use process simulation: 100%C, 0%M, 65%Y, 10%K
Use textile color: PANTONE 18-6030 TPX

**For Philadelphia Phillies Mascot Black**
Use Pantone Process Black
Use process simulation: 0%C, 0%M, 0%Y, 100%K
Use textile color: PANTONE 19-1102 TPX










**PHILADELPHIA PHILLIES MASCOT**

**Phillie Phanatic™**

**MASCOT ICONS**

In lieu of the colors referenced throughout this Style Guide, you may use the Pantone®* Colors listed. The colors shown throughout this Style Guide are printed in four-color process and are not intended to match the said PANTONE Color Standards. For the PANTONE Color Standards, refer to the current editions of the PANTONE Color Publications.

*PANTONE® is a registered trademark of Pantone, Inc.

©2018 Major League Baseball Properties

Any use of mascot names and designs must be approved by Major League Baseball Properties

PHAN0010691



PHAN0010692



PHAN0010693







**PHILADELPHIA PHILLIES OFFICIAL MASCOT DESIGNS**



# 3D MASCOT TURNAROUND

In lieu of the colors referenced throughout this Style Guide, you may use the Pantone®* Colors listed. The colors shown throughout this Style Guide are printed in four-color process and are not intended to match the said PANTONE Color Standards. For the PANTONE Color Standards, refer to the current editions of the PANTONE Color Publications.

*PANTONE® is a registered trademark of Pantone, Inc.

©2009 Major League Baseball Properties

Any use of mascot names and designs must be approved by Major League Baseball Properties



MITCHELL SILBERBERG & KNUPP LLP
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Paul D. Montclare
Partner
(917) 546-7704 Phone
(917) 546-7674 Fax
pdm@msk.com

July 29, 2020

**Via ECF**

Honorable Victor Marrero
U.S. District Judge
500 Pearl Street, Suite 1610
New York, NY 10007

Re:    **Phillies v. Harrison/Erickson, Inc. et al., No. 19-cv-7239-VM-SN**

Dear Judge Marrero:

We write for Defendants and Counterclaim Plaintiffs in response to The Phillies' July 27, 2020 letter.  For the reasons below, their proposed motion for partial summary judgment is meritless.

I.    **The "Redesigned" Phanatic and Related Style Guide Do Not Fall Within the Derivative Work Exception to Termination.**

On February 23, 2020, The Phillies introduced a Phanatic costume design with subtle modifications (hereinafter referred to as "P2").   The discovery record shows that The Phillies developed P2 to be instantly identifiable as an embodiment of the Phanatic solely in response to H/E's termination notice, and that The Phillies' own executives believed that nobody would notice the difference between the two mascots.  The Phillies have even publicly admitted in interviews that P2 is still the "same old Phanatic."

The Phillies seek to limit the Court to a simplistic visual comparison, relying primarily on *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982).[1]  That case is plainly distinguishable.  In *Eden Toys* the Second Circuit conducted a *de novo* review of the creative elements of the works involved because there was no expert opinion or other relevant evidence presented to the district court to inform the court's analysis.  Nothing in *Eden Toys* or any other case cited suggests that courts should preclude the use of experts or other evidence where relevant.  Instead, the Second Circuit noted with approval the district court's reliance on expert testimony in the seminal case discussing originality of a derivative work.  *See L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2d Cir. 1976).[2]  Courts routinely reject the superficial

---

[1] The Phillies seek to have the Court compare an image of P2 with the image of the Phanatic contained in the 1979 deposit.  (Ltr. at 3).  Such a comparison is too formalistic, ignoring the natural evolution of the Phanatic based on the availability of materials and updates in The Phillies' and Major League Baseball's branding.  *See* Exs. A & B, *infra*. These natural evolutions were not artistic choices, and The Phillies do not contend that any iteration of the Phanatic costume prior to P2—even the costume that appeared as recently as the 2019 baseball season—is a derivative work.

[2] The Phillies' own case law highlights the court's use of expert testimony in guiding the comparison of works.  *See Silberstein v. Fox Entm't Grp., Inc.*, 424 F. Supp. 2d 616, 628 (S.D.N.Y. 2004) (noting use of expert in comparison of visual works).



approach espoused by The Phillies. *See, e.g., Woods v. Bourne Co.*, 60 F.3d 978, 991-92 (2d Cir. 1995) (citing lay and expert testimony concerning creative process of, and variations made to, arrangements in determining they were not derivative works, even though a side-by–side visual comparison revealed works were "not literally identical"); *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763-64 (2d Cir. 1991) (holding that trial court properly relied on testimony of lay witness and expert witness in determining design based on preexisting source was not original); *see also Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1223 (9th Cir. 1997) (determining plaintiff's alleged works were not original in part because the record demonstrated that alterations to pre-existing work were guided by non-creative decisions).

The Phillies also ignore the Second Circuit's admonition that courts take "special caution in analyzing originality in derivative works, since too low a threshold will 'giv[e] the first [derivative work] creator a considerable power to interfere with the creation of subsequent derivative works from the same underlying work.'" *Woods*, 60 F.3d at 990 (citing *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983)); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980) (scope of protection afforded a derivative work "must not in any way affect the scope of any copyright protection in that preexisting material" pursuant to 17 U.S.C. § 103). Because P2's alterations are intentionally subtle and reflect a transparent attempt by The Phillies to pass it off as the original Phanatic, recognition of P2 as a derivative work could effectively give The Phillies a *de facto* monopoly over H/E's preexisting material, hindering H/E's ability to exercise their rights to use or license such material. *See Entm't Res. Grp.*, 122 F.3d at 1224 (citing *Durham* standard and explaining that recognition of plaintiff's alleged work as a "derivative work" would in effect give plaintiff a *de facto* monopoly that would hinder the owner of the preexisting work from exercising its own copyright rights); *L. Batlin*, 536 F.2d at 492 ("To extend copyrightability to miniscule variations would simply put a weapon for harassment in the hands of mischievous copiers . . . .").

The Phillies' position ignores the mountain of evidence demonstrating that The Phillies lacked any creative motivation behind P2, and that the alterations made on P2 demonstrate less than trivial creativity or independent creation. For the Courts' convenience, attached as Exhibits A and B are the expert reports addressing these issues. Notably, The Phillies have not designated any experts in this case.

## II.    The Phillies May Not Make Derivative Works of the Phanatic after Termination.

Regardless of whether The Phillies may use P2 under the derivative work exception, they may not develop any new derivative works that feature P2. The derivative work exception "does not extend to the preparation *after the termination* of other derivative works based upon the copyrighted work covered by the terminated grant," 17 U.S.C. § 203(b)(1) (emphasis added). P2 is admittedly based entirely on H/E's copyrighted work and is nearly identical in every respect, so any new work that features P2 would necessarily be "based upon" H/E's copyrighted work.

On June 15, 2020, the 1984 Assignment terminated and H/E reclaimed all ownership rights thereto. Nonetheless, in the last month alone, The Phillies have created P2 promotional images and audiovisual content, all of which unlawfully incorporate H/E's copyrighted work.



Moreover, The Phillies intend to continue creating unauthorized adaptations in the form of, *inter alia*, P2 merchandise, with full awareness that such adaptations would infringe H/E's rights in the preexisting material. Worse yet, they seek to make this Court an accessory by having it approve what The Phillies refer to as the "new style guide." (Ltr. at 3, Exh. E). While The Phillies argue that this "style guide" falls within the derivative work exception, they fail to inform the Court that the "style guide" is admittedly intended to help licensees develop new adaptations of H/E's work, which indisputably fall *outside* that exception. Based on The Phillies' unlawful conduct, H/E will soon amend its counterclaims to assert copyright infringement.

### III. The Rights to Certain "Post-1984 Style Guide" Materials Have Reverted to H/E.

The 1984 Assignment encompassed not only the Phanatic costume, but "all reproductions and portrayals of all or part of the [Phanatic] in any medium whatsoever . . . ." (Cmplt. Ex. G). When the 1984 Assignment terminated on June 15, 2020, all rights therein reverted to H/E.

Because The Phillies no longer own the rights to such "reproductions and portrayals" created prior to the 1984 Assignment, they also do not own copies of such "reproductions and portrayals" produced on other mediums or in other formats. *See, e.g., Peter Mayer Publs' Inc. v. Shilovskaya*, 11 F. Supp. 3d 421, 430-31 (S.D.N.Y. 2014) (digital copy of book not a derivative work notwithstanding formatting changes); *Past Pluto Prods. Corp. v. Dana*, 627 F. Supp. 1435, 1441 (S.D.N.Y. 1986) ("[P]roduction of a work of art in a different medium cannot by itself constitute the originality required for copyright protection."). The record demonstrates that numerous pieces of artwork requested by The Phillies between 1989 and 2018 were portrayals of copyrighted artwork created by H/E prior to 1984 and The Phillies' rights in such artwork was properly terminated.


Respectfully,


/s/ Paul D. Montclare


Paul D. Montclare
A Limited Liability Partnership of
MITCHELL SILBERBERG & KNUPP LLP

PDM/mcp

# EXHIBIT A

*The Phillies v. Harrison/Erickson, Incorporated et al.*
Expert Report of David Zung

## **Assignment and Conclusions**

I have been retained by the Defendants and Counterclaim Plaintiffs, Harrison/Erickson Incorporated, Harrison Erickson, Wayde Harrison, and Bonnie Erickson, with regard to *The Phillies v. Harrison/Erickson Incorporated, et al.* to provide expert analysis and commentary about the original Phillie Phanatic mascot and visual aspects, character traits, and artwork and/or materials related thereto, which was first created by Harrison Erickson in 1978, and the modified Phillie Phanatic mascot and materials related thereto that The Phillies and third parties made in connection with this litigation and introduced at baseball spring training on February 24, 2020. For clarity, I will hereafter refer to the former mascot as "P1" and the latter mascot as "P2." Specifically, I have been asked to opine on whether updates to the P1 costume and artwork exhibit more than trivial creativity when looking at P1 as it first existed in 1978 and P1 in the twenty-first century. As such, I have analyzed numerous depictions of P1, dating from the late 1970s to 2018 and 2019, and have determined that any updates in the "look" of P1 over time are purely cosmetic and do not exhibit more than minimal updates from an artistic standpoint. More significantly, I have been asked to opine on whether the modifications made to create P2 exhibit an artistic change compared to P1, including whether such modifications appear to be lifted from prior art, and/or so resemble P1 as to supplant it in a creative sense. To that end, I have analyzed all of the variances between P1 and P2, based on my comparison of various depictions of P1 and P2, and my review of the statements and testimony of representatives of The Phillies identifying and describing the variances. Based on my analysis, I conclude that any creativity exhibited by those variances is trivial at best, such that P2 is not, from an artistic point of view, a new piece of art as compared to P1.

## **Methodology**

In order to arrive at my conclusions I have referred to dozens, if not hundreds, of images of P1 and P2 produced in this litigation, as well as depositions and other documents related to P2, as well as outside sources pulled from my independent research. They are referenced in this report as well as in an appendix hereto. I additionally drew from my personal and professional experience as an artist, designer, professor, and creative director. I have also reviewed case law governing the originality requirement with respect to derivative works, to determine the facts and expert opinions courts rely upon when assessing the issues presented in the case. Based on the factors considered by the courts in these cases, herein I consider (i) the purported changes made to P1 and related artwork over time, and (ii) the purported variances between P1 and P2, and (iii) I evaluate whether those changes and variances exhibit more than trivial independent creation and creativity.

Based on extensive analysis of documents depicting P1 over a period of time and other documents produced in this case as well as deposition testimony, it is my conclusion that the P1 costume and artwork has stayed creatively consistent from its creation in 1978 to present. It has had some cosmetic updates, consistent with any brand, but those updates reflect very little artistic change, especially compared to other companies that have more creatively rebranded. In fact, the

consistency of P1 over the course of over four decades speaks more to a decision not to creatively alter P1.

Based on an extensive analysis of the same documents, as well as documents depicting P2, other documents and testimony produced in this case, and my own independent research, it is my conclusion that the changes made to P2 are not creative, and the differences between P2 and P1 are too insignificant to set P2 apart as a new creative work, whether in a marketplace or from an artistic point of view. Rather, the photographs of the P2 costume, the artwork of P2 that is transparently designed to mimic the artwork of P1, and statements by representatives of The Phillies concerning the creation of P2, all demonstrate that The Phillies designed P2 to be instantly identifiable as P1, so that they can try to legally continue to use the same exact mascot.

## My Experience

I have worked professionally in the New York City film and television industry as a designer and storyboard artist since the mid—eighties. In that time, I have worked on over a thousand projects with some of the leading film, animation and visual effects production companies in the country and the world.  My clients have included MTV, Nickelodeon, Disney, and Scholastic.
I have worked on commercial campaigns for everything from the Olympics to the Super Bowl, to not-for-profit and educational programs. I have worked with almost every brand imaginable from Ford, Honda, Nissan, and Hyundai to McDonald's, Wendy's, and Burger King, at the highest levels of the commercial industry. The teams of artists I have worked with are internationally recognized as the top of their professions and the ad campaigns I have worked on with them have won dozens of industry awards for creativity and technical proficiency over the years, including among others, Silver Medals from the British Broadcasting Industry, Mobius Awards in Computer Animation, and the International Advertising Award. I have consistently worked with existing branded high-profile and instantly recognizable characters in commercials and films so I am well aware of what constitutes a work of significant independent creation since corporate legal departments oversee the reproduction and depiction of these characters quite rigorously.

Over the course of my artistic career, I have personally designed hundreds of original characters for television series and commercials, in every form of media, including hand-drawn animation, stop motion a/k/a "claymation," computer animation, mixed lived action and computer-generated imagery (CGI), and traditional puppetry. My designs have in fact been used by Henson puppeteers for commercials on several occasions. Two characters I designed were used as ambassadors in major international ad campaigns. One of which was "Ruby," a computer-generated female ninja/assassin/spy character used by what was then known as ATI Technologies, Inc., a company known for its graphics processing chips, particularly in video gaming. The other was "Mr. Blue" an anthropomorphized light bulb character mascot that served as the friendly face of Kmart stores for approximately five years.

My initial training began as an undergraduate at Princeton University, where I graduated with honors from the architecture program. My junior and senior year thesis advisor was the award-winning architect and designer Professor Michael Graves, whom I subsequently worked for after college graduation. After working for Mr. Graves, I started my freelance career as an architectural renderer. My clients included renowned architects and architectural firms such as

Frank Gehry, I.M. Pei and Partners (renamed Pei Cobb Freed & Partners), Peter Eisenmann, Rafael Viñoly, and Gwathmey Siegel Kaufman, and my drawings and models for these clients were published widely in books and magazines and exhibited in museums.

While working as an architectural renderer, I started attending various art schools in New York City such as Parsons School of Design, Art Students League, New York Academy of Fine Arts, and National Academy of Design, where I trained for 10 years studying classical painting and drawing techniques. One of my important teachers was Ron Scherr, who painted the official portraits of President George H. W. Bush and a double portrait of Bush Presidents 41 and 43, General Colin Powell and Supreme Court Justice Anthony M. Kennedy, which was hung in the Supreme Court building upon his retirement.

As an educator, I have been teaching storyboarding at the renowned NYU Tisch School of the Arts Undergraduate Film and Television Department since 2005. In 2009, my class was rated number one of its kind in the country by Animation Magazine, a widely distributed and respected industry and trade magazine. I have also been teaching at NYU in the Graduate Department of Design for Stage and Film since 2012, where I train set, costume, and lighting designers for the film, theater, and entertainment industries. Our department is always rated among the top graduate level design departments in the country by college rating sources, and the faculty and alumni have won countless Oscars, Emmys, Tonys, and every other conceivable award. Besides these courses, I teach drawing, painting, design, and serve as a thesis supervisor. At the end of the academic year 2018-2019, the graduate students honored me with a nomination for the David Payne-Carter Excellence in Teaching Award, which goes to only one candidate from each department across NYU Tisch School of the Arts.

Besides NYU, I also have taught at the Fashion Institute of Technology (FIT) for the last 18 months. FIT is widely known for its fashion, fine arts, illustration, marketing, and animation programs. My class is called "Advanced Methods for Evolving Media" and trains students to be ready for the new art market in not only traditional media places like books, magazines and posters but for film, television, animation and video gaming. In particular, the class looks at the transition from traditional analogue artistic tools of trade, such as pens, pencils, markers, paper, and film cameras, to the digital age of computers, digital art programs, and digital film making techniques. In this class, I teach students to use traditional forms of image-making in tandem with digital techniques such as Adobe Photoshop, which gives me a unique perspective on what is required of the artist in producing artwork in digital formats.

Finally, I am currently finishing my third semester teaching at Brooklyn College Barry Feirstein Graduate School of Cinema. My first semester there I taught storyboarding to film and animation Graduate students. In Fall 2019 and Spring 2020, I have been the thesis advisor for the Digital Animation and Visual Effects Department graduating class.

My CV is attached as an exhibit to this report.

## **Compensation and Previous Involvements as an Expert Witness/Publications**

I am being compensated at an hourly rate of $500.00 for my services and am being reimbursed for related expenses. I have not previously testified as an expert witness. Ten years of my prior publications are listed in an appendix hereto.

## Observations of P1

*Description:* "P1," as mentioned, refers to the Phillie Phanatic mascot created by Harrison Erickson in 1978. P1 refers to both the P1 costume, which debuted at The Phillies' prior stadium on April 25, 1978 and has continued to be in use up until the end of the 2019 MLB season, and artwork portraying P1, much of which was created by Harrison Erickson in the late 1970s and early 1980s, and some of which was updated by Harrison Erickson, I am informed, at The Phillies' request or with The Phillies' permission.

P1 has been the official mascot for the Philadelphia Phillies since 1978, and has been considered by numerous publications to be among the best sports mascots. I understand that Harrison Erickson, a firm made up of Bonnie Erickson and her husband Wayde Harrison, were hired by The Phillies to design P1 after Jim Henson (of the Muppets) referred them to Harrison Erickson because Ms. Erickson had previously worked for Henson on *The Muppet Show*, where she designed some of the iconic characters such as Miss Piggy and Statler and Waldorf.[1]

I have not directly seen or handled the P1 costume, nor have I ever met Harrison Erickson, but over the years in my capacity as an artist and designer on commercial jobs, I have worked with Henson puppeteers. Their dedication to their art and craft puts them at the top of their professions. The Muppet characters designed by Ms. Erickson are held in the highest esteem by puppeteers and are used as industry standards for creativity and workmanship. Having watched video footage of the antics of the Phanatic costume being used and abused by performers, I am incredibly impressed at the amount of original thought that went into creating a memorable and unique design, along with the room for movement, flexibility, and character that is possible in this design.

The P1 design has remained relatively consistent, and various updates to the costume and to artwork created by Harrison Erickson in the early life of P1 exhibit changes that I would not consider to be particularly creative. Rather, they reflect cosmetic updates that retain the same original qualities exhibited in P1.

*Color:* One of the documents produced in this litigation is a slide show entitled "Phanatic 2020 Derivative Changes since 1984," which begins on PHAN0043246. The document appears to identify various color changes to the P1 costume over time and other changes.

I do not believe slight changes in color would represent a creative change, but here, they may not even be changes at all. Instead, they appear to be the result of differences in color reproduction processes of the times. Take one of the slides, PHAN0043248, which compares P1 in 1984 and

---

[1] https://muppet.fandom.com/wiki/Jim_Henson

2018, and is accompanied by the note "The Fur (shag carpet vs smoother lighter green)," suggesting that the green color of the body was made lighter over time:



But my opinion from looking at the two images is that the 1984 photograph was taken on traditional analog film stock and the 2018 photograph was taken by digital means, which would heavily account for any color variation. For arguments sake, even if the 2018 photograph was also taken using traditional analog film, each film stock has its own color bias that can affect how color is perceived. For instance, Kodak film is known to be warmer (that is, leaning towards the red spectrum), and Fuji film is known to be cooler (that is, leaning towards the blue spectrum) and more saturated. And each brand of camera and lens has its own signature color rendering profile. The time of day and year also cause differences in the color bias of photographs as the international standard measurement of the color temperature of light varies with conditions such as sunny or cloud days, and the sun's position, i.e. time of day. It is also useful to compare the skin tones of the fans in the backgrounds of both photos as a constant to compare the colors. In the older photo below, the people appear much more orange relative to the newer photo:



In sum, it is my view that using photographs from decades apart to show absolute color comparison is a useless exercise for determining color variances in what is ultimately the same costume design.[2]

The next slide, PHAN0043249, shows a photograph of P1 from 1985 and a photograph of P1 from 2018 to highlight color variances in the eyelashes, suggesting that they were "pink" in 1985 and "fuschia" in 2018:



Again, these color variances appear to be more the result of differences in the photographic color reproduction process, and the use of the word "pink" as opposed to "fuschia" is arbitrary. Below is another early photograph of P1, showing eyelashes that are more similar in color to the 2018 photograph, which further shows that color variations are more likely attributable to the color reproduction in the photograph—not design choice:



---

[2] There is also a note that the fabric is different between the 1984 and 2018 versions of P2. While this might contribute somewhat to a different texture, the strands are of the same length and retain the same character of the design in 1984.

All of this is buttressed by the fact that artwork portrayals created by Harrison/Erickson have also remained relatively consistent in color, other than some cosmetic modifications that do not significantly change the visual aesthetic and character of P1 and would not represent a creative change in my view. Below is a drawn image of P1 artwork in what appears to be the late 1970s or early 1980s,[3] and digital images of P1 artwork that appeared much more recently:



PHAN0000283

---

[3] While the copyright notice date is obscured, it contains the name "Harrison/Erickson." I understand that works copyrighted to Harrison/Erickson were created in 1984 or earlier, when Harrison Erickson owned the Phanatic copyright.



In examining the color palettes, both the early version and more recent version of P1 use colors selected from the Pantone Color Matching system, which is available at pantone.com. Pantone is a trademarked, universally-employed system of over 2,000 colors used by visual professionals such as artists, architects, interior designers, museum exhibition designers, graphic designers, as well as film, television, and theater designers. Pantone employs mixtures of four colors in varying but precise percentages in order to ensure that a particular color can be reproduced without variation from project to project, year to year, and industry to industry. The four colors at the foundation of the system are referred to as CMYK, Cyan (blue), Magenta (red), Y (yellow), and K (black). Each of these four colors is assigned a specific ratio giving each color a unique "fingerprint" on the color spectrum. The formulas for each of these colors has remained consistent over time with new colors being added over the years.[4]

---

[4] CMYK refers to a color mixing system, much like RGB (which stands for Red Green Blue) is a color mixing system. Different color mixing systems exist since different industries use different but overlapping "color spaces."

Comparisons of the color charts show very few variations, all of which are minimal. For instance:

- The color chart for the earlier version of P1 lists Pantone #361[5] as the shade of green for the body and mid-snout. The color chart for the more recent version of P1 also lists the exact same Pantone #361 for "Philadelphia Phillies Mascot Green." Accordingly, the predominant color green in depictions of P1 has remained identical.

- The color chart for the earlier version of P1 calls out Pantone #375[6] for the snout rings and shoe sides. The color chart for the more recent version of P1 lists #347[7] as "Philadelphia Phillies Mascot Dark Green," which is used for the snout rings. Both of these colors are related shades of green and accents to the green of Pantone #361 (above), and the variation in these minor trim elements are not major changes in the P1 design. One can see by the formulas in footnote 6 and 7 that the color percentages are split between C and Y, thereby keeping them closely in the same family of green. The surface area covered by #375 and #347 are identical and in the same areas of the P1 character. The differences between the use of these two colors is barely noticeable and show no significant creative differences.

- The earlier version of P1 lists #247[8] for the eyelashes, whereas the more recent version lists #240[9] for the eyelashes. One can readily see that the formulas are nearly identical and therefore the colors are nearly identical (whether referred to as "pink," "fuchsia," or any other color).

***The Phillies Uniform:***  The more obvious variation between early versions of P1 and more recent versions is perhaps the uniform worn by P1, most notably the jersey.[10] This variation is highlighted on the slide show first referenced above on page 4, on the document marked "PHAN0043250," in which images of the Phillies uniform in 1984 and 2019 are juxtaposed:

---

For example TV screens emit light and therefore do not have the same color range as in a magazine since the printed image depends on a pattern of thousands of small dots using the CMYK system sitting in close proximity to each other to create a particular color.

[5] The CMYK values for #361 are: 76%C, 0%M, 91%Y, 0%K.

[6] The CMYK values for #375 are: 40%C, 0%M, 98%Y, 0%K.

[7] The CMYK values for #347 are: 92%C, 0%M, 97%Y, 0%K.

[8] The CMYK values for #247 are: 30%C, 94%M, 0%Y, 0%K.

[9] The CMYK values for #240 are: 20%C, 90%M, 0%Y, 0%K.

[10] The hat also has minor updates, primarily in the "P" logo.  My analysis with respect to the jersey applies equally to the hat.

9



But such cosmetic updates in the Phillies uniform are not in my opinion creative from a design perspective, and changing the uniform on P1 to reflect an update in the Phillies' brand certainly does not constitute a creative alteration to P1. At the onset, it is important to define *what* P1 is. P1 typically wears a Phillies uniform, but it is also my understanding that P1 was designed such that the uniform was removable and changeable—in other words, P1 was specifically designed with the understanding that P1 could wear a range of outfits, and has built up a large wardrobe of outfits. What this suggests is that, while different clothing may alter the appearance of P1, it does not alter *its design.* Instead, the changes to the clothing on P1 are like the changes to a Barbie doll's outfit, where the essential nature of the figurine remains the same, even where the outfits are swapped out. A Barbie doll can wear any number of outfits, but it is still the same Barbie doll. Similarly, the Phanatic can wear a vintage Phillies uniform, a modern Phillies uniform, or any other number of outfits, but this does not change the essential nature of the P1 design.

P1 has in fact worn a range of different outfits, demonstrating that the outfit that P1 wears is conceptually and artistically separate from P1. Underneath each of these outfits, P1's design and signature characteristics remain the same:



Below, P1 is wearing a Santa hat instead of the normal Phillies baseball cap, likely for a game around Christmas. One cannot imagine that The Phillies would claim that this outfit decision turns P1 into some type of new "mashup" character of Santa Claus and the Phanatic:



Similarly, here is P1 in a Batman costume on a Halloween outing. While DC Comics may find this amusing and may have licensed the Phanatic to wear an outfit of their "Batman" character for the occasion, one thinks that DC would not be so pleased if The Phillies started claiming that they have created their own version of Batman:



Setting aside that P1 can change outfits and remain P1, I do not believe the uniform has been creatively altered. Rather, it has gone through relatively minor cosmetic updates, reflecting updates to the Phillies brand. With regard to color, the red shirt stripes and trim featured in the Phillies uniform and lettering are Pantone #185[11] on the earlier portrayal of P1, and Pantone #200[12] on the more recent portrayals P1. The cosmetic differences in color are negligible, as reflected in the Pantone color formulas, as are the impressions to the observer in my view. The famous Jessica Rabbit cartoon character, as portrayed in the film *Who Framed Roger Rabbit?*, could wear either shade of red lipstick and while the difference might be noticeable to some who are more attuned, it ultimately does little to change the creative expression.

Having dispelled the notion of a significant color change, one must consider if swapping out the initial "P" for the word "Phillies" constitutes a significant change that can be considered creative. When one looks at the early P1 artwork reproduced on page 8 of this report, the initial "P" appears on the jersey and the complete word "Phillies" appear on the handheld banner. The "P" is clearly synonymous with, and interchangeable with, the "Philadelphia Phillies" and is intended to evoke that with the fans. Using a simple version of a complete name for a company is common and standard use. One can walk down any city street and recognize the corporate logos for Chase bank and Citibank as completely different entities (though they both start with "C"). The eye of the CBS logo is the graphic proxy for the Central Broadcasting System, The National Broadcast System goes by NBC and is accompanied by its famous peacock.  The difference in the stylization of the "P" and "Phillies" is simply an updated font, and does little to creatively alter the uniform design.

These minor cosmetic changes reflect updates to the Phillies brand, as is standard for any brand over a long period of time.  Updating the uniform on P1 to reflect brand updates is not an artistic modification that in any way reinterprets the P1 design.

Comparing the jersey in earlier and more recent photos and artwork of P1 as well as the photos of the two jerseys, it appears that there are about the same number of pin stripes of the same thickness on the jersey while also retaining the same spacing between the stripes:

---

[11] The CMYK values for #185 are: 0%C, 100%M, 89%Y, 0%K.
[12] The CMYK values for #200 are: 0%C, 100%M, 76%Y, 13%K.



There is also a version of the P1 character wearing a jersey with no pinstripes at all but retaining the word "Phillies" across the chest, with red and blue piping around the neckline and outer sleeves, as demonstrated on PHAN0043246, the first page of the slide slow:



Those changes, however, are in my view cosmetic and do not reflect more than a trivial creative change that would in any way modify the character of P1. Similarly, the choice to remove a thicker stripe that appeared on the sides and shoulders of the 1984 jersey is a matter of style and not substance. Take the stripes off a well-known car like a Mini and one still recognizes the car as a Mini. The more recent uniform still retains the same short sleeves, V-neck, and buttons on the front, and remains a similar length, such that it sits on P1 in pretty much the same manner as the older uniform.

Finally, as demonstrated on PHAN0043251, the P1 as it appeared in 1981 had a 5-pointed star on the back of the jersey while the P1 as it appeared in 2018 sports the same star in the same position with the word "Phillies" on top of the star. It represents a minor addition to the jersey, not a creative design change that affects the P1 design. Rather, it simply reflects the fact that members of the team have their names on the back of their jerseys.

***The Harrison Erickson Artwork Style:*** It is my understanding that early portrayals of P1 were illustrated by hand and that more recent portrayals of P1 were created using Adobe Illustrator, which is a software program used to create art on a digital medium.

In looking at Ms. Erickson's artwork created for more recent purposes, such as the artwork in the Major League Baseball style guide, it is my view that it is really not "new" artwork at all. In particular, one can compare Ms. Erickson's hand drawn artwork and digital artwork and see that the visual changes to the character are relatively subtle, considering that they were created decades apart:



Ms. Erickson certainly used great technical skill in recreating and modernizing her older artwork, but she stays faithful to the creative choices she had previously made. There was little to no creative choice that went into making these modern renditions. The style, and aesthetic, remains true to the past, rather than artistically reinterpret it. Based on these design choices, it seems as though The Phillies wanted the Phanatic brand to remain consistent, and the P1 artwork to reflect that consistency. This would make sense, given that The Phillies apparently continued to use Ms. Erickson's services to reproduce P1 and recreate prior artwork, rather than the services of a third party.

Below is a demonstration of how Adobe Illustrator can be used to update prior artwork. The creative part of the process is conceived in the pencil sketch stage—as is the case with Ms. Erickson's earlier artwork. The use of Illustrator is a mechanical means of implementing the idea laid out on paper.

First, the artist begins with a hand-drawn sketch using a pencil on paper. This is the creative part of the process-conceiving of the sketch:



Second, the drawing is imported into Illustrator:



Third, the pencil drawing is made lighter for visibility:



Fourth, a perfect circle is drawn around the pencil drawing:



Fifth, the waves from the drawing are added in Illustrator. One can see that the artist's goal is to essentially imitate the underlying drawing:





Sixth, once the waves are finished being applied over the pencil sketch, the layer with the pencil sketch is turned off, leaving only the Illustrator lines:



Finally, the tips of the lines are shaped and refined:



18

Below is the final Illustrator file based on the pencil sketch. The Illustrator file could have been done by hand by a skilled artist, as demonstrated by the underlying sketch. The use of the digital platform is advantageous in its accurate scalability both in size and numbers, but it is not a deciding factor in the creative process:



Contrast the subtle changes of the Phanatic with the much more significant evolution of the Snap, Crackle, and Pop characters over the years, who are immediately associated with Rice Crispy. Notice the wide range of changes in facial features and body proportions throughout the years and different media. I would consider these major alterations to the characters that require a great deal of skill and creativity from the artists. It is difficult to rework a nationally recognized character and yet retain the essence of that character while remaining associated with its original commercial entity:

 

19



Below is the Lucky Charms Leprechaun, another example of a character that has gone through a much more significant evolution while remaining associated with the brand. One can see that over several iterations, the changes to his appearances, particularly the shape of his face, are quite significant. In some versions the colors have changed from a medium green to a dark green, the hat shape has changed, the color of the shirt changes, the color of the pants change but most significantly the face has undergone quite significant changes in shape and proportion.



Another example is the evolution of the Michelin Man over the years.

In a side by side comparison one can see how an earlier rendition of the Michelin man (right) had many more "ribs," and had bare hands and wore brown socks and shoes. He wore glasses and smoked a big cigar. The contemporary Michelin Man (left) has fewer and larger ribs, a distinct chest region, large white boots and hands, has big eyes with pupils, a distinctive face shape and an articulated smile:



Other pictures below show how the character has transitioned and been reinterpreted:





Bugs Bunny is yet another example of how a character can artistically evolve. Below are drawings placed side-by-side showing how the portrayal of the character evolved in the 1930s and 1940s:



All of these examples heavily contrast with P1, which has stayed quite consistent over the last 40 years.

***Conclusions***: In my view, P1 is clearly an artistic design of significant creativity. The concept reflects substantial creative thought on the part of designers with a clear, integrated vision of how this character should be portrayed. The design is unique and, as time has come to show, memorable and iconic.

At the same time, it is my view that the P1 design has remained relatively consistent with the vision first set forth by Harrison Erickson, and that many of the updated "looks" created by Harrison Erickson, including the ones reproduced above, do not exhibit what I would consider to be artwork that demonstrates new creative thought. There may have been technical skill used in updating the designs, but the alterations faithfully stay true to earlier design choices.

## Observations of P2

*Description:* "P2," as mentioned, refers to the Phillie Phanatic mascot that The Phillies and third parties made in connection with this litigation and introduced at its spring training on February 24, 2020. My analysis focuses on P2 as depicted in (i) the costume worn by the Phanatic performer, and (ii) the artwork depicting P2, which The Phillies have indicated they intend to use for purposes of licensing and merchandise.

As set forth below, P2 has some variances from the P1 design. For instance, The Phillies claim that they made the backside larger, added feathers to create "wings" on the arms, lightened the eyebrows, enlarged the hat, modified the eyelashes to make them star shaped, and made the snout cylindrical rather than conical, among other things. My review of documents and testimony in this litigation show that these changes were sparked by this lawsuit, and were deliberately designed in what the The Phillies hoped to be "creative" changes to P1. However, after reviewing each of those variances, I conclude that the modifications ultimately do little to change the impression that P2 is the exact same mascot as P1. The changes reflected in P2 are slavish. P2 is essentially nothing more than a copy of P1 but with very subtle differences, and none of those differences amount to more than a trivial amount of creativity. Many of the design choices also reflect the use of prior artistic expression without any creative attempt at reinterpretation.

Below are images of the P2 costume (right) and P1 costume (left):

 







As can be seen, the costumes are substantially identical, but with very minor modifications. In understanding how insignificant these modifications are, one must take into account the context in which a team mascot is expected to appear. The mascot's primary function is to be associated with the team it represents, and generally performs in a stadium setting full of fans. According to Major League Baseball attendance records,[13] the average attendance at Citizens Bank Park, where the Phillies play their home games, was roughly 33,000 people last year. The stadium must house the field and all of these fans, meaning that it is quite large. A team mascot must therefore be immediately recognizable to fans at any distance, which in the case of Citizens Bank Park, can be quite far. Small differences in details, such as whether the eyes are circular or oval, whether the arms are shaggy or have rounded edges, or whether the snout is conical or cylindrical, are simply not discernable from even some of the closer seats in the ballpark, and

---

[13] http://www.espn.com/mlb/attendance/_/year/2019

those details increasingly diminish as the distance from the field inversely increases, thereby rendering such differences irrelevant in terms of the overall impression to the viewer:





Below is an example of a fan's view of the Phanatic from what would be considered a relatively close distance in the ballpark. Using Adobe Photoshop, I inserted a photograph of P2 on top of the photograph of P1 to create a side-by-side comparison of what a fan would see (being mindful of the fact that most spectators would not see the Phanatic so close)[14]:

---

[14] I would also note the color shift that can be seen by comparing the color of the grass. These are both relatively recent photographs, demonstrating the wide differences in colors even in digital photography (as previously discussed on page 5 of this report).



www.shutterstock.com • 34286407      www.shutterstock.com • 34286407



Even from this relatively close distance, one would have to squint just to notice the changed details that the Phillies made to the P1 design.

As another point of reference, one can look from the Phanatic's point of view to see that fans are essentially reduced to indistinguishable blobs of color. Small details such as the shape of their glasses, arms, footwear, hair color, etc. are simply irrelevant:



Viewed in this context, I believe that most viewers in the stadium would be unlikely to even recognize P2 to be a new design. None of the modifications made by P2, even when taken together, change the fact that it is instantly recognizable as the Phanatic.

With that being said, I address each of the relevant modifications below, based on my thorough comparison of the P1 and P2 designs, as well as a review of Phillies deposition testimony describing what they view to be the modifications to the design, and explain why I believe the modifications are not creative or artistic. I will sometimes refer in this section to the 5 design hierarchies outlined from Art Center College of Entertainment Design Chair Tim Flattery.[15] Art Center College is located in Los Angeles and is world famous for its Industrial Design program. Graduates from this school go on to work in most of the car companies in the world, as well as design for major films in the motion picture industry such as the Star Wars series, Harry Potter, The Marvel Comics Universe, etc. This is an excellent diagnostic tool to assess design that I use in school when I teach:

**5 design hierarchies from Art Center College of Entertainment Design Chair Tim Flaherty:**

1. **Dominance.**
   What immediately catches the viewer's attention. Usually the silhouette, or maybe a bold color pop.

2. **Sub-dominance.**

---

[15] Mr. Flattery is profiled here: https://www.prweb.com/releases/entertainment/design/prweb4982354.htm

The second read, what the viewer notices next.

**3. Harmony.**
   Does the form and shape language of the design fit?

**4. Rhythm.**
   Similar to harmony, but focusing on repeating motifs/patterns/details.

**5. Balance.**
   Does the design feel right? Does it feel too monotonous? Does it look like it will tip over?

***Body Shape and Overall Impressions***:  I first address the body shape, and how the modifications to the body shape affect the overall impression of the Phanatic. Related to the body shape are the snout and arms, which I address in the next two sections. In the case of the Phanatic, the dominant hierarchy (meaning the first thing one recognizes), is the pear-shaped silhouette of a body covered with green fur. The silhouette is the very first impression a viewer gets of an object. In other words, the silhouette is what causes a viewer to instantly identify what something is. Accordingly, from a design standpoint, whether P2's silhouette differs from that of P1 plays a major role in whether P2 creates a new and different impression from P1.

As an example, below are silhouettes of different kinds of planes used by ground spotters in World War II to identify the country of original or a particular aircraft. Since the objects are moving fast at a faraway distance, details such as the markings identifying the nationality would have been impossible to discern. The silhouette was used to quickly discern where a plane was from and its functions and type. With lives at stake, ground spotters have very little time to make a quick identification of a plane as friend or foe by human eyes, so the use of silhouettes as a means of quick identification was vital for the war effort:





In the case of the Phanatic, The Phillies have characterized P2 as having a larger bottom, or "duck butt" in their words. But one can see that any additional volume does very little to change the visual impression of P1, even when looking at both P1 and P2 from the side:





Similarly, photos of the rear show that the silhouette remains the same. Any differences in proportions are trivial to the overall impression that P2 is still the same mascot. The rear ends of the tail are both sticking up the same amount, and while the hat is pointed in a different direction on these particular photos, that would not constitute an artistic change between P1 and P2. It similarly does not change the impression that P2 is the same mascot, and the hat itself is movable, as demonstrated by other side-by-side comparisons in which the hat is in the same position. The blue eyebrows peek over the tops of the green heads in both P1 and P2, and the

"shark tips" on the arms of P2 barely make an impression relative to the mass and shape of the character, which again, remains practically unchanged:

 

There may be some minor additional volume, but this is a matter of degree and does not represent any new artistic value or interpretation to the original design of P1. Even the green fur, which covers most of the surface area of the costume design, and is the first impression a viewer takes in of the mascot, is unchanged.

The lack of change is apparent when one views the silhouettes of the 3D turnaround artwork, which I understand is used as a template for Phanatic merchandise. Below are several demonstrations I created juxtaposing the 3D turnaround artwork of P1 and P2. First is a side silhouette demonstration, with P1 (black and white) in the top left, P2 (colorized) in the top right, the blue silhouette of P2 in the bottom right, and an orange image of P1 laid over the same blue silhouette:

## SIDE SILHOUETTE 1



Second is the same demonstration, but the bottom left and bottom right figures respectively show black outlines of P1 and P2:

# SIDE SILHOUETTE 3



The differences above are so minor as to ultimately be imperceptible, even to a trained eye, as demonstrated by the side-by-side black silhouette comparison in "Side Silhouette 3." The major difference between the silhouettes in P1 and P2 are P2's somewhat larger backside, but the difference is trivial and the overall impression does not change. The other major difference is the way the tail curls upwards, but it is a matter of graphic depiction of design intention, rather than

the actual execution of the tail feathers. Referring to the actual photographs of the P1 and P2 costumes showing the actual execution, one can see that the tail feathers are relatively identical.

The same side silhouettes are showcased, but now the preliminary concept design of the Phanatic is in the top left, P2 is in the top right, the blue silhouette of P2 in the bottom right, and the preliminary concept design is laid over both the orange image of P1 and the blue silhouette of P2:



SIDE SILHOUETTE 2

As shown above, the silhouette of P2 stays roughly identical to the concept that has always been envisioned for the Phanatic mascot. As can be seen by adding early concept art to the comparison, the Phanatic has always had a larger backside, from early concept art to the executed vision for P1, and now to P2. As can be seen above, P2's tail feathers sit at precisely the same spot as that of the early concept art, while retaining the silhouette of P1.

Next, is the front silhouette, with P1 (black and white) in the top left, P2 (colorized) in the top right, and on the bottom, images of P1 (orange) overlaid over a blue silhouette of P2:



FRONT SILHOUETTE

Like the side views, the front view demonstrates that the alteration in body proportions does not actually change the viewer's impression of the Phanatic. In fact, from the front, the body is roughly identical in width. The front silhouette also speaks to a consistency in the rhythm design hierarchy, which is the third of the five hierarchies (the second, subdominant, is discussed in more detail below). As can be seen above, the proportions across P1 and P2 are almost identical.

The red hat sits on top of the eyebrows in approximately the same spot on both P1 and P2, which sits on top of the eyelashes in approximately the same spot, which sits on top of the eyeballs in approximately the same spot, which sits on top of the snout in approximately the same spot, which sticks out from the front of the head in approximately the same spot, which sits on a white baseball jersey in approximately the same spot, which covers the torso in approximately the same spot, under which a pot belly sticks out at approximately the same spot, which sits on top of the legs at approximately the same spot, which comes down to the sneakers in approximately the same spot. From top to bottom, the rhythm of the design remains consistent across P1 and P2.

The balance hierarchy is also unaltered by the body shape. The Phanatic finds design balance in the side profile when one runs a straight line up from the ankles through the shoulders and to the middle of the head where there would be ears, if it had ears. The ungainly posture is balanced in the front by the big pot belly and in the rear by the large backside as illustrated by the "S" curve that I have drawn. The top of the head sports a baseball cap which finds balance at the feet by the shoes. The snout in front is balanced by the tail in the back. These elements keep the silly creature looking like it will fall over. As demonstrated, P2 does not change this balance:



The above comparisons, which I created by importing the documents supplied to me into Photoshop where I drew the blue guidelines and filled in the silhouettes with colors, all illustrate that P2's body essentially remains consistent with how the Phanatic body has always been conceptualized. The silhouettes of P2 and P1 are essentially identical, and as the bottom image shows, even before P1 was built, it was envisioned to have a rounded, birdlike backside with a tail feather sticking out near the top of the backside. The overall impression left by P2 remains unchanged, as all of its features remain in the same place and are balanced together in the same way.

Any changes made to create the body of P2 are therefore trivial, in the sense that it they do nothing to alter the overall character of P1. Any slight changes in the body's characteristics does not change the fact that any viewer looking at P2 would immediately recognize it to be the Phanatic.

Finally, I would note that the concept of enlarging the backside to resemble a "duck butt" is not an original concept and is reflected in numerous cartoons and mascot designs. Not only is this concept similar to the Phanatic as reflected in the preliminary concept design and P1, but it is similar to Donald Duck, which was apparently discussed by The Phillies during the design process:



All of this is to say that the minor proportional changes incorporated into the body of P2 do not reflect any type of creative change to P1. The changes are not unique, stay consistent with the concept that has always envisioned for the Phanatic, and they do nothing to distinguish P2 from P1, as both retain the same dominant pear-shaped green features, which are the first things any viewer would notice when the Phanatic comes out at a ballgame, as well as the same relative proportions and balance of features.

***Snout:*** Testimony on P2 mentions changing the conical megaphone shape of the P1 snout to something more cylindrical. The width and diameter of the P2 and P1 versions appear to be largely identical. The length of P2 is slightly shorter, but the difference is barely noticeable and absolutely not any sort of major creative design decision. It is still a snout, still green to match the body, and it appears approximately on the same place of the head as mentioned above. The

change in angle from conical to cylindrical is a matter of a few insignificant degrees and not enough to qualify as a major creative change to the appearance of the Phanatic character. The change is not noticeable when looking at the Phanatic from behind, and if looking at the Phanatic facing forward, the two snouts are practically indistinguishable, even up from a short distance (let alone from across a baseball field). Again, for clarity, P2 is on the left and P1 is on the right:

 

Even from other angles, the alteration to the snout is trivial and does not alter P1's dominant characteristic—its silhouette. I again refer to "Side Silhouette 3," and in particular, the black side silhouette of P1 on the bottom left and P2 on the bottom right:



As with the modified backside, the modified snout creates almost no change to the silhouette of P1 when looking at the two designs directly from the side. Any difference is trivial and a matter of only a small degree. Again, the snout rests in the same place on both P1 and P2, is roughly the same size, and does not affect the rhythm or balance of the mascot's figure. I would not consider this to be an artistic alteration to P1.

***Arms:*** P2 features some additional feathers (or scales) on the underside of the arms. But this is a trivial change to the design of P1 and not particularly creative, and it does not make a noticeable difference in the overall impression or profile of the Phanatic. Both P1 and P2 have the same wide and shaggy green arms. The difference in arms is utterly imperceptible when the Phanatic has its arms down, as demonstrated by photographs of P2 (left) and P1 (right):



Even with its arms lifted, the alteration is extremely subtle at numerous angles because the feathers are obscured by the fur (again, P2 is on left and P1 is on right):







The feathers themselves are not particularly original to P2, as they embody characteristics that have always existed on the Phanatic. Below are images of P2's arms interspersed with earlier artwork of P1, demonstrating how P2's arms echo the same design decisions that were previously made by Ms. Erickson to draw curves in the arms:







Even before P1 was developed, a sketch that I understand to be a preliminary design concept provided to The Phillies shows that the Phanatic was always envisioned to have wide and feathery arms:



I would therefore not consider the modifications to the arms to be a "new" design choice that evidence creativity from an artistic standpoint. Given that the Phanatic is a complete fantasy character, there were endless ways that P2's body could have been modified to show that it "evolved." Instead, the additions to the arms are slight and harken to the design decisions Ms. Erickson already envisioned with respect to P1.

Consider the wings on various other mascots:

 









As these images show, the concept of a "winged" mascot is not only commonplace, but the "wing" characteristics of these mascots are a much more significant design element of the costume, and most of them demonstrate far more artistic interpretation.  Take the St. Johns's mascot "Thunderbird" design depicted above (top right) as an example of a distinctive "wing" profile that cannot be mistaken for the silhouette of any other mascot. The "feathers" hang quite far down from the actual arms to form pronounced wings. The wings have quite pronounced and distinctive serrated edges whose effect is heightened by the white edge repeating the inside red triangles which are then echoed once again by another layer of white serrated "feathers" repeating another inside layer of red serrations. Not only are the wings distinctive shapes but so is the color scheme. Take the St Louis Cardinals "Fredbird" mascot design depicted above (middle left) as another example of a distinctive wing design. While the wings are smaller in the overall profile compared to "Thunderbird," they are still quite pronounced, having three layers of triangles that sit close to the forearm, with each layer taking on a different primary color—red, blue, and yellow. The Toronto "Ace" mascot depicted above (middle right) has small "feathers" running along the length of the arms and covering over the hands, similar to P2, but unlike P2, the feathers are not concealed by the green shaggy fur, so they give the mascot a more visually distinct silhouette.

P2's lack of innovation is even more considerable when one recognizes that all of these mascots are obviously birds, whereas the Phanatic has always been a fantasy creature with undefinable characteristics (such as the addition of a snout, rather than a beak), which ultimately gives The Phillies much more artistic freedom to come up with interesting and unique alterations.

I have also reviewed a document in which The Phillies claim that the backs of the hands of P2 are different from P1 because they are not covered in fur. There is however fur on the back of P2's hands, but the only true difference is that P2's fur is sewn to the length of the knuckles and not all the way down the length of the fingers:

 

To claim that a difference in where fur is sewn on the back of P1 and P2's hand is an important creative decision is in my professional view quite ridiculous. Putting P1 and P2 side by side the viewer would barely notice this tiny difference since both P1 and P2 have felt fingers on the

palm side, and perform the same function. Again, because the Phanatic is a fantasy creature, all kinds of creative liberties can be taken. The minor cosmetic difference does not creatively alter the impression given off by the hands. Whether or not the backside of the hand has fur attached all the way to the end of the fingers does not alter the functional aspects of the hands. For clarity, P2 is on the left and P1 is on the right:







To summarize, the decision to add subtle feathering to the arms constitutes a trivial change to the design of P1. The change does not creatively alter the visual character of P1. It barely makes an impression relative to the mass and shape of the character, and it copies from the impression that has already existed of P1, as depicted in numerous pieces of P1 artwork.

**Uniform:**  In the case of the Phanatic, the subdominant hierarchy would be the uniform that it wears. The subdominant hierarchy would be the second or third thing a viewer would notice in recognizing an object. For instance, while one would first recognize a bird to be a raptor by the

46

shape of its body and hooked beak, it is the white head and tail that would identify the bird as a bald eagle:



While the Phanatic was designed to wear multiple outfits (and such uniform changes do not change the dominant heirarchy—the large green silhouette), the uniform that it is most often associated with P1 is the predominantly white jersey.  In the case of P2, one can see that it is wearing that same jersey. It is roughly the same shape and size, and it covers the same amount of surface area in proportion to the rest of the mascot. Both wear short-sleeved jerseys that end at the mid-belly:



It is especially noteworthy that The Phillies chose to introduce P2 by having it appear in the same jersey as P1 because, as previously explained, the Phanatic mascot was *designed* to appear in different outfits and has numerous outfits to choose from. While P1 can wear any number of outfits and still be P1 (as explained earlier in this report), P2 was first introduced wearing the same jersey P1 is most often associated with, which as previously explained, has stayed relatively consistent since the 1980s other than relatively minor cosmetic updates in the team's branding.[16]

***Leggings:*** The leggings on P2 have been changed to blue socks from the red stirrups on P1. But the blue socks are not original to P2, as I would note that they previously were worn by P1:



For this reason alone, I do not find the addition of blue socks on P2, which P1 has already worn, to be a creative change. At the same time, this goes back to the fact that the Phanatic was designed to appear in different clothing. The outfit choice is artistically a separate consideration from the costume design. Notably, there were not numerous high-profile public statements by The Phillies suggesting the Phanatic had a "new look" when P1 appeared above, as there has been with respect to P2.

According to the internal email I reviewed that included the above picture, marked PHAN002572, P1 appeared with these socks last baseball season, and the Phanatic was wearing "his blue socks" to match with an "alternate jersey." The Phillies seem to recognize that an "outfit change" is not a change to the Phanatic itself, since the Phanatic can possess more than

---

[16] I also do not believe a minor change to the hat size is anything more than trivial. It does nothing to alter the perception of the Phanatic and is easily overlooked, especially inside a ballpark, as demonstrated by numerous side-by-side comparisons throughout this report.

one outfit. What this means, in my view, is that an outfit change to P2, especially something as minor as a change in leggings, does not constitute a design change from P1.

I would also note that as mentioned above, the profile on P2 remains the same as P1 and the relative proportions of the legs to the rest of the body and shoes remain the same. There were a variety of ways that The Phillies could visually altered to evolve the design to more significantly alter P1.

Below are some examples of the variety of leg designs available. The Hiroshima Carp mascot "Slyly" (top left) has a continuous shaggy profile that starts at the head and runs down the body to the legs to the shoes. The Florida Gators mascot (top right) similarly maintains a continuous profile running down the body to the feet, which are designed to resemble claws rather than oversized shoes, further fitting with the mascot theme of an alligator. The Oregon Duck (bottom) has legs that are white and orange, resembling duck feet and similarly fitting with the mascot theme of a duck:



Again, because the Phanatic is a fantasy creature, there are really no creative boundaries, no design choices that would be too fanciful. Instead, the leggings on P2 are already within the range of P1's outfits, does not alter the general impression of P1, and it is a relatively conventional design element, represented across numerous other mascots:



MeLVin - AHL Lehigh Valley Phantoms

ThunderBug - NHL Tampa Bay Lightning

*Shoes:* As I have emphasized, P1 was designed to wear multiple outfits, and it has appeared with different shoes since its creation (including shoes with the Liberty Bell logo that are featured on P2's shoes):



The Phillies recognize that the Phanatic can change shoes and still be the Phanatic, and have acknowledged that the Phanatic (in the P1 costume) has changed shoes. P1 simply does not become a new creative work each time it changes its shoes and similarly, the choice to change the shoe design on P2 does not reflect a change from P1, regardless of the shoe design.

That being said, a comparison of the shoes on P1 and P2 shows numerous similarities and the changes to the design are not in my view particularly creative, suggesting that any artistic input in the modified shoe, to the extent it was intended to modify the visual character of P1, was quite minimal.

Comparing Figure 1 to Figure 2 below, one can see the two stripes on the side of P1's shoes are moved to the top of P2's shoes. The Liberty Bell on the side of the shoes of P2 sits in approximately the same place and is about the same size as the "P" in P1:



1.

2.

Figures 3 and 4/4A show that the logo on the Liberty Bell and "P" logo appear only on the outside of the shoe and not on the inside of the shoe. The shoes on both P1 and P2 are the same ankle height. The toes are slightly bulbous on P1 and the toes are flatter on P2, but only marginally so, and the overall shape of the shoe is essentially the same:



In Figures 5 and 6, one can see that the Liberty Bell that appears on P2 had previously appeared on shoes worn on P1, further confirming that the shoes have remained an interchangeable element of the Phanatic, and suggesting that the decision to place the Liberty Bell on P2's shoe preexisted P2. The orange rectangle on the back of P1's shoe in Figure 6 has been multiplied, stretched out in length, and moved to the sides of P2's shoes in Figure 5.



5.

6.

The artwork depicting P2 shows that the shoes copy several creative motifs from the prior design. In Figure 8, the rounded shape of the shoelace is moved to and echoed by the shape of the Liberty Bell. In Figure 9, one can see again the two-stripe motif on the side of P1's shoe is moved to the top of P2's shoes:



The silhouette of the Liberty Bell on the side of P2's shoe is also not a unique interpretation of the Liberty Bell as there are numerous silhouetted depictions of the Liberty Bell. The P2 version of the silhouette was not created for P2, but was taken from a design The Phillies have used essentially since the 1950s and not creatively altered in any way (though it was recently altered in a way that more accurately depicts the Liberty Bell):

 

That design is not a creative depiction of the Liberty Bell and there are no creative design choices that make it immediately identifiable with The Phillies baseball team. Rather, it is a generic recreation of the Liberty Bell as it exists in reality, and a simple internet search provided numerous graphic representations of the Liberty Bell that are quite similar to the Liberty Bell above:



Contrast the Liberty Bell on P2 with the bell depicted in the iconic logo for Taco Bell, which cannot be easily confused with any generic bell silhouette. One can see how the shape, position, and color of the bell has been altered over time, but it remains a unique and recognizable logo that is not easily interchangeable:



Based on the above observations, the differences in the shoes are not significant, and certainly do not represent an artistic change that alters P1. Changing the shoes is not a change in the design of P1 given that the P1 costume allows for, and was intended to, wear different shoes; and the shoes themselves were not creatively designed given that they largely remain the same as the original shoes, and incorporate a Liberty Bell design that is neither new nor artistic.

One can see below the wide range of shoe choices, even on mascots that otherwise display similarities. The Atlanta Braves mascot's shoes (left) are a traditional below-the-ankle cut baseball shoe with a large clown-like shape. The tongue of the shoe is exaggerated and flips up and over the top of the shoe with a distinctive cursive "A" emblazoned on white over the black shoe. The Cincinnati Reds mascot (center) sports a plain black athletic shoe exaggerated in size that is cut below the ankle with no tongue at all. The toes and the heels are bulbous and rounded like a clown shoe. The New York Met's mascot (right) wears an ankle-cut athletic shoe with a tongue rising up on the front part of the foot and flipping over slightly. The shoe is black with distinctive white piping around the shoelaces as well as in a big "swoosh" pattern on the side. The laces are white. The toe, heel, and swoosh parts of the shoe are made of some sort of matte material that is different than the shinier body of the shoe:



***Eye shape:***  There is a note from The Phillies that the P2 version should have round eyes instead of the original oblong eyes of P1.  However, the black pupils remain the same size and distance from each other as well as sit on the snout in the same way in the same place, so the face retains the same expression and proportions recognizable as the "Phanatic." The change in the eye shape is so small relative to the overall design as to be rendered irrelevant. The Phillies even acknowledged that they were looking to keep the same overall impression—which they have

57

referred to as the "perpetual look of surprise." While there are many ways that eye shapes can be made more distinctive, I believe the change here barely constitutes a difference between P2 and P1, and certainly does not change the impression that P2 is the same as P1. For instance, the three mascots demonstrate just three ways that eye shapes can be altered.

***Eyelashes and Eyebrows:*** The color of the eyelashes and eyebrows on P2 appear to be within the same color range as the eyelashes and eyebrows on P1, but I have not had a chance to fully analyze a call out sheet of Pantone colors for the P2 design.[17] In any case, I would not consider these changes to reflect more than trivial creative choice for several reasons.  First, as mentioned, they still appear to be in the same general color range—magenta (red) and cyan (blue), as referenced in the Pantone chart, are the predominant colors in the eyelashes and eyebrows, respectively, thereby keeping the same aesthetic and impression, especially to the fans viewing from a distance in the ballpark.  Second, the changes themselves appear to reflect an attempt to copy, not an attempt to create something new.  For instance, The Phillies have characterized the P2 eyelashes as a lighter shade; but as mentioned much earlier in my report, The Phillies also apparently believed that the P1 eyelashes were a similarly light shade at one point, as demonstrated on the slide show, page PHAN0043249. As I explained, any purported color change was more likely the result of color reproduction processes, such as the type of film used and lighting, and not an actual color change. But, The Phillies' apparent reference to P1 previously having "pink" eyelashes in 1985, as reflected in that slideshow photograph, suggests that the color choice for P2's eyelashes was not the product of new, creative thought:

 

The eyebrow color similarly reflects an attempt to keep P2 consistent with the P1 design, as well as The Phillies' brand. The Phillies kept the eyebrows within the same color range, but it has been described by them as the "powder blue color" that is prominent with the team. The "powder blue" appears to be a "retro" team color—used on Phillies uniforms in the 1980s, and apparently making a comeback:

---

[17] The Phillies apparently produced this document around the close of business on the day I had to submit the report, and I did not have the full opportunity to incorporate it into my analysis.  I will supplement the report as necessary to incorporate such analyses.



Like the eyelashes, this minor color modification appears to reflect a desire to retain a prior, recognizable color, and not the product of new, creative thought. Regardless, a slight change in color to the eyebrows and eyelashes is not a creative design alteration, especially where those colors are within the same original color ranges.

The insignificance of the color change is further demonstrated by considering the harmony in which the colors go together. Under the harmony design hierarchy, one asks if the design elements are consistent with another. Do the colors go together? What are the ratios of shapes and colors relative to other parts? How do the details relate to each other from side to side, front to back, and top to bottom?

Below is a Color Distribution Study, demonstrating how all of the colors work together:



The Color Distribution Study above shows that the green on the body and white on the shirt cover a large majority of the surface area—roughly 75% to 80%. The ratio (or weight) of the

pink eyelashes to the total mass of the body remain about the same despite the differences in shapes (which I will address further below). P2 has more eyebrow mass than P1, but the amount added is relatively insignificant when compared to the total body mass. Even though the eyebrows on P2 are lighter than the eyebrows on P1, they are still in the same blue family and still sit in the same place on the head over the eye. The same can be said about the tails, despite the way they are drawn, as the drawing concerns design intentions that are not reflected in the actual construction of P2—the actual execution of the tail on P2 is quite similar to P1 in how the feathers stick up, and it does not represent a major design or creative decision. As noted the major change is in the color of the shoes and socks which account for about the lower 30% of the figure—but as noted in this report, the changes are neither creative nor alter P2 in such a way to make it a new work compared to P1.

Besides the colors, the changes in the shape of the eyelashes (and size of eyebrows) is insignificant, and similarly do not reflect more than trivial artistic choice. The five-pointed star motif used for the eyelash shape is in fact the same shape that has been on the back of the Phillies' jersey when P1 was first introduced in the late 1970s, and Harrison Erickson have highlighted this star motif in artwork depicting P1 since around that time:



Some of Harrison Erickson's artwork has put that start more directly in association the P1's face, and eyes in particular:



The five-pointed star motif is in fact extremely ubiquitous in popular culture, and the P2 version adds no significant creative design elements to the star motif as to identify it solely with the Phanatic's character. Below are examples of how commonly used a motif the star is in popular culture:







It is one of the basic shapes recognized by children:



It played a prominent role in the characters of Dr. Seuss's *The Sneetches*:



Multiple flags feature stars (with the 5-point start being particularly prominent), and The Phillies have acknowledged that the star comes from the American Flag:





Like The Phillies, multiple other sports teams make use of the star—and they do so in more unique ways. The Dallas Cowboys made the star's points quite sharp, and gave it a light trim surrounded by a dark border the same color as the body of the star. The COWBOYS logo is usually boldly emblazed across the star or underneath it. The team colors of silver and white are used. It is quite a distinct interpretation of a star that is inextricably linked to the Dallas Cowboys team:



The Houston Astros use an orange star that is shaded in a way to give the sense that it is three-dimensional, and set behind the recognizable "H" logo. Its unique characteristics makes it easy to associate with the Astros:



The U.S. Air Force also has used variations of the same star as insignia for its aircraft, and their placement of the star is uniquely identifiable by retaining its white color and placement inside a circle, with the points touching the outer edges of the circle:



The Hollywood Walk of Fame is a world-renowned tourist attraction using the 5-point star:



It also appears on the antennae of another mascot created by Harrison Erickson:



All of this is to say that the five-pointed star is a generic shape widely used in popular culture, including on P1 and numerous pieces of artwork created by Harrison Erickson that depict P1. The star used for the eyelashes of P2 is an "off the shelf" representation of a star that can be found ubiquitously throughout popular culture and it bears no stamp of a creative decision in the actual design of its shape. With respect to P2, The Phillies' decision to use this common shape

that is already widely known to be a part of P1, without providing any artistic interpretation of the shape, simply does not reflect a creative choice of more than a trivial nature in my opinion.

Contrast the star eyelashes with the pointed eyelashes of other mascots designed by Harrison Erickson, in particular, "Slyly," "Duncan," and "Sport." In many ways, the star eyelashes seem to mimic the angular eyelashes that are unmistakably a Harrison Erickson signature design motif. However, the choice to use a common five-pointed star uses considerably less artistic interpretation then the more arbitrary and unique nature of the pointed eyelashes on these preexisting mascots:



Based on the ubiquity of the five-pointed star and the similar impression they create to these other mascots, it is my impression that P2's eyelash shape is not creative at all.

Sticking the five-pointed star around the eyes ultimately does not give the impression that P2 is a new work when compared with P1. While it is certainly a modification, it reflects a desire by The Phillies to conform with prior and familiar expressions that fans have come to associate with P1, rather than innovate and reimagine their mascot design. The surface area and placement of the eyelash stars of P2, and the proportion between the size of the eye and eyelashes, are relatively the same as the scalloped eyelashes of P1, making any modification in shape relatively negligible:



This is especially true when one considers that P2 is primarily intended to be viewed not up close, as in the pictures above, but by fans sitting hundreds of feet away in a ballpark:



In conclusion, the decision to modify the eyelashes into a common star that has already been widely associated with the P1 is not creative, and is extremely insignificant when viewed in the greater context of the design and how it is typically viewed.

***Designed to copy P1:*** As I explained above, these variations, taken together, demonstrate no more than a trivial creative attempt to redesign the Phillies' mascot. Multiple pieces of P2 artwork, which I understand were recently developed, further demonstrate P2 to be what is in effect a slavish copy of P1, transparently created in an attempt to legally keep using Harrison Erickson's original design work. Below are side-by-side images of P2 artwork, next to images of P1 artwork created by Harrison Erickson:







As can be seen by the above comparisons, the P2 designs are created to replace the P1 designs. They are clear knock-off designs which retain all the character of the original designs. Not only are the specific "poses" of P1 copied, but the various visual accents from the P1 designs are copied as well in a further attempt to retain the character of those designs. While there is enough difference to tell them apart, the differences are trivial.

To most viewers, it would be easy to forget that the P2 design is different if the P1 design is taken away for long enough, and this appears to be The Phillies' intent. The Phillies could have reimagined the Phanatic mascot, but instead chose a design with no real changes in artistic substance, most of which are largely imperceptible to the average fan at a ballgame. I found it troubling, for instance, that even though someone in The Phillies organization commented that nobody would notice the difference during the design phase of P2, and some news reports questioned the differences, The Phillies did not try to modify P2 to set it further apart from P1. Rather, internal communications and deposition testimony I have reviewed suggest the goal was for the viewer to see the same mascot.

As an artist and character creator, I believe that this approach to character development speaks volumes about P2's lack of artistic originality. It is like putting lipstick on a pig in my opinion.

To further demonstrate how P2 stands to be a knock-off of, rather than creative reinterpretation of The Phillies' mascot, I think it is a worthwhile exercise to examine the similarities and

71

differences between other branded characters as examples of the significance in physical attributes when designing a distinctive mascot.

To help us demonstrate what a significant difference in design looks like within a similar range of characters we can compare P1 with the "Slyly" mascot:



As can be seen, the characters have notable similarities. They are both tall, with furry pear-shaped bodies and wear baseball jerseys that are of a similar style and size. But unlike P2, Slyly has numerous differences that set it apart from P1. Slyly has strikingly different colors from P1. Its legs are longer and expose the fur that runs from its head to its ankles, rather than leggings. Its shoes are noticeably cut lower (or covered by its fur). It has double nostrils and sports a significantly different profile. Its serrated eyebrows continue around the face and then are repeated by a row of different color serrations sticking behind them. P2 by contrast uses most of the same colors, keeps the same profile, relative proportions, and relative color choices. While some of the details reflect design modifications, those details are so insignificant as to be almost indistinguishable in a ballpark.

As another example of the range of creative options, the following photos show three mascots that all quite similarly have baseballs for heads, yet each one has characteristics that make it markedly distinguishable from the others.

First is Mr. Met, the mascot for the New York Mets. The red stitching of the baseball pattern circumnavigates the front part of his face, creating a ring around his feature face. The stitches are pointing counter-clockwise. His large eyes are roundish while the lower part of his eyes are flattened by the muscles of the cheeks pushed up from the smile. His pupils and irises are solid black dots. On the outside of his top eyelids are graphic representations of eyelids. His black eyebrows sit far up in his forehead in an exaggerated distance from his eyeballs. His nose is a simple soft cone shape that is quite large and prominent. On his cap, he sports the blue team

72

colors of the Mets with the team logo NY prominently displayed. The word Mets is written in large letters across his chest and the team blue is prominent through the V-neck cut of his jersey. He sports a blue belt, blue forearm sleeves and white gloves. His legs sport blue leggings and black oversized black sneakers with white laces and white trim:



Second is Cincinnati Reds mascot "Mr. Redlegs." Mr. Redlegs is distinguished by his giant black handlebar moustache, his old fashioned flat top baseball cap with red and white stripes and black bill. He sports a distinctive "C" for Cincinnati on his jersey, a red belt, red forearm sleeves and white gloves. As seen in other photos he has oversized plain black athletic shoes with no trim and red stockings. His facial features are quite distinct. His big smile exposes an upper row of white teeth under his handlebar moustache. His eyes are elliptical in the vertical axis and are set the width of one of his own eyes apart. The black pupils sit inside bright irises. The smile pushes the cheek muscles up to the eyes creating crescents that circumscribe the lower eyes. He has distinctive black eyebrows above his eyes. He has a most distinctive nose shape featuring a bulbous tip of the nose sprouting big fat nostrils to either side. The sides if his head are adorned with the familiar red stitching associated with the construction of actual baseballs. His hat is not a typical baseball cap and is instead more reminiscent of earlier styles. The red stitching is pointed downwards:



Third is the Atlanta Braves mascot called "Homer." The red stitches on the sides of his head are pointed upward in the opposite direction of the Cincinnati mascot which point downward. He

wears a Blue baseball cap with a red bill and a big white "A" prominently displayed. The word Braves is boldly displayed across his chest. His eyes are long and oblong, the "whites" of his eyes are a light grey and his pupils are a solid black with white highlights. Eye black is drawn under the eyes and he sports a wide smile with a single black line. He has a pear shape nose and soft mounds for cheeks. He has dark blues sleeves and black gloves. His plain black athletic shoes are oversized and sport the same white "A" as displayed on his cap. He wears a dark blue belt matching the other blue accents on his uniform.



While each of these mascots is quite similar, the significant variations in details effectively create a unique impression. The differences in overall size and shape, and the numerous distinguishable design details, leave the impression that these are three completely different characters.

Unlike the differences in these baseball heads, the differences between P1 and P2 are negligible and superficial. Again, the Phanatic is a fantasy creature, making the creative possibilities for altering the character practically endless. P2 reflects an attempt to change P1 without actually changing P1.

***Conclusions:*** In my expert opinion, based on my decades of work in character design, artwork, and teaching and researching, and my review of the materials in this case, as well as outside sources pulled from my independent research, P2 does not alter the fundamental design or character of P1 significantly enough to qualify it as a "new" work, from the point of view of an artist in the field. It is a slavish and uninspired attempt at modifying P1, and the changes amount to little more than cosmetic surgery. A pig wearing lipstick is still the same pig.

EXPERT REPORT OF DAVID ZUNG
RESPECTFULLY SUBMITTED ON MAY 26, 2020

David Zung

David Zung

**Source Materials Used**

Documents Produced in Discovery

HE000007

HE000009

HE000012 – HE000016

HE000026

HE000034 – HE000039

HE000043

HE000064

HE000104 – HE000105

HE000107 – HE000108

HE000118

HE000213

HE000227

HE000343 – HE000412

HE000416

HE000436 – HE000441

HE000450 – HE000453

HE000495

HE000500

HE000507

HE000552

HE000555

HE000557

HE000584 – HE000588

HE000563

HE000591

HE000804

HE001499 – 001507

HE002616 – 002619

HE003173 – HE003184

HE003290

HE003470

HE004668

HE004801

HE005968 – HE005977

HE006015 – HE006026

HE006322 - HE006337

HE006460 – HE006473

PHAN0000012

PHAN0000015

PHAN0000034 – PHAN0000037

PHAN0000048 – PHAN0000050

PHAN0000055

PHAN0000058 – PHAN0000060

PHAN0000062

PHAN0000079

PHAN0000083

PHAN0000120

PHAN0000232

PHAN0000240

PHAN0000242

PHAN0000260 – PHAN0000262

PHAN0000275

PHAN0000278

PHAN0000283

PHAN0000285 – PHAN0000287

PHAN0000294

PHAN0000302

PHAN0000478 – PHAN0000479

PHAN0000466 – PHAN0000470

PHAN0002572

PHAN0009512 – PHAN0009514

PHAN0009712

PHAN0010690

PHAN0010691

PHAN0010715

PHAN0042990 – PHAN0043005

PHAN0043016 – PHAN0043415

PHAN0043546 – PHAN0043566

Deposition Transcripts

Deposition Testimony of Bonnie Erickson dated February 7, 2020

Deposition Testimony of Tom Burgoyne dated February 13, 2020

Deposition Testimony of Scott Brandreth dated February 28, 2020

Deposition Testimony of Christine Legault-Long dated April 10, 2020

Deposition Testimony of Dave Raymond dated April 14, 2020

Deposition Testimony of Dave Buck (rough draft) dated April 23, 2020

Deposition Testimony of Scott Brandreth on behalf of The Phillies (rough draft) dated May 21, 2020

Court Documents

Complaint

Answer & Counterclaims

Transcript of March 19, 2020 Status Conference

Case Law

*Conan Props. Int'l LLC v. Sanchez*, 17-CV_162 (FB), 2018 WL 4522099 (E.D.N.Y. June 8, 2018)

*Detective Comics, Inc. v. Bruns Publ'ns*, 111 F.2d 432 (2d Cir. 1940)

*Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905 (2d Cir. 1980)

*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982)

*Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211 (9th Cir. 1997)

*L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486 (2d Cir. 1976)

*Past Pluto Prods. Corp. v. Dana*, 627 F. Supp. 1435 (S.D.N.Y. 1986)

<u>News Articles</u>

*Phillies File Lawsuit To Prevent Phanatic From Hitting Free Agency*
https://deadspin.com/phillies-file-lawsuit-to-prevent-phanatic-from-hitting-1836955104

*As legal battle enters home stretch, what will become of the Phillie Phanatic?*
https://www.bizjournals.com/philadelphia/news/2020/05/21/phillies-phanatic-designers-still-fighting-court-1.html

*Here's how Phillies' fan reacted to the Phanatic's makeover on Twitter*
https://www.pennlive.com/news/2020/02/heres-how-phillies-fan-reacted-to-the-phanatics-makeover-on-twitter.html

*The Phillies Unveil a New Phanatic as Lawyers Fight Over Mascot Copyright*
https://www.nytimes.com/2020/02/24/sports/baseball/phillie-phanatic-costume.html

*Phanatic mascot gets new look, as Phillies, creators tangle and many fans are not pleased*
https://www.fox43.com/article/sports/phillie-phanatic-phillies-mlb/521-e943df89-b531-4e7e-bb15-a3d9db34de8e

*Phillie Phanatic creators issue statement blasting team's 'new' mascot*
https://www.phillyvoice.com/phillie-phanatic-mascot-lawsuit-creators-issue-statement-blasting-phillies-changes-copyright-spring-training/

*Philadelphia Phillies Mascot New Phanatic Look . . . Doesn't Look Very New at All*
https://www.tmz.com/2020/02/23/phillies-phanatic-mascot-new-look-same-old-design-lawsuit-creators/

*'New' Phillie Phanatic Design Is Barely Any Different*
https://www.thebiglead.com/posts/new-phillie-phanatic-design-barely-different-01e1sgtk3jwj

*The Phillie Phanatic Has Evolved, Leaving Many Terrifying Biological Questions Unanswered*
https://www.vulture.com/2020/02/phillie-phanatic-debuts-new-design-amid-legal-battle.html

<u>Other Internet Sources</u>

Pantone colors
https://www.pantone.com/

Citizens Bank Stadium diagram
https://www.mlb.com/phillies/tickets/season-tickets/pricing

Major League Baseball Attendance statistics
http://www.espn.com/mlb/attendance/_/year/2019

Tom Sapp Designs:

https://www.tomsapp-realcharacters.com/gallery

Dave Raymond Designs:
https://raymondeg.com/

*Concept Artist Tim Flattery Named Entertainment Design Chair at Art Center College of Design*
https://www.prweb.com/releases/entertainment/design/prweb4982354.htm

Muppets history:
https://muppet.fandom.com/wiki/Muppet_Wiki
https://en.wikipedia.org/wiki/The_Muppets
https://muppet.fandom.com/wiki/Jim_Henson

Other Images Incorporated into Report from Internet

Images of the Phanatic (P1 and P2)

Images of Illustrator Tutorial

Images of Snap, Crackle, and Pop

Images of Lucky Charms Leprechaun

Images of Michelin Man

Images of Bugs Bunny

Images of Citizens Bank Park

Image of WWII Plane Silhouettes

Image of Donald Duck

Images of Other Mascots

Images of Liberty Bell Silhouette

Image of Taco Bell Logo

Image of Powder Blue Phillies Jersey

Images of 5-Pointed Star

**Publications**

I do not have written articles; my industry looks at the creative projects one has worked on and with whom as the measure of one's expertise and credibility. Below are select projects I have worked on in the last 10 years along with upcoming projects.

**2020**

"Little Lungs" national antismoking campaign for Hornet Animation.

Oil portrait commission for the retiring CEO of Brooklyn Hospital Center commissioned by the Board of Trustees.

Presently working on a documentary, web series and film projects around the daily lives and challenges of the Nursing Profession.

Fall 2020 – Creative director in conjunction with the Vatican for ECHO – Earth Our Common Home – celebrating the 5th Anniversary of the publication of Pope Francis' Encyclical Letter: *Laudit Si – On Care for our Common Planet.*

Fall 2020- continue Media Consultancy for the UNFPA.

**2019**

Media Consultant for the UNFPA (United Nations Population Fund) International Nairobi conference.

Storyboard artist for "Amend", a documentary about the history of the 14th Amendment starring Will Smith directed by Kenny Leon.

Storyboards for Friskees CGI and several other national ad campaigns for Nice Shoes animation.

Storyboards and designs for several different national ad campaigns for Buck Animation.

**2017- 2018**

Art Director for the puppeted TV children's show the "Moon and Me" written and directed by Andy Davenport, creator of the "Teletubbies".

Storyboards and production design for "Satellite", a live action musical half hour episodic TV show in development by Dan Romer (composer- "Beasts of the Southern Wild" and Adam Weber-assistant editor to Sally Mencke, Quentin Tarrantino's editor).

Concept art and design development for The Museum of Tolerance. Curated by Michael Shulan, former director of the 9/11Museum, and Lynne Breslin AIA.

**2014-2016**

Storyboards for Hasbro/Marvel/Star Wars/Guardian of the Galaxy campaign.

Storyboards/Production Designer for Hornet Animation- "McDonald's UK Happy Meals".

Storyboards/Production Designer for Hornet Animation- "British Gas" campaign.

Storyboards for Imaginary Forces "Gatorade" campaign.

Storyboards for M ss ng P eces - interactive Dos Equis campaign.

Storyboards for Passion Pictures - Met Life/Peanuts Super Bowl Ad.

**2013**

Production Designer for Scholastic Media's 3D CG reboot of the animated series
"The Magic School Bus".

Executive Producer/Producer "That's News to Me" a live action comedy short film starring
Caroline Rhea ("Sabrina the Teenage Witch"). Shown at the Tribeca film Festival.Written
and directed by David Steven Simon (writer - Fresh Prince of Beverly Hills, Mad About
You). Producer Fred Blankfein (Woody Allen's AD for 6 of his films including Annie Hall
and Manhattan.)

Storyboards/Production Designer for Hornet Animation - "Permanent TSB Irish Bank".

**2009-2012**

Storyboards/Layout Artist for Passion Pictures - 2012 BBC Olympics promo.

Storyboards/Production Designer for Hornet Animation - "Land Rover International".

Storyboards/Production Designer for Hornet Animation - "PNC National Bank - How Much
do the 12 Days of Christmas Cost?"

Graphic Designer for Rogan Gregory, fashion designer- "Chipotle employee clothing
line"

Storyboards/concepts for the opening title sequence of "The History of Us" - The History
Channel

Storyboards/concepts for the animated sequences in the feature film "Youth in Revolt"
with Hornet Animation

**2010-2011**
Concept Artist/character designer/ storyboards artist for KMart "Mr. Blue"
lightbulb brand mascot - regional and national commercial print and broadcast campaign

with RhinoFX/Gravity FX.

Corporate clients include Scholastic Media, Viacom, MTV, Nickelodeon, Disney, Discovery Channel, HBO, Cartoon Network, Ringling Brothers Barnum and Bailey Circus.

International and national campaigns include Apple, Honda, Toyota, Nike, McDonald's USA/UK, Burger King World Wide, British Gas, Proctor and Gamble Worldwide, BMW, Land Rover, Coca Cola Worldwide, Pepsi, AT&T, Asics, Puma, Campbell's Soup, and Chipotle.

*The Phillies v. Harrison/Erickson, Incorporated et al.*
Supplemental Expert Report of David Zung

## Introduction

This Supplemental Report, which incorporates my May 26, 2020 Expert Report, addresses documents and testimony in this case that were produced subsequent to the Expert Report or not sufficiently in advance of the Expert Report. As in the Expert Report, I consider the purported variances between P1 and P2 and evaluate whether those changes and variances exhibit more than trivial independent creation and creativity. The additional documents and testimony I reviewed further support my view that the variations between P1 and P2 are trivial.

## Color Comparison of P1 and P2

I have examined the Pantone color chart for P2, on the document marked PHAN0043570 and have compared it to the colors selected by Ms. Erickson for use in early artwork for P1:



**Phanatic PMS Colors (2020)**

**Light Green PMS 361** – Body & Mid-Snout

**Dark Green PMS 347** – Snout Rings

**Red PMS 200** – Cap, Jersey Pinstripes, Phillies Script, Blower (Tongue),
Leg Stripes, Back Lettering, Shoes

**Blue PMS 288** – Cap Button, Legs, Phillies Script Stars

**Pink PMS 231** – Eyelashes

**Powder Blue PMS 284** – Eyebrows, Tail

**Black** - Outline, Pupils



The colors selected for P2 represent alterations, but those alterations are slight, staying within the same color range:

- The body and mid-snout are listed as Pantone #361 on both P1 and P2, meaning that the color is identical. This is significant because this is the predominant green color associated with the Phanatic and the color that first grabs the attention of any viewer at a baseball game. The CMYK for this color is 68% C (cyan), 0% M (magenta), 100% Y (yellow), and 0% K (black).[1]

- The snout rings on P1 are listed as Pantone #375 (40% C, 0% M, 98% Y, 0% K), whereas the snout rings on P2 are listed as Pantone #347 (92% C, 0% M, 97% Y, 0% K). As the formulas show, the difference in colors is largely in the percentage of cyan. On both P1 and P2, this is an accent color to the body color. Whereas the cyan in the snout rings on P1 are 28% lower than in the body, the cyan in the snout rings on P2 are 24% higher than in the body. Accordingly, the snout rings have essentially the same color relationship to the body, but with one going up and one going down. Both serve as slightly different shades of green from the body.

- The red used in various items of clothing on P1 is listed as Pantone #185 (0% C, 100% M, 89% Y, 0% K) whereas the red used on P2 is listed as Pantone #200 (0%C, 100% M,

---

[1] As mentioned in the Expert Report, CMYK refers to the color mixing system, cyan, magenta, yellow, and black. Each of these four colors is assigned a unique "fingerprint" on the color spectrum.

76% Y, 13% K).  These CYMK values are nearly identical such that the color is nearly identical.  While the yellow value is 13% lower in Pantone # 200, the black value is 13% higher.  What this means is that both colors have the same amount of pigment, but the distribution is slightly different.

- The eyebrows on P1 are listed as Pantone #301 (100% C, 51% M, 0% Y, 34 % K) whereas the eyebrows on P2 are listed as Pantone #284 (54% C, 19% M, 0% Y, 0% K). Upon first glance the formulas appear fairly different but when one breaks down the math one can see that they are actually closely related.  These are blue accent colors so the shade of blue will be determined by the cyan percentage relative to the magenta percentage, with the black percentage determining how dark the color will appear.  The ratio of cyan to magenta is fairly close between the two colors, giving it a similar quality. The largest difference is the black percentage, which gives the shade of blue on P1 somewhat of a darker appearance.  But this is a matter of degree and the overall difference in the context of the two designs is quite minimal such that many would not even notice the difference unless it was pointed out to them.  This color difference in the eyebrows is even less significant when one considers that P2 still uses the exact same Pantone # 301 featured on P1 as an accent color on different elements, thereby retaining the same overall color impression.

- The eyelashes on P1 are listed as Pantone #247 (30% C, 94% M, 0% Y, 0% K) whereas the eyelashes on P2 are listed as Pantone # 231 (5% C, 61% M, 0% Y, 0% K).  Both of these colors maintain 0% of yellow and black, such that the change is purely in the cyan and magenta, with the color on P1 having higher percentages.  What this means is that the color on P1 is essentially the same as that on P2, but more intense.

### Dimension Comparisons

I have also examined the notes detailing the changes of dimensions between P1 and P2 and have concluded that any changes are fractional relative to the overall dimensions of the Phanatic.[2] These subtle dimensional changes fit a consistent pattern of marginal changes in the use of colors as described above.  The changes are trivial, incremental, and fractional.  They do not speak to any substantial creative design decisions, and further confirm my view that P2 is a slavish attempt to use what is essentially still the P1 design.

Most of the changes in body measurements are a matter of a few inches, so minute that they would not be noticeable at all to the naked eye, especially in the context of a moving figure in a large sports stadium. The most obvious changes are the width of the snout where it meets the base, and the slightly larger "duck butt"; however, neither of these significantly affect the design or perception that P2 is essentially the same design as P1.

The notes detailing dimensional changes indicate that the snout on P2 is slightly shorter in length, and it is cylindrical rather than conical, meaning that the circumference of the snout on P1 increases from the base to the end, whereas the circumference of the snout on P2 stays

---

[2] These notes are included in a document labeled P1-P2 measurements.pdf, which I understand The Phillies obtained from Randy Carfagno.

consistent. According to Ms. Erickson's materials and interviews that I have been supplied with, the snout was inspired by a megaphone, because the character concept of the Phanatic is that he acts as a megaphone for Phillies fans. On the other hand, I have read testimony from The Phillies discussing the creative process for P2 as well as a draft backstory that was provided to me, and there does not appear to be any creative justifications for making the snout less conical. The modification is creatively and conceptually arbitrary, working against the character, and an arbitrary change is not in my opinion creative. Instead, it appears the change is solely for the sake of change, without any real creative thought.

Design-wise, the slight shortening of the snout is balanced somewhat by the slight lengthening of the "duck butt," which reinforces the need for the same sort of balance inherent in Ms. Erickson's original design. The slight dimensional changes in the snout and backside of P2 in other words retain the same overall sense of balance and proportion as P1.

## Supplemental Analysis of Arm Modifications

As mentioned in the Expert Report, I do not believe the modifications to P2's arms are creative in any meaningful way. My review of The Phillies' deposition testimony and other documents that purport to provide creative justifications for the design choice further confirm this view.

Creative decisions would leave a trail of story notes and sketches addressing the "backstory" of the "evolution" of the Phanatic; but a proposed "backstory" that I have reviewed, which the author admits was not very good, does not provide any environmental pressures or reasons for the subsequent change.

Rather, Scott Brandreth, testifying in a deposition on behalf of The Phillies, noted that the Phanatic "thinks he can fly now that he has more wing tips and he's got additional feathers on his forearms." But if that was the creative driving force of the decision to change the arms, then one would expect to see bigger or more prominent wings with full feathers or some sort of flying appendages. The modifications to the arms are by contrast quite subtle and not particularly distinctive, and as mentioned in my Expert Report, simply conform to the same motifs first envisioned by Ms. Erickson decades earlier. To clarify, I am not being literal about the size of the wings; they do not actually need to be big enough to look like they can make P2 fly in order to be creative. My point is merely that The Phillies' own supposedly creative justifications afforded the P2 designers an opportunity for a bold design decision that was weakly addressed in an uninspired manner.

As I also mentioned in the Expert Report, the fact that the fur on the back of the hands is sewn to the length of the knuckles rather than the length of the fingers is a minor cosmetic difference, which in my view is not creative in any respect. More recent photographs of P2 however suggest that The Phillies modified the hands such that the contact point of the fur on the backside of the hands has been moved further back to the wrists:

4



This modification represents a departure from the original construction of P2, as the notes, marked PHAN0043074, of Randy Carfagno Productions (one of the builders of P2) specified that the "fur wing tips" would be "stitched further back on the <u>knuckles</u>," and there appears to be no creative purpose behind this further change to the hands. Attaching the fur to the wrists rather than the knuckles actually makes the design appear slightly floppier, contradicting The Phillies own earlier concerns about making the hands appear too "floppy," as reflected in an email from Dave Raymond, marked PHAN0043271. The design is working against itself.

The change is not really any more of a change from attaching the fur to the knuckles, which was not really much of a change from the original design covering the back of the hands in the first place. The floppy hands would only be evident in certain hand positions and motions, and not all of the time. Notably, the recent photographs showing these alterations were taken against an entirely black background and P2 was put in certain poses to showcase the alterations, giving off the impression that they are more significant than they actually are. For instance, the difference is completely concealed in the below pictures:

5

 

As stated in my Expert Report, to claim that a difference in where fur is sewn on the back of P1 and P2's hand is an important creative decision is in my professional view quite ridiculous, and this minor, last-minute change does not change that view.

SUPPLEMENTAL EXPERT REPORT OF DAVID ZUNG
RESPECTFULLY SUBMITTED ON JULY 10, 2020

David Zung

**New Source Materials Relied Upon**

PHAN0043567-PHAN0043585

P1-P2 measurements.pdf

Deposition Testimony of Scott Brandreth on behalf of The Phillies (rough draft) dated May 21, 2020

---

[3] The differences in these three new photographs of P2 are also good examples of the effect that different lighting conditions and cameras can have on color, as I touched on in the Expert Report. Assuming the costume in all three photographs is the same, one can see how the various colors are perceived differently in the different scenarios.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PHILLIES, a Pennsylvania limited partnership,<br><br>     Plaintiff,<br><br>  v.<br><br>HARRISON/ERICKSON, INCORPORATED, a New York corporation, HARRISON ERICKSON, a partnership, and WAYDE HARRISON and BONNIE ERICKSON,<br><br>     Defendants. | CASE NO. 1:19-cv-07239-VM<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' SUPPLEMENTAL RULE 26(a)(2)(C) EXPERT DISCLOSURE WITH RESPECT TO BONNIE ERICKSON**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Defendants and Counterclaim Plaintiffs Harrison/Erickson, Incorporated, Harrison Erickson, Wayde Harrison, and Bonnie Erickson (collectively, and individually, "Defendants") by and through their attorneys, respectfully provide the following disclosure concerning expert testimony.

## I.     WITNESS QUALIFICATIONS AND STATUS AS PARTY EXPERT

Bonnie Erickson, who is a party in this case and who is not specially employed to provide expert testimony in the case or one whose duties as a party's employee regularly involves giving expert testimony, is hereby disclosed as an expert witness in the case. She has had a long career as a designer of puppets, costumes, toys, artwork, and graphics, and is widely known for her work with Jim Henson and The Muppets, as well as with Children's Television Workshop. She has also authored and created numerous works of art concerning the Phillie Phanatic and other sports mascots. *See* HE 005968; https://en.wikipedia.org/wiki/Bonnie_Erickson. Prior mascots, designs, and characters on which Ms. Erickson has worked are listed in the referenced biography. She will rely upon her knowledge, skill, experience, training, and education, as well as documents produced in discovery in this case, to proffer opinions. See attached exhibits.

## II.     SUBJECT MATTER

Ms. Erickson will rely upon facts and data in the case that she has created, been made aware of, or personally observed. She will rely upon the artwork, materials, images, mascots, audiovisual works, and merchandise produced and exchanged by the parties in discovery in this case, as well as deposition testimony, exhibits, and expert testimony in the case. She will rely upon her experience and other attributes as well, including her experience with drawing characters and other works, with using Adobe Illustrator, with building mascots and other works

2

and characters, and with merchandising.  The Defendants reserve the right to supplement this response based on any further discovery produced or exchanged by the respective parties.

### III.    SUMMARY OF FACTS AND OPINIONS

1.    The original Phanatic mascot/costume/sculpture and artwork portraying the Phanatic dating prior to October 31, 1984 listed on the attached Exhibit A and incorporated in this disclosure involved, in Ms. Erickson's opinion, significant creative work product by Ms. Erickson and Wayde Harrison, but not by The Phillies.  Specifically, designing and constructing the mascot/costume/sculpture involved significant creative work by Ms. Erickson and Wayde Harrison.  It involved conceiving of and fixing in tangible form(s) a character of a visual and physical nature that expressed personality, graphic appeal, artistic distinction, and humor. Although the Phanatic designed and built by Harrison and Erickson was designed and built to be worn by a person, the mascot/costume/sculpture that became the Phanatic, in Ms. Erickson's expert opinion, reflect significant artistic choices.  Moreover, artwork depicting, or referring to the Phanatic created prior to the October 31, 1984 assignment ("1984 Assignment") as identified in Exhibit A also, in Ms. Erickson's expert opinion, reflects significant artistic choices ("Pre-Assignment Artwork").  This Pre-Assignment artwork has been exchanged in prior discovery in this case, and/or has been marked as a deposition exhibit in this case.  Attached hereto as Exhibit B and incorporated in this disclosure is a list of documents relied on by Bonnie Erickson in connection with her foregoing opinion.

2.    Throughout the years subsequent to the 1984 Assignment, Ms. Erickson provided additional Phanatic-related artwork and/or materials, including at the request of The Phillies or with their permission and consent ("Post-Assignment Artwork"). The Post-Assignment Artwork identified as numbers 1, 2, 75, 77, 79, 82, 84, 86, 87, 88 on Appendix A to Plaintiff's

3

Supplemental Response to Defendants' Interrogatory Nos. 5 and 6 and depicted in the documents marked HE000034, HE000584, PHAN0010690, PHAN0043256, conform to the creative choices previously made by Harrison/Erickson to create the Pre-Assignment Artwork. In addition, subsequent to the 1984 Assignment, Harrison/Erickson repaired and provided new copies of the Phanatic mascot/costume/sculpture. Harrison/Erickson was not asked by The Phillies to alter or modify the design of the Phanatic mascot/costume/sculpture that existed prior to the 1984 Assignment in any type of creative way. Ms. Erickson will opine that the Phanatic mascot/costume/sculpture which was the subject of the 1984 Assignment has not been creatively altered or modified. Ms. Erickson will also opine that the Post-Assignment Artwork identified in this paragraph did not change the creative content of the Phanatic or reinterpret the Phanatic in any new or meaningful way. The Post-Assignment Artwork identified in this paragraph involved changes of format or color, functional or utilitarian work, or other insignificant alterations as compared to Pre-Assignment Artwork, which were less than minimal from a creative standpoint. In her expert opinion, her use of digital software products to convert the format of Pre-Existing Artwork and/or to make minor alterations to Pre-Existing Artwork did not require more than trivial new creativity. While, in her opinion, her work on the Post-Assignment Artwork identified in this paragraph involved technical skill and significant investments of time, changes made for the purpose of updating Pre-Assignment Artwork reflected the same creative choices previously made for the Pre-Assignment Artwork and did not involve new creative choices of more than a trivial nature.

3. The Phanatic costume that the parties have been referencing as "P2" and artwork portraying P2 is/are, from an artistic point of view, extremely similar – in Ms. Erickson's expert opinion – to the original Phanatic and artwork, so much so, that the two would be perceived as

nearly identical. Depictions of this P2 costume and P2 artwork identified as part of this report in Exhibit C are, in Ms. Erickson's expert opinion, attempts to reproduce artwork and/or materials previously created by Harrison/ Erickson. The alterations to the original Phanatic with respect to the P2 costume and P2 artwork are, in Ms. Erickson's expert opinion, of less than minimal artistic significance. The eyes, eyelashes and eyebrows, hat, jersey, snout, shoes, posterior, tail, leggings, feathering, arms, and hands, in her opinion, replicate and/or mimic the features of other mascots in the marketplace created by Harrison/Erickson, namely Slyly, Duncan, Sport, Stuff, and the Phanatic itself (in its original form and as depicted over time), as well as the features of mascots developed by others, namely, Schooner, Cattrick, Loco, Screamer, Reggy the Purple Party Dude, Guilford, Melvin, and the Oregon Duck (and other mascots that share such features), The Phillies' claimed alterations to the Phanatic's eyes, eyelashes and eyebrows, hat, jersey, snout, shoes, posterior, tail, leggings, feathering, arms, and hands reflect, in Ms. Erickson's expert opinion, trivial changes from an artistic standpoint that do not distinguish P2, creatively, from the Phanatic. Attached hereto as Exhibit D and made a part of this disclosure is a comparison of P1 and P2 created by Ms. Erickson.

      4. Also, the faux fur used for P2 is the same fabric from a dye lot Harrison/Erickson provided to the Phillies. PHAN0043240. The hands on the Phanatic had been changed to fleece palms instead of faux fur fabric prior to 1984. The orange fleece inside the snout and green feathers on the end of the P2 snout are the same as the Phanatic. PHAN0043074. Artwork prior to 1984 also shows the hat on both the left and right sides. PHAN0043246. The original logo for Phanatic products has the hat on the right, as reflected below:



Ms. Erickson will opine that these attributes of P2 do not reflect more than a trivial variation from the original Phanatic that existed prior to the 1984 Assignment.


DATED:  New York, New York               Mitchell Silberberg & Knupp LLP
        June 8, 2020


                                         By: /s/ Paul D. Montclare
                                             Paul D. Montclare (*pdm@msk.com*)
                                             Leo M. Lichtman (*lml@msk.com*)
                                             Elaine Nguyen (*eln@msk.com*)
                                             437 Madison Avenue, 25th Floor
                                             New York, NY 10022
                                             Telephone: (212) 509-3900
                                             Facsimile:  (212) 509-7239

                                             J. Matthew Williams (*mxw@msk.com*)
                                             1818 N St. NW, 7th Floor
                                             Washington, DC 20036
                                             Telephone: (202) 355-7900
                                             Facsimile: (202) 355-7899

                                             *Attorneys for Defendants*
                                             *Harrison/Erickson Incorporated,*
                                             *Harrison Erickson, Wayde Harrison, and*
                                             *Bonnie Erickson*

**EXHIBIT A**

| BATES |
|-------|
| HE000007 |
| HE000009 |
| HE000028 |
| HE000030 |
| HE000032 |
| HE000039 |
| HE000064 |
| HE000081 |
| HE000104 – HE000113 |
| HE000115 |
| HE000117 – HE000118 |
| HE000171 |
| HE000183 |
| HE000195 |
| HE000198 |
| HE000201 |
| HE000343 – HE000412 |
| HE000488 – HE000489 |
| HE000495 |
| HE000520 – HE000521 |
| HE000523 – HE000524 |

| |
|---|
| HE000528 |
| HE000537 |
| HE000549 |
| HE000551 – HE000552 |
| HE000554 |
| HE000556 |
| HE000558 – HE000559 |
| HE000562 – HE000563 |
| HE000565 – HE000566 |
| HE000574 |
| HE000576 |
| HE000578 |
| HE000675 |
| HE000680 – HE000703 |
| HE000705 – HE000718 |
| HE000720 – HE000724 |
| HE000726 |
| HE000729 – HE000735 |
| HE000737 |
| HE001132 |
| HE002246 |
| HE002248 |
| HE002259 – HE002260 |
| HE002283 |

12217655.1

| |
|---|
| HE002287 |
| HE003845 |
| HE004049 – HE004050 |
| HE004042 |
| HE004057 – HE004058 |
| HE004060 |
| HE004062 – HE004063 |
| HE004071 |
| HE004073 – HE004075 |
| HE004079 – HE004082 |
| HE004084 – HE004089 |
| HE004093 – HE004096 |
| HE004246 – HE004249 |
| HE004258 – HE004260 |
| HE004262 |
| HE004283 – HE004285 |
| HE004288 |
| HE004294 |
| HE004668 – HE004675 |
| HE006087 |
| PHAN0000018 |
| PHAN0000034 – PHAN0000037 |
| PHAN0000045 – PHAN0000046 |
| PHAN0000048 |

| |
|---|
| PHAN0000055 |
| PHAN0000058 – PHAN0000060 |
| PHAN0000062 – PHAN0000063 |
| PHAN0000066 |
| PHAN0000086 |
| PHAN0000120 |
| PHAN0000123 – PHAN0000125 |
| PHAN0000129 – PHAN0000137 |
| PHAN0000232 |
| PHAN0000240 |
| PHAN0000242 |
| PHAN0000258 – PHAN0000262 |
| PHAN0000275 |
| PHAN0000278 |
| PHAN0000283 |
| PHAN0000287 |
| PHAN0000291 |
| PHAN0000294 |
| PHAN0000302 |
| PHAN0001230 |

**EXBHIT B**

| Bates/Description |
|---|
| PHAN0042989 |
| PHAN0042990-03 |
| PHAN0043004-05 |
| PHAN0043006 |
| PHAN0043007-09 |
| PHAN0043010-15 |
| PHAN0043016-19 |
| PHAN0043020-22 |
| PHAN0043023 |
| PHAN0043024 |
| PHAN0043025-26 |
| PHAN0043027 |
| PHAN0043028 |
| PHAN0043029-31 |
| PHAN0043032-34 |
| PHAN0043035-38 |
| PHAN0043039-40 |
| PHAN0043041-51 |
| PHAN0043052-54 |
| PHAN0043055-56 |

| |
|---|
| PHAN0043057-58 |
| PHAN0043059-61 |
| PHAN0043062-67 |
| PHAN0043068-72 |
| PHAN0043073-76 |
| PHAN0043077 |
| PHAN0043078 |
| PHAN0043079-86 |
| PHAN0043087-88 |
| PHAN0043089-95 |
| PHAN0043096 |
| PHAN0043097-01 |
| PHAN0043102-11 |
| PHAN0043112-17 |
| PHAN0043118-22 |
| PHAN0043123-74 |
| PHAN0043175 |
| PHAN0043176-81 |
| PHAN0043182-87 |
| PHAN0043188-93 |
| PHAN0043194-95 |
| PHAN0043196-02 |

| |
|---|
| PHAN0043203-10 |
| PHAN0043211-14 |
| PHAN0043215-18 |
| PHAN0043219-26 |
| PHAN0043227-31 |
| PHAN0043232-37 |
| PHAN0043238 - 39 |
| PHAN0043240-41 |
| PHAN0043242-44 |
| PHAN0043245-54 |
| PHAN0043255 |
| PHAN0043256-62 |
| PHAN0043263-64 |
| PHAN0043265-66 |
| PHAN0043267-69 |
| PHAN0043270-75 |
| PHAN0043276-79 |
| PHAN0043280-86 |
| PHAN0043287-94 |
| PHAN0043295-98 |
| PHAN0043299-12 |
| PHAN0043313-19 |

| |
|---|
| PHAN0043320-25 |
| PHAN0043326-30 |
| PHAN0043331-36 |
| PHAN0043337-42 |
| PHAN0043343-47 |
| PHAN0043348-52 |
| PHAN0043353-54 |
| PHAN0043355-59 |
| PHAN0043360-80 |
| PHAN0043381-02 |
| PHAN0043403-15 |
| PHAN0043543 |
| PHAN0043544 |
| PHAN0043545 |
| PHAN0043546-66 |
| PHAN0000118 |
| PHAN0000119 |
| PHAN0000120 |
| PHAN0000122 |
| PHAN0000656-716 |
| PHAN0000063 |
| PHAN0000002 |

| |
|---|
| PHAN0000004 |
| PHAN0000006 |
| PHAN0000007 |
| PHAN0000009 |
| PHAN0000011 |
| PHAN0000013 |
| PHAN0000014 |
| PHAN0000016-19 |
| PHAN000020-28 |
| PHAN0000029-32 |
| PHAN00000034 |
| PHAN00000036 |
| PHAN0000015 |
| PHAN0021319-23 |
| PHAN0001266-71 |
| Phillies' Interrogatory Appendix of Alleged Derivative Works |
| Deposition Testimony of Scott Brandreth, Tom Burgoyne, William Giles, Christine Long, David Buck, David Raymond, and Philadelphia |

Phillies concerning creation of Phanatic, Style Guides, and P2

## EXHIBIT C

| BATES |
| --- |
| PHAN0042990 – PHAN0043005 |
| PHAN0043017 |
| PHAN0043026 |
| PHAN0043031 |
| PHAN0043038 |
| PHAN0043056 |
| PHAN0043060 – PHAN0043061 |
| PHAN0043177 – PHAN0043181 |
| PHAN0043183 – PHAN0043187 |
| PHAN0043189 – PHAN0043193 |
| PHAN0043195 |
| PHAN0043215 – PHAN0043218 |
| PHAN0043547 – PHAN0043566 |

# EXHIBIT D

**PHILADELPHIA PHILLIES OFFICIAL MASCOT DESIGNS**



# 3D MASCOT
# TURNAROUND



CONFIDENTIAL



PHAN0043026

Update 1–13–2019



# MLB art transparency over P2

Update 1-13-2019

