**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PHILLIES, a Pennsylvania limited partnership,<br><br>Plaintiff,<br><br>v.<br><br>HARRISON/ERICKSON, INCORPORATED, a New York corporation, HARRISON ERICKSON, a partnership, and WAYDE HARRISON and BONNIE ERICKSON,<br><br>Defendants. | CIVIL ACTION NO. 19-7239-VM-SN<br><br><br>JURY TRIAL DEMANDED |

**PLAINTIFF AND COUNTERCLAIM DEFENDANT'S MEMORANDA OF LAW IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
AND MOTION TO DISMISS AMENDED COUNTERCLAIMS**

Dated:  December 10, 2020

David J. Wolfsohn (PA ID No. 57974)
djwolfsohn@duanemorris.com
*(admitted pro hac vice)*
Tyler R. Marandola (PA ID No. 313585)
tmarandola@duanemorris.com
*(admitted pro hac vice)*
Kendra C. Oxholm (NY ID No. 5267828)
kcoxholm@duanemorris.com
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Tel:      (215) 979-1000
Fax:     (215) 979-1020

and

David T. McTaggart (NY ID 4097598)
dtmctaggart@duanemorris.com
DUANE MORRIS LLP
1540 Broadway
New York, NY 10036-4086
Tel:      (212) 692-1000
Fax:     (212) 202-4931

*Attorneys for Plaintiff, The Phillies*

# TABLE OF CONTENTS

Page

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.      STATEMENT OF FACTS MATERIAL TO THIS MOTION ..........................................2

    A.      H/E Develops the Phanatic Costume for The Phillies in 1978, Registers It as an "Artistic Sculpture" with the Copyright Office in 1979, and Assigns All of its Rights in the Artistic Sculpture to The Phillies in 1984. ........................ 2

    B.      After Acquiring the Rights to the Phanatic Costume, The Phillies Builds Substantial Good Will in the Mascot. ...................................................................... 3

    C.      H/E Sends The Phillies a Purported Termination Notice ....................................... 4

    D.      The Phillies Redesigns the Phanatic Costume Before June 15, 2020 .................... 5

II.     LEGAL STANDARD .......................................................................................................5

III.    ARGUMENT .....................................................................................................................6

    A.      In Addition to the 368 Designs Conceded by H/E, the Phillies Has the Right to Continue to Utilize P2 and Other Designs Under Section 203(b)(1). ............................................................................................................ 6

        1.      The Phillies Can Continue to Utilize P2 because It Is a Derivative Work Prepared Under the Authority of the 1984 Grant...................................... 11

        2.      The Phillies Can Continue to Utilize Particular P2 Artwork Because It Consists of Derivative Works Prepared Under the Authority of the 1984 Agreement. ............................................................................................... 15

        3.      Defendants' Proposed Expert Testimony on "Creativity" and "Artistic Significance" Is Not Admissible................................................................ 17

    B.      H/E's Purported Notice of Termination Is Not Effective as to H/E's Post-1984 Grants of Rights to H/E Artwork. .............................................................. 26

    C.      CONCLUSION ...................................................................................................... 32

**COUNTERCLAIM DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AMENDED COUNTERCLAIM**

I.      RELEVANT ALLEGATIONS IN THE AMENDED COUNTERCLAIMS...................33

II.     LEGAL STANDARD......................................................................................................34

III.   ARGUMENT ................................................................................................................34

       A.     H/E Fails to Plead Infringement with the Requisite Specificity. .......................... 34

       B.     H/E Fails to State a Claim for Infringement of the Unregistered Artwork
              Included in Exhibit B. ......................................................................................... 36

       C.     The Phillies' Use of P2 is Non-Infringing as a Matter of Law. ........................... 38

IV.    CONCLUSION ............................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Alfred Bell & Co. v. Catalda Fine Arts*,
    191 F.2d 99 (2d Cir. 1951)....................................................................................................22

*Anderson v. Hertz Corp.*,
    507 F. Supp. 2d 320 (S.D.N.Y. 2007)....................................................................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................34

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005)..................................................................................18

*Bitetto v. Rometty*,
    2018 WL 941736 (N.D.N.Y. Feb. 16, 2018) ......................................................................36

*Boisson v. Banian, Ltd.*,
    273 F.3d 262 (2d Cir. 2001)...........................................................................................8, 21

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
    683 F.2d 610 (2d Cir. 1982)........................................................................................... 30-32

*Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998)...........................................................................................7, 20

*Cole v. John Wiley & Sons, Inc.*,
    2012 WL 3133520 (S.D.N.Y. Aug. 1, 2012) ................................................................. 35-36

*Daubert v. Merrell Dow Pharma, Inc.*,
    509 U.S. 579 (1993)............................................................................................................18

*Davidson v. United States*,
    138 Fed. Cl. 159 (Fed. Cl. 2018) ......................................................................................9, 12

*Design Basics, L.L.C. v. Deshano Companies, Inc.*,
    2012 WL 4340784 (E.D. Mich. Sept. 21, 2012)......................................................... 19, 21-22

*Durham Indus., Inc. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980).............................................................................................. 8-9

*Durkin v. Platz*,
    920 F. Supp. 2d 1316 (N.D. Ga. 2013) ..........................................................................19, 22

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
    697 F.2d 27 (2d Cir. 1982)............................................................................................*Passim*

*Feist Pubs, Inc. v. Rural Telephone Serv.*,
    499 U.S. 340 (1991)............................................................................................................7

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423 (2d Cir. 2001)..............................................................................................6

*Gasery v. Kalakuta Sunrise, LLC*,
    422 F. Supp. 3d 807 (S.D.N.Y. 2019)............................................................................28

*Godinger Silver Art Co., v. Int'l Silver Art Co.*,
    1995 WL 702357 (S.D.N.Y. Nov. 28, 1995)............................................................10, 12

*Guity v. Santos*,
    2019 WL 6619217 (S.D.N.Y. Dec. 5, 2019) ..............................................................34, 39

*Horror Inc. v. Miller*,
    335 F. Supp. 3d 273 (D. Conn. 2018)............................................................................29

*Interscope Records v. Time Warner, Inc.*,
    2010 WL 11505708 (C.D. Cal. June 28, 2010) ............................................................28

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    399 F. Supp. 3d 120 (S.D.N.Y. 2019)............................................................................27

*Keane Dealer Servs., Inc. v. Harts*,
    968 F.Supp. 944 (S.D.N.Y. 1997) ..................................................................................28

*Keeling v. Hars*,
    809 F.3d 43 (2d Cir. 2015), cert. denied, 136 S. Ct. 2519 (2016) ...............................7

*Kelly v. L.L. Cool J.*,
    145 F.R.D. 32 (S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994)................................34-36

*Kleeberg v. Eber*,
    2020 WL 4586904 (S.D.N.Y. Aug. 10, 2020) ................................................................5

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995)..........................................................................................8, 21

*KnowledgeAZ, Inc. v. Jim Walters Res., Inc.*,
    617 F. Supp. 2d 774 (S.D. Ind. 2008) ............................................................................38

*Kumho Tire Co., Ltd v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................................18

*L. Batlin & Son, Inc. v. Snyder*,
    536 F.2d 486 (2d Cir. 1976)............................................................................................8

*Lewinson v. Henry Holt & Co., LLC,*
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)........................................................................38

*In re Literary Works in Elec. Databases Copyright Litig.,*
    509 F.3d 116 (2d Cir. 2007)....................................................................................38

*MalibuMedia, LLC v. Baker,*
    2020 WL 3978302 (S.D.N.Y. June 18, 2020) ................................................... 36-37

*Music Sales Corp. v. Morris,*
    73 F. Supp. 2d 364 (S.D.N.Y. 1999)........................................................................31

*Newton v. Penguin/Berkley Pub. USA,*
    No. 13 CIV. 1283 CM, 2014 WL 61232 (S.D.N.Y. Jan. 6, 2014) .........................38

*In re NYSE Specialists Sec. Litig.,*
    503 F.3d 89 (2d Cir. 2007)......................................................................................34

*Palmer Kane LLC v. Scholastic Corp.,*
    2013 WL 709276 (S.D.N.Y. Feb. 27, 2013).............................................................35

*Paul Morelli Design, Inc. v. Tiffany & Co.,*
    200 F. Supp. 2d 482 (E.D. Pa. 2002) ....................................................................19

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
    602 F.3d 57 (2d Cir. 2010)......................................................................................38

*Psihoyos v. Pearson Educ., Inc.,*
    855 F. Supp. 2d 103 (S.D.N.Y. 2012)......................................................................28

*Reed Elsevier, Inc. v. Muchnick,*
    559 U.S. 154 (2010)................................................................................................38

*Riegel v. Medtronic, Inc.,*
    451 F.3d 104 (2d Cir. 2006).....................................................................................18

*Scorpio Music S.A. v. Willis,*
    2012 WL 1598043 (S.D. Cal. May 7, 2012).............................................................30

*Sharp v. Patterson,*
    2004 WL 2480426 (S.D.N.Y. 2004).........................................................................35

*Silberstein v. Fox Entm't Group, Inc.,*
    424 F. Supp. 2d 616 (S.D.N.Y. 2004)................................................................... 9-10

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.,*
    642 F. Supp. 2d 206 (S.D.N.Y. 2009)................................................................ 37-38

*Stratton v. Upper Playground Enterprises, Inc.*,
    2010 WL 5313317 (C.D. Cal. Dec. 16, 2010) ......................................................................15

*Stuart v. Am Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998) ...................................................................................................5

*Talkisp Corp. v. Xcast Labs., Inc.*,
    No. C05-0055, 2005 WL 3466618 (N.D. Iowa Dec. 19, 2005) .............................................29

*Ward v. Andrews McMeel Pub., LLC*,
    963 F. Supp. 2d 222 (S.D.N.Y. 2013) ...................................................................................15

*We Shall Overcome Foundation v. The Richmond Organization, Inc.*,
    2017 WL 3981311 (S.D.N.Y. Sept. 8, 2017) .........................................................................19

*Weissman v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989), cert. denied 493 U.S. 883 (1989) .....................................9, 12

*Well-Made Toy Manufacturing Corp. v. Goffa International Corp.*,
    210 F. Supp. 2d 147 (E.D.N.Y. 2002), *aff'd*, 354 F.2d 112 (2d Cir. 2003) ...........................10

*Well-Made Toy Mfg., Corp. v. Goffa Int'l*,
    354 F. 3d 112 (2d Cir. 2003) ........................................................................................7, 10, 20

*Xclusive-Lee, Inc. v. Hadid*,
    2019 WL 3281013 (E.D.N.Y. July 18, 2019) ........................................................................37

*Yamashita v. Scholastic, Inc.*,
    2017 WL 74738 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 936 F.3d 98 (2d Cir. 2019) .......................35

*Young-Wolff v. McGraw-Hill Companies*,
    2014 WL 349711 (S.D.N.Y. Jan. 31, 2014) ..........................................................................36

**Statutes**

17 U.S.C. § 101 ..........................................................................................................................7, 12

17 U.S.C. § 102 ............................................................................................................................20

17 U.S.C. § 106 ............................................................................................................................14

17 U.S.C. § 203 ......................................................................................................................*Passim*

17 U.S.C. § 304 ............................................................................................................................31

17 U.S.C. § 411 ............................................................................................................................38

**Other Authorities**

37 C.F.R. § 201.10 ................................................................................................................27, 31

Fed. R. Civ. P. 12(b)(6) ........................................................................................................32, 40

Fed. R. Civ. P. 26(a)(2)(C) .........................................................................................................25

Fed. R. Civ. P. 56(a) ....................................................................................................................5

Fed. R. Evid. 702(a) ..............................................................................................................18, 22

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Bonnie Erickson, Wayde Harrison, and Harrison Erickson ("H/E") do not have the right to terminate their 1984 assignment of rights in the Phanatic costume to The Phillies under Section 203 of the Copyright Act because, *inter alia*, The Phillies is a co-author of that design, The Phillies created the copyrightable "character" of the Phanatic, H/E has already "used up" its claimed termination rights, the Phanatic is trademarked, and H/E committed fraud on the Copyright Office.  But even if H/E did somehow have any rights under Section 203, those rights are severely limited by Section 203(b)(1) and by H/E's other, later grants of rights to The Phillies, which H/E is not claiming to try and terminate.

First, under Section 203(b)(1)—the Derivative Works Exception—The Phillies can continue to utilize "derivative works" prepared before June 15, 2020, including its redesign of the Phanatic costume, dubbed "P2," and various two-dimensional designs.  Indeed, H/E has admitted that The Phillies can continue to utilize 368 of those designs.  This motion seeks a declaration that P2 and nine other designs are also subject to the Derivative Works Exception.

Second, even if H/E had termination rights, its notice of termination by its express terms applies only to the 1984 assignment of H/E's rights in the original Phanatic costume; it is not effective as to any of the later licenses H/E granted to The Phillies to use products and artwork developed by H/E.  And it is also ineffective as to the Phanatic artwork developed by H/E and provided to The Phillies because none of those designs were mentioned in the notice of termination.  As a matter of law, therefore, The Phillies has the right to continue to use that artwork within the scope of those licenses.

1

## I.      STATEMENT OF FACTS MATERIAL TO THIS MOTION

### A.      H/E Develops the Phanatic Costume for The Phillies in 1978, Registers It as an "Artistic Sculpture" with the Copyright Office in 1979, and Assigns All of its Rights in the Artistic Sculpture to The Phillies in 1984.

In February 1978, then Phillies Executive Vice President Bill Giles, at the urging of

Phillies Marketing Director Denny Lehman, decided to develop a new mascot for The Phillies.

SOF ¶ 1.  At the recommendation of Jim Henson, The Phillies called Bonnie Erickson, who had

founded a creative design firm with her husband, Wayde Harrison—called Harrison/Erickson

("H/E").  Pl.'s 56.1 Statement of Undisputed Facts ("SOF") ¶ 2.  On March 17, 1978, The

Phillies and H/E entered into an agreement whereby H/E would provide a design[1] and construct

a costume for $3,900.  SOF ¶ 4.  The Phillies' Dave Raymond debuted the Phanatic at a home

game on April 25, 1978.  SOF ¶ 10.  The Phanatic quickly became enormously popular.  SOF ¶

12.  Wayde Harrison noted that summer in his business diary that Raymond had created a "fun

and sensitive character."  SOF ¶ 11.

In May 1979, H/E sued The Phillies for copyright infringement.  SOF ¶ 13.  Before filing

suit, H/E filed a registration application describing the work as an "artistic sculpture" titled

"Phillie Phanatic."  SOF ¶ 14.  The Copyright Office registered the work as a "sculpture,"

describing it as "Shaggy creature wearing tennis shoes, tights & baseball shirt while carrying

pennant."  SOF ¶ 15.  On November 1, 1979, The Phillies and H/E settled the litigation and

entered into a new agreement, which acknowledged that The Phillies had "valuable trademark,

service mark and other property rights" associated with the Phanatic, and granted The Phillies

exclusive rights to use "the PHILLIE PHANATIC in costume form, and in various reproductions

of the costume."  SOF ¶¶ 16-17.  The 1979 agreement, however, left to H/E "sole and exclusive

---

[1] The Phillies contends that it is the co-author of the costume design, which defendants
dispute, but that contention is not material to this motion.

artistic control" of "all reproductions of the PHILLIE PHANATIC, including merchandise, audio visual and photographic reproductions."  SOF ¶ 18.

On October 31, 1984, the parties entered into the 1984 Agreement, whereby H/E assigned for $215,000 all of its rights in "the MASCOT," defined as "the artistic sculpture presently known as the 'Phillies [sic] Phanatic.'"  SOF ¶¶ 19-20, 26.  The agreement assigns to The Phillies "all of HE's right, title and interest in and to (a) the copyright in the artistic sculpture identified above . . . ."  SOF ¶ 24.  H/E further agreed that it would not "create any other artistic sculpture in the form of [the Phanatic] or substantially similar to [the Phanatic]."  SOF ¶ 20.

### B.    After Acquiring the Rights to the Phanatic Costume, The Phillies Builds Substantial Good Will in the Mascot.

Over the past 40 years, The Phillies has invested millions of dollars in making the Phanatic a symbol of the club and building its good will, including decades of performances at Phillies games, hundreds of charity appearances, as well as movies, commercials, and social media appearances.  SOF ¶¶ 30-32.  H/E concedes that, as a result of The Phillies' investment, the Phanatic has become a symbol of the club.  SOF ¶ 29.  The Phillies and its or Major League Baseball's licensees have created hundreds of promotional items, products, and designs based on the Phanatic, including  cartoons, bookmarks, posters, books, toys, dolls, bobbleheads, figurines, t-shirts, hats, jewelry, socks, shoes, and headbands.  SOF ¶ 33.  The Phillies' goodwill in the Phanatic is reflected in various incontestable trademarks, including in the name Phanatic, in the Phanatic's design, and in various other costume elements.  SOF ¶ 31.

Among The Phillies' investments was the payment to H/E of at least $789,627 for Phanatic costumes and artwork.[2]  SOF ¶ 27.  For example, after the 1984 Agreement was

---

[2] Combined with the license and assignment fees, The Phillies has paid Defendants over $1 million related to the Phanatic.  SOF ¶ 28.

executed, Wayde Harrison told The Phillies' Chris Long that that agreement did not cover artwork that Bonnie Erickson had previously created, and that an additional payment would be required for the rights to use that artwork.  SOF ¶¶ 40, 42.  Accordingly, in 1990, The Phillies paid H/E $1,000 for the rights to use certain pre-1984 Agreement artwork.  SOF ¶¶ 41, 43.  H/E compiled certain of its pre-1984 art into what it called the "Original Phanatic Style Guide."  SOF ¶ 44.  A style guide is used to show licensees and vendors a "good starting place"—a template or model—for designing new products.  SOF ¶ 45.

Beginning in the 1990s and up until 2018, The Phillies also paid H/E to design dozens of other Phanatic illustrations for the Phillies' use.  SOF ¶¶ 46-48, 50, 52, 54-56, 58-59, 61, 63, 65, 67, 69-70, 72.  In providing these designs to The Phillies, H/E knew and intended that The Phillies, MLB, and their licensees would use them for merchandise and promotional materials.  SOF ¶¶ 56, 60, 62-63, 71, 73-74.  H/E never informed The Phillies that its use was limited in any way.  SOF ¶¶ 49, 51, 53, 57, 64, 66, 68, 71, 73-74.

### C.    H/E Sends The Phillies a Purported Termination Notice.

On June 1, 2018, H/E's attorneys sent The Phillies' a notice purporting to terminate the 1984 Agreement effective June 15, 2020.  SOF ¶ 84.  The notice identifies the only grant subject to termination as the 1984 Agreement, and identifies the only "work" subject to termination as the one covered by the 1979 registration of the "Artistic Sculpture":

> Title – Phillie Phanatic
> Authors – Wayde Harrison & Bonnie Erickson
> Registration Number – VA 23-[7]48

SOF ¶¶ 85-88.  After a year of negotiations did not result in any agreement, The Phillies filed this declaratory judgment action on August 2, 2019.  SOF ¶¶ 89-90.

4

### D.     The Phillies Redesigns the Phanatic Costume Before June 15, 2020.

To protect its huge investment in the Phanatic in the event of possible termination, The Phillies redesigned the Phanatic costume and modified and created artwork to reflect those design changes.  SOF ¶ 91.  The redesign was done by a team of employees and former employees, including the original "Phanatic"—Dave Raymond—who had designed mascots in a partnership with Erickson and Harrison, and later at his own company.  SOF ¶ 92.  Artist Tom Sapp prepared artwork reflecting the design changes, and costume builder Randy Carfagno built the new costume.  SOF ¶¶ 93-96.  The P2 costume made its public debut on February 23, 2020 at Spring Training.  SOF ¶ 100.  After P2's public debut, Mr. Sapp and in-house Phillies artists prepared additional artwork portraying P2 in different poses and activities.  SOF ¶¶ 101-102.

## II.     LEGAL STANDARD

A party may move for partial summary judgment on part of a claim or defense.  Fed. R. Civ. P. 56(a).  The Court must grant partial summary judgment where the evidence of record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A "material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Stuart v. Am Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A "fact is 'material' when it 'might affect the outcome of the suit under the governing law.'"  *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 326 (S.D.N.Y. 2007) (quoting *Liberty  Lobby*, 477 U.S. at 248), *aff'd*, 303 F. App'x 946 (2d Cir. 2008).  "[T]o receive consideration, evidence submitted in support of or in opposition to a motion for summary judgment must be admissible at trial."  *Kleeberg v. Eber*, 2020 WL 4586904, at *12 (S.D.N.Y. Aug. 10, 2020).  The non-movant "may

not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

## III. ARGUMENT

### A. In Addition to the 368 Designs Conceded by H/E, the Phillies Has the Right to Continue to Utilize P2 and Other Designs Under Section 203(b)(1).

Any right to termination is circumscribed by the Derivative Works Exception.  Under the express terms of 17 U.S.C. § 203(b)(1), the author does ***not*** have the right to terminate a grantee's right to continue to utilize derivative works prepared under the authority of the grant being terminated.  Congress intended section 203(b)(1) to protect the investments of grantees, like The Phillies, who "contribute a great deal themselves to the success of a work and assume considerable economic risks and losses which the other does not."  Exh. 76, Statement of Barbara A. Ringer, Copyright Office, *Tr. of Meeting on Prelim. Draft for Rev. U.S. Copyright Law: Discussions of §§ 14-18* (June 11, 1963), House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Rev. Part 3, Prelim. Draft for Revised U.S. Copyright Law and Discussions and Comments on the Draft, 277 (Omnibus Legislative History Volume 3, PDF Pg. 1073).[3]

The Copyright Act contains only one definition of "derivative work":

a work ***based upon one or more preexisting works***, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, ***elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."***

---

[3] Unless otherwise stated, all exhibits cited in this brief are attached to the Declaration of David J. Wolfsohn, Esq., filed herewith.

17 U.S.C. § 101 (emphasis added).[4]  Because a derivative work must be "based upon one or more preexisting works," it by definition "borrows substantially from existing works."  *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 (2d Cir. 1982).  Thus, a work is not a derivative work unless it is ***substantially similar to, and therefore infringes***, the original work. *Well-Made Toy Mfg., Corp. v. Goffa Int'l*, 354 F. 3d 112, 117 (2d Cir. 2003) (to be a derivative work, secondary work must infringe and be substantially similar to original work); *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc*., 150 F.3d 132, 143 n.9 (2d Cir. 1998) (if secondary work sufficiently transforms the expression of the original work such that the two works cease to be substantially similar, then secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original work (citing 1 Nimmer § 3.01 at 3-3 ("a work will be considered a derivative work only if it would be considered an infringing work"))).

As compared with the original work, the secondary work has that small dash of originality necessary to make the modifications "as a whole, represent an original work of authorship."  17 U.S.C. § 101.  Thus, as with other works, originality is the "touchstone of copyright protection" for a derivative work.  *Feist Pubs, Inc. v. Rural Telephone Serv.*, 499 U.S. 340, 347 (1991).  The standard for originality is "extremely low; even a slight amount will suffice."  *Id.* at 345.  Originality, moreover, can consist of the "selection and arrangement" of otherwise non-protectable elements, such as common facial features, colors, or letters.  *See Keeling v. Hars*, 809 F.3d 43, 50-51 (2d Cir. 2015) (stage play that added non-copyrightable "commonly used individual stage directions and theatrical devices" to screenplay had sufficient

---

[4] The definition of "derivative work," like all definitions contained in section 101, applies to ***all sections of the Copyright Act:***  "Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following . . . ."  17 U.S.C. § 101.

originality to be copyrightable as derivative work); *Boisson v. Banian, Ltd.*, 273 F.3d 262, 269-71 (2d Cir. 2001) (arrangement of letters and selection of colors for alphabet quilt copyrightable); *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995) (selection of leaves and squirrels and color and layout for sweater sufficiently original to be copyrightable).[5]

The Second Circuit's decision in *Eden Toys* shows what is meant by a "slight amount" of originality. There, the Court held that a redrawn version of a Paddington Bear sketch was a derivative work. Specifically, the "changed proportions of the hat," the "elimination of individualized fingers and toes," and the "overall smoothing of lines," combined, provided a "cleaner 'look'" that met the "minimal requirements of originality." *Eden Toys*, 697 F.2d at 35.



| Original Work: "Ivor Wood Sketch," *Eden Toys*, 697 F.2d at 31. | Derivative Work: "Eden/Gibson drawing," *Eden Toys*, 697 F.2d at 31. |
|---|---|

Similarly, in *Silberstein v. Fox Entm't Grp., Inc.*, Judge Holwell held that a "Sqrat" illustration derived from a beaver image contained changes sufficiently original to be

---

[5] In contrast, courts typically deny derivative work status only where modifications are dictated by the medium or by mechanical rules (such as in a conversion from metal to plastic), or are the product of purposeful copying of the entire work (as where a copier tries to recreate preexisting material as closely as possible in some different format). *See Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905 at 908-909, 910 (2d Cir. 1980) (toys based on Disney characters not derivative works where they amounted to "mere reproduction of the Disney characters in plastic," with "no distinguishable variation" from underlying characters); *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2d Cir. 1976) (conversion of metal bank to plastic not original where it contained "no elements of difference that amounted to significant alteration or that had any purpose other than the functional one of making a more suitable (and probably less expensive) figure in the plastic medium").

copyrightable—its "tail, its ear, its whiskers, and the sign it holds in its paw" (excluding the
name "Sqrat").  424 F. Supp. 2d 616, 629, 630 (S.D.N.Y. 2004), *aff'd sub nom. Silberstein v.
John Does 1-10*, 242 F. App'x 720 (2d Cir. 2007).

| Original Work: Beaver Image, Exh. 77. | Derivative Work: Sqrat, Exh. 77. |
|---|---|
|  | |

    The Court need not go beyond a straightforward visual comparison of the original 1979
Phanatic to The Phillies' derivative works to determine that they meet the requisite level of
originality as a matter of law.  *See Weissman v. Freeman*, 868 F.2d 1313, 1322 (2d Cir. 1989)
("the evidence upon which the derivative work determination must be based is solely
documentary"), *cert. denied* 493 U.S. 883 (1989).  Courts routinely judge originality of visual art
based on such a "visual comparison."  *Eden Toys*, 697 F.2d at 35; *see also Durham Indus.*, 630
F.2d at 908-909, 910 (toys based on Disney character did not contain sufficient originality based
upon "[o]ne look at Tomy's figures" and the "mute testimony of Mickey, Donald and Pluto
themselves"); *Davidson v. United States*, 138 Fed. Cl. 159, 171 (Fed. Cl. 2018) (Las Vegas Lady
Liberty statue was derivative work of Statue of Liberty based on a "comparison of the two
faces") & Exh. 79 (comparison); *Godinger Silver Art Co., v. Int'l Silver Art Co.*, 1995 WL
702357, *3 (S.D.N.Y. Nov. 28, 1995) ("visual comparison" of Baroque silverware designs) &
Exh. 78 (comparison); *Silberstein*, 424 F. Supp. 2d at 622, 629 & n.8 (visual comparisons of
drawings) & Exh. 77 (images); *Well-Made Toy Manufacturing Corp. v. Goffa Int'l Corp.*, 210 F.

Supp. 2d 147, 164-65 (E.D.N.Y. 2002), *aff'd,* 354 F.3d 112 (2d Cir. 2003) (scaling up 20-inch

doll to 48-inch doll created derivative work because scaling requires choosing alterations to

"proportions of the various parts and their relation to one another" from among a "range of

options" that permitted "artistic discretion").

Notably, H/E has conceded that, over the years, The Phillies and licensees of MLB have

created hundreds of works based on the Phanatic that either meet this threshold for originality or

are noninfringing, including artwork, books, and merchandise.  In December 2019, in response to

interrogatories from Defendants, The Phillies painstakingly compiled a list of 399 "Derivative or

Non-Infringing Works" that The Phillies claims it can continue to utilize.  Exh. 23.  When asked

at the end of the case whether they contended that any items on The Phillies' list were ***not***

derivative works, Defendants identified only 31, leaving 368 works that Defendants concede The

Phillies may continue to use.[6]  Exh. 26 at p. 23, at Resp. to Interrogatory No. 25.

The Phillies, therefore, has the right to continue to utilize derivative works based on the

original Phanatic as long as (1) the works contain the minimal degree of originality required to

be considered "derivative works"; (2) the works were prepared before the purported termination

date—June 15, 2020; and (3) the works were prepared "under authority of the grant"—here, the

1984 Agreement.  All of those criteria are met as to the works at issue here.

---

[6] Of course, as set forth above, a work may be "derived from" a prior work, but retain so little
of the original that the two are not substantially similar, in which case the work is non-infringing,
rather than a derivative work.  *Well-Made Toys*, 354 F.3d at 117.  Some of the 368 works that
Defendants concede are original fall within this category, hence The Phillies' labeling the list
"Derivative or Non-Infringing Works."  In the case of noninfringing works, The Phillies would
have the right to use them regardless of the Derivative Works Exception.

1.      **The Phillies Can Continue to Utilize P2 because It Is a Derivative Work Prepared Under the Authority of the 1984 Grant.**

By conducting a visual comparison between P2 and the original Phanatic costume and applying the "extremely low" bar for originality described above, the Court can conclude that P2 is a derivative work as a matter of law:[7]

| Original Phanatic (Exh. 7 at HE000016) | P2 (Exh. A to Decl. of Scott Brandreth, at PHAN0042999) |
|---|---|



A visual comparison reflects that the overall design contains more than trivial original differences from the 1979 Phanatic costume.  While the changes should be considered as a whole, 17 U.S.C. § 101, some of the more notable distinctions include:  P2's squat, cylindrical

---

[7] Side-by-side comparisons of the front, side, and back of P2 and the original Phanatic costume, as well as close-ups of the respective heads, are attached to the Wolfsohn Declaration as Exh. 69.  For the original Phanatic, Defendants have identified five photos that they contend were created around the time they submitted their application to the Copyright Office.  Ex. 7 (HE000012-HE000016).  The parties dispute which, if any, of the photos were in fact submitted, *see* Dkt Nos. 96, 97, but that is immaterial here, as there is no dispute that the photos accurately depict the Phanatic as it appeared around 1979.

snout as opposed to the 1979 Phanatic's conical, longer "megaphone" snout; P2's "wing tips" extending past its operable, separate hands; articulated fingers versus more mitten-shaped hands; the large, stylized "feathers" outlining the bottoms of P2's arms; P2's "duck butt," which is longer, bigger, and angles up; P2's powder blue, wispier eyebrows and pink "eyelashes" that suggest, but do not actually depict, 5-pointed stars; P2's wider, larger head and oversized cap; and P2's round eyes with oval pupils compared to egg-shaped eyes with round pupils. SOF ¶¶ 95(a)-(j). In addition, P2 wears a differently designed jersey and dramatically different stockings and shoes. SOF ¶¶ 95(k)-(m). The feature, proportion, and clothing changes give P2 a more bird-like impression. Taken together, these differences are at least as significant as those found to be original in *Eden Toys*, *Silberstein*, *Godinger Silver*, and *Davidson*. P2, therefore, contains the minimal "dash of originality" required to be considered a derivative work under Second Circuit law. *Weissmann*, 868 F.2d at 1321.

While the Court need not look any further than the photos themselves, the undisputed factual record likewise supports this conclusion. First, though Defendants contend that P2 makes only trivial alterations to the 1979 Phanatic, they have repeatedly claimed that their other costume designs—which share numerous design elements with the 1979 Phanatic—are *entirely* original, to the point where they lack even the substantial similarity necessary to be a derivative work. In the 1984 Agreement, Defendants agreed that they would not thereafter design any mascot "substantially similar" to the Phanatic, and Ms. Erickson testified that Defendants had always complied with that obligation. SOF ¶ 76. Thus, Defendants have taken the position that "Slyly," "Sport," and "Duncan," all mascots designed by H/E that post-date the Phanatic, SOF ¶ 77, are not substantially similar to the Phanatic, even though they all share similar bodies, necks, "fur," oval/egg-shaped eyeballs, lack of mouth, long snouts, and large size:

12



| "Slyly"<br>Ex. 61 at HE003180-81 | "Sport"<br>Ex. 61 at HE003179 | "Duncan"<br>Ex. 61 at HE003176 |
|---|---|---|

SOF ¶ 77; SOF ¶ 78 (all registered separately without identifying any "preexisting works"); Exh. 8 at 121:12-124:8 (B. Erickson July 15, 2020 Dep. Tr., stating design for Duncan was not "based on another work"); SOF ¶ 79-83 (Erickson testimony on differences).

Second, Ms. Erickson has admitted that subtle decisions about the shape of a snout, the size and shape of the eyeballs, whether to use feathers or fabric for a tail, etc. are all significant creative choices. *See, e.g.*, SOF ¶ 7 & Exh. 8 (B. Erickson July 15, 2020 Dep. Tr.) at 30:7-31:4 (decision about shape of snout was "original" even though she copied shape of megaphone), 36:9-12 (decision to use scallop-shaped "eyebrows" was artistic choice); 41:8-15 (decision to cover hands with fur was significant artistic choice), 43:2-22 (decision to use three fingers and thumb was an artistic choice because "I consider myself an artist"), 46:10-24 (decision to use egg-shaped eyeballs as opposed to Henson's eyeball designs was significant artistically), 56:7-57:4 (decision to make tail out of feathers was artistically different than Henson design for tail), 73:23-74:20 (decision to use feathers for eyebrows was artistically significant different from

Henson's use of feathers for eyebrows for "Animal"), 77:12-18 (decision to use slightly different shade of green for Phanatic than Oscar the Grouch was "partly practical, partly artistic"), 79:19-81:5 (decision to use commercial egg-shaped containers for Phanatic's eyes was "artistically significant choice").  With respect to the snout, Erickson testified that the Phanatic was "built around" the snout's megaphone shape, and therefore Duncan's "sloped and shaped" snout was a "significant" difference, SOF ¶ 79, as was the decision to use "feathers" around the base of the Phanatic's snout, SOF ¶ 80.  Likewise, Erickson testified that Slyly's distinct tail and eyebrows were a "significant" difference with the Phanatic, SOF ¶ 81, as was her choice to put Slyly's egg-shaped eyes upside-down as compared to the Phanatic, SOF ¶ 82.  The different choices made by P2's designers concerning, *e.g.*, the shape of the snout, the size and shape of the eyeballs, the color of the eyebrows and eyelashes, and the design of the arms and hands are no less creatively significant that Erickson's.

Because the Court should determine by conducting a visual comparison that P2 meets the requisite standard as a matter of law for being a derivative work, there is no genuine dispute of material fact as to that issue.  Because P2 was developed before June 15, 2020, P2 may "continue to be utilized [by The Phillies] under the terms of the grant after its termination."  17 U.S.C. § 203(b)(1).  In this context—an assignment of all right, title, and interest to the underlying work—The Phillies' utilization right includes the right to reproduce P2, to distribute copies of P2, and to display P2 publicly at Phillies' baseball games, on TV, on the Phanavision screen at the ballpark, and on social media.  *See* 17 U.S.C. § 106 (listing rights of copyright owner); 3 Nimmer on Copyright § 11.02[C][1] (Derivative Works Exception permits reproduction and public display to permit continued utilization of a work).  Accordingly, The Phillies is entitled to partial summary judgment on Count V of its Complaint as to the P2 costume.

14

2.      **The Phillies Can Continue to Utilize Particular P2 Artwork Because It Consists of Derivative Works Prepared Under the Authority of the 1984 Agreement.**

The Phillies is also entitled to continue utilizing artistic renderings of P2, depicted in Exhibit B to the Declaration of Scott Brandreth, created by Tom Sapp and in-house Phillies artists.  The P2 Artwork falls within the Derivative Works Exception for the same reason that the P2 costume does—the illustrations are original works created before June 15, 2020, SOF ¶¶ 94, 101-102, embodying all the design changes reflected in the P2 costume. *See supra* pp. 11-12.

Exh. B to Brandreth Decl., at PHAN0043558



In addition, the P2 Artwork reflects original and significant artistic choices about how to depict the costume in 2-D.[8]  H/E cannot seriously contend that these designs are not sufficiently original derivative works as compared to the original Phanatic costume since H/E contends that its own drawings created before 1984 "reflect[] significant artistic choices," Exh. 80 at 3 (B. Erickson Suppl. Expert Disclosure), and are separately entitled to copyright protection, *see*

---

[8] Each drawing reflects imaginative, artistic decisions to translate a 3-D costume into 2-D drawings.  *See, e.g.*, *Ward v. Andrews McMeel Pub., LLC*, 963 F. Supp. 2d 222, 234 (S.D.N.Y. 2013) (illustrations depicting stick figure in different configurations displayed minimal modicum of creativity needed for copyright protection); *Stratton v. Upper Playground Enterprises, Inc.*, 2010 WL 5313317, at *4 (C.D. Cal. Dec. 16, 2010) (illustrations of common item, using lines, shapes and angles of artist's choosing sufficiently original for copyright protection).

Amended Counterclaims ¶ 60 & Ex. B ("[I]ndependent registrations for the works listed on Exhibit B were filed with the U.S. Copyright Office . . . .").

The Phillies also has the right to continue to use the "P2 3-D Turnaround" illustration created by Tom Sapp. This design is markedly different from the 1979 Phanatic costume—much more so than the Paddington or Sqrat drawings. *See supra* pp. 8-9.



**Ex. 67 (PHAN0043055)**

The Phillies is also entitled to continue to utilize the 2007 3-D Turnaround created by H/E for The Phillies because that illustration is itself a derivative work prepared under the authority of the grant. This design was created for The Phillies for an MLB Style Guide, which serves as a model or template for licensees to develop Phanatic merchandise. SOF ¶¶ 45, 59-60.



**Exh. 41 at 2**

16

The 2007 3-D Turnaround "reflects significant artistic choices" just as Bonnie Erickson contends her other Phanatic illustrations do, Exh. 80 at 3 (B. Erickson Suppl. Expert Disclosure). And the 2007 3-D Turnaround is no less original than the hundreds of other Phanatic illustrations and designs that H/E has conceded are derivative or noninfringing works.  Ex. 26, at p. 23, Resp. to Interrog. No. 25; Ex. 23 (App'x A to Phillies' Interrog. Response).

Because the P2 illustrations depicted in Exhibit B to Mr. Brandreth's Declaration, the P2 3-D Turnaround (Exh. 67 at 3), and the 2007 3-D Turnaround (Exh. 41 at 3) all meet the low bar for originality under the Second Circuit standard, they are all derivative works that The Phillies can continue to utilize after June 15, 2020.[9]  The Phillies therefore is entitled to partial summary judgment on Count V of its Complaint as to these works.

### 3.    Defendants' Proposed Expert Testimony on "Creativity" and "Artistic Significance" Is Not Admissible.

In a misguided attempt to try and manufacture an issue of fact, Defendants have disclosed Ms. Erickson and storyboard artist David Zung as "experts" to testify that the modifications made to P2 lack sufficient "artistic significance" or "creativity" to qualify as a derivative work. Defendants proffer Ms. Erickson for the opinion that the "alterations to the original Phanatic with respect to the P2 costume and artwork are . . . of less than minimal artistic significance." Exh. 80 at 5 (B. Erickson Suppl. Expert Disclosure).  Zung states that the P2 "modifications ultimately do little to change the impression that P2 is the exact same mascot as P1." Exh. 81 at 24 (Zung Report).  He also claims that the redesign does not "amount to more than a trivial amount of creativity" and that the design choices "reflect the use of prior artistic expression without any creative attempt at reinterpretation."  *Id.*  Neither of these proposed expert opinions

---

[9] All of these illustrations were developed before June 15, 2020 under the authority of the 1984 Agreement.  SOF ¶¶ 59, 94, 96.

17

creates a genuine issue of material fact.

At the outset, Zung's opinion should be excluded because he admitted that he is not an "expert on the design of sports mascot costumes," and therefore has no basis to testify about "originality" or "creativity" applied to the mascot design field. Exh. 83 at 139:9-12 (Zung July 21, 2020 Dep. Tr.). But regardless of qualifications, the Court must disregard both Zung and Erickson's opinions at the summary judgment stage because they do no more than offer subjective, contradictory, and arbitrary opinions about what is and is not "creative," unmoored from any reliable methodology. *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (district court must assess admissibility of expert testimony at summary judgment stage). To the contrary, to the extent Zung and Erickson purport to have a "methodology" at all, it is one that bears no connection to the Copyright Act's originality standard, and it produces arbitrary and absurd results. Their opinions must be excluded as unreliable and unhelpful to the trier of fact.

Federal Rule of Evidence 702 requires that an expert's opinion "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Moreover, an expert's opinions must be the "product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.* at 702(c), (d). The court acts as a "gatekeeper," only admitting expert testimony after making a threshold determination that the expert and his or her opinion satisfy these standards for admissibility. *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharma, Inc.*, 509 U.S. 579, 592-03 (1993). In doing so, the Court must scrutinize both the "validity of the expert's methodology," and the "analytical connection between the application of the expert's proffered theory to the facts at issue." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 350 (S.D.N.Y. 2005).

18

First, both Zung and Erickson purport to offer what is in essence a *legal* opinion on the ultimate issue of whether the works at-issue contain sufficient originality to be copyrightable. As set forth above, the appropriate originality analysis involves a simple visual comparison by the Court, and there is therefore nothing in Zung or Erickson's opinion that would help this analysis. As a result, courts routinely exclude opinions of experts who purport to testify as to the ultimate issue of what is and is not original under the Copyright Act. *See We Shall Overcome Foundation v. The Richmond Organization, Inc.*, 2017 WL 3981311, at *20-21 (S.D.N.Y. Sept. 8, 2017) (excluding expert opinion that addition of single word was original where court could conclude as a "matter of law" that addition was not original); *Durkin v. Platz*, 920 F. Supp. 2d 1316, 1330 (N.D. Ga. 2013) (purported expert with no expertise in copyright law was not qualified to opine on whether screenplay was a derivative work of an underlying manuscript); *Design Basics, L.L.C. v. Deshano Companies, Inc.*, 2012 WL 4340784, at *3 (E.D. Mich. Sept. 21, 2012) (excluding opinion on originality where expert attempted to opine on what was and was not original within the meaning of the Copyright Act); *Paul Morelli Design, Inc. v. Tiffany & Co.*, 200 F. Supp. 2d 482, 487 (E.D. Pa. 2002) (expert testimony on the "ultimate issues of originality and creativity" would not assist jury since court instructed jury on the law).

Second, Zung and Erickson's opinions should be excluded because they do not apply the correct standard for determining what is a derivative work. In *Durkin*, the court excluded an expert's opinion on the ground that his methodology did not conform to the derivative work standard because he required the work in question to have "significant" additions to the underlying manuscript on the order of an "entire scene, major character, or plot event that would alter the reader's/viewer's reception of the work's focus and theme." 920 F. Supp. 2d at 1331.

Zung and Erickson both make a similar mistake because they conclude that if P2 is "recognizable as the Phanatic" then it cannot be a derivative work.  Exh. 81 at 28 (Zung Report); Exh. 8 at 118:23-119:8, 120:3-11; 154:9-157:12 (B. Erickson July 15, 2020 Dep. Tr.) (as long as changes to Phanatic result in something people perceive as the Phanatic, then by definition those changes are not creative; "I think the character is still perceived as the Phanatic and I think that if you had done any creative changes, you wouldn't perceive it that way."); Exh. 81 at 2 (Zung Report) (to be a derivative work, the "differences between P2 and P1" must "set P2 apart as a new creative work, whether in a marketplace or from an artistic point of view.").  By this logic, since all the Paddington drawings look like Paddington and the different designs of the Statue of Liberty still show Lady Liberty, they cannot be derivative works.  This is the opposite of the correct methodology for assessing the originality of a derivative work.  As set forth above, a derivative work is *by definition* substantially similar to the underlying work, and thus will always be "recognizable" as the underlying work.  *Well-Made Toy Mfg.*, 354 F.3d at 117; *Castle Rock Entertainment*, 150 F.3d at 143.  P2 *must* be recognizable as "the Phanatic" for it to be a derivative work.  Thus Erickson and Zung assume that the very thing that makes P2 a derivative work somehow disqualifies it.[10]

Moreover, Erickson and Zung both engage in a piecemeal analysis that subtracts individual design elements from the overall design if they think they can find an analogous

---

[10] Zung did not apply the Second Circuit's *Eden Toys* standard correctly because he came out with a contrary opinion:  In his view, all of the changes that the Second Circuit found to be original were trivial and not creative, Exh. 83 at 36:3-47:21 (Zung July 21, 2020 Dep. Tr.), and the combination was also trivial because it was not "transformational or interpretative" and it "doesn't add anything new conceptually to the character," *id.* at 47:22-51:16.  Zung applied this incorrect standard in evaluating the P2 design for originality.  *Id.* at 51:17-25.  Of course, ideas are not copyrightable, so whether P2 offers a new "concept" is entirely beside the point.  17 U.S.C. § 102(b) ("In no case does copyright protection extend to any idea, procedure, process, . . . concept . . . ").  Copyright protects the expressions of concepts, not concepts themselves.

"concept" in some preexisting "prior art"—whether on costumes, airplanes, or beer bottles.  Exh. 83 at 29-68 (Zung Report).  But they take the opposite approach when they conclude that Erickson's and others' designs are "creative"—there, they consider the works as a whole. *Compare id.* at 73-74 (concluding that three mascots with baseball heads all, as a whole, "create a unique impression") *with* 29-68 (analyzing each element of P2 separately).  Neither of them ever actually compared P2 as a whole to another mascot in the marketplace.  Had they done so, they would have had to conclude that P2 is markedly different.  Because originality exists in the selection and arrangement of otherwise unprotectable, common elements, to fail to consider the work as a whole is legal error, and warrant exclusion of an expert's opinion.  *See Boisson*, 273 F.3d at 269-71; *Design Basics*, 2012 WL 4340784, at *4 (excluding expert opinion as not conforming to the law because it "failed to consider the [work] as a whole").  Indeed, if that were not the case, then the original Phanatic would not be copyrightable either, as it, like any design, could be broken down into constituent design elements that existed before.  *Knitwaves*, 71 F.3d at 1003 (cautioning against "dissecting [works] into their separate components" because "if we took this argument to its logical conclusion, we might have to decide that 'there can be no originality in a painting because all colors of paint have been used somewhere in the past'"); Exh. 8 (B. Erickson July 15, 2020 Dep. Tr.) at 11:6-13:20 (elements of original Phanatic design existed before), 14:15-15:2 (Henson designed large white eyeballs with very dark black pupil), 18:9-20:5 (Henson designed character with horn-shaped snout), 42:6-10 (Henson designed characters with four fingers), 64:19-65:8 (Henson's Rowlf had oval eyes), 71:4-74:24 (Henson's "Animal" used feathers for eyebrows), 84:14-85:15 (snout in precursor drawing for the Phanatic

may have been inspired by Henson drawing of "Snerff").[11]  And in any event, Zung and

Erickson's method requiring P2 to reflect "novel" concepts, meaning distinguishable over "prior

art," is not a copyright law concept at all.  *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d

133, 135 (2d Cir. 2004) (the "proposition that standard or common features are not protected is

inconsistent with copyright law"; "a work need not be particularly novel or unusual"); *Alfred*

*Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 101 (2d Cir. 1951) ("The novelty of the art or

thing described or explained has nothing to do with the validity of the copyright.").[12]  Zung and

Erickson thus improperly discount individual elements that they find to be not sufficiently

"novel" or "creative," rather than applying the correct approach of asking whether the selection

and arrangement of elements on P2 is creative as a whole.

Third, because their methods are unreliable and their opinions conclusory and results

oriented, neither Zung nor Erickson "reliably appl[y] the principles and methods to the facts of

the case."  Fed. R. Evid. 702; *see also Durkin*, 920 F. Supp. 2d at 1332 ("Naturally, the result of

---

[11] When considering the original Phanatic, Zung finds it to be creative by assessing the "totality of it," claiming he had not "seen anything that looks like this before." Exh. 83 at 55:5-21 (Zung July 21, 2020 Dep Tr.).

[12] Zung's improper "prior art" methodology infects his entire report.  He discounts P2's new "wings" because he finds the "***concept*** of a 'winged' mascot" to be "commonplace." Exh. 81 at 45 (Zung Report).  He concludes that P2's blue socks are not a "creative change" because P2 appeared on one occasion in the past wearing different blue and red socks. *Id.* at 48.  He concludes that P2's shoes bearing an image of the Liberty Bell are not a "creative depiction" because he found similar "graphic representations of the Liberty Bell" on the internet. *Id.* at 56. He concludes that the choice of star-like eyelashes for P2 is not "creative" because a "five-pointed star motif is in fact extremely ubiquitous in popular culture." *Id.* at 61.  (In fact, P2 does not use five-pointed stars at all, as Zung reluctantly admitted, notwithstanding improper coaching by his counsel. Exh. 83 at 209:21-215:9 (Zung July 21, 2020 Dep. Tr.).  No other mascot uses this particular design.  He concludes that P2's "duck butt" is not "an original ***concept***" because it is "reflected in numerous cartoons and mascot designs." Exh. 81 at 38 (Zung Report).  But he then applies the opposite approach to the original Phanatic, claiming that "scalloped" eyelashes are creative because no real creature has eyelashes like them. Exh. 83 at 76:20-77:7 (Zung July 21, 2020 Dep. Tr.)—ignoring the fact that no real creature has pink, star-like eyelashes either.

an unqualified expert using unreliable methods is an irrelevant opinion.")  To the contrary, Zung

and Erickson reach completely arbitrary conclusions, highlighted by the examples below.

***Other "Updated" Mascots.*** Zung identifies the Lucky Charms Leprechaun as an example

of a mascot that has undergone "significant change," in comparison to P2, whose changes Zung

finds "trivial."  Exh. 81 at 20-21 (Zung Report).  Zung identifies several artistic changes that he

contends would make the current version of the Leprechaun a derivative work of earlier versions:

> In some versions the colors have changed from a medium green to a dark green, the
> hat shape has changed, the color of the shirt changes, the color of the pants change
> but most significantly the face has undergone quite significant changes in shape
> and proportion.

*Id.* at 20.  Zung contrasts several pictures to show these changes, including:



*Id.* at 21.  Zung offers no reasoning for why he concludes that the change of colors from

"medium green to dark green" along with the "color of the shirt" are significant on the Lucky

Charms Leprechaun, but marked changes in color and clothing on P2 are somehow insignificant.

*Id.* at 46-57 (discussing uniform, shoes, and socks); Exh. 82 at 1-3 (Zung Suppl. Report)

(discounting color changes, such as different shade of blue, purple, and green in P2, because they

are "within the same color range").  Zung similarly applies a double standard regarding the

Leprechaun's face—saying it has "undergone quite significant changes in shape and proportion,"

while at the same time discounting the numerous changes to the shape and proportion of the

Phanatic's head, hat, snout, and other facial features.  Exh. 81 at 20.  Zung offers no reason for

why, when it came to other mascots, he fails to apply his "rule" that a mascot is not "creative" if

the changes leave it "recognizable," *id.* at 28, despite the fact that all the mascots he identifies as

23

having undergone "significant" updates—the Leprechaun; Snap, Crackle, and Pop; the Michelin Man; and Bugs Bunny—are "instantly recognizable" as their former selves, *id.* at 19-23.

*Clothing and Shoes*. Zung rejects out-of-hand the notion that P2's redesigned jersey, stockings, and new shoes are creative because, under Zung's P2 methodology, an "outfit change to P2 . . . does not constituted a design change." *Id.* at 49; *see also id.* at 51 (shoe changes not significant because "Phanatic can change shoes and still be the Phanatic"); Exh. 83 at 184:23-185:2 (Zung July 21, 2020 Dep. Tr.) (uniform not part of the design). But Zung takes precisely the opposite approach with other mascots, lauding their "distinctive" artistry largely based on their clothing. Zung finds that the Atlanta Braves "Homer," the Cincinnati Reds' Mr. RedLegs, and Mr. Met—all of which have heads that look like baseballs—are all creatively distinguishable from each other largely because of their different shoe designs. Exh. 81 at 57 (Zung Report). Somehow, Mr. Met's  black "ankle-cut athletic shoe" with a "swoosh" and "white piping" is "distinctive," Homer's all black shoes are "creative" because they feature the Braves' "distinctive cursive A," Mr. RedLegs' all-black athletic shoe is creative because it is "exaggerated in size," and H/E's designs for shoes and socks for the Phanatic were creative. Exh. 81 at 57 (Zung Report); Exh. 83 at 62:7-63:12 (Zung July 21, 2020 Dep. Tr.). But to Zung, P2's stockings and shoes—a mix of red, white, and blue, with a Liberty Bell logo on the side— are not even part of the design.[13] Exh. 81 at 48-57 (Zung Report); Exh. 83  at 184:23-185:2 (Zung July 21, 2020 Dep. Tr.).

---

[13] Zung also asserts that to determine whether changes are "significant" on P2, one must "take into account the context in which a team mascot is expected to appear," which Zung wrongly assumes is only in a stadium in front of fans. Exh. 81  at 25 (Zung Report). But Zung uses zoomed-in pictures of the three other mascots discussed above, all with prominent heads decorated as baseballs, to analyze small differences to conclude that the three mascots are significantly different. *Id.* at 57 (Zung Report). Zung not only is not an expert in mascot design, as he admitted, but he apparently knows nothing about baseball. First, as can been in Exh. A to

Similarly, Zung argues that minor changes to the clothing of Snap, Crackle, and Pop were "creative and significant," but he discounts entirely the changes to P2's jersey, shoes, socks, and hat.  Exh. 83 at 93:8-14 (Zung July 21, 2020 Dep. Tr.); *id* at 184:23-185:2 (uniform is not part of the design of P2).  Zung also repeatedly dismisses the changes to P2 as "purely cosmetic" or as "cosmetic updates"—apparently on the theory that a "cosmetic" change is not creative.  *E.g.*, Exh. 81 at 1, 4, 7, 10, 13 (Zung Report).  But "cosmetic" details—which are all about appearance—are of course a key part of any costume design. There is no rhyme or reason to this "methodology."

Although Erickson's disclosure as a party expert under Fed. R. Civ. P. 26(a)(2)(C) did not require her to prepare a report that would show how she applied her unreliable methodology in specific instances, her deposition testimony revealed an equally subjective, contradictory, and results-oriented approach.  As explained above, when it came to her own works, she judged every difference between her Phanatic design and other mascots or Jim Henson's designs (which she was exposed to when she worked for him before designing the Phanatic) to be  "significant," "artistic," and "creative"—whether it was snout shape, eye shape and position, or eyelash and eyebrow shape, material, and color; but when it came to P2, every single design difference is deemed "slavish."  Exh. 2 (B. Erickson Feb. 7, 2020 Dep. Tr.) at 215:7-19 (changing orientation of eyes on mascot was "a significant difference" when Erickson did it), 216:3-21 (differences in tail and eyebrows "significant" between two mascots), 221:16-222:6 (on Duncan, the "sloped and shaped" snout without feathers at the base is a "significant" difference from Phanatic's

---

Defendants' Amended Counterclaims, the Phanatic is typically seen in camera close-up or social media, not from far away in the stands.  Moreover, incredibly, Zung was apparently unaware that in 2020 there were no fans at all in the stands at any MLB games, and so unfortunately no fan got to see P2 from a seat in the ballpark this year.

"megaphone" snout), 60:12-61:5 (addition of party blower tongue was a significant difference

between March 1978 sketch that she made and 1979 Phanatic costume), 65:11-20 (removing fur

"rings" from neck of preliminary was a significant difference from 1979 Phanatic costume),

81:3-10 (choosing  star-shape for back of Phanatic jersey was a "significant contribution" to the

jersey).  At the end of the day, Erickson does not analyze P2 as a whole, she mistakenly assumes

that if P2 is recognizable as the Phanatic it does not reflect "any creative changes," Exh. 8 at

154:9-157:12 (B. Erickson July 15, 2020 Dep. Tr.), and her conclusions about what is

"significant," "creative," or "original" are completely subjective.  At perhaps the most revealing

point in her deposition, she suggested that whatever she does is artistic "because creating

characters is what I do.  I believe that's enough.  It's my job."  Exh. 8 at 104:9-15 (B. Erickson

July 15, 2020 Dep. Tr.).  Since, in her mind at least, the P2 design team apparently is not up to

her standards, nothing they did was creative.

Erickson's subjective conclusions based on a complete misunderstanding of the standard

for determining what is a derivative work are as unreliable and as unhelpful as Zung's.  Because

Zung's and Erickson's opinions as to originality are inadmissible, the Court should disregard

them at the summary judgment stage.

### B.      H/E's Purported Notice of Termination Is Not Effective as to H/E's Post-1984 Grants of Rights to H/E Artwork.

Aside from the Derivative Works Exception, The Phillies has the right to continue to use

certain Phanatic artwork created by H/E because it was licensed to The Phillies after the 1984

Agreement was executed and neither the licenses nor the artwork were listed in H/E's Notice of

Termination.  H/E's Notice purported to terminate *only* the grant of rights in the 1984 Agreement

to one work—the Phanatic costume.  Therefore, even assuming the Notice is effective at all,[14] it did not terminate *all* of The Phillies' interests in the Phanatic because the Notice did not terminate The Phillies' licenses from H/E to use the Phanatic artwork.  The Phillies is therefore entitled to partial summary judgment on H/E's claim that H/E's Termination Notice effectively terminated all of The Phillies' copyright interests related to the Phanatic.

The regulations governing the form and content of a Section 203 termination notice specify that the notice "must include a clear identification of" several items, including "[t]he date of execution of the grant being terminated," "[a] brief statement reasonably identifying the grant to which the notice of termination applies," and "[f]or each work to which the notice of termination applies, the title of the work and the name of the author . . . and, if possible and practicable, the original copyright registration number." 37 C.F.R. §201.10(b)(2).  H/E's June 2018 Notice identifies October 31, 1984 as the date of execution of the grant being terminated, and does not identify any licenses granted by H/E on any other date.  SOF ¶ 85; Exh. 65.  And the brief statement reasonably identifying the grant to which the notice of termination applies similarly refers only to the October 31, 1984 grant.  SOF ¶ 87; Exh. 65.

Each time H/E delivered artwork to The Phillies over the course of the past three decades, H/E separately "granted" The Phillies the rights to use that artwork by implied license.  An implied license exists where "the totality of the parties' conduct indicates an intent to grant permission to use the copyrighted work." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 141 (S.D.N.Y. 2019).  In determining whether an implied

---

[14] The Phillies maintains that H/E's Notice of Termination does not terminate The Phillies' rights in the Phanatic because The Phillies is a co-author of that design, The Phillies created the copyrightable "character" of the Phanatic, H/E has already "used up" its claimed termination rights, and Section 203 does not apply to the sale of a design that both parties intended to be a trademark/brand.  The Phillies reserves those claims for trial.

license exists, courts focus on "whether the putative licensor delivered the work [to the licensee] with the intent that the licensee copy and distribute it." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 122 (S.D.N.Y. 2012). "'[C]onsent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license. . . .'" *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp. 944, 947 (S.D.N.Y. 1997) (citation omitted).[15]

The Phillies paid H/E to design dozens of Phanatic illustrations between 1992 and 2018. SOF ¶¶ 47-73. H/E delivered the illustrations to The Phillies intending that they be used broadly for marketing and merchandise—including in the "Style Guide" that would be given to licensees as the basis for merchandise designs—and without informing the Phillies as to *any* limitations regarding its use of the artwork. SOF ¶¶ 47-75. Although there were no written express agreements relating to The Phillies' use of those works, H/E developed the artwork for The Phillies and delivered it with the intent that The Phillies copy and distribute it, thus creating an implied license each time artwork was delivered. SOF ¶¶ 47-75.

The Phillies also had an implied license to Phanatic illustrations Erickson designed before 1984. Those illustrations were not included in the 1984 grant. The 1984 Agreement is clear that it transferred to the Phillies H/E's copyright in "the MASCOT," defined as "the artistic sculpture

---

[15] The Second Circuit has not ruled on the requirements for finding an implied license. In *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* the Second Circuit wrote in dicta that "courts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" 211 F.3d 21, 25 (2d Cir. 2000) (quoting *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990)). District courts in this circuit have since said that the three requirements referred to in *SmithKline* are not required in all circumstances to find an implied license. *See, e.g., Psihoyos,* 855 F. Supp. 2d at 124; *Gasery v. Kalakuta Sunrise, LLC,* 422 F. Supp. 3d 807, 815-16 (S.D.N.Y. 2019); *see also Interscope Records v. Time Warner, Inc.,* 2010 WL 11505708, at *4, 8-9 (C.D. Cal. June 28, 2010) (holding that "nothing in *Effects Associates* establishes that these three elements are *necessary* requirements for an implied license").

presently known as the 'Phillies Phanatic.'"  SOF ¶¶ 20-22.  The assignment transferred H/E's

rights in that specific work, not mentioning H/E's rights in any existing or future artwork:

> HE, for good and valuable consideration, . . . hereby sells, assigns, and transfers to the PHILLIES, its successors and assigns, all of HE's right, title and interest in and to (a) *the copyright in the artistic sculpture identified above*, and all renewals and extensions thereof and (b) any and all causes of action heretofore accrued in HE/s favor for infringement of said copyright.

SOF ¶ 24; *see also* SOF ¶ 25 (second form of assignment attached to 1984 Agreement).

It was not until after the execution of the 1984 Agreement that The Phillies expressed

interest in using the Phanatic artwork that had been created by H/E before 1984.  SOF ¶ 40.

When the Phillies asked Wayde Harrison about using H/E's pre-1984 artwork, Mr. Harrison said

that *the 1984 Agreement did not include H/E's 2-D artwork*.  SOF ¶¶ 41-42.  The Phillies

agreed to pay H/E $1,000 for the right to use the art for promotional and merchandising

purposes, with no limitations.  SOF ¶ 43.  H/E thus provided the Phillies a "grant" of rights—

separate from the 1984 Agreement—to use the artwork by implied license.[16]

Each of the separate implied licenses for the 2-D Phanatic artwork created by H/E is a

separate "grant" that is independently subject to potential termination under Section 203 at the

time and under the process specified in Section 203.  17 U.S.C. § 203(a) ("[T]he exclusive or

nonexclusive grant of a *transfer or license* of copyright or of any right under a copyright . . . is

subject to termination under the following conditions . . . ."); *see also, e.g.*, *Horror Inc. v. Miller*,

335 F. Supp. 3d 273, 318-19 (D. Conn. 2018) (holding that a "grant" of an implied license "is

subject to section 203's termination right"), *appeal filed* No. 18-3123 (Oct. 19, 2018); *Talkisp*

---

[16] H/E compiled this pre-1984 artwork into a "Style Guide"—a term H/E knew referred to a collection of artwork that could be used as a template for the Phillies or its licensees to design new products, renditions, and reproductions.  SOF ¶¶ 44-45.

*Corp. v. Xcast Labs., Inc.*, 2005 WL 3466618, at \*8 (N.D. Iowa Dec. 19, 2005) (implied license

not terminated where formalities of Section 203 were not followed), *report and recommendation*

*adopted*, 2006 WL 8456904 (N.D. Iowa Mar. 30, 2006).  Because the Notice did not identify any

grant other than the 1984 Agreement, the termination is not effective as to any of the later-

granted licenses to H/E's artwork.  *See, e.g.*, *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d

610, 622-23 (2d Cir. 1982) (holding that termination of grant related to an original book and

certain sequels did not affect licensee's right to use other sequels not included in the termination

notice); *Scorpio Music S.A. v. Willis*, 2012 WL 1598043, at \*3-4 & n.2 (S.D. Cal. May 7, 2012)

("the term 'grant' refers to a *single* transaction"; author's termination of one "grant" had no

effect on separate, related transfers of copyright interests).

     Moreover, even if some of the 2-D artwork had been included in the 1984 grant, the

Notice of Termination is not effective as to any of the artwork because no artwork was identified

in the Notice.  As to the work to which the notice of termination applies, the Notice identified

only the Phanatic costume:

> Title – Phillie Phanatic
> Authors – Wayde Harrison & Bonnie Erickson
> Registration Number – VA 23-[7]48

SOF ¶¶ 85-86.  H/E's dozens of 2-D drawings of the Phanatic not identified.[17]

---

[17] The passing reference to "two and three dimensional drawings *of the work* consisting of a
shaggy creature wearing tennis shoes, tights and a baseball shirt while carrying a pennant" in the
"brief statement reasonably identifying the grant" is not sufficient to incorporate the many 2-D
drawings of the Phanatic that were created by H/E over the years.  Even that reference refers to
the relevant "work" as the artistic sculpture, as described by the Copyright Office in "notes"
associated with the registration.  SOF ¶¶ 15, 85.  In the sections of the Notice describing the
work to which the Notice applied, there is no reference to any details (i.e., titles of the works,
dates of publication, dates of the licenses) that would suggest that the Notice was intended to
apply to anything other than the Phanatic costume.  Exh. 65 at 4.  Similarly, although the letter
attaching the Notice mentioned "artwork," it only did so in the statement, "As you know,
[Bonnie Erickson and Wayde Harrison] created the copyrighted character and accompanying

"[O]nly the works specified in a termination notice are terminated, even where the notice purports to terminate a grant including more works than actually listed in the notice." *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 380 (S.D.N.Y. 1999) (citing *Burroughs*, 683 F.2d at 621-23). The Second Circuit explicitly addressed this issue in *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, a case in which the purported termination notice at issue related to "Tarzan of the Apes" and a series of sequels written by Edgar Rice Burroughs. The notice of termination listed 35 of Burroughs's works, including "Tarzan of the Apes," but it did not mention five of Burroughs's subsequent Tarzan books. *Id.* at 618.[18] The court explained that, "[t]o be effective, a notice of termination under § 304(c) must clearly identify 'the grant to which the notice of termination applies,' and must list the title, author, and date of original copyright for 'each work to which the notice of termination applies.'" *Id.* at 622 (quoting 37 C.F.R. § 201.10(b)).[19] The Second Circuit held that, because five of the Tarzan books were omitted from the list of works to which the notice of termination applied, the termination did not apply to those five books, and,

---

artwork for the Phillie Phanatic," and not in the context of any works that were to be affected by the Notice. SOF ¶ 84; Exh. 65 at 1. The letter refers to only one "work" affected by the Notice—the Phanatic costume. SOF ¶ 84; Ex. 65 at 1 ("[W]e would like to immediately commence a renegotiation for this grant with The Phillies for the remainder of the copyright term of ***the work***, so that The Phillies may continue to use the Phillie Phanatic.").

[18] Burroughs transferred his rights in all of his literary works, including the original "Tarzan of the Apes" book and several sequels, to a corporation formed to control the rights to his works, ERB, Inc. *Burroughs*, 683 F.2d at 614-15. ERB thereafter granted MGM the rights to create an original story, a film, and remakes of the film based on the Tarzan character and other characters in fourteen Tarzan books written by Burroughs. *Id.* Burroughs's heirs served a termination notice on ERB purporting to exercise their termination rights under 17 U.S.C. § 304. *Id.* at 617-18. Five of the 14 books included in ERB's license to MGM were omitted from the termination notice. *Id.* Burroughs's heirs argued that their notice served on ERB effectively "terminated whatever character license MGM had under" its license agreement with ERB. *Id.* at 621. The Second Circuit disagreed.

[19] Although *Burroughs* involved a termination under Section 304, termination notices under either Section 304 or Section 203 must list the title of the work, the name of the author, the date of publication of the work, and, if possible, the copyright registration number. *Compare* 37 C.F.R. § 201.10(b)(1)(iii)-(iv) *with* 37 C.F.R. § 201.10(b)(2)(iii)-(iv).

accordingly, the license as to them remained in effect. *Id.* at 622-23.  And, even though "Tarzan

of the Apes," in which the Tarzan character made its first appearance, was covered by the

termination, the licensee still had the right to use and reuse the Tarzan character by virtue of its

right to use the five omitted books because, "[w]hen an author grants the rights to a work that

contains material protected by the author's copyright in an earlier work, the grant implicitly

authorizes the use of all material contained in the licensed work, including material that may be

covered by the author's other copyrights." *Id.* at 622.  Pursuant to *Burroughs*, because H/E's

Notice only listed information about the Phanatic costume and omitted the artwork created by

H/E and based on the Phanatic, the Phillies' interests in the artwork remains intact. *Id.* at 622.

### C.    CONCLUSION

Accordingly, The Phillies respectfully requests that the Court grant it partial summary

judgment.

### COUNTERCLAIM DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AMENDED COUNTERCLAIM

Stripped of its inappropriate invective and meandering brief-like legal argument, H/E's

copyright infringement allegations fail to state a claim under Rule 12(b)(6).  First, to the extent

H/E is claiming that The Phillies is infringing its copyrights by using and/or selling unspecified

artwork and merchandise, H/E fails to allege what specific infringing acts are at issue—an

essential element for pleading a copyright infringement claim.  This is particularly important in

this context because even H/E has admitted that The Phillies can continue to utilize 368 designs

without infringing H/E's purported copyrights.  Second, H/E's claim is based, at least in part, on

several 2-D Phanatic drawings that are not registered with the Copyright Office.  Because

registration of the at-issue copyrighted works is a prerequisite to suit, H/E's claim fails to the

extent it is based on those unregistered drawings.  Third, to the extent H/E's infringement claim

is based on The Phillies' use of its new design for the Phanatic costume—"P2"—H/E's claim

fails as a matter of law. The Court need look no further than the pleadings and the documents

H/E relies upon in bringing its infringement claim to determine that P2 is a derivative work that

The Phillies may continue to utilize pursuant to 17 U.S.C. § 203(b)(1). As a result, H/E fails to

state a claim for copyright infringement and its counterclaim for infringement must be dismissed.

## I.    RELEVANT ALLEGATIONS IN THE AMENDED COUNTERCLAIMS

In 1984, H/E assigned to The Phillies the copyright in "the artistic sculpture presently

known as the 'Phillies Phanatic,'" which had been registered with the Copyright Office in 1979.

Compl., Ex. G (incorporated by reference into Amended Counterclaims ("AC") ¶ 1 & Answer ¶

1); *see also* AC ¶¶ 14, 15. In June 2018, H/E sent a notice of termination of the 1984 assignment

to the Phillies, listing an effective termination date of June 15, 2020. H/E Answer ¶ 8. Before

June 15, while the 1984 assignment was in effect, The Phillies created a new version of the

Phanatic, referred to as "P2," as well as a "P2 Style Guide" containing P2 artwork. AC ¶¶ 18,

27. P2 was introduced at the Phillies' Spring Training on February 23, 2020. AC ¶ 18. Since its

debut, The Phillies has utilized P2 as a mascot appearing at baseball games and in promotional

photos and videos. AC ¶ 25.

In its new cause of action for copyright infringement, H/E alleges that The Phillies has

somehow infringed its registered copyright in the Phanatic costume, as well as H/E's copyright

in certain unregistered artwork depicted in Exhibit B, although by what acts, it is not clear. AC

¶¶ 60-61. H/E seems to allege that the Phillies has infringed by utilizing the P2 costume in the

"non-exhaustive list" depicted in Exhibit A, AC ¶ 25, by utilizing unidentified Phanatic

"artwork" in unspecified ways, AC ¶ 17, and by selling unidentified "merchandise," AC ¶ 30.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id.*  Although the Court must accept all allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, "legal conclusions, deductions or opinions couched as factual allegations" are not entitled to "a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks and alterations omitted).  When considering a motion to dismiss, the Court may consider works referenced in the complaint, as well as "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possess or knew about and upon which they relied in bringing the suit.'" *Guity v. Santos*, 2019 WL 6619217, at \*2 (S.D.N.Y. Dec. 5, 2019) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)).

## III.    ARGUMENT

### A.    H/E Fails to Plead Infringement with the Requisite Specificity.

To state a claim for copyright infringement, a plaintiff must allege "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994).  The plaintiff's allegations must set out the "particular infringing acts . . .  with some specificity." *Id.* at 36 n.3.  Given "the principle enshrined in Rule 8—namely, to provide defendants fair notice against them—a

34

plaintiff . . . may not rest on bare-bones allegations that infringement occurred." *Sharp v. Patterson*, 2004 WL 2480426, *12 (S.D.N.Y. 2004). "Broad, sweeping allegations of infringement do not comply with Rule 8." *Kelly*, 145 F.R.D. at 36 n.3.

In its counterclaim for infringement, H/E does not plead The Phillies' alleged acts of infringement with the requisite specificity. H/E's claim appears to be based, in part, on unnamed "artwork" and "merchandise" that H/E believes is being used or sold by the Phillies, but it is impossible to discern from the allegations what artwork and/or merchandise H/E claims is infringing. *See, e.g.*, AC ¶¶ 17, 25, 26, 30, 61. For example, H/E claims that The Phillies "continue[s] to sell and knowingly authorize, enable, encourage, and/or induce others to sell ***unauthorized merchandise*** featuring numerous pieces of the Phanatic Artwork listed on Exhibit B." AC ¶ 30. Similarly, H/E alleges that the Phillies "continu[es] to exploit ***merchandise*** that unlawfully incorporates the Phanatic Artwork." AC ¶ 61. But nowhere in the AC is there any reference to what "artwork" (other than, perhaps, the "P2 Style Guide") or "merchandise" H/E claims is infringing. These sweeping, conclusory claims of "unauthorized" or "unlawful" use, without any explanation as to what artwork or merchandise, specifically, infringes H/E's purported copyrights are insufficient to state a claim for infringement.[20] *See, e.g.*, *Yamashita v. Scholastic, Inc.*, 2017 WL 74738, at *1 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 936 F.3d 98 (2d Cir. 2019); *Palmer Kane LLC v. Scholastic Corp.*, 2013 WL 709276, at *3 (S.D.N.Y. Feb. 27, 2013); *Cole v. John Wiley & Sons, Inc.*, 2012 WL 3133520, at *13-14 (S.D.N.Y. Aug. 1, 2012).

---

[20] The Phillies cannot adequately respond to H/E's complaint without more specificity regarding what acts, specifically, are allegedly infringing—particularly because, in this case, H/E has already conceded that the Phillies has the right to continue to utilize and sell a vast array of Phanatic-related artwork and merchandise. Exh. 26 at p. 23, Resp. to Interrog. No. 25; Exh. 23 (Appendix A to Plaintiff's Interrogatory Responses).

In addition, to the extent H/E's infringement counterclaim is based on the Phillies' creation and/or use of artwork or merchandise, the claim fails because H/E does not adequately plead the time-period in which the infringement allegedly occurred.  *See, e.g.*, *Young-Wolff v. McGraw-Hill Companies*, 2014 WL 349711, at *5 (S.D.N.Y. Jan. 31, 2014); *Cole*, 2012 WL 3133520, at *13.  For example, with respect to the "P2 Style Guide," H/E does not identify when it was created.  Identification of the time period in which the alleged infringement occurred is particularly important here, where even H/E concedes that derivative works created before June 15, 2020 fall within the derivative works exception of Section 203 and thus are noninfringing.  *See supra* pp. 6-11.  In addition, H/E appears to plead a claim based on some unidentified *future* infringement.  *See* AC ¶ 26 ("The Phillies have repeatedly admitted that they **intend to** create new merchandise featuring P2 after the Effective Termination Date.").  Speculation about future infringement cannot form the basis of an infringement complaint.  *See Bitetto v. Rometty*, 2018 WL 941736, at *3 (N.D.N.Y. Feb. 16, 2018) ("Not only do these allegations still fail to specify precisely when Defendant allegedly infringed his copyright, but the assertion that Defendant has committed wrongdoing three months in the future is nonsensical.").

Because H/E has failed to plead by what acts during what time the Phillies infringed H/E's copyright, H/E's counterclaim for copyright infringement must be dismissed.

### B.   H/E Fails to State a Claim for Infringement of the Unregistered Artwork Included in Exhibit B.

H/E's counterclaim for infringement must be dismissed for the additional reason that H/E fails to plead that the copyrights on which its claim is based have been registered in accordance with the Copyright Act.  *Kelly*, 145 F.R.D. at 36.  To state a claim for copyright infringement, the claimant must establish that each copyright upon which the claim is based was registered before suit was instituted.  *MalibuMedia, LLC v. Baker*, 2020 WL 3978302, at *4 (S.D.N.Y. June

18, 2020), *report and recommendation adopted*, 2020 WL 3972736 (S.D.N.Y. July 13, 2020).

"'[R]egistration occurs, and a copyright claimant may commence an infringement suit, when the Copyright Office registers a copyright,' not when the claimant first submits its registration application and related materials." *Id.* (quoting *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886 (2019)).

H/E admits that the artwork in Exhibit B is unregistered, but incorrectly assumes that H/E will be able to "amend their Counterclaims as necessary to reflect those registrations when they are issued." AC ¶ 60. But a claimant is not allowed to amend a claim for infringement based on works that were not registered at the time the initial claim was filed. *Malibu Media*, 2020 WL 3978302, at *4. "[A] contrary result would make a meaningless formality of [the Supreme Court's] requirement that an application be approved prior to filing suit [since] a plaintiff could file suit at any time, notwithstanding Section 411(a)'s precondition, and simply update the complaint when registration finally occurred." *Id.* (quotation marks and citation omitted); *see also Xclusive-Lee, Inc. v. Hadid*, 2019 WL 3281013, at *3-4 (E.D.N.Y. July 18, 2019).

The fact that the illustrations in Exhibit B may be derivative works based on the Phanatic costume, which H/E fraudulently registered as an "artistic sculpture," does not change the result. A plaintiff cannot maintain suit on "a claim of infringement in an unregistered derivative work, even if that claim is coupled with a claim of infringement in the validly registered original work."[21] *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 206, 208-09

---

[21] Where a defendant *copies* an unregistered derivative work, a plaintiff can sue for infringement of the original, registered work, but only to the extent that the copying of the derivative work infringes the registered work. *SimplexGrinnell*, 642 F. Supp. 2d at 214-15. Such a claim is not the same as a claim for infringement of the unregistered derivative work. *Id.* In such a situation, the comparison is not between the allegedly infringing work and the unregistered derivative, but between the allegedly infringing work and the registered work; the unregistered derivative work is, and must be, irrelevant to the infringement analysis because it is

(S.D.N.Y. 2009) (citing *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 122-23 (2d Cir. 2007)) [22]; *see also, e.g.*, *KnowledgeAZ, Inc. v. Jim Walters Res., Inc.*, 617 F. Supp. 2d 774, 789 (S.D. Ind. 2008) ("[T]he owner of a derivative work must register its copyright, just as it would for a work that was entirely original, if it seeks to pursue an action based on the infringement of that new work. . . . .").  Accordingly, because the artwork in Exhibit B was not registered at the time the AC was filed, AC ¶ 60, H/E's infringement counterclaim must be dismissed to the extent it is based on the artwork in Exhibit B.

C.    **The Phillies' Use of P2 is Non-Infringing as a Matter of Law.**

With respect to H/E's claim that The Phillies has infringed H/E's rights in the Phanatic costume by utilizing the P2 costume after June 15, 2020, the claim must be dismissed because the Phillies' use of P2 is, as a matter of law, non-infringing.  A court can dismiss an infringement claim on a 12(b)(6) motion when it is apparent from the face of the complaint, and the related documents that may be referenced, that the defendant is not infringing as a matter of law.  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (Where "the works in question are attached to a plaintiff's complaint, it is entirely appropriate for the district

---

unregistered.  *Id.*; *see also Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 562 (S.D.N.Y. 2009) ("[T]he Court must compare the allegedly infringing work with the Registered Work, and not with the Unregistered Manuscript.").  Notably, H/E does not allege that The Phillies copied any of the unregistered derivative works.

[22] In *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), the Supreme Court clarified that the registration requirement in 17 U.S.C. § 411(b) is not a jurisdictional requirement, as it was referred to in *SimplexGrinnell* and *In re Literary Works*. But because the registration requirement is still a statutory prerequisite to suit, the holding that a plaintiff cannot sue for infringement of an unregistered derivative work is still good law even when registration is not characterized as a "jurisdictional" requirement. *See, e.g.*, *Newton v. Penguin/Berkley Pub. USA*, 2014 WL 61232, at *4-5 (S.D.N.Y. Jan. 6, 2014) (explaining that in *Reed Elsevier*, the Supreme Court clarified that registration is a "precondition" to filing a claim for infringement, and holding that "a new version or derivative work is a separate work which is independently subject to the Section 411(a) registration requirement, even if the original work was registered").

court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation.").

Here, H/E alleges that The Phillies owned the copyright in the Phanatic costume at least until June 15, 2020. Compl., Ex. G (incorporated by reference into AC ¶ 1 & Answer ¶ 1); AC ¶¶ 14, 15. And H/E does not assert that The Phillies did not have the right to create and utilize P2 prior to June 15, 2020. Assuming for the purposes of this motion that H/E's Notice of Termination is effective and that H/E has a validly registered copyright in the Phanatic costume, whether or not the Phillies' use of P2 infringes H/E's alleged copyright comes down to whether the P2 costume is a derivative work that was developed before June 15, 2020 under the authority of the 1984 assignment. *See* AC ¶¶ 18-22. If it is a derivative work developed before June 15, The Phillies' use of P2 is necessarily non-infringing because The Phillies has the right to continue to utilize P2 under the derivative works exception of 17 U.S.C. § 203(b). *See supra* pp. 11-15; *see also* AC ¶ 19. The Court is entitled to make the determination, as a matter of law, that the Phillies' utilization of its "P2" costume is non-infringing pursuant to 17 U.S.C. § 203(b)(1) by making a "visual comparison" between P2 and the Phanatic costume. *See supra* pp. 9-10; *see also* Exh. 69.[23] As set forth in detail above, P2 clearly meets the requisite level of originality for a derivative work. *See supra* pp. 11-15. And P2 was introduced by the Phillies on February 23, 2020—well before June 15. AC ¶ 18. Accordingly, because § 203(b)(1) permits the Phillies to

---

[23] Because "[i]n copyright infringement actions, 'the works themselves supersede and control contrary descriptions of them,'" the court may consider copies of the works submitted as exhibits along with the motion to dismiss. *Guity v. Santos*, 2019 WL 6619217, at *2 (quoting *Peter F. Gaito*, 602 F.3d at 64). Accordingly, the Court may compare the photos of the Phanatic costume and P2 in Exhibit A attached to the AC, Exh. 7 and Exh. 69 attached to the Wolfsohn Declaration, and Exh. A attached to the Brandreth Declaration.

continue to utilize any derivative work prepared before termination of the 1984 assignment, the Phillies has the absolute right to continue to utilize P2.

Likewise, H/E's claim that The Phillies has infringed by creating "derivatives of derivatives" is implausible and must be dismissed. *See* AC ¶¶ 23-25. If, as H/E alleges, P2 is not a derivative work, then there can be no "derivatives of derivatives." But if the various P2 routines and costumes referred to by H/E as "derivatives of derivatives" are, in fact, "derivative works," then P2 must be one as well. The differences between the depictions of P2 in Exhibit A to the AC show much fewer significant differences than those between P2 and the original Phanatic costume. *Compare* AC, Exhibit A *with* Exh. 69 (Comparison of P2 to original Phanatic). If P2 clowning around is "derivative," then P2 itself must be a derivative work of the original Phanatic costume. In fact, H/E's examples of post-June 15 Phanatic activity are simply the "continued utilization" of P2 as a mascot—donning silly outfits and engaging in slapstick— which are uses that are squarely within the scope of § 203(b)(1): "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 203(b)(1). Under the plain language of § 203(b)(1), The Phillies is entitled to "continue to . . . utilize[]" P2 and the related artwork as they were utilized before the purported termination on June 15, and H/E's infringement claim based on those works must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, H/E fails to state a claim for copyright infringement, and the infringement counterclaim must be dismissed pursuant to Rule 12(b)(6).

40

Dated:  December 10, 2020                  By: <u>David J. Wolfsohn</u> _____
                                           David J. Wolfsohn (PA ID No. 57974)
                                           djwolfsohn@duanemorris.com
                                           *(admitted pro hac vice)*
                                           Tyler R. Marandola (PA ID No. 313585)
                                           tmarandola@duanemorris.com
                                           *(admitted pro hac vice)*
                                           Kendra C. Oxholm (NY ID No. 5267828)
                                           kcoxholm@duanemorris.com
                                           DUANE MORRIS LLP
                                           30 South 17th Street
                                           Philadelphia, PA 19103
                                           Tel:       (215) 979-1000
                                           Fax:       (215) 979-1020

                                           and

                                           David T. McTaggart (NY ID 4097598)
                                           dtmctaggart@duanemorris.com
                                           DUANE MORRIS LLP
                                           1540 Broadway
                                           New York, NY 10036-4086
                                           Tel:       (212) 692-1000
                                           Fax:       (212) 202-4931

                                           *Attorneys for Plaintiff, The Phillies*

## <u>CERTIFICATE OF SERVICE</u>

I, Tyler Marandola, hereby certify that on December 10, 2020, I caused to be served, via CM/ECF, a true and correct copy of the foregoing "Plaintiff And Counterclaim Defendant's Memoranda Of Law In Support Of Its Motion For Partial Summary Judgment And Motion To Dismiss Amended Counterclaims" upon all counsel of record in this action.

*s/Tyler R. Marandola*
Tyler R. Marandola, Esq.