## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PHILLIES, a Pennsylvania limited partnership<br><br>          Plaintiff,<br><br>     v.<br><br>HARRISON/ERICKSON, INCORPORATED, a New York corporation, HARRISON ERICKSON, a partnership, and WAYDE HARRISON and BONNIE ERICKSON,<br><br>          Defendants. | CASE NO. 1:19-cv-07239-VM |

**JOINT MEMORANDUM IN SUPPORT OF DEFENDANT/COUNTERCLAIM PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION FOR PARTIAL <u>SUMMARY JUDGMENT AND MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

H/E'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PHILLIES' MOTION FOR SUMMARY JUDGMENT .............. 1

I.     The Phillies Hire H/E to Create and Design The Phanatic ........... 1

II.    H/E Retains Sole Artistic Control Over The Phanatic From 1978 To 1984 .............. 3

III.   In 1984, H/E Agree to Assign Their Rights in the Phanatic to The Phillies ............ 5

IV.    H/E Continued to Do Work for the Phillies ................... 6

V.     In 2018, H/E Serves a Notice to Terminate the 1984 Copyright Assignment Pursuant to the  Express Terms of Section 203 of the Copyright Act (17 U.S.C. § 203) ........... 7

VI.    The Phillies Bring this Lawsuit Claiming for the First Time that H/E's 1979 Copyright Registration was Fraudulent .......... 7

VII.   The Phillies Make Less than Trivial Alterations to H/E's Phanatic in an Attempt To Circumvent H/E's Termination Rights ........ 8

LEGAL STANDARD FOR SUMMARY JUDGMENT ............ 10

ARGUMENT ................ 10

I.     Count I of The Phillies' Complaint Concerning the Validity of the Termination Notice Should Be Dismissed and H/E is Entitled to Summary Judgment on Count IV in Their Amended Counterclaims ......... 10

II.    Count II of The Phillies' Complaint Concerning H/E's Purported' Fraud on the Copyright Office Should Be Dismissed and H/E is Entitled to Summary Judgment on the Third Cause of Action in Their Counterclaims ........... 13

       A.     H/E Did Not Commit Fraud on the Copyright Office ........... 14

       B.     The Phillies Are Barred From Challenging the Validity of the Phanatic Copyright By Equitable Estoppel, Judicial Estoppel, Res Judicata, the Statute of Limitations and Unclean Hands ........ 17

III.   Counts III and IV of The Phillies' Complaint Concerning The Phillies' Purported Co-Authorship of the Phanatic Mascot and Authorship of the Phanatic Character Should Be Dismissed and H/E is Entitled to Summary Judgment on the First and Second Counts in Their Amended Counterclaims ............ 20

# TABLE OF CONTENTS
## (continued)

**Page**

**A.**    **The Phillies Are Not Joint Authors of the Phanatic Costume** ........................ 20

**B.**    **H/E, Not The Phillies, Are Authors of the Phanatic Character**..................... 22

**C.**    **The Phillies are Barred from Asserting any Claim for Authorship**................ 25

**IV.**  **H/E Is Entitled to Summary Judgment on Count V of The Phillies' Complaint and The Phillies' Motion for Partial Summary Judgement Should Be Denied** ........ 27

    **A.**    **H/E Is Entitled to Summary Judgment on The Phillies' Request for Declaratory Relief Concerning "P2"**.................................................... 27

        *1.*    *Unrebutted Expert Opinions* ................................................. 30

        *2.*    *The Phillies' Own Admissions* ............................................. 32

        *3.*    *Concluding Legal Analysis Concerning P2's Lack of Originality* .......... 32

    **B.**    **Any New P2 Works Created By The Phillies After Termination Are Infringing** ........................................................................ 34

    **C.**    **The Phillies Are Not Entitled to Partial Summary Judgment on the Issues Raised in Their Motion; Instead the Issues Must Be Resolved in H/E's Favor as a Matter of Law** ........................................................ 37

        *1.*    *The Court Should Consider the Whole Record, Including Expert Testimony, Not Just Side-by-Side Comparisons* ....................... 38

        *2.*    *The Phillies Are Not Entitled to Summary Judgment on Works Other Than P2; Instead H/E Should Be Awarded Summary Judgment* ............. 42

**V.**    **Count VI of The Phillies' Complaint Seeking an Injunction Concerning Phanatic-Related Trademarks Should Be Dismissed** .................................... 48

**VI.**  **Counts VII and VIII of The Phillies' Complaint for Purported Unjust Enrichment and a Breach of the Covenant of Good Faith and Fair Dealing Should be Dismissed** ....................................................................... 52

    **A.**    **The State Claims Are Preempted** ........................................ 52

    **B.**    **The State Claims Fail on the Merits**..................................... 52

CONCLUSION........................................................................... 54

LEGAL STANDARD..................................................................... 55

ARGUMENT ............................................................................. 55

**I.**    **H/E Provide The Phillies With Sufficient Notice of Their Infringement Claim** ....... 55

# TABLE OF CONTENTS
## (continued)

**Page**

II.    **H/E's Registration for the Phanatic Sufficiently Supports Their Infringement Claim** ........................................................................................................ 58

III.   **The Court Should Reject The Phillies' Improper Attempt to Side-Step the Summary Judgment Standard With Respect to P2** ..................................................... 59

CONCLUSION ................................................................................................................ 60

# **TABLE OF AUTHORITIES**

**Page**

CASES

*16 Casa Duse, LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015)..................................................................21

*Agence France Presse v. Morel*,
   769 F. Supp. 2d 295 (S.D.N.Y. 2011)...................................................51

*Alexander v. Haley*,
   460 F. Supp. 40 (S.D.N.Y. 1978) .........................................................24

*Am. Soc. of Composers, Authors, and Publishers by Bergman v. Pataki*,
   930 F. Supp. 873 (S.D.N.Y. 1996) .......................................................52

*Anderson v. Liberty Lobby, Inc*,
   477 U.S. 242 (1986)..............................................................................10

*Archie MD, Inc. v. Elsevier, Inc.*,
   261 F. Supp. 3d 512 (S.D.N.Y. 2017)...................................................14

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)..................................................................57

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................55, 56

*Ass'n of Am. Med. Colleges v. Cuomo*,
   928 F.2d 519 (2d Cir. 1991)..................................................................52

*Azkour v. Little Rest Twelve, Inc.*,
   2012 WL 1026730 (S.D.N.Y. Mar. 27, 2012) ......................................54

*Balderman v. U.S. Veterans Admin.*,
   870 F.2d 57 (2d Cir. 1989)..............................................................19, 27

*Baldwin v. EMI Feist Catalog, Inc.*,
   805 F.3d 18 (2d Cir. 2015)..............................................................11, 12

*Bein v. Heath*,
   47 U.S. 228 (1848)................................................................................19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................55, 56

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page</u>

*Blagman v. Apple Inc.*,
    2013 WL 2181709 (S.D.N.Y. May 20, 2013) ....................................................56, 58

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004)...................................................................................52

*Brown v. Ames*,
    201 F.3d 654 (5th Cir. 2000) ................................................................................24

*Brown v. St. Paul Travelers Co., Inc.*,
    331 F. App'x 68 (2d Cir. 2009) ............................................................................20

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
    683 F.2d 610 (2d Cir. 1982)...........................................................................44, 45

*Cabell v. Zimmerman*,
    2010 WL 996007 (S.D.N.Y. Mar. 12, 2010) .......................................................55

*Carell v. Shubert Org., Inc.*,
    104 F. Supp. 2d 236 (S.D.N.Y. 2000)............................................................15, 26

*Carson v. Dynegy, Inc.*,
    344 F.3d 446 (5th Cir. 2003) ................................................................................17

*Charles v. Seinfeld*,
    803 F. App'x 550 (2d Cir. 2020) ..........................................................................26

*Childress v. Taylor*,
    945 F.2d 500 (2d Cir. 1991)..................................................................................21

*Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*,
    413 F.3d 324 (2d Cir. 2005)..................................................................................15

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    886 F.2d 490 (2d Cir. 1989)..................................................................................50

*Cole v. John Wiley & Sons, Inc.*
    2012 WL 3133520 (S.D.N.Y. Aug. 1, 2012)........................................................57

*Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.*,
    522 F.2d 369 (2d Cir. 1975)..................................................................................17

*Conan Properties Int'l LLC v. Sanchez*,
    2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018).......................................................23

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page</u>

*Conan Properties Int'l LLC v. Sanchez*,
  2018 WL 4522099 (E.D.N.Y. June 8, 2018) ........................................................23

*Cooley v. Penguin Grp. (USA) Inc.*,
  31 F. Supp. 3d 599 (S.D.N.Y. 2014)............................................................37, 60

*Corning Glass Works v. S. New England Tel. Co.*,
  674 F. Supp. 999 (W.D.N.Y.), *aff'd*, 835 F.2d 451 (2d Cir. 1987) .........................18

*Daniels v. Walt Disney Co.*,
  958 F.3d 767 (9th Cir. 2020) .....................................................................21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003).................................................................................51

*DeCarlo v. Archie Comic Publications, Inc.*,
  127 F. Supp. 2d 497 (S.D.N.Y. 2001), *aff'd*, 11 F. App'x 26 (2d Cir. 2001)..............17, 26, 27

*Design Basics, LLC v. Deshano Companies, Inc.*,
  2012 WL 4340784 (E.D. Mich. Sept. 21, 2012)....................................................40

*Design Basics, LLC v. Petros Homes, Inc.*,
  2017 WL 2842783 (N.D. Ohio July 3, 2017) ...............................................40, 41

*Design Options, Inc. v. BellePointe, Inc.*,
  940 F. Supp. 86 (S.D.N.Y. 1996) ................................................................21

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) .....................................................................24

*Durham Indus., Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980).............................................................28, 29, 33, 40, 41

*Durkin v. Platz*,
  920 F. Supp. 2d 1316 (N.D. Ga. 2013) ..........................................................40

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
  697 F.2d 27 (2d Cir. 1982)...............................................................38, 40, 41

*Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*,
  936 F.3d 69 (2d Cir. 2019).................................................................11, 52

*Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ...........................................................29, 33, 38

## TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page</u>

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)....................................................................................55

*Felix Cat Prods., Inc. v. New Line Cinema*,
    2000 WL 770481 (C.D. Cal. Apr. 28, 2000) ..........................................50

*Flannigan v. Vulcan Power Grp., L.L.C.*,
    712 F. Supp. 2d 63 (S.D.N.Y. 2010)......................................................18

*Folio Impressions, Inc. v. Byer California*,
    937 F.2d 759 (2d Cir. 1991).............................................................38, 39

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998).....................................................................35

*Friedl v. City of New York*,
    210 F.3d 79 (2d Cir. 2000).....................................................................55

*Fun With Phonics, LLC v. LeapFrog Enterprises, Inc.*,
    2010 WL 11404474 (C.D. Cal. Sept. 10, 2010) ....................................24

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988).................................................................33

*Gilliam v. Am. Broad. Companies, Inc.*,
    538 F.2d 14 (2d Cir. 1976).....................................................................21

*Global Network Comm'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006)...................................................................60

*Gracen v. Bradford Exch.*,
    698 F.2d 300 (7th Cir. 1983) .................................................................33

*H.G. Shopping Centers, L.P. v. Birney*,
    2000 WL 33538615 (S.D. Tex. Dec. 29, 2000).....................................50

*Halo Lifestyle LLC v. Halo Farm, Inc.*,
    2019 WL 1620744 (S.D.N.Y. Apr. 16, 2019)........................................49

*Hamad v. Cook*,
    2014 WL 3507340 (S.D.N.Y. June 30, 2014) .......................................25

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
    723 F. Supp. 976 (S.D.N.Y. 1989) ........................................................53

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page</u>

*Home Design Servs., Inc. v. Trumble*,
    2011 WL 1638910 (D. Colo. Apr. 29, 2011) ................................................................40, 42

*Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*,
    826 F. Supp. 2d 619 (S.D.N.Y. 2011) .........................................................................58

*Johansen v. Sony Music Entm'mt Inc.*,
    2020 WL 1529442 (S.D.N.Y. Mar. 31, 2020) ...........................................................45

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    327 F. Supp. 3d 606 (S.D.N.Y. 2018)..........................................................................58

*Kelly v. L.L. Cool J.*,
    145 F.R.D. 32 (S.D.N.Y. 1992), *aff'd sub nom*, 23 F.3d 398 (2d Cir. 1994) .........................57

*KGB, Inc. v. Giannoulas*,
    104 Cal.App.3d 844 (1980) .........................................................................................24

*Kieselstein-Cord v. Accessories by Pearl, Inc.*,
    632 F.2d 989 (2d Cir. 1980)..........................................................................................39

*Kim v. Kum Gang, Inc.*,
    2014 WL 2081775 (S.D.N.Y. May 12, 2014) ............................................................47

*Klauber Bros. v. Russell-Newman, Inc.*,
    2013 WL 1245456 (S.D.N.Y. Mar. 26, 2013)*, aff'd sub nom. Klauber Bros. v.*
    *Bon-Ton Stores, Inc.,* 557 F. App'x 77 (2d Cir. 2014) ..............................................59

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)......................................................................................................29

*Kwan v. Schlein*,
    2009 WL 10678967 (S.D.N.Y. Apr. 23, 2009)...........................................................14

*Kwan v. Schlein*,
    634 F.3d 224 (2d Cir. 2011).....................................................................................25, 26

*L. Batlin & Son, Inc. v. Snyder*,
    536 F.2d 486 (2d Cir. 1976).....................................................................................29, 39

*Lefkowitz v. McGraw-Hill Glob. Educ. Holdings, LLC*,
    23 F. Supp. 3d 344 (S.D.N.Y. 2014)............................................................................57

TABLE OF AUTHORITIES
<u>(continued)</u>

*Lesley v. Spike TV,*
  241 F. App'x 357 (9th Cir. 2007) .........................................................................24

*Lockheed Martin Corp. v. Retail Holdings, N.V.,*
  639 F.3d 63 (2d Cir. 2011).....................................................................................43

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,*
  507 F.3d 252 (4th Cir. 2007) .................................................................................51

*M3 Girl Designs, LLC v. Blue Brownies, LLC,*
  2012 WL 12885060 (N.D. Tex. June 1, 2012) .......................................................39

*Mahan v. Roc Nation, LLC,*
  634 F. App'x 329 (2d Cir. 2016) ...........................................................................26

*Major League Baseball Promotion Corp. et al. v. Brofman et al.,*
  No. 87-3894 (E.D. Pa.) ..........................................................................................19

*Malibu Media, LLC v. Doe,*
  2019 WL 1454317 (S.D.N.Y. Apr. 2, 2019)..........................................................59

*Mannion v. Coors Brewing Co.,*
  377 F. Supp. 2d 444 (S.D.N.Y. 2005)....................................................................37

*Masquerade Novelty, Inc. v. Unique Indus., Inc.,*
  912 F.2d 663 (3d Cir.1990).....................................................................................15

*Mattel, Inc. v. Goldberger Doll Mfg. Co.,*
  365 F.3d 133 (2d Cir. 2004).....................................................................................33

*Maverick Recording Co. v. Goldshteyn,*
  2006 WL 2166870 (E.D.N.Y. July 31, 2006) ........................................................58

*Merchant v. Levy,*
  92 F.3d 51 (2d Cir. 1996).........................................................................................25

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.,*
  528 F.3d 1258 (10th Cir. 2008) ..............................................................................46

*Mills Music, Inc. v. Snyder,*
  469 U.S. 153 (1985)....................................................................................34, 35, 54

*Mtume v. Sony Music Entm't,*
  408 F. Supp. 3d 471 (S.D.N.Y. 2019).....................................................................45

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page</u>

*Music Sales Corp v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999).....................................................................45

*Nat'l Theme Prods., Inc. v. Jerry B. Beck, Inc.*,
    696 F. Supp. 1348 (S.D. Cal. 1988)....................................................................15

*Palmer Kane v. Scholastic Corp.*,
    2013 WL 709276 (S.D.N.Y. Feb. 27, 2013)........................................................57

*Past Pluto Prods. Corp. v. Dana*,
    627 F. Supp. 1435 (S.D.N.Y. 1986).....................................................................46

*Paul Morelli Design, Inc. v. Tiffany & Co.*,
    200 F. Supp. 2d 482 (E.D. Pa. 2002)...................................................................40

*Penguin Grp. (USA) Inc. v. Steinbeck*,
    537 F.3d 193 (2d Cir. 2008).........................................................................12, 13

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004).........................................................................19, 27

*Peter Mayer Publs Inc. v. Shilovskaya*,
    11 F. Supp. 3d 421 (S.D.N.Y. 2014)....................................................................46

*Price v. Fox Entm't Grp., Inc.*,
    473 F. Supp. 2d 446 (S.D.N.Y. 2007)..................................................................25

*Prima Creations, Inc. v. Santa's Best Craft, L.L.C.*,
    2011 WL 2982777 (E.D. Pa. July 22, 2011)........................................................16

*Procter & Gamble Co. v. Colgate-Palmolive Co.*,
    1998 WL 788802 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999) ...............29, 33

*Purohit v. Legend Pictures, LLC*,
    448 F. Supp. 3d 382 (D. Del. 2020).....................................................................36

*Pyatt v. Jean*,
    2006 WL 8440910 (E.D.N.Y. Aug. 29, 2006).......................................................40

*Quadratec, Inc. v. Turn 5, Inc.*,
    2015 WL 4876314 (E.D. Pa. Aug. 13, 2015) ......................................................57

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)..........................................................................................59

# TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page</u>

*Richard Feiner & Co. v. Larry Harmon Pictures Corp.*,
    38 F. Supp. 2d 276 (S.D.N.Y. 1999) ..........................................................................57

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ..........................................................................................50

*Ruotolo v. City of New York*,
    514 F.3d 184 (2d Cir. 2008) ..........................................................................................55

*Saleh v. Sulka Trading Ltd.*,
    957 F.3d 348 (2d Cir. 2020) ....................................................................................49, 50

*Sasson v. Hachette Filipacchi Presse*,
    2016 WL 1599492 (S.D.N.Y. Apr. 20, 2016) ..............................................................49

*Schneider v. Pearson Educ., Inc.*,
    2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013) ................................................................57

*Schrock v. Learning Curve, Int'l, Inc.*,
    586 F.3d 513 (7th Cir. 2009) ........................................................................................37

*Siegel v. Warner Bros. Entm't Inc.*,
    658 F. Supp. 2d 1036 (C.D. Cal. 2009) .......................................................................45

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
    931 F.3d 215 (3d Cir. Aug. 1, 2019) ............................................................................15

*Software For Moving, Inc. v. Frid*,
    2010 WL 2143670 (S.D.N.Y. May 27, 2010) .............................................................57

*Star Athletica, LLC v. Varsity Brands, Inc.*,
    137 S. Ct. 1002 (2017) ..................................................................................................16

*Stewart v. Abend*,
    495 U.S. 207 (1990) ................................................................................................11, 35

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998) ....................................................................................20, 21

*Titan Sports, Inc. v. Hellwig*,
    1999 WL 301695 (D. Conn. 1999) ..............................................................................23

*U.S. v. Citron*,
    783 F.2d 307 (2d Cir. 1986) ..........................................................................................47

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page</u>

*University of Alabama Bd. of Trustees v. New Life Art, Inc.*,
  683 F.3d 1266 (11th Cir. 2012) .......................................................50

*Vacchi v. E\*TRADE Fin. Corp.*,
  2019 WL 4392794 (S.D.N.Y. Sept. 13, 2019)........................................23

*W.W.W. Associates, Inc. v. Giancontieri*,
  77 N.Y.2d 157 (1990) ...................................................................43

*Warner Bros. Inc. v. Am. Broad. Companies, Inc.*,
  720 F.2d 231 (2d Cir. 1983).............................................................23

*Washington v. Kellwood Co.*,
  2009 WL 855652 (S.D.N.Y. Mar. 24, 2009) .........................................53

*Watt v. Butler*,
  744 F. Supp. 2d 1315 (N.D. Ga. 2010),
  *aff'd*, 457 F. App'x 856 (11th Cir. 2012)............................................42

*We Shall Overcome Foundation v. The Richmond Org., Inc.*,
  2017 WL 3981311 (S.D.N.Y. Sept. 8, 2017).........................................40

*Whimsicality v. Rubie's Costume Co., Inc.*,
  891 F.2d 452 (2d Cir. 1989).........................................................16, 17

*Whimsicality, Inc. v. Rubie's Costume Co., Inc.*,
  836 F. Supp. 112 (E.D.N.Y. 1993) ....................................................16

*Wight v. BankAmerica Corp.*,
  219 F.3d 79 (2d Cir. 2000)..............................................................18

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995)..............................................27, 38, 39, 48

*Yamashita v. Scholastic, Inc.*,
  2017 WL 74738 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 936 F.3d 98 (2d Cir. 2019)........................57

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
  2017 WL 2829517 (S.D.N.Y. June 29, 2017) .......................................57

**STATUTES**

15 U.S.C. § 1125(c) ........................................................................51

# TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page</u>

17 U.S.C.

§ 101...........................................................................................................14, 16, 28
§ 103(b)...................................................................................................................29
§ 106......................................................................................................................55
§ 203..................................................................................7, 11, 12, 13, 45, 54
§ 203(a)..................................................................................................................10
§ 203(a)(3)............................................................................................................11
§ 203(a)(4)(A)......................................................................................................10
§ 203(a)(5)....................................................................................................11, 52
§ 203(b)(1)....................................................1, 8, 27, 28, 34, 35, 36, 56, 59
§ 205......................................................................................................................43
§ 302......................................................................................................................53
§ 304..............................................................................................................13, 35
§ 410(c)...................................................................................................................14
§ 411(a)..................................................................................................................13
§ 411(b)..................................................................................................................14
§ 411(b)(1)(A)(B)..............................................................................................14
§ 507......................................................................................................................25
§ 507(b)..................................................................................................................19

1976 Copyright Act.........................................................................8, 14, 15, 53

Copyright Act..............................................................................................10, 11, 52

**OTHER AUTHORITIES**

3 Nimmer on Copyright § 11.02[C][1] .................................................33, 36

*Copyright Law Revision Part 6, Supp. Rep. of the Register of Copyrights on the
General Revision of the U.S. Copyright Law: 1965 Revision Bill*, 76
(May 1965)............................................................................................................11

Fed. R. Civ. P.
Rule 8.....................................................................................................................56
Rule 12(b)(6)...............................................................................................54, 55, 60
Rule 12(d)..............................................................................................................55
Rule 56(a)..............................................................................................................10

H.R. Rep. 94-1476 (1976).......................................................................................34

U.S. Constitution, Supremacy Clause........................................................................52

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**<u>Page</u>**

U.S. Copyright Office,
 *Compendium of Copyright Practices* (1st Ed. 1973)...............................................................15
 *Registrability of Costume Designs*, 56 F.R. 56530-02, 56532 (1991)....................................15

**H/E'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO THE PHILLIES' MOTION FOR SUMMARY JUDGMENT**

Defendants/Counterclaim Plaintiffs Bonnie Erickson, Wayde Harrison, Harrison Erickson, and Harrison/Erickson, Incorporated (collectively, "H/E") respectfully submit this joint Memorandum of Law:

(i)      In Support of H/E's Motion for Summary Judgment to Dismiss All Eight Counts of The Phillies' Complaint and for Summary Judgment on H/E's First Four Counterclaims.

(ii)      In Opposition to The Phillies' Motion For Partial Summary Judgment on Count V of their Complaint, which seeks a judicial declaration that The Phillies have the right to continue to use certain iterations of the Phillie Phanatic, notwithstanding that on June 20, 2020, H/E pursuant to section 203 of the Copyright Act terminated H/E's 1984 grant of the existing Phanatic copyrights to The Phillies; and

(iii)      In Opposition to the Phillies' FRCP 12(b)(6) Motion to Dismiss H/E's Fifth Cause of Action for copyright infringement set forth in H/E's Amended Counterclaims.

## INTRODUCTION

There are no facts or law to support The Phillies' eight count prolix complaint.  Nor are their attacks on Harrison and Erickson anything but empty bluster.  This case is an attempt by The Phillies to strong-arm H/E into abandoning their absolute right under the copyright law to terminate H/E's 1984 assignment of their rights in the Phanatic to The Phillies.  As set forth below, H/E's motion for summary judgment should be granted.

## STATEMENT OF UNDISPUTED FACTS

## I.      The Phillies Hire H/E to Create and Design The Phanatic

Bonnie Erickson is a designer of puppets, costumes, toys, and graphics, renowned for her work with The Jim Henson Company, where she designed such iconic *Muppets* characters as Miss Piggy, and Statler and Waldorf.  SUF ¶¶ 1-2; Declaration of Bonnie Erickson ("Erickson Decl."),

¶¶ 2-5. With her husband, Counterclaim Plaintiff Wayde Harrison, she is a partner in Counterclaim Plaintiff Harrison/Erickson ("H/E"). SUF ¶ 3; Erickson Decl. ¶ 1. In 1978, at the request of The Phillies, H/E designed and created the Phillie Phanatic mascot artwork and a 3-dimensional costume to be worn by a performer with H/E's approval.[1] SUF ¶¶ 5-9. Jim Henson recommended that The Phillies hire H/E. SUF ¶ 8. The Phillies' Executive Vice President, Bill Giles, initially did not want a new mascot, but was persuaded by the Marketing Director, Denny Lehman, who had observed another mascot, the "San Diego Chicken," achieve popularity. SUF ¶ 6.

On March 17, 1978, The Phillies entered into a written agreement with H/E, agreeing to pay H/E $3,900 to create and design the Phanatic ("March 1978 Agreement"). SUF ¶¶ 11-12. In that agreement, The Phillies expressly acknowledged that H/E were being retained "for the design and construction of a character to be known as The Phillie Fanatic for use as an entertainer during home baseball games," and further acknowledged: "The character will be copywritten by Harrison/Erickson who reserve all rights of its use for purposes other than expressly specified in writing." SUF ¶ 12.[2] It is indisputable that The Phillies understood that H/E initially owned and controlled the copyright in and to the Phanatic. SUF ¶ 14.

H/E drew on their extensive artistic talent and experience to create the Phanatic as a fictional fantasy art piece, with a high entertainment value that would be a natural for merchandise tie-ins. SUF ¶¶ 15, 29-31; Erickson Decl. ¶¶ 6-8.[3] H/E also designed numerous pieces of related

---

[1] While the Phillies refer to Erickson's creation as a "costume", that is not a complete description of the mascot created by H/E. In fact, H/E created extensive artwork depicting the Phanatic, and maintained exclusive control over the Phanatic's use, character and portrayal in multiple media prior to the 1984 copyright assignment to the Phillies. SUF ¶¶ 12, 35-36, 38, 40, 50-51, 54-56. Accordingly, this memorandum will identify H/E's copyrighted work as the "Phanatic."

[2] The Phillies were represented by counsel in connection with this agreement, as with all of the relevant agreements. SUF ¶¶ 13, 39, 53, 63.

[3] The Phanatic is a fantasy animal. SUF ¶ 15. H/E designed the large snout of the Phanatic to resemble a megaphone, because the name Phanatic implied a loud and boisterous cheerleader-type,

artwork, illustrated by Bonnie Erickson, which depicted the Phanatic in a variety of poses and expressions.  Erickson Decl. ¶ 7, Ex. A.  The Phanatic was conceived and then created from the imagination and considerable artistic talent of H/E.  SUF ¶ 15.[4]

After creating the Phanatic costume, H/E approved The Phillies hiring Dave Raymond as the first person to perform inside the Phanatic costume.  SUF ¶¶ 17, 52.c., 55.  H/E provided Raymond with instructions on how to prepare for the role and how to behave while performing.  SUF ¶¶ 17, 52.c.[5]  The Phanatic mascot debuted at a baseball game at The Phillies' home field on April 25, 1978.  SUF ¶ 21.  The Phanatic quickly became a hit with the fans in Philadelphia.  SUF ¶ 27.  On June 21, 1978, Frank Sullivan, The Phillies Promotion Director, wrote to H/E, thanking them for the "excellent job [they] did making Phillie Phanatic for us."  *Id.*

## II.   H/E Retains Sole Artistic Control Over The Phanatic From 1978 To 1984

Between 1978 and 1984, the parties entered into multiple written agreements in which The Phillies expressly acknowledged H/E's ownership and authorship of the Phanatic.  SUF ¶¶ 12, 34, 50-52, 56.  On July 15, 1978, H/E granted The Phillies a 3-year, renewable license to make

---

super fan character.  *Id.*  H/E also chose green as the color for the mascot, because after visiting The Phillies' old Veterans Stadium to gather inspiration, they thought a green mascot would stand out among the colored seats.  *Id.*  H/E also developed different "costumes" for the Phanatic to wear at various events, such as a tuxedo, exercise outfit, nightgown and slippers, raincoat and boots, and Hawaiian shirt.  SUF ¶ 31; Erickson Decl. ¶ 8.

[4]  The Phillies have claimed in this case that  Bill Giles, a Phillies corporate executive requested that the Phanatic contain certain features Montclare Decl. Ex. 24 ("Compl."), at ¶¶ 1-2, 35, 38, 41, but he admitted at his deposition that he did not interact with H/E during the design process, had no clear recollection or notes of any such contribution, and finally testified that he may have "brainwashed himself" over the years into believing he came up with certain features, and was known to take credit for the work of others."  SUF ¶ 32.

[5]  Raymond, the first performer inside the costume, testified that the Phanatic's personality was something he came up with in his head, based on his love of slapstick humor and his own personality, none of which is copyrightable even if it were true, which is hotly disputed. SUF ¶¶ 22-24.  Also, Raymond admitted that he performed "as the Phanatic" only "within the Phanatic costume," which is the Phanatic.  SUF ¶ 25.

reproductions of "[H/E's] copyrighted character presently known as 'Phillie Phanatic,'" in and as part of various souvenir items such as keychains, decals, tee-shirts and dolls . . . . ("Licensed Articles") ("July 1978 Agreement") SUF ¶ 34.  The July 1978 agreement expressly acknowledged that The Phillies' rights were conditioned on H/E's prior approval of each Licensed Article, and further expressly agreed that all Licensed Articles would bear a copyright notice "© 1978 Harrison Erickson," and promised not to "make any use of the Phillie Phanatic character" other than as "expressly authorized." SUF ¶¶ 35-36, 38.  On September 7, 1978, counsel for The Phillies wrote to H/E's counsel to notify H/E that Phanatic key chains being distributed by The Phillies would include language stating "The Phillie Phanatic character is the copyrighted creation of Harrison-Erickson, New York, New York."  SUF ¶ 40.

After entering into the July 1978 Agreement, a dispute arose in which H/E found that The Phillies were authorizing the manufacture of poor quality merchandise depicting the Phanatic. SUF ¶ 41.  On May 4, 1979, H/E received a copyright registration for the Phanatic "artistic sculpture," Registration No. VA 023-748.  SUF ¶ 42. The copyright registration listed Bonnie Erickson and Wayde Harrison as co-authors; it did not list The Phillies, Bill Giles, or Dave Raymond as an author or co-author of the Phanatic.  SUF ¶ 42.[6]  On May 18, 1979, H/E filed a lawsuit against The Phillies in the Southern District of New York for, *inter alia*, copyright infringement based on The Phillies' failure to comply with the terms of its license because of unauthorized manufacturing and sale of inferior Phanatic merchandise, which was not approved by H/E as required by the July 1978 Agreement. SUF ¶ 45.

In this litigation, The Phillies did not claim to own any copyright interest in the Phanatic.

---

[6] H/E submitted as deposit copy materials to the Copyright Office multiple color photographs of a person wearing the Phanatic costume in a variety of poses, including facing forward, backward, to the side, and holding a pennant.  SUF ¶ 44.

Nor did they claim any authorship interest in the Phanatic. SUF ¶¶ 46-48. Nor did The Phillies dispute the validity of the H/E 1979 copyright registration, which was alleged as part of H/E's claim for copyright infringement. *Id*. On November 1, 1979, The Phillies agreed to settle the claims and entered into a new license agreement (the "November 1979 Agreement"). SUF ¶ 49.

The November 1979 Agreement expressly acknowledged that H/E owned the copyright to the Phanatic, SUF ¶¶ 49-50. The November 1979 Agreement also confirmed that the Phanatic was H/E's copyrighted work and that H/E "shall have the sole and exclusive control of the final details of the design and construction of the Phillie Phanatic costumes and all reproductions of the Phillie Phanatic, including merchandise, audio visual, and photographic reproductions." SUF ¶ 52.b. The November 1979 Agreement further specified that a proper copyright notice in the name of H/E shall be "duly affixed by [The Phillies] to each and every reproduction, photograph, or costume of the Phillie Phanatic used, made, or distributed by [The Phillies]." SUF ¶ 52.f.

Also, The Phillies again confirmed that it would not "employ any person as performer of the costume unless the person is approved by [H/E] in writing," that H/E would "have the right to train the performer at [H/E's] stated office in New York City," and that "no performer shall appear in the costume until [H/E] notifies [The Phillies] in writing that the performer is ready to appear." SUF ¶ 52.c. The Phillies Bill Giles wrote to H/E on November 26, 1979 that he was "delighted that we have been able to work out a contract governing the future use of the Phillie Phanatic," and acknowledged that The Phillies were providing H/E with a lump sum payment of $115,000 in order to settle the claims in the lawsuit. SUF ¶ 54.

## III.     In 1984, H/E Agree to Assign Their Rights in the Phanatic to The Phillies

In 1984, The Phillies for the first time determined that they wanted to purchase H/E's copyrights in the Phanatic. In the words of Bill Giles, The Phillies did not want to have to ask H/E every time it wanted to "do a picture of the Phanatic." SUF ¶¶ 57, 63. On October 31, 1984, H/E

and The Phillies entered into an agreement, whereby H/E agreed to assign to the Phillies H/E's rights, title, and interest in the Phanatic, and all "reproductions and portrayals" thereto, in exchange for $215,000 (the "1984 Agreement").  SUF ¶ 57.

The 1984 Agreement expressly acknowledged that H/E "own[ed] the copyright of the artistic sculpture presently known as the 'Phillies Phanatic' (hereinafter referred to as the 'MASCOT')," and referenced H/E's registration number in the attached "short form" assignments.[7]  SUF ¶ 57.   The Phillies did not question that H/E's "copyright [was] valid throughout the world." [8]  *Id*.  Instead, The Phillies agreed to "use its best efforts to credit HE as the creator of the MASCOT in all literature and publications issued, or contributed to, by the Phillies where the origin of the MASCOT is germane."  SUF ¶ 59.  H/E agreed to assign their rights on the understanding that The Phillies would abide by these terms.  SUF ¶ 60.

## IV.   H/E Continued to Do Work for The Phillies

Following execution of the 1984 Agreement, The Phillies continued to ask H/E to perform services related to the Phanatic, which H/E agreed to do, often at discounted rates. SUF ¶ 64; Erickson Decl. ¶ 12.  H/E were sometimes asked to create new artwork depicting the Phanatic, but often times, H/E were asked to update their earlier work—artwork that The Phillies had obtained pursuant to the 1984 Agreement.   SUF ¶¶ 57, 66-68; Erickson Decl. ¶ 12.  Examples of such artwork are provided in Erickson Decl., Ex. A.

After The Phillies purchased the copyright rights to the Phanatic, they never asked H/E to

---

[7] On June 24, 1987, The Phillies recorded the short form in the records of the Copyright Office to perfect the transfer.  SUF ¶ 62.

[8] This is the same copyright registration which H/E filed in 1979, which was provided to The Phillies in the 1979 litigation, and again as part of the 1984 Agreement.  Now, 40 years after the litigation and 35 years after the 1984 Agreement, The Phillies incredibly claim that the H/E's registration is somehow fraudulent. See Argument, Section II, *infra*, which seeks summary judgment to dismiss this disingenuous fraud claim.

alter the overall design of the Phanatic costume.  SUF ¶ 70; Erickson Decl. ¶ 22.  They continued

to use H/E for their design work because The Phillies wanted to keep the look consistent.  SUF

¶ 69.  The Phillies also continued to represent that H/E were the creators and original copyright

owners of the Phanatic.  SUF ¶¶ 71-76.  The Phillies filed a sworn declaration in a 1987 federal

lawsuit attesting:

> "[b]y virtue of agreements between The Phillies and authors Wayde
> Harrison and Bonnie Erickson, all right, title and interest in and to
> the Phillie Phanatic character . . . has been assigned to The Phillies.
> Harrison and Erickson and The Phillies have duly complied in all
> respects with the United States Copyright Act and all other laws
> governing copyright including obtaining a copyright registration
> certificate, and recordation of the assignment."

SUF ¶ 73.  The Phillies were awarded a default judgment in that case.  *Id*.  As recently as 2018,

Tom Burgoyne, Tthe Phillies' current Phanatic performer, referred to H/E as the "creators of the

Phillie Phanatic."  SUF ¶ 76.

## V.     In 2018, H/E Serves a Notice to Terminate the 1984 Copyright Assignment Pursuant to the Express Terms of Section 203 of the Copyright Act (17 U.S.C. § 203)

On June 1, 2018, pursuant to the express provisions of Section 203 of the Copyright Act

(17 U.S.C. § 203), H/E delivered notice to The Phillies that H/E intended to terminate the grant of

rights under the 1984 Agreement on June 15, 2020, and invited The Phillies to "immediately

commence a negotiation" for the rights for the remainder of the copyright term.  SUF ¶¶ 77-80.[9]

## VI.    The Phillies Bring this Lawsuit Claiming for the First Time that H/E's 1979 Copyright Registration was Fraudulent

The parties attempted to negotiate a new assignment in what H/E believed to be in good

faith; however, these negotiations ceased when The Phillies stopped all communications and filed

---

[9] H/E recorded this notice at the Copyright Office.  H/E were terminating the "[g]rant of transfer
of copyright executed by Wayde Harrison & Bonnie Erickson, the co-authors of 'Phillie Phanatic'
– including any two and three dimensional drawings of the work …" SUF ¶¶ 79-81.

the instant lawsuit.  SUF ¶¶ 82-83.  In this lawsuit, The Phillies assert, for the very first time after 40 years that they are somehow authors of the Phanatic costume, that The Phillies are the "sole author" of the Phanatic's "character," and that the Phanatic copyright is not valid.  These representations contradict The Phillies' representations in every single agreement with H/E.

In addition, The Phillies allege for the first time 40 years after The Phillies were provided with this registration in the 1979 litigation, and 35 years after The Phillies took and filed an assignment of H/E's copyright pursuant to the 1984 Agreement, that H/E's 1979 Copyright Registration was a fraud.  And they made this charge even though for decades The Phillies repeatedly acknowledged the validity of H/E's 1979 opyright registration and used it to enforce the rights assigned to it under the 1984 Agreement.  SUF ¶¶ 48, 50, 57, 71, 73.

There was no new fact learned by The Phillies that prompted this fraud claim. Instead, it was the direct result of The Phillies receiving H/E's Termination Notice to reclaim its copyright as expressly authorized by the Copyright Act.  Every action by The Phillies since then has been aimed at destroying H/E's statutory termination rights, and crushing H/E with false claims both legal and factual.

**VII.  The Phillies Make Less than Trivial Alterations to H/E's Phanatic in an Attempt To Circumvent H/E's Termination Rights**

After starting this lawsuit, and keenly aware of the validity of H/E's termination rights, The Phillies secretly began to develop a knock-off design of the Phanatic at the direction of its lawyers, referred to as "P2."  SUF ¶¶ 85-86.  The lawyer-led Phillies plan was to try to circumvent H/E's right to terminate the 1984 copyright grant, by making negligible, unnoticeable changes to the Phanatic, hoping to convince this Court that P2 was a permissible derivative work prepared prior to termination.  SUF ¶¶ 86-101.  *See* Argument, Section IV, *infra*.  *See also* 17 U.S.C. § 203(b)(1).  But at the same time, The Phillies really did not want their fans to notice any change

in the Phanatic.  SUF ¶¶ 88, 89, 94.  So The Phillies intentionally endeavored to make changes so trivial and artistically insignificant that their fans would not notice.  SUF ¶ 94.  They did not want to change the iconic Phanatic, which is now the most recognizable Mascot in professional sports, and even occupies a space in the Baseball Hall of Fame in Cooperstown, New York. SUF ¶ 88.  But The Phillies, one of the richest baseball franchises in the world, did not want to pay to renew the H/E copyright grant.  SUF ¶¶ 86, 101.

After receiving H/E's termination notice on June 1, 2018, The Phillies hired Randy Carfagno to fashion a Phanatic knockoff.  SUF ¶ 92.  Mr. Carfagno had worked on repairs and replacements of the original Phanatic costume for decades, and had previously used materials that H/E had provided The Phillies in connection with the Phanatic.  SUF ¶¶ 92-93; Erickson Decl. ¶¶ 25-31.  During the process of making P2, an executive of The Phillies commented that he did not think anybody would notice the difference between the Phanatic and P2.  SUF ¶ 96.  On February 23, 2020, The Phillies introduced P2 to the public.  SUF ¶ 97.  Members of the press immediately commented on the trivial nature of the changes, publishing articles such as "New 'Phillie Phanatic Design is Barely any Different," and, in recognition of this, representatives of the The Phillies publicly stated that P2 was still "the same old Phanatic."  SUF ¶¶ 98-99.  David Zung, an outside expert retained by H/E for this litigation with decades of experience in character design, concluded that the creative differences between P2 and the Phanatic were trivial at best.  SUF ¶ 100.  Bonnie Erickson, unquestionably one of the preeminent designers of sports mascots in the country, agrees.  Erickson Decl. ¶ 24, Ex. I.  Tellingly, the Phillies have not designated an expert to rebut H/E's highly qualified expert opinions.  SUF ¶ 100.

Besides creating the look-alike P2 costume, The Phillies have made other works with the same less-than-trivial P2 variations.  SUF ¶¶ 103-06.  This includes a collection of artwork for a P2 "style guide," which The Phillies intend to use to assist licensees who wish to develop new

merchandise post-termination that features P2.  SUF ¶ 105.  The Phillies also created P2 "3D turnaround" artwork, which would similarly be used to assist licensees in developing new post-termination merchandise.  SUF ¶ 106.

Thus, despite the termination of the 1984 Phanatic copyright grant to The Phillies on June 15, 2020, The Phillies intend to exploit the Phanatic, by using P2 to continue to create new Phanatic promotional materials, artwork, and merchandise, without the consent of H/E.  SUF ¶¶ 107-09. The Phillies have already created numerous works that feature P2 after June 15, 2020. SUF ¶¶ 103-104, 108.

It is time to put the Phillies charade to rest and dismiss their disingenuous Complaint.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986).

## ARGUMENT

**I.**   **Count I of The Phillies' Complaint Concerning the Validity of the Termination Notice Should Be Dismissed and H/E is Entitled to Summary Judgment on Count IV in Their Amended Counterclaims**

The Copyright Act states: "[T]he exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination."  17 U.S.C. § 203(a).  In order for termination to be effective, it must be accomplished by "serving an advance notice in writing," within a period of time "not less than two or more than ten years" before the date of termination.  17 U.S.C. § 203(a)(4)(A).  Termination may be effected "at any time during a period of five years beginning

at the end of thirty-five years from the date of execution of the grant."  17 U.S.C. § 203(a)(3).

Here, H/E served a valid termination notice on June 1, 2018, notifying The Phillies of their intent to terminate the grant of rights under the 1984 Agreement on June 15, 2020, which date has now passed.  SUF ¶¶ 77-81.  The Phillies do not dispute the timeliness of the notice.  However, they dispute whether the notice is valid, arguing that the 1984 Agreement assigned rights "forever."  Compl. ¶ 66.  This argument is meritless because the right of termination by an author is "inalienable."  *Stewart v. Abend*, 495 U.S. 207, 230 (1990).  It "may be effected notwithstanding any agreement to the contrary."  17 U.S.C. § 203(a)(5); *see also Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*, 936 F.3d 69, 73 (2d Cir. 2019) ("Under U.S. law, a contractual assignment, no matter how expansively phrased, is still subject to the termination right.").  Even a grant of rights that expressly includes all "reversionary and termination interests," will not surrender the termination right because the statute does not allow an author to contract away or waive this right, which has not yet vested.  *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015).  Thus, even a grant of rights "forever" may be terminated.  *Ennio Morricone*, 936 F.3d at 73.

The Phillies also argue that the 1984 Agreement purportedly constituted a "renegotiation" of the parties' earlier 1979 settlement, and that authors must choose once between such a renegotiation and later exercising their termination rights.  Compl. ¶ 14.  Setting aside that the 1984 Agreement constituted the one ***and only*** assignment of rights in the Phanatic and that referring to it as a renegotiation is misleading, SUF ¶¶ 56-57, there is no basis in law to hold that an author may not engage in multiple renegotiations and then terminate the latest in time grant.  The legislative history leading up to the enactment of the Copyright Act expressly states that the § 203 termination right was intended to allow authors to voluntarily terminate an existing grant and enter into a new one, while retaining their termination rights.  *See Copyright Law Revision Part 6, Supp. Rep. of the Register of Copyrights on the General Revision of the U.S. Copyright*

*Law: 1965 Revision Bill*, 76 (May 1965) ("There is nothing in section 203 to prevent the parties to a transfer or license from voluntarily agreeing between themselves to terminate an existing agreement and to negotiate another one, ***thus starting another 35 year period running***.") (submitted herewith as Montclare Ex. 97.)

*Baldwin v. EMI Feist Catalog, Inc.* is dispositive on this issue. There, the Second Circuit considered the validity of a § 203 termination notice, which purported to terminate a grant of rights in the song "Santa Claus is Comin' to Town." The parties or their successors had entered three prior agreements concerning rights to the song, the last of which was executed in 1981. Like The Phillies do here, the grantee claimed that the third agreement was not terminable. The Second Circuit disagreed. Because the 1981 agreement was the current source of the publishers' rights in the song, the authors were entitled to terminate that agreement under § 203, notwithstanding the existence of the earlier agreements. *Id.* at 32.

In support of their misguided theory that authors who enter multiple agreements concerning the same work may not terminate the last agreement in such a chain, The Phillies principally rely on a mischaracterization of *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008), which is distinguishable. Unlike *Baldwin*, *Penguin Grp.* **did not** involve termination of a post-1977 grant signed by an author, but instead involved an attempt to set aside a 1994 agreement executed by the author's widow as an agreement to the contrary, and to terminate an earlier 1938 agreement that had already been extinguished by the 1994 agreement. The Second Circuit held that the termination notice was not valid because the 1994 agreement itself terminated and superseded the 1938 agreement, such that the 1994 agreement was the operative termination agreement and therefore there was no longer any 1938 agreement to terminate. *Id.* at 202. The court also held the 1994 agreement was not an "agreement to the contrary" within the meaning of the statute because, *inter alia*, it was negotiated by the author's widow during the window for

12

terminating the 1938 agreement,[10] and, even though that meant no additional opportunity to terminate would be provided because post-1977 agreements, like the 1994 agreement at issue, may only be terminated if executed by an author, that did not render the 1994 agreement improper, given that under the operative provision applicable to the 1938 agreement, § 304(d), termination rights may only be executed once. *See Penguin Grp.*, 537 F.3d at 202-04.

Given its facts and their impact of the legal outcome, *Penguin Grp.* does not apply. The instant case concerns termination of a post-1977 grant of rights executed by authors pursuant to § 203, not a contractually superseded pre-1978 grant covered by § 304. Nothing in § 203, the legislative history, or the case law states that an author who has entered multiple post-1978 agreements with a grantee cannot terminate the most recent grant at the appropriate time. Thus, H/E's termination notice is valid, and H/E is entitled to summary judgment dismissing The Phillies' first cause of action and affirmatively finding that the grant of rights under the 1984 Agreement terminated on June 15, 2020, with all rights thereunder reverting to H/E.

**II.    Count II of The Phillies' Complaint Concerning H/E's Purported' Fraud on the Copyright Office Should Be Dismissed and H/E is Entitled to Summary Judgment on the Third Cause of Action in Their Counterclaims**

The Phillies assert that H/E cannot enforce their copyright rights in the Phanatic—the same rights that The Phillies itself has enforced for decades pursuant to the 1984 Agreement—because H/E purportedly committed "fraud on the Copyright Office." Compl. ¶ 15. *See* 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."). This more than 40 year old, stale, unfounded claim is so meritless and repugnant that it

---

[10] Calculating the appropriate timing for a termination notice applicable to a grant executed prior to 1978 differs from calculating the timing for post-1977 grants because the former are covered by 17 U.S.C. § 304 and the latter by 17 U.S.C. § 203.

reveals that The Phillies are willing to plead even the most frivolous claims to try to hinder H/E from stopping them from infringing H/E's reclaimed copyrights.  The Court should dismiss The Phillies' second cause of action and grant H/E summary judgment on their third Counterclaim.

### A.        H/E Did Not Commit Fraud on the Copyright Office

A copyright registration made within five years of publication shall constitute *prima facie* evidence of the validity of the copyright.  17 U.S.C. § 410(c).  That copyright registration remains valid, regardless of whether the certificate contains any inaccurate information, unless it can be demonstrated that "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."   17 U.S.C. § 411(b)(1)(A)(B).[11]  The Phillies meet neither prong.

First, The Phillies cannot demonstrate that the Phanatic registration contains a material inaccuracy that would have caused the Register to refuse registration.  The Phillies' claim is premised on the theory that the phrase "artistic sculpture" is inaccurate as a description of the registered work, and that the Copyright Office would not have registered the Phanatic if it had known that the Phanatic was a costume.  Compl. ¶¶ 94-106.  This premise is flawed.

As a threshold matter, it is accurate to refer to the Phanatic as an "artistic sculpture."  The term "sculpture" is grounded in the Copyright Act and is the preferred nomenclature of the Copyright Office.  17 U.S.C. § 101 (defining "pictorial, graphic, and sculptural works").  The First Edition of the *Copyright Compendium of U.S. Copyright Office Practices*, which was the relevant

---

[11] 17 U.S.C. § 411(b) was intended to articulate the common law standards for fraud on the Copyright Office.  *See Archie MD, Inc. v. Elsevier, Inc.*, 261 F. Supp. 3d 512, 518 (S.D.N.Y. 2017) (citing 2 Nimmer on Copyright § 7.20[B][1]-[2]).   Those standards state that fraud on the Copyright Office is shown by proving that the copyright application was factually incorrect; that the inaccuracies were willful or deliberate; and that the Copyright Office relied on the misrepresentations.  *Kwan v. Schlein*, 2009 WL 10678967, at *4 (S.D.N.Y. Apr. 23, 2009).

edition in 1979 when the Phanatic was registered, states: "[in] all cases, ***registration must be based upon those copyrightable features such as artistic sculpture***, carving, or pictorial representation which can be identified separately and are capable of existing independently as a work of art . . . ."  U.S. Copyright Office, *Compendium of Copyright Practices*, 2-297 (1st Ed. 1973) (emphasis added) (submitted herewith as Montclare Decl. Ex. 94).  In 1991, a Copyright Office Policy decision clarified the registrability of costume designs: "In accordance with the copyright principles applying to useful articles, fanciful costumes will be registered ***if they contain separable pictorial or sculptural authorship***" (emphasis added). U.S. Copyright Office, *Registrability of Costume Designs*, 56 F.R. 56530-02, 56532 (1991) (submitted herewith as Montclare Decl. Ex. 95).

Moreover, any purported inaccuracy is immaterial, given that the Phanatic is indisputably a copyrightable work of authorship.  Indeed, The Phillies *admit* that the Phanatic is copyrightable. Compl. ¶ 108; Montclare Ex. 33, at 10.[12]  And they must, given the legion of case law holding that costumes with copyrightable aspects are subject to copyright protection.  *See, e.g.*, *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 224 (3d Cir. Aug. 1, 2019) (banana costume copyrightable); *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 329 (2d Cir. 2005) ("[I]t is at least possible that elements of [plaintiff]'s plush sculpted animal costumes are separable from the overall design of the costume, and hence eligible for protection under the Copyright Act."); *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 247 (S.D.N.Y. 2000) (makeup designs and costumes for musical Cats copyrightable); *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 664 (3d Cir.1990) (masquerade masks subject to copyright protection); *Nat'l Theme Prods., Inc. v. Jerry B. Beck, Inc.*, 696 F. Supp. 1348, 1353 (S.D. Cal. 1988) (costumes were

---

[12] Given The Phillies' own admissions, it is apparent that this claim is nothing more than a misguided attempt to smear H/E and impugn their credibility.

copyrightable as applied art). For this reason, at least one court has explicitly rejected arguments akin to The Phillies'. *See, e.g.*, *Prima Creations, Inc. v. Santa's Best Craft, L.L.C.*, 2011 WL 2982777, at *4 (E.D. Pa. July 22, 2011) (denying fraud claim where plaintiff registered elf hat as a "sculpture," because the work "would still be entitled to copyright protection").[13]

The Phillies principally rely on *Whimsicality v. Rubie's Costume Co., Inc.*, in which the court held that it was improper to register the particular works at issue—masquerade costumes— as "soft sculptures." 891 F.2d 452, 455-56 (2d Cir. 1989). *Whimsicality* is not controlling. Rather, it was rendered moot on remand after the district court vacated the underlying judgment, based on a newly-introduced affidavit of a high level Copyright Office examiner who clarified that referring to the works as "soft sculptures" was "within the practice routinely allowed by the Copyright Office." *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 836 F. Supp. 112, 115 (E.D.N.Y. 1993). Accordingly, The Phillies cannot demonstrate any material inaccuracy.

<u>Second</u>, The Phillies have no basis to show that H/E provided misleading information to the Copyright Office. Bonnie Erickson and Wayde Harrison both testified that their copyright counsel registered the Phanatic as an artistic sculpture and that they had no intent to include anything inaccurate in the application. SUF ¶¶ 43-44. Erickson also testified that, as an artist, she believes it is accurate to describe the Phanatic as a sculpture. SUF ¶ 43, Montclare Ex. 15, at 240:9-245:21. And H/E submitted as deposit copies photographs of the Phanatic in several poses,

---

[13] Costumes are a type of useful article, which "shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. In 2017, the Supreme Court clarified that "a feature of the design of a useful article is eligible for copyright if, when identified and imagined apart from the useful article, it would qualify as a pictorial, graphic, or sculptural work either on its own or when fixed in some other tangible form." *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1012 (2017). The Phanatic costume design, which has been fixed in countless other pictorial, graphic, and sculptural works, easily meets the test.

SUF ¶ 44, demonstrating that the Phanatic was not a stationary sculpture, but rather was a movable, three-dimensional item to be used with a performer inside, which was the appropriate manner of registering the Phanatic. *See Whimsicality*, 891 F.2d at 455, n.5 (crediting registrant in another case that had provided "accompanying photos show[ing] human models wearing the costumes" in registration). On top of this, H/E consistently referred to other mascots as "artistic sculptures" in registration applications, none of which have been rejected or otherwise challenged. SUF ¶ 43.[14] The Phillies have introduced no evidence to rebut any of these undisputed facts.

**B.** **The Phillies Are Barred From Challenging the Validity of the Phanatic Copyright By Equitable Estoppel, Judicial Estoppel, Res Judicata, the Statute of Limitations and Unclean Hands**

The Phillies' fraud claim is also barred because it contradicts their own course of conduct over decades. <u>First</u>, The Phillies are equitably estopped from asserting fraud on the Copyright Office. Equitable estoppel requires proof that (1) a plaintiff had knowledge of a defendant's conduct; (2) the plaintiff either (a) intended that defendant rely on the plaintiff's acts or omissions or (b) acted or failed to act in such a manner that the defendant had a right to believe it was intended to rely on the plaintiff's conduct; (3) the defendant was ignorant of the true facts; and (4) the defendant relied on plaintiff's conduct to its detriment. *DeCarlo v. Archie Comic Publications, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001), *aff'd*, 11 F. App'x 26 (2d Cir. 2001). Estoppel may be accomplished by a plaintiff's silence and inaction. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003). Estoppel applies when one party in a relationship with another has an opportunity to speak in order to avoid harm or injury and fails to do so to the prejudice of the other party. *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir. 1975).

---

[14] One of H/E's mascots, which was registered by a third-party that purchased the rights, was described as a "costume" in the registration application and the Copyright Office *still accepted the registration*, further demonstrating the hollow premise of The Phillies' claim. Montclare Decl. Ex. 96.

Here, The Phillies never told H/E that they believed the registration to be fraudulently obtained until after H/E served their termination notice in 2018.  To the contrary, The Phillies acknowledged H/E as the copyright owners of the Phanatic mascot in numerous documents, SUF ¶¶ 12, 34, 49, 57; acknowledged the existence of the registration itself in numerous documents, SUF ¶¶ 50, 57; expressly referred to the Phanatic as an "artistic sculpture" in multiple documents, including the 1984 Agreement, *id.*; recorded a short form assignment document with the Copyright Office to reflect that The Phillies had become the owner of the rights covered by the registration, SUF ¶ 62; and even asserted their rights under the registration in litigation against a third party.[15] SUF ¶ 73.  Because The Phillies failed to inform H/E as to their purported belief as to the invalidity of the copyright, H/E settled the 1979 litigation with The Phillies; assigned their rights to The Phillies in 1984; and continued to do business with The Phillies for decades—including at discounted rates.  SUF ¶¶ 49, 57, 64; Erickson Decl. ¶ 12.  H/E relied on both The Phillies' written acknowledgements of the validity of the registration and The Phillies' silence to the contrary in carrying out this continued business.  SUF ¶ 60; Erickson Decl. ¶ 13.

Second, The Phillies are judicially estopped from asserting fraud on the Copyright Office. Judicial estoppel "is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).  A party is judicially estopped from taking a position when they argued an inconsistent position in a prior proceeding that was adopted by the court.  *Flannigan v. Vulcan Power Grp., L.L.C.*, 712 F. Supp. 2d 63, 69 (S.D.N.Y.

---

[15] "When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Corning Glass Works v. S. New England Tel. Co.*, 674 F. Supp. 999, 1013 (W.D.N.Y.), *aff'd*, 835 F.2d 451 (2d Cir. 1987).

2010).  Here, The Phillies provided a sworn statement in a copyright enforcement action attesting to the validity of the copyright in a 1987 lawsuit captioned *Major League Baseball Promotion Corp. et al. v. Brofman et al.*, No. 87-3894 (E.D. Pa.).  SUF ¶ 73.  The court relied on The Phillies' representation that they held a valid copyright when it awarded them a default judgment.  *Id.*

Third, res judicata bars The Phillies' fraud claim.  Res judicata bars "subsequent litigation of any ground of recovery that was available in the prior action, whether or not it was actually litigated or determined."  *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 62 (2d Cir. 1989).  The Phillies and H/E entered the November 1979 Agreement to settle a lawsuit brought by H/E against The Phillies for *inter alia* copyright infringement.  SUF ¶¶ 49-51, 54.  Rather than challenge the validity then, The Phillies agreed to dismiss that lawsuit with prejudice and enter into the November 1979 Agreement, which expressly recognized H/E's copyright rights in the Phanatic.

Fourth, the fraud claim is also barred by the Copyright Act's three-year statute of limitations.  *See* 17 U.S.C. §507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.").  The Phillies' opportunity to challenge the validity of the registration accrued decades ago.  They had full knowledge of the registration since 1979, and never even questioned its validity until after 2018.

Finally, the fraud claim should fail because The Phillies have unclean hands.  "The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.  To aid a party in such a case would make this court the abetter of iniquity."  *Bein v. Heath*, 47 U.S. 228, 247 (1848); *accord PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (quoting *Bein*).  It would be highly inequitable to allow The Phillies to challenge a copyright that they acknowledged the validity of, and benefitted from, for decades.

**III.    Counts III and IV of The Phillies' Complaint Concerning The Phillies' Purported Co-Authorship of the Phanatic Mascot and Authorship of the Phanatic Character Should Be Dismissed and H/E is Entitled to Summary Judgment on the First and Second Counts in Their Amended Counterclaims**

Like The Phillies' fraud on the Copyright Office claim, their authorship claims are baseless and transparently concocted to attempt to deprive H/E of their termination rights.  The Phillies did not author either the Phanatic costume or any copyrightable Phanatic character.  Accordingly, the Court should dismiss The Phillies' third and fourth counts and grant H/E summary judgment on the first and second counts in their Amended Counterclaims.

**A.    The Phillies Are Not Joint Authors of the Phanatic Costume**

It cannot be disputed that The Phillies' purported contributions to the Phanatic's costume design did not rise to the level of joint authorship.  A co-authorship claimant in this Circuit must show that "each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors."  *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998).  The Phillies meet neither prong.

First, The Phillies failed to put forward any material evidence demonstrating that they provided a copyrightable contribution to the Phanatic.  It cannot be disputed that H/E are acclaimed character creators who were hired to design and construct the Phanatic.  SUF ¶¶ 1-2, 9, 11.  Nonetheless, The Phillies try to take authorship credit by asserting that Bill Giles contributed specific design elements, including that it would be an "indefinable" creature, "fat," and "green" and have a "big snout," Compl. ¶¶ 1, 108, but Bill Giles himself testified that he did not interact with H/E during the design process; has no clear recollection or notes; may have "brainwashed himself" into believing he conceived of certain design elements; and was known to take credit for the work of others when describing his role in the creative process.  SUF ¶¶ 10, 32-33.  *See Brown v. St. Paul Travelers Co., Inc.*, 331 F. App'x 68, 70 (2d Cir. 2009) (plaintiff's statement that she

had no recollection or record insufficient to raise a genuine issue of material fact).

Even setting aside The Phillies' evidentiary failures, none of Giles' purported suggestions rise to the level of a copyrightable contribution. *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 90 (S.D.N.Y. 1996) (explaining that suggestions of ideas for "themes, trims, or colors" does not rise to requisite level to qualify as joint author); *Daniels v. Walt Disney Co.*, 958 F.3d 767, 772 (9th Cir. 2020) (color choice, by itself, is not copyrightable).

<u>Second</u>, The Phillies indisputably did not intend to be regarded as co-authors. It is not enough that putative co-authors collaborated, or intended their contributions to be merged into inseparable parts of a unitary whole. Rather, the putative joint authors "*must intend to regard themselves as joint authors*." *Thomson*, 147 F.3d at 201 (emphasis added); *see also, e.g.*, *Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991). Here, H/E were consistently billed as the creators and The Phillies admittedly never sought to be credited as co-authors, SUF ¶¶ 12, 59, 36, 52; Montclare Decl. Ex. 33, at 11-12; H/E retained sole decision-making authority over the design and implementation of the Phanatic mascot and related works, SUF ¶¶ 12, 35, 38, 52, 56; H/E exercised sole creative control over all depictions of the Phanatic; and H/E held sole approval over deals with third parties to merchandise the Phanatic. *Id.* *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015) (explaining that "factual indicia of ownership and authorship" relevant to the joint author vs. sole authorship inquiry include "decisionmaking authority, billing, and written agreements with third parties"). In each agreement with H/E, The Phillies expressly acknowledged that the Phanatic was H/E's copyright. SUF ¶¶ 12, 36, 38, 50, 52, 57. *See Gilliam v. Am. Broad. Companies, Inc.*, 538 F.2d 14, 22 (2d Cir. 1976) (provisions in agreement whereby one party was to retain all rights in work suggested that the other party did not consider itself a joint author). On top of this, when H/E assigned their rights to The Phillies, The Phillies contractually agreed to "use its best efforts to credit [H/E] as the creator of the [Phanatic]," and consistent with that

agreement, The Phillies have referred to H/E—and not themselves—as the creators of the Phanatic for decades.  SUF ¶ 59.  The Phillies unquestionably lacked the requisite intent to be considered co-authors, and even declined in an interrogatory response to state otherwise.  Montclare Ex. 33, at 11-12.  Moreover, H/E certainly never intended to share authorship with The Phillies.  Under the facts and dispositive cases, H/E are the sole authors as a matter of law.

**B.      H/E, Not The Phillies, Are Authors of the Phanatic Character**

As an initial matter, The Phillies cannot be considered the *sole* author of the Phanatic "character"—as they claim to be—because The Phillies admitted that the costume designed by H/E is part of the Phanatic's "character."  Montclare Ex. 12, at 100:8-102:9.[16]  Moreover, the Phillies do not hold *any* authorship interest in the Phanatic "character."  As explained above, H/E held *sole creative control* over the Phanatic from 1978 to 1984.  From the start, The Phillies acknowledged that H/E was designing and constructing a "character" that would "be copywritten by Harrison/Erickson who reserve all rights."  SUF ¶ 12.  The Phillies soon obtained certain merchandising rights, which they acknowledged involved "reproductions of [H/E's] copyrighted character" and were conditioned on H/E's review of each item and prior approval, and they acknowledged that they would have no right, except as expressly authorized, to "make any use of the Phillie Phanatic character."  SUF ¶¶ 35-38.  After purchasing the rights in the Phanatic, The Phillies sought to enforce those rights through a sworn statement explaining that the rights "in and to the Phillie Phanatic character" were "[b]y virtue of agreements between The Phillies and authors Wayde Harrison and Bonnie Erickson."  SUF ¶¶ 73.[17]

---

[16] Aware of this blatant admission, The Phillies' counsel improperly interrupted his client's testimony to pose baseless objections.

[17] The Phillies remarkably have attempted to disregard these admissions in numerous legal documents by twisting a single phrase in Wayde Harrison's private business journal that complemented Raymond's performance and noted that he "developed a fun and sensitive character."  Unlike The Phillies' admissions in these legal documents, Harrison clearly was not

There can accordingly be no dispute that any purported "character copyright" in the Phanatic was created by virtue of its embodiment in the Phanatic works of authorship that were created by H/E, or that were otherwise created subject to H/E's sole creative and artistic approval. *See Conan Properties Int'l LLC v. Sanchez*, 2018 WL 3869894, at *3 (E.D.N.Y. Aug. 15, 2018) ("[T]he Second Circuit recognizes that copyright protection for characters is a result of their embodiment in original works of authorship."); *Vacchi v. E*TRADE Fin. Corp.*, 2019 WL 4392794, at *4 (S.D.N.Y. Sept. 13, 2019) ("[C]opyright protection for characters results when they are embodied in original works of authorship that are themselves protected by the law of copyright."); *Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 235 (2d Cir. 1983) ("Plaintiffs own the copyrights in various works embodying the character Superman and have thereby acquired copyright protection for the character itself").[18]

The Phillies instead claim that Dave Raymond—who could not even perform as the Phanatic without H/E's approval—authored the Phanatic "character" because he "gave life" to H/E's work of authorship.  Compl. ¶ 17.  This has no basis in law.  To achieve character protection, the character must be "sufficiently delineated," *Warner*, 720 F.2d at 240-41, meaning that the "author fixed in a tangible medium of expression the abstract concept that is a character." *Conan*, 2018 WL 4522099, at *10.  Courts look at visual depictions, name, dialogue, relationships with other characters, actions and conduct, personality traits, and written descriptions, in determining

---

referring to The Phillies' purported copyright authorship in the Phanatic "character."  Notably, Harrison noted in that same journal that Dave Raymond "like[d] the character" that H/E created when Raymond came in to H/E's studio for a costume fitting.  SUF ¶ 18; Harrison Decl. ¶ 6.

[18] The Copyright Office will not even register a claim in a "character" separate from a work of authorship, further confirming that one cannot assert authorship in a "character" that is divorced from an underlying work. *Conan Properties Int'l LLC v. Sanchez*, 2018 WL 4522099, at *6 (E.D.N.Y. June 8, 2018), report and recommendation adopted as modified, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018); *Titan Sports, Inc. v. Hellwig*, 1999 WL 301695 (D. Conn. 1999).

whether a character is sufficiently delineated.  *Fun With Phonics, LLC v. LeapFrog Enterprises, Inc.*, 2010 WL 11404474, at *6 (C.D. Cal. Sept. 10, 2010).

Here, The Phillies cannot articulate any copyrightable contribution to the Phanatic "character," and did not fix a protectable character in a tangible work.  When pressed to identify the scope of their purported "character" rights, The Phillies identified a number of abstract, uncopyrightable traits that could apply to any sports mascot and which are not tied to any particular copyrighted work, *i.e.,* the Phanatic is a "passionate Philadelphia sports fan" with a "child-like enthusiasm" that is "frenetic and hyper," "displays slapstick humor," "loves to dance," and "[w]ears his emotions on his sleeve." Montclare Decl. Ex. 33, at 12-13.  *See KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844, 857 (1980) ("The concept of parading as a mascot in an animal costume would seem to be in the public domain."); *see also Lesley v. Spike TV,* 241 F. App'x 357, 358 (9th Cir. 2007) (improvised performances of television personality on a gameshow were not copyrightable); *Fun With Phonics*, 2010 WL 11404474, at *5–6 ("lightly sketched" characters not entitled to independent protection); *Alexander v. Haley*, 460 F. Supp. 40, 45-46 (S.D.N.Y. 1978) (material from common sources, *scenes a faire* characters or settings, stock ideas, and basic themes, are not copyrightable).[19]

These traits furthermore are not copyrightable because they are admittedly personality traits that Dave Raymond formed in his head and did not write down, which he claims are an extension of his own personality.  SUF ¶¶ 22-24.  "A person's name or likeness is not a work of authorship" under copyright law.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003-04 (9th Cir. 2001) (citing 1 Nimmer on Copyright § 1.01[B][1][c]); *Brown v. Ames*, 201 F.3d 654, 658

---

[19] To hold otherwise would effectively give The Phillies a monopoly over mascots that are "mute" and "love to dance," creating an absurd result.

(5th Cir. 2000) ("A *persona* does not fall within the subject matter of copyright.").[20]

In a last-ditch effort, The Phillies belatedly produced after the close of discovery films portraying the Phanatic, in order to claim that they had created works of authorship that embody the Phanatic character.  The Phillies have put forth no witnesses or documents to demonstrate when these films were created or who created these films, and these films should therefore be excluded for lacking foundation.  *See Hamad v. Cook*, 2014 WL 3507340, at *7 & n. 2 (S.D.N.Y. June 30, 2014) (precluding documents on summary judgment that could not be properly authenticated and lacked foundation).  Regardless, The Phillies ignore that H/E held sole creative approval over ***all audiovisual works*** featuring the Phanatic from 1978 to 1984, pursuant to the agreements in which The Phillies expressly recognized H/E's rights in the "copyrighted character".

### C.      The Phillies are Barred from Asserting any Claim for Authorship

Though the evidence overwhelmingly demonstrates H/E's authorship and The Phillies' lack thereof, the Court may dispose of The Phillies' authorship claims for an even simpler reason: they are barred by the Copyright Act's three-year statute of limitation.  17 U.S.C. § 507.  Claims for authorship accrue only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.  *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (citing *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)).  And a co-author knows he or she jointly created a work from the moment of its creation.  *Merchant v. Levy*, 92 F.3d 51, 55 (2d Cir. 1996).

Any number of events can trigger the accrual of a claim, including an express or implied assertion of sole authorship or ownership or express repudiation of the claimants' authorship.  *See Kwan*, 634 F.3d at 228; *see also Price v. Fox Entm't Grp., Inc.*, 473 F. Supp. 2d 446, 457 (S.D.N.Y.

---

[20] Tellingly, Dave Raymond admitted that he could only perform as the Phantic when wearing the Phanatic costume, and had never performed as the Phanatic in a different mascot costume.  SUF ¶ 25.  This is because the Phanatic's "character" does not exist outside of works authored by H/E.

2007) (claim accrued when party seeking authorship was not credited as author); *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (claim accrued when work was released with copyright notice signifying defendant as sole copyright owner and plaintiff did not get royalties); *Charles v. Seinfeld*, 803 F. App'x 550 (2d Cir. 2020) (claim accrued when plaintiff's request for backend compensation was rejected and work premiered without crediting plaintiff); *DeCarlo*, 127 F. Supp. 2d at 507-08 (S.D.N.Y. 2001) (claim accrued where plaintiff was aware that defendants claimed ownership over characters, including rights to license those characters); *Carell*, 104 F. Supp. 2d. at 236 (claim accrued where plaintiff demanded defendants seek a license).

The Phillies were aware *from the moment of the Phanatic's creation* that H/E claimed sole authorship in the Phanatic. When The Phillies hired H/E to create the Phanatic, they acknowledged that "[t]he character will be copywritten by [H/E] who reserve all rights . . . ." SUF ¶ 12. The Phillies entered into another agreement a few months later granting them certain merchandising rights, but acknowledged that such merchandise required H/E's prior approval and would bear a copyright notice solely in H/E's name. SUF ¶¶ 34-36. The Phillies further agreed that they "shall have no right to make any use of the Phillie Phanatic character" except as expressly authorized therein. SUF ¶ 38. When The Phillies exceeded the scope of the license, H/E obtained a copyright registration in their name and sued The Phillies for infringement. SUF ¶¶ 41-45. The Phillies never claimed to hold any authorship interest during that litigation, even though it is a fundamental maxim that co-authors cannot sue one another for copyright infringement. SUF ¶¶ 46-48. *Kwan*, 634 F.3d at 229 (citing *Weissmann v. Freeman*, 868 F.2d 1313, 138 (2d Cir. 1989)). Instead, The Phillies settled that litigation by entering into the November 1979 Settlement, in which they again acknowledged that any rights they had in the Phanatic were subject to H/E's approval. SUF ¶¶ 50-52. When The Phillies purchased the rights in 1984, they agreed to credit H/E as the creators. SUF ¶ 59. Consistent with that understanding, The Phillies have consistently credited H/E as the

creators of the Phanatic for decades.  SUF ¶¶ 71-76.  The Phillies' authorship claims, transparently concocted decades later to circumvent H/E's right of termination, are barred as untimely.

Furthermore, for reasons explained *supra* in Section II.B., The Phillies' authorship claims are equitably estopped and barred by their unclean hands. The Phillies ratified numerous agreements that made clear the parties' understandings that H/E authored the Phanatic, and H/E relied on The Phillies' representations when they granted rights to The Phillies and provided work for The Phillies—often at discounted rates—for decades.  *See DeCarlo*, 127 F. Supp. 2d at 509-10; *PenneCom*, 372 F.3d at 493.  Allowing The Phillies to now prevail on their authorship claims after their acknowledgement for decades H/E's authorship rights would be extremely inequitable.

Finally, for the reasons explained above, The Phillies' authorship claims are barred by res judicata.  The Phillies failed to raise the defense of co-authorship when H/E sued it for copyright infringement in 1979.  Instead, The Phillies agreed to a settlement, dismissing the lawsuit with prejudice and expressly acknowledge H/E's authorship.  *See Balderman*, 870 F.2d at 62.

## IV.   H/E Is Entitled to Summary Judgment on Count V of The Phillies' Complaint and The Phillies' Motion for Partial Summary Judgement Should Be Denied

### A.    H/E Is Entitled to Summary Judgment on The Phillies' Request for Declaratory Relief Concerning "P2"

There is a narrow exception to the termination right, which provides that derivative works "prepared under authority of the grant ***before its termination*** may continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 203(b)(1) (the "Derivative Works Exception") (emphasis added).  The Phillies' Complaint asks the Court for a declaration concerning their ability to continue to use purported derivative works, now to include a lawyer-concocted knock off of the original Phanatic ("P1") referred to by the parties as "P2" and developed and built after the filing of the Complaint.  It is their burden to prove that this purported derivative work is covered by the Derivative Works Exception, *Woods v. Bourne Co.*, 60 F.3d 978, 994 (2d Cir. 1995), and that new

uses of P2 would fit within the exception. *See* 17 U.S.C. § 203(b)(1) ("[t]his privilege **does not extend to the preparation after the termination of other derivative works** based upon the copyrighted work covered by the terminated grant.") (emphasis added).

As a matter of law, P2 is a not copyrightable derivative work. A derivative work is defined as a work that is "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. Here, The Phillies did not recast, transform, or adapt the Phanatic. Thus, as can be discerned from viewing the various depictions and photographs in the record, such as the side-by-side below, P2 is a reproduction of the registered P1.

 

The Second Circuit has explained that the copyrightability of derivative works is subject to two "important and related" limitations: "First, to support a copyright the original aspects of a derivative work **must be more than trivial**. Second, the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material and **must not affect the scope of any copyright protection in that preexisting material**." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980) (emphasis added). The first prong reflects the long-standing view in this Circuit that to obtain copyright for a derivative work, the new work must

"contain some substantial, not merely trivial originality." *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976) (quoting *Chamberlain v. Uris Sales Corp.*, 150 F.2d 512, 513 (2d Cir. 1945). "Courts have consistently rejected attempts to gain copyright protection for allegedly derivative works that are based on trivial changes to preexisting materials." *Procter & Gamble Co. v. Colgate-Palmolive Co.*, 1998 WL 788802, at *40 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999) (citing cases). The second prong under the *Durham* test reflects the explicit requirement that a copyright in a derivative work "not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material." 17 U.S.C. § 103(b). For instance, where a derivative work is "so similar to the well-known copyrighted characters that [it is] based upon," granting a copyright in that derivative work would have the practical effect of providing the derivative work creator with a *de facto* monopoly over all derivatives of that copyrighted character, hampering the rights of the owner in the underlying work to create or license its own derivative works. *See Entm't Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1224 (9th Cir. 1997) (following *Durham* test).

Here, the record overwhelmingly demonstrates that H/E are entitled to summary judgment on P2. First, H/E's unrebutted experts addressed at length the artistic qualities of P1 and the negligible artistic significance of the lawyer-driven "changes" made to rollout P2.[21] Their declarations and expert disclosures/reports are submitted with this Motion. They are both imminently qualified to opine on P2's design characteristics. Both unequivocally opined that the variations exhibited in P2 to be less than trivial. *See* Declaration of David Zung ("Zung Decl.")

---

[21] The admissibility of the opinions is addressed *infra* in Section IV.C.1. The Supreme Court has explained that the test for reliability of experts is "flexible" and that "the relevant reliability concerns may focus upon personal knowledge and experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). There are many different kinds of experts and expertise, and the *Daubert* gatekeeping inquiry must be "tied to the facts" of a particular case." *Id.*

Exs. B-C (Zung Reports); Erickson Ex. I (Erickson Expert Disclosures).  Second, The Phillies' admissions and documents demonstrate that their intent was to develop a knock off of P1 with barely discernable modifications that they hoped would allow them to continue using the "same old Phanatic" after termination, not a new character.  Thus, it is unsurprising that when H/E's experts—independent of each other—created digital overlays of the P2 and P1 designs, depicted in Appendix 1 hereto, the differences were negligible.  Third, when the law is applied to the expert testimony, admissions and documents, P2 does not qualify as a derivative work.

        *1.*    *Unrebutted Expert Opinions*

        *a)*    *David Zung*

Retained expert David Zung was educated in the arts at Princeton, Parsons School of Design, Art Students League, New York Academy of Fine Arts, and the National Academy of Design.  Zung Decl. Ex. A, Ex. B at 2-3.  He has also taught courses at NYU Tisch School of the Arts, the Fashion Institute of Technology, and the Brooklyn College Barry Feirstein Graduate School of Cinema.  *Id.*  Over the course of his career, he has "personally designed hundreds of original characters for television series and commercials, in every form of media, including hand-drawn animation, stop motion a/k/a 'claymation,' computer animation, mixed lived action and computer-generated imagery (CGI), and traditional puppetry."  *Id.*  Moreover, his "designs have in fact been used by Henson puppeteers for commercials on several occasions. Two characters [he] designed were used as ambassadors in major international ad campaigns."  *Id.*

In a seventy-four page, detailed report, Zung, *inter alia*, compared and contrasted the elements and the overall impressions of P1 and P2, including specifically The Phillies' claims as to how the mascot was altered.  He did so based on his own, extensive experience and expressly used a methodology that considered the facts analyzed by courts in the Second Circuit when determining the originality of potential derivative works.  He also buttressed this analysis by

referencing and applying a respected method for assessing art referred to as "the 5 design hierarchies," which was outlined by a preeminent artist and the Art Center College of Entertainment Design Chair Tim Flattery.  This process caused Zung to opine as follows:

> P2 has some variances from the P1 design.  For instance, The Phillies claim that they made the backside larger, added feathers to create 'wings' on the arms, lightened the eyebrows, enlarged the hat, modified the eyelashes to make them star shaped, and made the snout cylindrical rather than conical, among other things. My review of documents and testimony in this litigation show that these changes were sparked by this lawsuit, and were deliberately designed in what the The Phillies hoped to be "creative" changes to P1. However, after reviewing each of those variances, I conclude that the modifications ultimately do little to change the impression that P2 is the exact same mascot as P1. The changes reflected in P2 are slavish. P2 is essentially nothing more than a copy of P1 but with very subtle differences, and none of those differences amount to more than a trivial amount of creativity. Many of the design choices also reflect the use of prior artistic expression without any creative attempt at reinterpretation.

Zung Decl. Ex. B, at 24.

In sum, Zung concluded that P2 does not alter the fundamental design or character of P1 significantly enough to qualify it as a 'new' work, from the point of view of an artist in the field. It is a slavish and uninspired attempt at modifying P1, and the changes amount to little more than cosmetic surgery."  Zung Decl. Ex B., at 74.[22]

> b)    *Bonnie Erickson*

Bonnie Erickson is of course a pre-eminent designer of sports mascots, who has drawn on her vast experience in character design and puppetry to create numerous memorable mascots, including the Phanatic.  *See* SUF ¶¶ 1-2, Erickson Decl. ¶¶ 2-5.  She drew on her experience to compare and contrast the elements and the overall impressions of P1 and P2.  She concluded that "[t]he Phanatic costume that the parties have been referencing as 'P2' and artwork portraying P2

---

[22] In a Supplemental Report, Zung considered additional information concerning P2 that was unavailable to him at the time of his first report because it had not yet been produced in discovery. Zung Decl. Ex ¶ C.  None of this information altered his conclusion, and in his opinion, the new information further supported his conclusion.  *Id.*

is/are, from an artistic point of view, extremely similar … to the original Phanatic and artwork, so much so, that the two would be perceived as nearly identical. Depictions of this P2 costume and P2 artwork … attempts to reproduce artwork and/or materials previously created by Harrison/ Erickson. The alterations to the original Phanatic with respect to the P2 costume and P2 artwork are, in Erickson's expert opinion, of less than minimal artistic significance." Erickson Decl. Ex. I.

2.   <u>The Phillies' Own Admissions</u>

A treasure trove of documents Judge Netburn ordered The Phillies to produce, and deposition testimony, only make the opinions of H/E's experts more powerful.  The Phillies did not want to change their mascot, and, prompted solely by H/E's notice of termination, intentionally designed P2 to give the viewer the impression that P2 was still the same Phanatic—adding modifications to the Phanatic at the direction of counsel which are so inconsequential that The Phillies' own executives did not think anybody would notice the difference.  SUF ¶¶ 86-99.  P2 was created by referencing numerous photographs and artwork depicting the Phanatic over time, and Randy Carfagno, who The Phillies hired to construct P2, had worked on the original Phanatic's costume since the early 1980s.  He still had access to the patterns (which are in effect blueprints for building the costume), as well as access to all of the same materials.  SUF ¶¶ 90-92; Erickson Decl. ¶¶ 25-31.   When P2 was introduced to the public on February 23, 2020, the press immediately commented on the triviality of the changes, noting in articles that one had to "squint to find any difference" between P2 and the "original" Phanatic, and, capitalizing on this press coverage, The Phillies publicly described P2 as "the same old Phanatic," and continued to release promotional materials, even after the date of termination, that treated P2 as if it was, in fact, the same old Phanatic.  SUF ¶¶ 96-99, 103, 105-08; *see also* Am. Compl. ¶¶ 24-25.

3.   *Concluding Legal Analysis Concerning P2's Lack of Originality*

Applying the legal standards discussed above in this Section, H/E is entitled to summary

judgment under these facts on the question of whether P2 is a copyrightable derivative work that may be utilized under the Derivative Work Exception.  It is not, because P2 is unquestionably "instantly identifiable" as an embodiment of the Phanatic.  *See Entm't Res. Grp. Inc.*, 122 F.3d at 1223 (holding that costumes based on copyrighted characters were not derivative works where they were "instantly identifiable as embodiments" of the underlying copyrighted characters in "yet another form").  Instead, it is the equivalent of a minor, editorial revision to the character.  *See* 3 Nimmer on Copyright § 11.02[C][1] ("[S]uppose the publisher, prior to publication, made a number of editorial changes in the manuscript and claims to have thereby published a 'derivative work' for further 'utilization' purposes.  In most cases, such editorial revisions probably would be regarded as too minimal to warrant characterizing the result as a derivative work.").  Furthermore, not a single variation between P2 and the Phanatic is the product of independent creation.  *See Durham*, 630 F. 2d at 910 (explaining that "independent creation" is a requirement to obtain copyright protection).  Every single variation is artistically uninspired.  *See Procter & Gamble Co.*, 1998 WL 788802, at *43 (holding that purported derivative work lacked originality where each of the allegedly unique elements were "not only lacking in originality, but so conventional, in fact, that they constitute *scenes a faire*").[23]

Finally, due to the extremely negligible variation between the Phanatic and P2, and given that The Phillies hold out P2 as the "same old Phanatic," recognition of P2 as a derivative work would undoubtedly affect the scope of the copyright in the Phanatic.  In effect, The Phillies would continue to hold a *de facto* copyright in the Phanatic, pushing directly into H/E's own rights in the Phanatic and fundamentally undermining H/E's right of termination.  *See Gracen v. Bradford*

---

[23] Although "novelty" is not required, a work must be "independently created" to merit protection. *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004).  It cannot be based on "slavish copying."  *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).

*Exch.*, 698 F.2d 300, 305 (7th Cir. 1983) (explaining that courts assessing originality of derivative works must "assure a sufficiently gross difference between the underlying and the derivative work to avoid entangling subsequent artists depicting the underlying work in copyright problems").  P2 is just a copy of the Phanatic as a matter of law.

### B.   Any New P2 Works Created By The Phillies After Termination Are Infringing

Regardless of whether The Phillies may utilize P2 and other works under the Derivative Works Exception, they ***may not develop any new derivative works that feature P2 or other derivative works***.  The Derivative Works Exception "does not extend to the preparation ***after the termination*** of other derivative works based upon the copyrighted work covered by the terminated grant." 17 U.S.C. § 203(b)(1) (emphasis added).  Yet, The Phillies argue that if they, for example, can utilize P2 after termination under the Derivative Work Exception, then they can "reproduce P2, [] distribute copies of P2, and [] display P2 publicly at Phillies' baseball games, on TV, on the Phanavision screen at the ballpark, and on social media."  Br. at 14.  But this is not the law.

The clear limiting language of 17 U.S.C. § 203(b)(1)—that the Derivative Work Exception "does not extend to the preparation after the termination of other derivative works"—reflects the express intent of Congress to limit the exception to only encompass derivative works prepared prior to termination. The privilege "is not broad enough to permit the preparation of other derivative works" after termination.  *See* H.R. Rep. 94-1476, at 127 (1976) ("In other words, a film made from a play could continue to be licensed for performance after the motion picture contract had been terminated but any remake rights covered by the contract would be cut off."). Accordingly, any new post-termination derivative work created by the Phillies using P2 would necessarily be a work "based upon [the original H/E] copyrighted work covered by [H/E's] terminated grant," which is expressly prohibited by 17 U.S.C. § 203(b)(1).

The Supreme Court's holding in *Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985) is

instructive.  In the context of discussing a grantee's rights to "utilize" a derivative work after termination, the Court explained:

> "The critical point in determining whether the right to continue utilizing a derivative work survives the termination of a transfer of a copyright is whether it was 'prepared' before the termination.  Pretermination derivative works—those prepared under the authority of the terminated grant—may continue to be utilized under the terms of the terminated grant.  ***Derivative works prepared after the termination of the grant are not extended this exemption from the termination provisions***.

*Id.* at 173 (emphasis added).

A few years later, the Supreme Court once again confirmed that the grantees' rights under the derivative work exception are limited to the use of derivative works created *before* termination. In *Stewart v. Abend*, the Court noted, in the context of the § 304 termination right, that the author "may not . . . terminate the right to use a derivative work for which the owner of the derivative work has held valid rights in the original and renewal terms.  The author, however, ***may terminate the right to create new derivative works***."  495 U.S. 207, 225 (1990) (internal citations omitted) (emphasis added).  The Second Circuit further confirmed the limitations of the derivative work exception in *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17 (2d Cir. 1998) by explaining that if the "utilization" of the pre-termination derivative work results in the creation of a new derivative work, then the derivative work exception ***does not apply***.  *See id.* at 22, n.7.

Thus, the plain language of 17 U.S.C. § 203(b)(1), the legislative history, and all of the relevant cases establish a clear limitation on the derivative work exception under section 203(b)(1): while grantees may use a pre-termination derivative work after termination, the grantee may not create new derivative works after termination that are based on a pre-termination derivative work that was based on the original copyrighted work that reverted to the grantor upon termination.  In other words, a grantee may "utilize" the pre-termination derivative work after termination in any manner permitted by the grant, ***but the line is drawn if the "utilization" creates a new derivative***

***work of the original work.***[24]

The Phillies conflate the use of a pre-termination derivative work—which is permitted under 17 U.S.C. § 203(b)(1)—with the creation of post-termination derivative works that are necessarily based on the original work—which is not permitted pursuant to the limitation in the derivative works exception, expressly set forth in 17 U.S.C. § 203(b)(1).  Therefore even assuming *arguendo* that P2 is a pre-termination derivative work, The Phillies may not utilize any derivative work of P2 after termination, absent the consent of the terminating party, H/E.

Yet, The Phillies have already willfully created a variety of post-termination derivative works without authorization, failing to recognize that ***each audiovisual work, photograph, piece of artwork, or merchandise depicting P2 constitutes a new derivative work of the Phanatic***.  Dozens of new, post-termination promotional videos, photographs, and artwork have already been published on YouTube and on other Phillies social media pages, without the consent of H/E.  *See* Amended Counterclaims, Ex. A; SUF ¶ 108-09.  The Phillies have even created a video series entitled "Storytime with the Phillie Phanatic," which involves precisely the conduct that courts identify as creating a derivative work.  SUF ¶ 108; *see Purohit v. Legend Pictures, LLC*, 448 F. Supp. 3d 382 (D. Del. 2020) (YouTube video depicting illustrations of book along with voiceover of person reading said book constituted a derivative work of the book).  Each of these new videos, photographs, and artwork injects the minimal threshold of originality to qualify as a new work of authorship, and is therefore an unauthorized post-termination derivative work of the Phanatic.  *See,*

---

[24] The Nimmer treatise agrees. In discussing what rights a grantee has in a derivative work after termination, Nimmer explains that if "the original (now terminated) grant permitted such uses, such uses would not be the subject of termination because the post-termination licenses would simply constitute the further utilization of the previously prepared derivative work within the meaning of the Derivative Works Exception."  However, where the use creates a new derivative work, then "***the terminating party, rather than the original grantee, must grant rights to create this new derivative work***."  3 Nimmer on Copyright § 11.02[C][1] (emphasis added).

*e.g, Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 607-09 (S.D.N.Y. 2014) (photograph of sculpture constituted a derivative work based on sculpture and was therefore subject to a separate copyright from sculpture); *Schrock v. Learning Curve, Int'l, Inc.*, 586 F.3d 513, 519 (7th Cir. 2009) (photographs of three-dimensional "Thomas & Friends" train toys contained enough independent expression to constitute derivative works based on the toys); *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005) ("Unless a photograph replicates another work with total or near-total fidelity, it will be at least somewhat original in the rendition.").

The Phillies have admitted that they intend to *expand* use of P2 by continuing to create even more unauthorized derivative works.  Multiple representatives of The Phillies testified that The Phillies intend to use P2 in the same ways they used the original Phanatic, including through the development of new merchandise and other items featuring P2, even though The Phillies no longer hold any copyright rights in the Phanatic.  Indeed, The Phillies seeks approval by this Court of the P2 "Style Guide," which is admittedly intended to be used by licensees to create further adaptations of P2.  SUF ¶ 105.

### C.    The Phillies Are Not Entitled to Partial Summary Judgment on the Issues Raised in Their Motion; Instead the Issues Must Be Resolved in H/E's Favor as a Matter of Law

In their own Motion for Partial Summary Judgment, The Phillies ask the Court to hold (i) that H/E's experts should be excluded and that the Court should ignore other facts related to P2's development because the Court is limited to a side-by-side comparison of P1 and P2 (and related artwork) to assess whether P2 may be utilized under the Derivative Work Exception and (ii) that they are entitled to continue using other purported derivative works either because they were not covered by H/E's termination notice or because they fall within the Derivative Works Exception.  The Phillies are not entitled to summary judgment based on these issues.  Instead, H/E is entitled to summary judgment.

1.       *The Court Should Consider the Whole Record, Including Expert Testimony,*
         *Not Just Side-by-Side Comparisons*

To encourage the Court to ignore the factual record concerning how P2 was concocted and

H/E's expert testimony, The Phillies desperately seek to have this Court engage in a limited "visual

comparison" of images standing alone.   Setting aside that even the images alone reveal the

weakness of The Phillies' case for P2, courts routinely reject such a limited approach.   *See, e.g.,*

*Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763-64 (2d Cir. 1991) (holding that trial

court properly relied on testimony of lay witness and expert witness concerning design process in

determining design based on preexisting source); *Entm't Res. Grp., Inc.*, 122 F.3d at 1223

(determining plaintiff's alleged works not original in part because record demonstrated that

alterations to pre-existing work were guided by non-creative decisions).

The Phillies principally rely on *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697

F.2d 27 (2d Cir. 1982), a case which provides little discussion of the derivative work standard and

which is distinguishable.   There, the Second Circuit conducted a *de novo* review of the creative

elements of the works involved, as there was no expert opinion or other relevant evidence

presented to the district court to inform the court's analysis.   The Phillies have put forth no

authority for the position that the Court is *restricted* to a simple visual comparison, and indeed

there is none.   Moreover, The Phillies ignore that, subsequent to *Eden Toys*, the Second Circuit

further clarified the standard for derivative works, admonishing that courts take "special caution

in analyzing originality in derivative works, since too low a threshold will 'giv[e] the first

[derivative work] creator a considerable power to interfere with the creation of subsequent

derivative works from the same underlying work."   *Woods*, 60 F.3d at 990 (citing *Gracen v.*

*Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983) (alteration in original)).

In *Woods,* the Second Circuit concluded that a piano-vocal arrangement was not a

derivative works, notwithstanding that the court's side-by-side comparison with the lead sheet "quickly reveal[ed] that they are not literally identical."  60 F.3d at 992.  Instead, the court considered expert testimony on "whether the differences were 'substantial variations' reflecting deliberate aesthetic choices or merely 'trivial changes," and cited to other facts such has testimony concerning the creative processes behind the arrangement, which suggested that the arrangement and lead sheet were "simply two different renderings" of the same song.  *Id.*  The Court should do so here as well because the testimony of Zung and Erickson is admissible and proper and the record belies a conclusion that P2 and associated works are copyrightable.[25]  The Phillies' arguments otherwise are baseless.

    <u>First</u>, The Phillies misconstrue the opinions proffered by Zung and Erickson by arguing that the opinions concern the ultimate outcome of legal issues.  Br. 19.  In fact, they opined on the significance of the variations between P1 and P2 from a creative design standpoint, which is directly relevant to the Court's determination, and which is directly in line with the expert opinions provided in the seminal cases addressing the originality of derivative works.  *See L. Batlin* 536 F.2d at 489 (approving district court's reliance on expert testimony that "variations found in [the purported derivative work] were merely 'trivial' and that it was a reproduction of the [underlying work] made as simply as possible for the purposes of manufacture"); *Woods*, 60 F.3d at 992 (discussed *supra*).  Indeed, experts on the factual issues underlying originality determinations are

---

[25] The Phillies do not argue that Erickson is unqualified to opine on the issues presented.  They do half-heartedly argue that Zung is unqualified because he testified he is not an "expert on the design of sports mascot costumes."  Br. 18.  But The Phillies' counsel posed a vague and ambiguously worded question, and Zung's answer was taken out of context.  *See* Zung Decl. ¶¶ 3-9., Ex. D.(134:11-140:13).  Zung's vast experience speaks for itself.  Not only has he spent decades designing characters and mascots, including at some of the most famous animation studios, but he currently teaches classes in character and costume design.  *Id.* Exs. A-C, E-F.

routinely allowed.[26]  Regardless, opinions that go to the ultimate issue do not warrant wholesale

exclusion of the testimony.  *See Design Basics, LLC v. Petros Homes, Inc.*, 2017 WL 2842783, at

*7 (N.D. Ohio July 3, 2017) ("[T]he inclusion of such opinions . . . does not render [the expert's]

entire report and/or testimony inadmissible.").[27]

      Second, The Phillies argue that the experts' opinions are inconsistent with the Second

Circuit's approach to assessing derivative works.[28]  However, their analyses are consistent with

the derivative work standard—it is The Phillies who seek to distort the standard.  Tellingly, The

Phillies fail to even cite the two-pronged approach set forth by the Second Circuit in *Durham* and

followed in countless other cases, which Zung relied upon to construct his methodology.  Rather

than doing so, The Phillies contend Zung did not apply the Second Circuit's "*Eden Toys* standard"

---

[26] *See, e.g.*, *Folio*, 937 F.2d at 763-64 (discussed *supra*); *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980) (noting with approval expert testimony that belt buckles at issue "r[ose] to the level of creative art"); *M3 Girl Designs, LLC v. Blue Brownies, LLC*, 2012 WL 12885060, at 3 (N.D. Tex. June 1, 2012) (permitting jewelry expert to testify as to the lack of originality in plaintiff's artwork and designs); *Home Design Servs., Inc. v. Trumble*, 2011 WL 1638910, at *3 (D. Colo. Apr. 29, 2011) (there is "no 'per se ban'" on expert testimony related to originality); *Pyatt v. Jean*, 2006 WL 8440910, at *5 (E.D.N.Y. Aug. 29, 2006) ("[A]n expert may be useful to enlighten a court on the issue of originality.").

[27] The Phillies cite inapposite cases.  In *We Shall Overcome Foundation v. The Richmond Org., Inc.*, the court excluded an expert opinion as irrelevant because he opined on the significance of a change in a single word to establish originality, but the inclusion of a single new word is not copyrightable as a matter of law.  2017 WL 3981311, at *20-21 (S.D.N.Y. Sept. 8, 2017).  In *Durkin v. Platz*, defendants failed to disclose the expert until over two months after discovery closed.  920 F. Supp. 2d 1316, 1326-28 (N.D. Ga. 2013).  In *Design Basics, LLC v. Deshano Companies, Inc.*, the court principally took issue with the fact that the expert had "wandered afield from his area of expertise."  2012 WL 4340784, at *2 (E.D. Mich. Sept. 21, 2012).  And in *Paul Morelli Design, Inc. v. Tiffany & Co.*, the court noted that the jury had already heard testimony from other fact and expert witnesses concerning the origin, design, elements, and manufacture of the allegedly infringing works.  200 F. Supp. 2d 482, 487 (E.D. Pa. 2002).

[28] By way of example, The Phillies claim that Zung "conclude[d] that if P2 is 'recognizable as the Phanatic' then it cannot be a derivative work," Br. 19, but Zung said no such thing.  Rather, he observed that P2 is "instantly recognizable as the Phanatic" in explaining why the variations exhibited in P2 are insignificant.  This observation is consistent with The Phillies' own internal observation that "nobody would notice the difference."  Zung Report _; SUF _.

correctly because, looking at blurred copies of the works at issue in *Eden Toys*, he testified that the changes to Paddington Bear appeared to be insignificant.  Zung explained over objection at his deposition the images showed to him were like "Xerox copies of Xerox copies of Xerox copies, so that all the reproduction . . . it obscures the quality of the line work and the value of the tones." Zung Decl. ¶¶ 21-25, Ex. D (24:17-25:14).  The Phillies' counsel proceeded to demand "yes or no" answers from Zung, even after Zung repeatedly explained that creativity is not binary.  *Id.* (38:7-44:23).  Finally, Zung made clear that he was giving his opinion as an artist, and not opining on the legal aspects of the court's conclusions in *Eden Toys*.  *Id.*; *see Design Basics, LLC v. Petros Homes, Inc.*, 2017 WL 2842783, at *4, 6-7 (N.D. Ohio July 3, 2017) (admitting design expert, and noting that he did not need to be an expert in copyright law).

The Phillies further take issue with the experts' purported "piecemeal analys[e]s," arguing that they subtract the individual design elements from the overall design, rather than considering the "selection and arrangement" of changes with respect to P2 as a whole.  Br. 20-21.  But Zung and Erickson looked at *both* the individual components of P2 *and* the work as a whole, and concluded that under both analyses, the variations in P2 were less than trivial.  Zung Decl. ¶¶ 16-20, Ex. B, at 24-37; Erickson Decl. Ex. I.  *See Design Basics*, 2017 WL 2842783, at *7 (explaining that while individual design features do not necessarily need to be afforded copyright protection, "that does not mean . . . that a comparison of the individual design features is completely irrelevant").  Contrary to The Phillies assertions, the experts also engaged in both analyses with respect to other works discussed in the report/disclosures.  For example, The Phillies claim Zung applied inconsistent approaches because he concluded that three separate baseball-head themed mascots were creative because they "create a unique impression" as a whole, Br. 21, but ignore that Zung also broke down their elements to discuss how they combined to create different overall

impressions.  Zung Decl. ¶ 17, Ex. B, at 73-74.[29]

Third, The Phillies manufacture a number of other purported flaws in the experts' analyses (many of which are addressed in Zung's attached declaration), but even if these objections were valid (and they are not), such objections go to weight, not admissibility.  *See Home Design Servs.,* 2011 WL 1638910, at *4 ("Weaknesses in [the expert's] methodology may be explored on cross examination, and it will be up to the jury to decide what weight to accord to his testimony."); *Watt v. Butler*, 744 F. Supp. 2d 1315 (N.D. Ga. 2010), *aff'd*, 457 F. App'x 856 (11th Cir. 2012) (admitting expert where methodology was consistent with that used in his professional studies, and explaining that defendants' objections to the expert's analyses of the evidence went to the weight and accuracy of testimony, not reliability of methodology).

2.   *The Phillies Are Not Entitled to Summary Judgment on Works Other Than P2; Instead H/E Should Be Awarded Summary Judgment*

a)   *Pre-1984 Artwork and Reproductions Thereof*

The Phillies argue that they are entitled to a declaration stating that they may continue to use Phanatic artwork created by H/E prior to execution of the 1984 Agreement for two reasons. First, they claim that the 1984 Agreement only assigned rights in the registered Phanatic mascot and no other work.  Hence, they conclude, H/E's termination notice cannot apply to any artwork other than the registered work.  Second, they argue that, even assuming the 1984 Agreement did assign rights in all pre-1984 Phanatic artwork created by H/E, H/E's termination notice did not cover any work other than the registered Phanatic.  Neither argument has merit.

---

[29] The Phillies also suggest that the experts apply a double standard when they opine that P1 and other mascots display significant artistry.  But unlike P2, P1 is ***not based on another character***. The question is not whether P1 itself is original; rather it is ***whether P2 has some copyrightable variations from P1 that are more than trivial.***  *Durham Indus.*, 630 F.2d at 909-910.

(1)      The Scope of the 1984 Agreement's Assignment

The Phillies submit a declaration from former employee Christine Legault-Long and a sparsely detailed invoice.  She states that The Phillies actually did not purchase any pre-1984 Phanatic artwork until 1990, after she asked Wayde Harrison whether The Phillies held such rights and Wayde Harrison told her they did not.[30]  This newfound position is belied by the plain language of the 1984 Agreement, and it is well established that extrinsic evidence of the parties' intent may only be considered where an agreement is ambiguous, and "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162-63 (1990) (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969); *accord Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

The grant of rights under the 1984 Agreement, which encompassed a grant in and to the "MASCOT" (the "artistic sculpture" known as the Phillie Phanatic) "***and in and to all reproductions and portrayals of all or part of the MASCOT in any medium whatsoever***" (emphasis added), assigned rights in any artwork that was created prior to the execution of the 1984 Agreement.  SUF ¶ 57.[31]  This plain language cannot be replaced by a decades-old purported

---

[30] This position was raised for the first time on summary judgment.  The Phillies never asked Harrison about the purported conversation in his deposition, Ms. Legault-Long did not discuss this purported conversation in her own deposition, and there is no documentary evidence to support that this conversation took place.  *See* Declaration of Wayde Harrison, ¶¶ 3-5.  The Long Declaration also contradicts her testimony in 1987, when she attested in a copyright infringement action that The Phillies held "all rights, title, and interest in the Phillie Phanatic character, including but not limited to the copyrights therein and . . . the right to license third parties to use the name and likeness of the Phillie Phanatc character on merchandise of all kinds, has been assigned to The Phillies."  SUF ¶ 73.

[31] The Phillies' newfound interpretation of the contract improperly renders language from paragraph 1 superfluous.  If the grant was limited to the mascot itself, the language that appears above in bold would be pointless.  Moreover, even if one construed the contract to cover the mascot itself and images of the actual mascot, the word "portrayals" would be redundant of the word "reproductions."  The Phillies, while failing to quote the language shown in bold above, cite to

conversation that The Phillies did not even raise in discovery.[32]  Moreover, the record is clear that

The Phillies understood this unambiguous grant of rights.  Bill Giles, who ran the team in 1984,

explained at his deposition that the entire reason for entering into the 1984 Agreement was to avoid

being in the very situation Ms. Legault-Long is claiming The Phillies were in, making clear that it

was The Phillies' objective to no longer need H/E's permission to use or create Phanatic-related

works.  SUF ¶ 63.  Given these facts and the contractual language, the Court should rule that as a

matter of law the 1984 Agreement assigned Phanatic-related artwork and that H/E's termination

notice terminated that assignment.

> (2)  H/E's Termination Notice Properly Terminated the Assignment of Rights for All Pre-1984 Works

The Phillies also claim H/E's notice of termination did not effectively terminate H/E's

rights in the pre-1984 artwork that was encompassed in the 1984 Agreement because H/E's notice

of termination only specified that it was terminating the rights in the costume.  Br. at 26-27.  But

the notice of termination made clear that ***all rights*** under the 1984 Agreement—including "two

and three dimensional drawings"—were being terminated.  SUF ¶ 80.  The Phillies cite *Burroughs*

*v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610 (2d Cir. 1982) for the proposition that the notice of

termination must list every work being terminated but that case involved a much smaller universe

---

language from "short form" assignments attached to the 1984 Agreement.  The Phillies point out that these short form assignments only reference the registered artistic sculpture, not other works. However, this is unsurprising because the purpose of a short form assignment is often to provide a transferee with a document that may be recorded at the Copyright Office for purposes of perfecting title to a registered copyright.  *See* 17 U.S.C. §205 (dealing with recordation of transfers and impact on priority between conflicting transfers).  The short forms do not alter the meaning of paragraph 1 of the contract.

[32] Paragraph 10 of the 1984 Agreement states: "This writing constitutes the entire agreement between the parties, and none of the provisions herein contained shall be waived, modified or otherwise altered or discharged except by an instrument in writing signed by both HE and the Phillies."  SUF ¶ 61.  The Phillies submit no such signed writing with Ms. Long's declaration and no such document has been produced in discovery.

of works with clear titles whereas the pre-1984 artwork at issue here rarely even had titles and would have been impracticable to list. *Burroughs* also did not analyze one of the key provisions governing the content of termination notices. Where, as here, works consist of a series containing characters—such as the works at issue here—"requiring the terminating party to list separately each work in the series or all works in which the character appears would render the termination right meaningless. ***Instead, notice that reasonably puts the terminated party on notice of the character being terminated is sufficient***." *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1093-94 (C.D. Cal. 2009) (citing 3 Patry on Copyright § 7.45) (emphasis added). The court in *Siegel* specifically looked to the "harmless error" provision, which states that "[h]armless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of [the statute] shall not render the notice invalid." *Id.* at 1092 (citing 37 C.F.R. § 201.10(e)(1) (alteration in original)). Applying that provision, the court held that a notice of termination was valid as to several works featuring Superman that were not specifically included in the notice, since the notice clearly applied to each work embodying Superman. *Id.* at 1091-93.

*Burroughs* has been expressly distinguished in more recent cases precisely because it did not consider the harmless error provision. For instance, in *Mtume v. Sony Music Entm't*, 408 F. Supp. 3d 471 (S.D.N.Y. 2019), the court found *Burroughs* inapposite because the harmless error rule applied. Citing *Siegel*, the court explained that an error's "'materiality,' and hence its 'harmlessness,' [is] to be viewed through the prism of the information needed to adequately advance the purpose sought by the statutory termination provisions themselves." *Id.* at 476. Courts must look at the unambiguous purposes of § 203—to provide protections for authors of creative works—against the competing regulatory objective "for the existing assignee to receive reasonable notice of what rights of theirs are being affected through the exercise of the [artist]'s . . . termination

right." *Id.* at 477.[33]  Because it was apparent that the notice of termination was terminating all the granted rights, the entire grants has been effectively terminated.

Given the rights to the pre-1984 artwork have reverted to H/E, The Phillies may no longer use the artwork under the Derivative Work Exception even if reproductions of the artwork were created and delivered by H/E or others to The Phillies after 1984.  A work does not qualify as a derivative work by virtue of a change in medium alone.  *See, e.g.*, *Peter Mayer Publs Inc. v. Shilovskaya*, 11 F. Supp. 3d 421, 427-29 (S.D.N.Y. 2014) (conversion of print book to eBook not derivative work); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258 (10th Cir. 2008) (digital wire-frame computer models of cars were not new expressions subject to copyright protection because the models reflected a lack of any creative decisions); *Past Pluto Prods. Corp. v. Dana*, 627 F. Supp. 1435, 1443 (S.D.N.Y. 1986) (the "mere transposition" of the Statute of Liberty into a different medium "does not constitute the originality necessary to sustain a claim of copyright; at best, it is evidence of manufacturing skill").

Here, The Phillies regularly asked H/E to update earlier artwork by placing it in newer formats, without any creative alteration.  Scott Brandreth testified that he hired H/E in order to keep the designs consistent.  SUF ¶  69; *see also* Erickson Decl. ¶ 22.  Numerous pieces of artwork The Phillies claim were created under the terms of the grant are reproductions of pre-1984 artwork which were digitized.  For instance, The Phillies claim that because it purchased a "Back to School" Phanatic illustration in 2017, the design was prepared under the terms of the 1984 Agreement.  But that illustration was just a digitized version of a 1980 illustration, which Erickson

---

[33] The Phillies also cite *Music Sales Corp v. Morris*, 73 F. Supp. 2d 364 (S.D.N.Y. 1999), but the court there concluded that a basic description of the terminated grant was adequate, considering the custom of the industry and the Register of Copyrights, and noted that the Register customarily accepted boilerplate language in termination notices.  *Id.* at 378; *see also Johansen v. Sony Music Entm'mt Inc.*, 2020 WL 1529442, at *5 (S.D.N.Y. Mar. 31, 2020).

explained was "almost virtually the same."  SUF ¶ 68; Erickson Decl. ¶ 19, Ex. F.  The Phillies

also claim that numerous pieces of "retro" artwork are derivative works created after 1984 because

H/E provided the team with digital copies of the illustrations in later years.  SUF ¶ 68; Erickson

Decl. ¶ 20, Ex. G.   Again, The Phillies were paying H/E to digitize (not artistically alter) early

artwork, the rights to which had been granted to The Phillies in 1984.  The Phillies were not paying

for the creation of new derivative works.  *See also* SUF ¶ 69; Zung Decl. Ex. B, at 15-23; Erickson

Decl. Ex. I.   Because The Phillies' rights to artwork created prior to the execution of that

agreement, The Phillies' rights to use these digital copies also terminated.

*b)*     *Other Purported Derivative Works*

Separate from the issues of P2 and pre-1984 artwork, The Phillies also introduced a chart

purporting to contain 399 works that The Phillies claim constitute pre-termination derivative works

that may be utilized under the Derivative Works Exception.  ECF No. 127-23, Ex. 23 annexed to

Declaration of David J. Wolfsohn ("Appendix A").  The Phillies seek to obtain a ruling that it has

the right to use a vast majority of these works. This claim is without any factual support.  In each

row, Appendix A lists a purported derivative work, a purported year of creation, and a purported

author/designer/licensee.   Appendix A, however, has not been authenticated, and constitutes an

amalgamation of inadmissible hearsay and unauthenticated information.   Indeed, one Phillies'

representative testified he pulled the information as to authorship and other imbedded "facts" off

the top of his head.  Montclare Decl. Ex. 5 (99:16-104:20).  It is undisputed that this chart was

prepared by counsel and The Phillies proffered no witness to testify to its preparation.  *Id*.  H/E

objects to the use of this chart as being wholly inadmissible.  *See* Response to Phillies' SUF ¶ 33.

The chart itself is not a business record.  Nor have The Phillies attempted to authenticate or

introduce it as a summary evidence. The Phillies have admitted that, for many of the items on

Appendix A, the underlying records do not even exist.  Montclare Decl. Ex. 5 (99:16-104:20).

Thus, this document would not be admissible if introduced at trial and cannot be considered now either. *See, e.g.*, *Kim v. Kum Gang, Inc.*, 2014 WL 2081775, at *4 (S.D.N.Y. May 12, 2014) (excluding charts where party did not have any witness who had personal knowledge of the creation of the charts and failed to preserve the underlying documents); *U.S. v. Citron*, 783 F.2d 307, 316-17 (2d Cir. 1986); *see also* Response to Phillies' SUF ¶ 33.

Yet, the Phillies argue that H/E has admitted that it can continue to utilize 368 of the 399 designs on Appendix A under the Derivative Works Exception. Br. at 1. This is false. In an interrogatory, The Phillies asked H/E to identify which items H/E contended were not derivative works prepared under authority of the grant of rights contained in the 1984 Agreement. H/E responded that ***at least*** 31 items were not derivative works, as well as any item that constituted a reproduction of those 31 items.[34] Montclare Decl. Ex. 101, at 23-24; *see* Response to Phillies' SUF ¶ 37. Many of the items were undoubtedly created by H/E, but other listed works suggest that the identified item was created by another person, and yet the Phillies have not introduced a shred of evidence to support that claim. *See Woods*, 60 F.3d at 994. The Phillies are not entitled to summary judgment where they cannot prove that claimed derivative works were created by the Phillies under the terms of the 1984 Agreement. *Id*. at 993-94 (grantee had no right to royalties in connection with performances of purported pre-termination derivative works where the "source materials" could not be identified and grantee "introduced no evidence that any of these disputed performances were of pre-termination [derivative works]").

## V.     Count VI of The Phillies' Complaint Seeking an Injunction Concerning Phanatic-Related Trademarks Should Be Dismissed

The Phillies' sixth count seeks to use their purported trademark rights in Phanatic images to bar H/E from exercising their own lawful copyright rights. The Phillies claim that any attempt

---

[34] While The Phillies claim to list 399 "works," many of them were reproduced numerous times.

by H/E to sell its rights in the Phanatic would violate their rights under the Lanham Act, and asks this Court to enter a permanent injunction "barring H/E from selling purported rights in the Phanatic to any sports team or commercial entity and from selling any Phanatic-related merchandise." Compl. ¶¶ 132-43.  The Phillies do not define "merchandise."

As a threshold matter, the Court lacks subject matter jurisdiction over this claim because The Phillies have failed to allege any case or controversy.  "The Supreme Court has described a 'case of actual controversy' sufficient for a court to exercise jurisdiction over a declaratory judgment action as 'a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Halo Lifestyle LLC v. Halo Farm, Inc.*, 2019 WL 1620744, at *3 (S.D.N.Y. Apr. 16, 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). "'A justiciable controversy' is not 'a difference or dispute of a hypothetical or abstract character.'" *Sasson v. Hachette Filipacchi Presse*, 2016 WL 1599492, at *3 (S.D.N.Y. Apr. 20, 2016) (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937)).  "It must be 'definite and concrete, touching the legal relations' of parties with 'adverse legal interests' and it must 'admit of specific relief through a decree of a conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *MedImmune*, 549 U.S. at 127 (internal quotation marks omitted)). "A court looks to the totality of the circumstances when determining whether a controversy is justiciable." *Id.* (quoting *MedImmune*, 549 U.S. at 127).  In trademark cases, a plaintiff must show that a potential infringer has a "definite intent and apparent ability to commence use of the marks on the product." *Saleh v. Sulka Trading Ltd.*, 957 F.3d 348, 354 (2d Cir. 2020) (quoting *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 596 (2d Cir. 1996)).

The Phillies have failed to demonstrate any intent by H/E to use Phanatic marks.  The Phillies rest their entire claim on an innocuous statement made by Bonnie Erickson during a

confidential settlement conference.  There, Erickson referred to making the Phanatic a "free agent" if a settlement could not be reached.  Rather than being a threat, this remark responded, in baseball terms, to The Phillies' negotiating position that the Phanatic was of very little value to them.  SUF ¶ 82; Erickson Decl. ¶¶ 33-34.  Both Erickson and Harrison testified that H/E have no plans to sell or license their rights in the Phanatic and are awaiting the results of this lawsuit.  SUF ¶ 84.  The supposed "threat" put forward by The Phillies is a fabrication.[35]  Thus, the Court lacks jurisdiction. *See, e.g.*, *Saleh*, 957 F.3d at 357 (affirming dismissal of Lanham Act declaratory relief claim); *H.G. Shopping Centers, L.P. v. Birney*, 2000 WL 33538615, at *1 (S.D. Tex. Dec. 29, 2000) ("Until such time as Defendants actually pursue the expanded use of their trademark or in any other fashion face an actual conflict between their mark and that of Plaintiffs, any opinion rendered by the court on these matters would be advisory.").

Nor have the The Phillies put forward how some hypothetical and unidentified use of the Phanatic would create consumer confusion or dilution.  The Phillies have not even attempted to put forward any evidence—such as consumer surveys or expert testimony—to suggest otherwise, and instead, support their claim only by their own *ipse dixit* statements.  On top of this, there are myriad ways in which H/E or a subsequent purchaser or licensee could exploit H/E's copyright rights in the Phanatic creative works without infringing or diluting The Phillies' purported marks.  Indeed, the Lanham Act accommodates consumer and artistic interests by insulating from restriction works of artistic expression that are not explicitly misleading as to source or content. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490 (2d Cir. 1989) (following *Rogers v. Grimaldi*, 875 F.2d 994, 1000 (2d Cir. 1989)).  As such, trademarked

---

[35] The Phillies allege that H/E previously "made one of its mascot costumes a 'free agent'" by selling the Montreal Expos' "Youppi!," mascot to the Montreal Canadiens when the Expos moved to Washington, D.C. and became the Nationals.  Compl. ¶ 137.  This is false.  H/E sold the rights long ago and had no part in that transaction.  Erickson Decl. ¶ 34.

characters may be used in creative works without infringing the rights of the trademark owner. *See, e.g.*, *Felix Cat Prods., Inc. v. New Line Cinema*, 2000 WL 770481, at *4 (C.D. Cal. Apr. 28, 2000) (dismissing trademark infringement claim where character was used as an expression of an idea in a film, rather than as a mark to identify or distinguish goods); *University of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1277 (11th Cir. 2012) (art depicting University of Alabama football players and uniform designs did not violate trademark rights where there was no evidence that items were marketed as being endorsed by University). Courts have also held that parodic uses are unlikely to cause consumer confusion or dilution. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007). Indeed, the Lanham Act provides parody and noncommercial use defenses against dilution claims. 15 U.S.C. §1125(c).[36]

Finally, The Phillies' Lanham Act claim is also meritless because the team seeks to improperly invoke the Lanham Act "as an end run around the copyright laws." *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 307 (S.D.N.Y. 2011) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)). Indeed, the Supreme Court in *Dastar* instructed lower courts to be "careful to caution against misuse or over-extension" of trademark and related protections into areas traditionally occupied by copyright, *Dastar*, 539 U.S. at 34, which is precisely what The Phillies seek to do. Allowing purported trademark rights to prevent authors from lawfully using their copyrighted work after termination, would up-end the entire termination scheme and be inconsistent with Congress's intent to provide authors with the ability to recoup their rights after 35 years. The Phillies' Lanham Act claim should be dismissed.

---

[36] H/E does not concede that The Phillies' marks are "famous" or qualify for protection against dilution under the Lanham Act, and will challenge that assertion later if this claim survives.

**VI.    Counts VII and VIII of The Phillies' Complaint for Purported Unjust Enrichment and a Breach of the Covenant of Good Faith and Fair Dealing Should be Dismissed**

The Phillies allege that if H/E are permitted to terminate the 1984 Agreement, then The Phillies should be compensated because H/E were unjustly enriched and breached the covenant of good faith and fair dealing, on the basis that H/E failed to disclose their intent to terminate the "forever" assignment in the 1984 Agreement.  Compl. ¶¶ 144-155.  These claims are frivolous.

**A.    The State Claims Are Preempted**

Recognition of these state claims would fundamentally undermine H/E's federal termination rights, and thus, the claims are preempted pursuant to the Supremacy Clause of the U.S. Constitution and the Copyright Act.  Conflict preemption occurs where state law stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ass'n of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 522-23 (2d Cir. 1991); s*ee also Am. Soc. of Composers, Authors, and Publishers by Bergman v. Pataki*, 930 F. Supp. 873, 878 (S.D.N.Y. 1996) (state law preempted where it "hinder[ed] the realization of the federal copyright scheme").  The Phillies' claims is at odds with Congress's stated intent that the termination right be inalienable. Termination may be effected notwithstanding any agreement to the contrary, 17 U.S.C. § 203(a)(5), no matter how expansively phrased.  *See Ennio Morricone*, 936 F.3d at 73.[37]

**B.    The State Claims Fail on the Merits**

The unjust enrichment claim (Count VII) is baseless.  "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what

---

[37] This fundamental conflict is further highlighted by The Phillies' inconsistent theory of damages, which requires the Court to accept the premise that the term "forever" was limited by the duration of copyright terms but not limited by statutory termination rights.  The Phillies' damages claim is that they would have owned the copyright *for the statutory duration of the term*, or 70 years plus the life of the authors—Wayde Harrison and Bonnie Erickson.

plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  As discussed above, the Second Circuit has made clear that express perpetual language no matter how broadly worded is still subject to the termination right.  This includes a transfer of all rights, title, and interest forever.  Equity and good conscience do not militate against allowing H/E to retain the $215,000 they were paid decades ago, given (i) that they are justifiably exercising an inalienable right that Congress bestowed upon them (one that H/E could not have contracted away even if they wanted to) and (ii) The Phillies have exploited the Phanatic copyrights for decades to their great financial benefit, which far outweighs the relatively small amount paid in 1984.  If the Court adopts The Phillies' theory, any author who transfers a copyright interest, to avoid liability, would have to limit the transfer to 35 years or otherwise disclaim, up front, that the author intends to exercise his termination right 35 years later.  This would fundamentally undermine the assignability of copyrights, which are generally drafted with perpetual language, reflecting the fact that an authors' termination right is optional.

As with unjust enrichment, Count VIII (Breach of the Duty of Good Faith and Fair Dealing) also fails.  "'The elements of a claim for breach of the duty of good faith and fair dealing are practically identical to the elements of a negligence claim:' (1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Washington v. Kellwood Co.*, 2009 WL 855652 at *6 (S.D.N.Y. Mar. 24, 2009) (quoting *Boyd v. Univ. of Illinois*, 2001 WL 246402, at *10 (S.D.N.Y. Mar. 13, 2001)).  "[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989).

The Phillies essentially seek to hold H/E responsible for failing to disclose to The Phillies—who had more than adequate legal representation at the time—that the copyright

assignment under the 1984 Agreement was subject to the provisions of the Copyright Act.  H/E had no duty to inform The Phillies of the existence of termination rights, just as H/E had no duty to disclose that copyrights do not last "forever."  *See* 17 U.S.C. § 302.[38]  The Phillies' attempt to impose such a duty on H/E flies in the face of the principle that each party to a transaction is responsible for the work of their own counsel.  *See Azkour v. Little Rest Twelve, Inc.*, 2012 WL 1026730, at *3 (S.D.N.Y. Mar. 27, 2012).

## CONCLUSION

For the foregoing reasons, the Court should deny The Phillies' Partial Motion for Summary Judgment and grant H/E's Motion for Summary Judgment, dismissing each of The Phillies' Causes of Action and finding in H/E's favor on their first four Counterclaims.

## THE PHILLIES' MOTION TO DISMISS SHOULD BE DENIED

Counterclaim Plaintiffs ("H/E") filed their Amended Counterclaims ("Am. CC.") to add a claim for copyright infringement and update their request for injunctive relief, based on The Phillies' unauthorized use of H/E's copyrighted work, the Phillie Phanatic, and related artwork. The Am. CC reflects the simple fact that The Phillies have refused to recognize H/E's notice of termination—which became effective on June 15, 2020 pursuant to 17 U.S.C. § 203 (the "Effective Termination Date")—and have failed to obtain authorization to use Counterclaim Plaintiffs' copyrighted works.  As demonstrated in the Am. CC, The Phillies have surreptitiously created—and are now unlawfully exploiting—a wholesale knock-off of the Phillie Phanatic. The Am. CC sets forth The Phillies' unlawful conduct in detail, even incorporating an exhibit setting forth precise examples of such conduct, and explains exactly how such conduct entitles

---

[38] It is implausible that The Phillies' attorneys lacked a basic understanding of the Copyright Act, including the existence of termination rights.  This is particularly true because termination rights were relatively new under the 1976 Act, and the Supreme Court notably heard oral argument on the termination right in *Mills Music*, *Inc. v. Snyder* only a few weeks before the 1984 Agreement.

Counterclaim Plaintiffs to relief.  These allegations easily meet the requisite pleading standards.

## LEGAL STANDARD

When considering a motion filed under F.R.C.P 12(b)(6), the court must—after accepting all sufficiently pled factual matter as true—consider whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim may be considered "plausible" if a plaintiff pleads facts that enable a court to reasonably infer the defendant's liability for the conduct alleged. *Iqbal*, 556 U.S. at 678.  Detailed factual allegations are not required in order for a complaint to survive a Rule 12(b)(6) motion; the plaintiff need merely "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Threadbare legal conclusions will not create a plausible claim, but the court must accept all the facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 679; *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  While the Court's consideration under Rule 12(b)(6) is limited to the pleadings, *see Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000), "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion *must* be treated as one for summary judgment under Rule 56" and "[a]ll parties *must* be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d) (emphasis added).

## ARGUMENT

### I.     H/E Provide The Phillies With Sufficient Notice of Their Infringement Claim

To prevail on copyright infringement, a plaintiff must demonstrate only that: (1) it owns valid copyrights; and (2) the defendant violated one or more of the exclusive rights in 17 U.S.C. § 106.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Cabell v.*

*Zimmerman,* 2010 WL 996007, at *2 (S.D.N.Y. Mar. 12, 2010).  Here, H/E allege that they exclusively own and/or control all rights, title, and interest in and to the Phanatic mascot design and respective artwork listed on Exhibit B (the "Phanatic Copyrights") as of June 15, 2020, when their termination of the 1984 Agreement went into effect.  H/E also alleges that The Phillies have, with knowledge of H/E's rights in the Phanatic Copyrights, infringed them by deliberately reproducing, adapting, distributing, and publicly displaying them after the Effective Termination Date.  As set forth in more detail:

- The Phillies are unlawfully exploiting a reproduction of the Phanatic ("P2") after the Effective Termination Date. Am. CC. ¶ 22.  They are consciously doing so without authorization, fully aware that the rights to the Phanatic reverted to H/E.  *Id.*

- The Phillies have unlawfully exploited P2 by publicly displaying P2 during broadcasts of baseball games at Citizens Bank Park after the Effective Termination Date.  Am. CC. ¶ 25

- The Phillies have unlawfully exploited P2 by preparing, publicly displaying, and disseminating numerous new photographs and artwork that prominently feature P2 after the Effective Termination Date.  Am. CC. ¶ 25.

- The Phillies have unlawfully exploited P2 by creating new videos of P2 performing routines at baseball games and around Citizens Bank Park, and other promotional videos and photographs after the Effective Termination Date.  Am. CC. ¶¶ 24-25.

- Each new photograph, artwork, and video that features P2 after the Effective Termination Date is a new work based on the Phanatic. The Phillies have created such new works under the guise of the derivative work exception, but the derivative work exception expressly states that the privilege does not allow The Phillies to create these new works after the Effective Termination Date.  17 U.S.C. § 203(b)(1).  Am. CC. ¶¶ 23-25, 28.

- Specific examples that set forth precise acts of infringement are identified on Exhibit A, which is incorporated by reference.  Am. CC ¶ 25.  These examples represent a non-exhaustive list illustrating the vast number of ways that The Phillies are exploiting P2, in blatant disregard for Counterclaim Plaintiffs' rights in the underlying Phanatic mascot design.

- In addition to The Phillies' unlawful activities with respect to P2, The Phillies are also continuing to sell and knowingly authorize, encourage, and/or induce others to sell unauthorized merchandise featuring numerous pieces of the Phanatic Artwork listed on Exhibit B, which is incorporated by reference.  Am. CC. ¶ 30.  The Phillies are exploiting such merchandise or licensing others to do so after June 15, 2020, even though the rights to such artwork reverted to H/E.  Am. CC. ¶¶ 30, 59

These allegations, which are assumed to be true, satisfy the pleading standards of Fed. R. Civ. P.

8 and set forth a plausible claim for copyright infringement under *Twombly/Iqbal*.

The Phillies claim that the infringing acts must be set forth with some specificity, Br. at 34, and H/E have done so.  The Phillies, however, seek to impose an improper particularity requirement.  *See, e.g.*, *Blagman v. Apple Inc.,* 2013 WL 2181709, at *3 (S.D.N.Y. May 20, 2013); *Software For Moving, Inc. v. Frid*, 2010 WL 2143670, at *3 (S.D.N.Y. May 27, 2010)); *see also Schneider v. Pearson Educ., Inc.*, 2013 WL 1386968, at *3 (S.D.N.Y. Apr. 5, 2013); *Richard Feiner & Co. v. Larry Harmon Pictures Corp.*, 38 F. Supp. 2d 276, 279 (S.D.N.Y. 1999).

The Phillies ignore that H/E attached to their Counterclaims a non-exhaustive list ***illustrating specific examples of The Phillies' infringing conduct***, and further plead that The Phillies seemingly continue to produce new infringing works every week.  Am. CC. ¶ 25.  This in itself provides The Phillies with sufficient notice of the claims.  *See Zuma Press, Inc. v. Getty Images (US), Inc.*, 2017 WL 2829517, at *3 (S.D.N.Y. June 29, 2017) (listing works at issue and providing specific information relevant to the case for some of those works provided sufficient notice to defendant); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir. 2010) (rejecting defendants' contention that *Twombly* and *Iqbal* "require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible").[39]

---

[39] The Phillies' citation to *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 n.3 (S.D.N.Y. 1992), *aff'd sub nom*, 23 F.3d 398 (2d Cir. 1994) actually contradicts their position.  There, the court noted, "[d]efendant argues that it is not possible to determine from the complaint the nature of the claimed infringement.  However, *such a level of specificity is not required in a complaint.*" (internal citation omitted) (emphasis added).  Other cited cases are also distinguishable.  For instance, in *Yamashita v. Scholastic, Inc.*, 2017 WL 74738 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 936 F.3d 98 (2d Cir. 2019) the plaintiff asserted little to no factual details giving rise to infringement, and in *Palmer Kane v. Scholastic Corp.*, 2013 WL 709276, at *3 (S.D.N.Y. Feb. 27, 2013), which numerous courts have distinguished, the plaintiff failed to identify the copyrighted works at issue; *compare Lefkowitz v. McGraw-Hill Glob. Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 355 (S.D.N.Y. 2014) (refusing to rely on *Palmer Kane*); *Quadratec, Inc. v. Turn 5, Inc.*, 2015 WL 4876314, at *5 (E.D. Pa. Aug. 13, 2015) (same).  For similar reasons, *Cole v. John Wiley & Sons, Inc.* 2012 WL 3133520 (S.D.N.Y. Aug. 1, 2012) is also distinguishable.

The Phillies further argue that H/E fail to plead adequately the time-period of infringement. Br. at 36.  Not so.  <u>First</u>, H/E make clear that their entitlement to relief is premised exclusively on conduct *after* June 15, 2020, the Effective Termination Date. Am. CC. ¶¶ 22, 25.  <u>Second</u>, examples provided on Exhibit A explicitly provide the date of publication.  *See* Am. CC. Ex. A. Third, H/E have alleged a continuing violation by The Phillies, Am. CC. ¶¶ 25, 26-28, 33, and courts in this Circuit have routinely held that this satisfies the pleading requirements.  *See, e.g.*, *Blagman*, 2013 WL 2181709*,* at *3 (citing cases); *Maverick Recording Co. v. Goldsteyn*, 2006 WL 2166870, at *4 (E.D.N.Y. July 31, 2006).[40]

The Phillies also argue that H/E's claim is based on *future* infringement, but this is misguided, as H/E's entitlement to relief is premised on *present* infringement.  The Phillies' expressed intent to unlawfully exploit the Phanatic in the future notwithstanding H/E's termination, *see* Am. CC. ¶¶ 28, 33, also demonstrates that The Phillies' present infringing conduct is willful, continuing in nature, and will not cease absent injunctive relief.  *See, e.g.*, *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 637 (S.D.N.Y. 2018) ("Permanent injunctions are generally granted where liability has been established and there is a threat of continuing infringement."); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011).  H/E accordingly meet the requisite pleading standards.

## II.    <u>H/E's Registration for the Phanatic Sufficiently Supports Their Infringement Claim</u>

The Phillies are correct that the artwork on Exhibit B are pending registration, but they misconstrue the basis for H/E's claims.  The Phillies admit as they must that a lawsuit can be maintained on unregistered derivative works to the extent that the copying of the unregistered

---

[40] The specific instances of infringement identified on Exhibit A are still ongoing as The Phillies have not removed these online postings, and egregiously, ***have continued posting new infringing videos and photographs after the Amended Counterclaims were filed.***  SUF ¶ 108.

derivative works infringes the registered work.  Br. at 37 n. 21 (citing *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 206, 214-15 (S.D.N.Y. 2009)). This is exactly what H/E alleges.  The Phanatic Artwork listed on Exhibit B are copyrightable subject matter, H/E own and/or control all rights, title, and interest in and to the Phanatic Artwork, and the Phanatic Artwork repeats content verbatim from the original copyrighted Phanatic mascot design that The Phillies have infringed.  Am. C. ¶¶ 59-60.[41]  H/E thus properly plead infringement of a registered work, based on the unlawful copying of these unregistered derivative works.[42]

## III.   The Court Should Reject The Phillies' Improper Attempt to Side-Step the Summary Judgment Standard With Respect to P2

For all of the reasons set forth in H/E's Motion for Summary Judgment, *supra* Section IV.A., P2 is not a derivative work as a matter of law, and The Phillies' "continued utilization" of P2 after June 15, 2020 is not protected under the derivative work exception to termination, *See* 17 U.S.C. § 203(b)(1).  But even assuming *arguendo* that The Phillies did have the right to "utilize" P2 pursuant to the derivative work exception, 17 U.S.C. § 203(b)(1), that same exception does not allow The Phillies to create new derivative works based on the Phanatic because ***the derivative work exception does not extend to the preparation of new derivative works after termination***.  17 U.S.C. § 203(b)(1). *See Supra* Section IV.B.

---

[41] Actions for unauthorized copying of unregistered derivative works are barred ***only*** where "the allegedly infringing work 'only copied expressive elements' of the unregistered derivative work which 'd[id] not appear in any work whose copyright ha[d] been registered." *See Klauber Bros. v. Russell-Newman, Inc.,* 2013 WL 1245456, at *5 (S.D.N.Y. Mar. 26, 2013)*, aff'd sub nom. Klauber Bros. v. Bon-Ton Stores, Inc.,* 557 F. App'x 77 (2d Cir. 2014) (citing *Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp*., 354 F.3d 112, 116 (2d Cir.2003)), *abrogated by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)).  That is not the case here.

[42] As H/E make clear, they intend to amend their Counterclaims to include the additional registrations when they are issued*.  Am. CC. ¶ 60.  If the Court determines that *Fourth Estate* bars amendment, H/E will file a second, related action once those registrations issue.  *See Malibu Media, LLC v. Doe*, 2019 WL 1454317, at *4 (S.D.N.Y. Apr. 2, 2019) (noting that dismissal of claims related to unregistered works was without prejudice to the filing of a new action).

The Phillies have no right to prepare new derivative works based on the Phanatic, but that is precisely what they are doing, and have threatened to continue doing, *inter alia* by creating numerous unauthorized photographs and videos after termination featuring P2, including the photographs and videos identified on Exhibit A to the Amended Counterclaims. *See* Am. CC. ¶¶ 24-29, 33, Ex. A; SUF ¶ 108. *See, e.g., Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 607-09 (S.D.N.Y. 2014).[43]

In any event, The Phillies' attempt to have this issue determined on a Rule 12(b)(6) motion, fully aware that this very issue is subject to the parties' summary judgment motions, is clearly improper. "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Global Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original). "The streamlined testing of the substantive merits, on the other hand, *is more appropriately reserved for the summary judgment procedure*, governed by Rule 56, where both parties may 'conduct appropriate discovery and submit the additional supporting material contemplated by' that rule." *Id.* (emphasis added). The Court should not entertain The Phillies' attempt to sidestep those motions and ignore all of the pertinent facts in the record that directly bear on the Court's determination of these issues.

## CONCLUSION

For the reasons set forth herein, The Phillies' motion to dismiss should be denied.

---

[43] The Phillies have no intention of curbing their infringing behavior and have threatened to continue creating and exploiting new works after termination, Am. CC. ¶¶ 26-28, 33, which, as explained above, is directly relevant to H/E's claim for injunctive relief.

DATED:      January 20, 2021                    MITCHELL SILBERBERG & KNUPP LLP
            New York, New York


                                                By: /s/ Paul D. Montclare
                                                    Paul D. Montclare (*pdm@msk.com*)
                                                    Leo M. Lichtman (*lml@msk.com*)
                                                    Elaine Nguyen (*eln@msk.com*)
                                                    437 Madison Avenue, 25th Floor
                                                    New York, NY 10022
                                                    Telephone: (212) 509-3900
                                                    Facsimile:  (212) 509-7239

                                                    J. Matthew Williams (*mxw@msk.com*)
                                                    1818 N St. NW, 7th Floor
                                                    Washington, DC 20036
                                                    Telephone: (202) 355-7900
                                                    Facsimile: (202) 355-7899

                                                    *Attorneys for Defendants and*
                                                    *Counterclaim Plaintiffs Harrison/Erickson*
                                                    *Incorporated, Harrison Erickson, Wayde*
                                                    *Harrison, and Bonnie Erickson*

## APPENDIX





