# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PHILLIES, a Pennsylvania limited partnership,<br><br>        Plaintiff,<br><br>  v.<br><br>HARRISON/ERICKSON, INCORPORATED, a New York corporation, HARRISON ERICKSON, a partnership, and WAYDE HARRISON and BONNIE ERICKSON,<br><br>        Defendants. | CIVIL ACTION NO. 19-7239-VM-SN<br><br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S COMBINED (1) REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO DISMISS AND (2) OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.    The Phillies' Reply in Support of its Motion for Partial Summary Judgment ..................... 1

    A.    The Termination Notice Does not Affect Post-1984 Grants to H/E's Artwork. ........................................................................................... 1

    B.    The Termination Notice Does not Affect H/E's Pre-1984 Artwork. ...................... 1

    C.    H/E's Purported Notice of Termination Is Not Effective as to Any Artwork ................................................................................................... 2

    D.    The Phillies May Continue to Utilize 368 Phanatic Works. ................................. 5

    E.    P2 is a Derivative Work That The Phillies May Continue to Utilize. ................... 6

        1.    H/E Fundamentally Misunderstands the Nature of Derivative Works. .................................................................................................. 7

        2.    H/E's "Expert" Opinions Are Subjective, Conclusory, Arbitrary, and Apply Incorrect Legal Standards. ..................................... 12

    F.    H/E's Argument About "New P2 Works Created . . . After Termination" is Unripe and Seeks an Advisory Opinion ................................................ 16

II.   The Phillies' Opposition to H/E's Motion for Summary Judgment .................................. 19

    A.    H/E is not Entitled to Summary Judgment on The Phillies' Claim regarding H/E's Fraud on the Copyright Office. ................................................. 19

    B.    Genuine Issues of Fact Preclude Summary Judgment on Authorship ................. 26

        1.    The Phillies is a Joint Author of the Costume. ........................................ 26

        2.    Genuine Issues of Material Fact Preclude Summary Judgment Regarding The Phanatic Character. .......................................................... 31

        3.    The Statute of Limitations Does Not Bar The Phillies' Claims ............... 37

    C.    H/E is not Entitled to Summary Judgment on the Trademark Claim. ................. 40

    D.    Genuine Issues of Material Fact Preclude Summary Judgment on The Phillies' State Law Claims ................................................................................... 43

i

III.    The Phillies' Reply in Support of its Motion to Dismiss .................................................. 46

    A.    H/E's Infringement Claim is Not Adequately Pled. ............................................. 46

    B.    H/E Cannot Base its Claims on Unregistered Artwork. ....................................... 48

    C.    The Phillies' Use of P2 is Non-Infringing. ......................................................... 50

## TABLE OF AUTHORITIES

**Cases**

*AARP v. 200 Kelsey Assocs., LLC*,
    2009 WL 47499 (S.D.N.Y. Jan. 8, 2009) .......................................................40, 42

*Alexander v. Haley*,
    460 F. Supp. 40 (S.D.N.Y. 1978).........................................................................37

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
    382 F. Supp. 3d 312 (S.D.N.Y. 2019)...................................................................19

*Architettura, Inc. v. DBSI Cumberland at Granbury LP*,
    652 F. Supp. 2d 775 (N.D. Tex. 2009) .................................................................18

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)................................................................................47

*AT&T Corp. v. Syniverse Techs., Inc.*,
    2014 WL 4412392 (S.D.N.Y. Sept. 8, 2014).........................................................1

*Baker v. Robert I. Lappin Charitable Foundation*,
    415 F. Supp. 2d 473 (S.D.N.Y. 2006)......................................................27, 28, 30

*Bates v. Long Island R.R.*,
    997 F.2d 1028 (2d Cir. 1993)...............................................................................24

*Bell v. A-Leet Leasing Corp.*,
    863 F.2d 257 (2d Cir. 1988).................................................................................6

*Berk v. St. Vincents Hosp. & Med. Ctr.*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005)..................................................................12

*Blagman v. Apple Inc.*,
    2013 WL 2181709 (S.D.N.Y. May 20, 2013) ......................................................47

*Boisson v. Banian, Ltd.*,
    273 F.3d 262 (2d Cir. 2001)................................................................................28

*Bruhn NewTech, Inc. v. United States*,
    144 Fed. Cl. 755 (Fed. Cl. 2019) ..................................................................21, 48

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
    342 F.3d 149 (2d Cir. 2003)..........................................................................26, 38

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
    683 F.2d 610, 618 (2d Cir. 1982).........................................................................3

*C=Holdings B.V. v. Asiarim Corp.*,
   992 F. Supp. 2d 223 (S.D.N.Y. 2013) ............................................................42, 43

*Carell v. Shubert Org., Inc.*,
   104 F. Supp. 2d 236 (S.D.N.Y. 2000) ...................................................................22

*Carmichael Lodge No. 2103 v. Leonard*,
   2009 WL 2985476 (E.D. Cal. Sept. 16, 2009) ......................................................49

*Channer v. Dep't of Homeland Sec.*,
   527 F.3d 275 (2d Cir. 2008) ...................................................................................25

*Childress v. Taylor*,
   945 F.2d 500 (2d Cir. 1991) ............................................................................27, 29

*Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*,
   413 F.3d 324 (2d Cir. 2005) ...................................................................................22

*Cole v. John Wiley & Sons, Inc.*,
   2012 WL 3133520 (S.D.N.Y. Aug. 1, 2012) ........................................................48

*Cummings v. Brookhaven Sci. Assocs., LLC*,
   2011 WL 6371753 (E.D.N.Y. Dec. 20, 2011) ......................................................25

*Cusamano v. Alexander*,
   691 F. Supp. 2d 312 (N.D.N.Y. 2009) ..................................................................16

*Daniels v. Walt Disney Co.*,
   958 F.3d 767 (9th Cir. 2020) .................................................................................31

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003) .................................................................................................43

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) .........................................................................31, 33

*DeClaro v. Archie*,
   127 F. Supp. 2d 497 (S.D.N.Y. 2001),
   *aff'd*, 11 F. App'x 26 (2d Cir. 2001) ....................................................................23

*Dorchen/Martin Assocs., Inc. v. Brook of Boyne City, Inc.*,
   2013 WL 2418175 (E.D. Mich. June 3, 2013) ......................................................26

*Durham Industries, Inc. v. Tomy Corp.*,
   630 F.2d 905 (2d Cir. 1980) ............................................................................10, 11

*Durkin v. Platz*,
   920 F.Supp. 2d 1316 (N.D. Ga. 2013) ..................................................................12

*Eden Toys, Inc. v. Marshall Field & Co.*,
  675 F.2d 498 (2d Cir. 1982)..................................................................................11

*Eden Toys, Inc. v. Florelle Undergrarment Co.*,
  697 F.2d 27 (2d Cir. 1982).............................................................................*Passim*

*Edwards v. Macy's Inc.*,
  2015 WL 4104718 (S.D.N.Y. June 30, 2015) .........................................................2

*Entertainment Research Grp. Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ........................................................................9, 10

*Everly v. Everly*,
  958 F.3d 442 (6th Cir. 2020) ........................................................................38, 39

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
  155 F.3d 17 (2d Cir. 1998)..................................................................................18

*Fun with Phonics, LLC v. LeapFrog Enters., Inc.*,
  2010 WL 11404474 (C.D. Cal. Sept. 10, 2010) ...................................................37

*Gary Friedrich Enters. v. Marvel Characters, Inc.*,
  716 F.3d 302 (2d Cir. 2013)................................................................................30

*Godinger Silver Art Co., Ltd. v. Int'l Silver Co.*,
  1995 WL 702357 (S.D.N.Y. Nov. 28, 1995)..........................................................8

*Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*,
  925 F.3d 1140 (9th Cir. 2019) ............................................................................21

*Gould v. Board of Educ. of Sewanhaka Cent. High Sch. Dist.*,
  81 N.Y.2d 446 (1993) .........................................................................................44

*Guerrero v. City of New York*,
  2018 WL 4333985 (S.D.N.Y. Sept. 11, 2018).......................................................1

*Halo Lifestyle LLC v. Halo Farm, Inc.*,
  2019 WL 1620744 (S.D.N.Y. Apr. 16, 2019)......................................................41

*Halo Optical Prod., Inc. v. Liberty Sport, Inc.*,
  2017 WL 1082443 (N.D.N.Y. Mar. 22, 2017) ....................................................42

*Hartman v. Hallmark Cards, Inc.*,
  639 F. Supp. 816 (W.D. Mo. 1986) ....................................................................48

*Hectronic GmbH v. Hectronic USA Corp.*,
  2020 WL 6947684 (S.D.N.Y. Nov. 24, 2020)......................................................42

*Hord v. Jackson*,
    281 F. Supp. 3d 417 (S.D.N.Y. 2017)............................................................................8

*Horror, Inc. v. Miller*,
    335 F. Supp. 3d 273 (D. Conn. 2018)........................................................................30

*Huurman v. Foster*,
    2010 WL 2545865 (S.D.N.Y. June 21, 2010) .................................................28, 29

*Imperial Laces Inc. v. Westchester Lace Inc.*,
    1998 WL 830630 (S.D.N.Y. Nov. 30, 1998)...............................................................8

*Kamerman v. Curtis*,
    285 N.Y 221 (1941)...................................................................................................45

*Kelly v. L.L. Cool J.*,
    145 F.R.D. 32 (S.D.N.Y. 1992) ...........................................................................46-48

*KGB, Inc. v. Giannoulas*,
    104 Cal. App. 3d 844 (1980) ....................................................................................37

*KnowledgeAZ, Inc. v. Jim Walters Res.*,
    617 F. Supp. 2d 774 (S.D. Ind. 2008)......................................................................49

*Kwan v. Schlein*,
    634 F.3d 224 (2d Cir. 2011).....................................................................................37

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*,
    248 F.R.D. 126 (S.D.N.Y. 2007) ...............................................................................6

*L. Batlin & Son, Inc. v. Snyder*,
    536 F.2d 486 (2d Cir. 1976)...............................................................................10, 11

*Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc.*,
    176 F. Supp. 2d 199 (S.D.N.Y. 2011)................................................................44, 45

*Lego A/S v. Best-Lock Const. Toys, Inc.*,
    874 F. Supp. 2d 75 (D. Conn. 2012)........................................................................23

*Lesley v. Spike TV*,
    241 Fed. Appx. 357 (9th Cir. 2007)..........................................................................37

*Lewinson v. Henry Holt & Co., LLC*,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)......................................................................49

*Lifeguard Licensing Corp. v. Kozak*,
    371 F. Supp. 3d 114 (S.D.N.Y. 2019).......................................................................41

*Masquerade Novelty, Inc. v. Unique Indus., Inc.*,
 912 F.2d 663 (3d Cir. 1990)..................................................................22

*Membler.com LLC v. Barber*,
 2013 WL 5348546 (S.D.N.Y. Sept. 23, 2013)........................................28

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co., Inc.*,
 900 F. Supp. 1287 (C.D. Cal. 1995) ......................................................31

*Mitchell v. Cty. of Nassau*,
 786 F. Supp. 2d 545 (E.D.N.Y. 2011) .....................................................2

*Mohr v. Sci. & Eng'g Servs., Inc.*,
 204 F. Supp. 3d 1281 (N.D. Ala. 2016) .................................................23

*Mtume v. Sony Music Entm't*,
 408 F. Supp. 3d 471 (S.D.N.Y. 2019)......................................................5

*Music Sales Corp. v. Morris*,
 73 F. Supp. 2d 364 (S.D.N.Y. 1999)........................................................3

*Nat'l Theme Prods. v. Jerry B. Beck, Inc.*,
 696 F.Supp. 1348 (S.D. Cal. 1988)........................................................22

*In re NC & VA Warranty Co., Inc.*,
 554 B.R. 110 (Bankr. M.D.N.C. 2016)...................................................25

*Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*,
 525 F. App'x 12 (2d Cir. 2013) ...............................................................2

*Palmer Kane LLC v. Scholastic Corp.*,
 2013 WL 709276 (S.D.N.Y. Feb. 27, 2013)...........................................48

*Palmer/kane LLC v. Gareth Stevens Publ'g*,
 2016 WL 6238612 (S.D.N.Y. Oct. 24, 2016) .........................................21

*Polaroid Corp. v. Polarad Elecs. Corp.*,
 287 F.2d 492 (2d Cir. 1961)...................................................................42

*Prima Creations, Inc. v. Santa's Best Craft, L.L.C.*,
 2011 WL 2982777 (E.D. Pa. July 22, 2011)...........................................22

*Pritchett v. Pound*,
 473 F.3d 217 (5th Cir. 2006) .................................................................26

*R.A.C. Holding, Inc. v. City of Syracuse*,
 684 N.Y.S.2d 740 (Fourth Dep't 1999) ...................................................2

*Re-Alco Indus. v. Nat'l Center for Health Educ.*,
   812 F. Supp. 387 (S.D.N.Y. 1993)......................................................................16

*Richard Feiner & Co. v. Larry Harmon Pictures Corp.*,
   38 F. Supp. 2d 276 (S.D.N.Y. 1999).................................................................47

*Robinson v. Buy-Rite Costume Jewelry, Inc.*,
   2004 WL 1878781 (S.D.N.Y. Aug 23, 2004).....................................................28

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir. 1992)............................................................................19

*Saleh v. Sulka Trading Ltd.*,
   957 F.3d 348 (2d Cir. 2020)............................................................................40

*Sands v. CBS Interactive Inc.*,
   2019 WL 1447014 (S.D.N.Y. Mar. 13, 2019)..................................................24

*Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*,
   2009 WL 1576467 (S.D.N.Y. June 2, 2009) ...................................................16

*Savin Corp. v. Savin Grp.*,
   391 F.3d 439 (2d Cir. 2004)......................................................................42, 43

*Schneider v. Pearson Educ., Inc.*,
   2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013)................................................47, 48

*Shamrock Power Sales, LLC v. Scherer*,
   2015 WL 5730339 (S.D.N.Y. Sept. 30, 2015)..................................................16

*Sheltry v. Unum Life Ins. Co. of Am.*,
   247 F. Supp. 2d 169 (D. Conn. 2003)...............................................................25

*Siegel v. Warner Bros. Entm't Inc.*,
   658 F. Supp. 2d 1036 (C.D. Cal. 2009) .......................................................... 3-5

*Siegel v. Warner Bros. Entm't Inc.*,
   690 F. Supp. 2d 1048 (C.D. Cal. 2009) .......................................................... 3-4

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
   931 F.3d 215 (3d Cir. 2019)............................................................................22

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
   642 F. Supp. 2d 206 (S.D.N.Y. 2009).........................................................48-49

*Software For Moving, Inc. v. Frid*,
   2010 WL 2143670 (S.D.N.Y. May 27, 2010) ...................................................47

*St. Paul Mercury Ins. Co. v. M & T Bank Corp.,*
    2014 WL 641438 (S.D.N.Y. Feb. 19, 2014) ........................................................ 2

*Steinbeck v. McIntosh & Otis, Inc.,*
    433 F. Supp. 2d 395 (S.D.N.Y. 2006) .......................................................... 44

*Texas v. United States,*
    523 U.S. 296 (1998) .................................................................................. 16

*United States v. Amdahl Corp.,*
    786 F.2d 387 (Fed. Cir. 1986) ...................................................................... 45

*United States v. Potamkin Cadillac Corp.,*
    689 F.2d 379 (2d Cir. 1982) ............................................................................ 8

*Venugopal v. Sharadha Terry Prod., Ltd.,*
    2009 WL 1468462 (W.D.N.Y. May 22, 2009) ........................................ 41

*Waldman Pub. Corp. v. Landoll, Inc.,*
    43 F.3d 775 (2d Cir. 1994) ...................................................................... 7-8

*Warner Bros. Inc. v. Am. Broadcasting Cos., Inc.,*
    720 F.2d 231 (2d Cir. 1983) ........................................................ 31, 36, 37

*Weissmann v. Freeman,*
    868 F.2d 1313 (2d Cir. 1989) .................................................................. 7-8

*In re Westchester Tank Fabricators, Ltd.,*
    207 B.R. 391 (Bankr. E.D.N.Y. 1997) ...................................................... 24

*Whimsicality, Inc. v. Rubie's Costume Co.,*
    891 F.2d 452, 454-56 (2d Cir. 1989) ............................................... *Passim*

*Whimsicality, Inc. v. Rubie's Costume Co.,*
    836 F. Supp. 112 (E.D.N.Y. 1993) .......................................................... 22

*Wolfe v. Nat'l Med. Care, Inc.,*
    616 F. Supp. 2d 596 (S.D.W. Va. 2009) .................................................. 26

*Yamashita v. Scholastic, Inc.,*
    2017 WL 74738 (S.D.N.Y. Jan. 5, 2017) ................................................ 48

*Zuma Press, Inc. v. Getty Images (US), Inc.,*
    2017 WL 2829517 (S.D.N.Y. June 29, 2017) ........................................ 48

**Statutes**

15 U.S.C. § 1114 ........................................................................................ 42

15 U.S.C. § 1125 ....................................................................................................42

17 U.S.C. § 101 ..............................................................................................7, 26

17 U.S.C. § 103 ....................................................................................................11

17 U.S.C. § 106 ....................................................................................................17

17 U.S.C. § 203 .............................................................................................*Passim*

17 U.S.C. § 302 ....................................................................................................45

17 U.S.C. § 411 ........................................................................................19, 20, 21

17 U.S.C. § 507 .............................................................................................26, 38

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 1984 Agreement / 1984 Assignment | Refers to the agreement between Harrison Erickson, Inc. and The Phillies, dated October 31, 1984, submitted as Exhibit 16 to the December 10, 2020 Declaration of David J. Wolfsohn (ECF No. 127-16) |
| AC | Refers to Defendants' First Amended Counterclaims (ECF No. 118) |
| Complaint | Refers to The Phillies' Complaint (ECF No. 1) |
| Buck Decl. | Refers to the March 5, 2021 Declaration of David Buck, filed herewith |
| Derivative Works Exception | Refers to the exception in 17 U.S.C. § 203(b)(1) |
| DX ___ | Refers to the corresponding Exhibit filed with the January 20, 2021 Declaration of Paul D. Montclare (ECF No. 136) |
| Erickson Decl. | Refers to the January 20, 2021 Declaration of Bonnie Erickson (ECF No. 137) |
| Harrison Decl. | Refers to the January 20, 2021 Declaration of Wayde Harrison (ECF No. 138) |
| H/E | Refers collectively to Defendants/Counterclaim Plaintiffs Harrison/Erickson, Inc., Harrison/Erickson, a partnership, Bonnie Erickson, and Wayde Harrison |
| H/E Br. | Refers to the Joint Memorandum in Support of Defendant/Counterclaim Plaintiffs' Motion for Summary Judgment and in Opposition to Plaintiff/Counterclaim Defendant's Motion for Partial Summary Judgment and Motion to Dismiss (ECF No. 141) |
| H/E RSUF | Refers to Defendant/Counterclaim Plaintiff's Response to The Phillies' Statement of Undisputed Facts (ECF No. 140). Citations to H/E RSUF refer to The Phillies' statement of fact in the referenced numbered paragraph as well as H/E's response thereto. |
| H/E SUF | Refers to Defendant/Counterclaim Plaintiff's Statement of Undisputed Facts (ECF No. 135) |

| Long Decl. | Refers to the December 9, 2020 Declaration of Christine Legault-Long (ECF No. 128) |
| P1 | Refers to the 1978 Phanatic costume |
| P2 | Refers to The Phillies' redesigned Phanatic costume, debuted in 2020 |
| Pl. Br. | Refers to Plaintiff and Counterclaim Defendant's Memoranda of Law in Support of its Motion for Partial Summary Judgment and Motion to Dismiss Amended Counterclaims (ECF No. 125) |
| Pl. CSF | Refers to The Phillies' Counterstatement of Facts, filed herewith as part of The Phillies' Response to Defendants/Counterclaim Plaintiffs' Statement of Undisputed Facts |
| Pl. RSUF | Refers to The Phillies' Response to Defendants/Counterclaim Plaintiffs' Statement of Undisputed Facts, filed herewith |
| Pl. SUF / The Phillies' SUF | Refers to Plaintiff's Local Rule 56.1 Statement of Undisputed Facts (ECF No. 126) |
| PX ___ | PXs Numbered 1-83 refer to Exhibits filed with the December 10, 2020 Declaration of David J. Wolfsohn (ECF No. 127).  PXs Numbered 84-166 refer to Exhibits filed with the March 8, 2021 Declaration of Kendra C. Oxholm, filed herewith. |
| Raymond Decl. | Refers to the March 6, 2021 Declaration of David Raymond, filed herewith |
| Zung Decl. | Refers to the January 19, 2021 Declaration of David Zung (ECF No. 139) |

## ARGUMENT

I.    **The Phillies' Reply in Support of its Motion for Partial Summary Judgment**

    A.    **The Termination Notice Does not Affect Post-1984 Grants to H/E's Artwork.**

In its opening brief, The Phillies argued that H/E's notice of termination was not effective as to any of the artwork created by H/E for The Phillies after 1984 because the artwork was subject to separate implied licenses that H/E did not identify in its termination notice.  Pl. Br. at 26-30.  The June 2018 termination notice identifies only the 1984 Assignment as the "grant" being terminated.  H/E RSUF ¶¶ 85, 87; PX 65.  H/E does not dispute that, in numerous separate transactions over 35 years, The Phillies paid H/E for Phanatic designs.  When H/E delivered each of those designs to The Phillies, it separately granted The Phillies the rights to use them by implied license, and those licenses are not identified in H/E's termination notice.  Pl. Br. at 27-28.  H/E does not refute or even address that argument.   H/E thus concedes that The Phillies can use the post-1984 artwork described in ¶¶ 46-75 of The Phillies' SUF.[1]  *See Guerrero v. City of New York*, 2018 WL 4333985, at *9 (S.D.N.Y. Sept. 11, 2018); *AT&T Corp. v. Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014).

    B.    **The Termination Notice Does not Affect H/E's Pre-1984 Artwork.**

H/E's termination notice was also ineffective as to the separate grant that authorized The

---

[1] It is undisputed that the Phanatic designs described in  ¶¶ 47, 48, 50, 54, 55, 58, 61, 65, and 67 of The Phillies' SUF and three of the designs described in ¶ 59 (depicted in PX 41 at PHAN0001816, 1818 & 1823), were ***new*** designs created by H/E for The Phillies after 1984. H/E RSUF ¶¶ 46, 47-51, 54, 55-62, 65-66, 67-68.  H/E characterizes certain of the post-1984 designs as digitized "reproductions" of pre-1984 designs–specifically the artwork described in ¶¶ 52, 59 (other than the 3 designs mentioned), 63, 69, 70, and 72 of The Phillies' SUF.  H/E Br. at 46; H/E RSUF ¶¶ 52-53, 59-60, 63-64, 69-71, 72-73.  Whether the designs are reproductions or derivative works is immaterial because H/E concedes the fact that each of the post-1984 designs was subject to a ***separate grant***.  Ms. Erickson even confirmed in her testimony that, with respect to the so-called "reproductions," The Phillies paid H/E for a grant of rights to use the updated versions.  *See, e.g.*, PX 87, 2/7/20 Erickson Dep. Tr. 122:24-123:23, 170:4:172:25.

Phillies to use H/E's artwork designed before 1984.  As explained by Christine Legault-Long, when The Phillies expressed interest in using some of H/E's pre-1984 artwork after the 1984 Assignment was signed, Wayde Harrison told her the assignment did not cover it, and The Phillies would have to pay more for a license.  Long Decl. ¶¶ 4-6; Pl. Br. 28-30; Pl. SUF ¶¶ 40-44.  The Phillies paid the requested fee.  Long Decl. ¶¶ 4-6.  That grant is not listed in the termination notice, so the notice does not apply to it.  H/E RSUF ¶¶ 85, 87; Pl. Br. at 27-30.

H/E argues that the 1984 Assignment encompassed Ms. Erickson's pre-1984 art.  H/E Br. at 43.  But, importantly, Mr. Harrison does not deny that The Phillies paid separately, after the 1984 Assignment was signed, for a license to use the pre-1984 art; instead, he states that he does not recall the conversation.  Harrison Decl. ¶ 4.  "[L]ack of memory does not create a genuine issue of fact."  *Edwards v. Macy's Inc.*, 2015 WL 4104718, at *6 (S.D.N.Y. June 30, 2015); *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 560 (E.D.N.Y. 2011).  It is therefore undisputed that (1) Harrison told Long that the 1984 Assignment did not cover Erickson's earlier art and (2) The Phillies paid H/E for the license to that art.  The 1984 Assignment does not mention any of Ms. Erickson's artwork; it refers repeatedly to the "MASCOT," which is defined as "the artistic sculpture."  PX 16.  But even if the 1984 Assignment could be construed as covering that art work, there is no dispute that The Phillies received a license to the pre-1984 artwork in 1990.[2]

### C.   H/E's Purported Notice of Termination Is Not Effective as to Any Artwork

The Phillies is entitled to summary judgment regarding *all* Phanatic artwork for the

---

[2] H/E's argument that the Court cannot consider evidence of the post-1984 grant for the pre-1984 artwork is off base because "[i]t is well settled that the parol evidence rule does not bar evidence of agreements made after the execution of an integrated contract."  *St. Paul Mercury Ins. Co. v. M & T Bank Corp.*, 2014 WL 641438, at *5 (S.D.N.Y. Feb. 19, 2014).  And H/E cannot now dispute the validity of the later agreement after accepting The Phillies' payment.  *R.A.C. Holding, Inc. v. City of Syracuse*, 684 N.Y.S.2d 740, 741 (Fourth Dep't 1999); *Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*, 525 F. App'x 12, 13-14 (2d Cir. 2013).

additional reason that none of it was identified in H/E's notice of termination.  A Section 203

termination notice "must include a clear identification of . . . [f]or each work to which the notice

of termination applies, the title of the work and the name of the author . . . and, if possible and

practicable, the original copyright registration number."  37 C.F.R. § 201.10(b)(2); *see also* Pl.

Br. at 27.  H/E's notice omitted the art, H/E RSUF ¶ 86; PX 65, but H/E argues that its omission

was a "harmless error" under C.F.R. § 201.10(e)(1).  H/E suggests that, if the at-issue works

relate to a character, the "harmless error" provision effectively cancels out the need to list each

work subject to termination.  H/E Br. at 45.  H/E's interpretation goes too far for two reasons.

First, the works at issue in *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, related to a

character—Tarzan—and, in that case, the Second Circuit held that the termination notice was not

effective as to the works that were not specifically listed in the termination notice.  683 F.2d 610,

618, 622-23 (2d Cir. 1982); *see also Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 380

(S.D.N.Y. 1999).[3]  That case governs here.  Second, H/E cannot satisfy the "harmless error"

standard articulated in the cases upon which it relies.  H/E relies primarily on *Siegel v. Warner

Bros. Entm't Inc.* ("*Siegel I*"), 658 F. Supp. 2d 1036 (C.D. Cal. 2009), but, unlike H/E's notice,

the termination notice in *Siegel* included the required information for "literally tens of thousands

of Superman works published from 1938 to 1997" in a list that "span[ned] some 546 pages."

*Siegel v. Warner Bros. Entm't Inc.* ("*Siegel II*"), 690 F. Supp. 2d 1048, 1050 (C.D. Cal. 2009).

The notice also included a "catch-all" clause describing details of the at-issue works and

explicitly stating that the notice was intended to apply to "every such Superman-related work

---

[3] H/E attempts to distinguish *Music Sales* by arguing that the court found that the notice's
description of the grant being terminated was adequate to identify the grant at issue.  That
holding is not relevant to whether a notice applies to works not listed.  As to the latter, the court
held that only the specific works listed would be subject to termination, even if the notice
purports to terminate a grant that includes more works than those listed.  73 F. Supp. 2d at 380.

ever created," including any inadvertently omitted from the meticulously catalogued list. *Id.* at 1051. Despite the plaintiff's "near-Herculean effort and diligence . . . placed on cataloging the works," however, two-weeks' worth of comic strips were omitted from the "nearly six-pound" list. *Siegel I,* 658 F. Supp. 2d at 1091, 1095. It was this omission that the court found to be "harmless error" because the "546-page listing of titles of works subject to the notice," in combination with the "catch-all clause," made it "painfully obvious" that it was the plaintiff's "intent to terminate the copyrights in *all* the Superman works." *Id.* at 1095. The court noted that, in a situation in which a termination notice fails to include "*any* information in the notice about the work in question," the omission "would thwart a recipient's ability to be . . . apprised" of what rights were at stake. *Siegel II*, 690 F. Supp. 2d at 1056.

The court's holding was narrow:

> [T]he Court does not hold that all termination notices with similar catch-all provisions will necessarily be sufficient as to inadvertently omitted works. However, when the notice evidences a demonstrable effort at cataloguing all the relevant and related works, where the universe of those works is large (and certainly larger than the universe of thirty-five works at issue in *Burroughs*), and where the number of omitted works is minute relative to the included works, the presence of a comprehensive catch-all provision such as that found here leads to the conclusion that the relevant omission was harmless error and the termination notice should be found to be effective even as to the omitted works.

*Siegel I*, 658 F. Supp. 2d at 1094-95.[4]

Here, H/E made **no** effort to catalogue **any** of the artwork, instead listing only:

> Title – Phillie Phanatic
> Authors – Wayde Harrison & Bonnie Erickson
> Registration Number – VA 23-[7]48

---

[4] The *Siegel* court also explained that even if the Second Circuit had addressed the "harmless error" exception in *Burroughs*, it could have come to the same conclusion. *Siegel I*, 658 F. Supp. 2d at 1094-95; *Siegel II*, 690 F. Supp. 2d at 1048, 1057-58.

H/E RSUF ¶ 86; PX 65.  Of course, Registration VA 23-748 covers an "artistic sculpture," and nothing else.  Under *Siegel*, therefore, the "harmless error" exception does not apply.  Moreover, unlike in *Siegel*, where the omitted works were a tiny fraction of the works at issue, here, by listing only the costume, H/E omitted 99% of the total universe of works it now contends was intended to be included.  Under *Siegel*'s analysis, such a "significant level of exclusion" is not harmless error.  *Siegel I*, 658 F. Supp. 2d at 1094.[5]  Because H/E failed to identify any artwork in its notice, it is not effective as to any of H/E's pre-1984 or post-1984 Phanatic artwork.

> **D.     The Phillies May Continue to Utilize 368 Phanatic Works**.

In its opening brief, The Phillies pointed out that H/E conceded that 368 works identified in The Phillies' interrogatory responses are derivative works developed under the authority of the 1984 grant or noninfringing works.  Pl. Br. at 10.  H/E now attempts to recant that concession, H/E Br. at 47-48, but it fails to raise a genuine issue of material fact regarding these 368 works. In response to H/E's interrogatory asking The Phillies to "[i]dentify each derivative work you allege you created during the term of the 1984 Assignment, and which you allege you have the right to continue to use after the effective termination date," PX 22 at 3 (Interrog. No. 5), The Phillies served "Appendix A," describing 399 derivative or non-infringing works, with representative images and citations to documents containing additional information.  PX 22 at 4 & PX 23.  The Phillies later served the following contention interrogatory: "Do you contend that any of the items on Appendix A . . . is not a derivative work that was prepared under authority of the grant of rights contained in the 1984 Assignment?  If yes, state all facts supporting those contentions."  PX 26 at 23 (Interrog. No. 25).  In response, H/E stated, "Yes. At least the

---

[5] *Mtume v. Sony Music Entm't*, does not support H/E's argument.  In *Mtume*, the notice listed the at-issue works, but may have listed an incorrect date of execution of the grant, and the court held the incorrect date *might* be a harmless error.  408 F. Supp. 3d 471, 475-77 (S.D.N.Y. 2019).

following items on Appendix A . . . are not derivative works prepared under the authority of the grant of rights contained in the 1984 Assignment." *Id.* H/E listed *only 31 items* from Appendix A—effectively conceding that The Phillies may continue to use the other 368. *Id.* H/E's admission proves there is no dispute as to the 368 works. Pl. Br. at 10.

H/E argues that Appendix A is not admissible, but that is a red herring: ***H/E's interrogatory response***—the evidence The Phillies relies upon—***is*** admissible. *Bell v. A-Leet Leasing Corp.*, 863 F.2d 257, 259 (2d Cir. 1988). H/E also argues that, by saying "at least," it reserved the right to later argue that some of the 368 works are not derivative or noninfringing—although, it still fails to identify any more than 31. In fact, after H/E served its responses, The Phillies gave H/E the opportunity to add any other works to the list. PX 166 at 3. H/E declined, thereby confirming that the 368 may be used by The Phillies. *Id.* Moreover, it is absurd for H/E to suggest that a response ***specifically listing only 31 works*** actually means that ***none*** of the works described in Appendix A falls within the Derivative Works Exception. Permitting H/E to wriggle out of its response would defeat the whole point of contention interrogatories: to "assist parties in narrowing and clarifying the disputed issues and reducing the possibility of surprise at trial." *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 157 (S.D.N.Y. 2007).[6] There is no dispute that the 368 works fall within the Derivative Works Exception or are noninfringing, and The Phillies is entitled to continue to utilize them.

### E.    P2 is a Derivative Work That The Phillies May Continue to Utilize.

H/E ignores, thereby effectively conceding, the fact that P2 has at least 13 significant design changes that, when considered as a whole, are visually much more significant than the minor changes to Paddington that the Second Circuit found sufficient to constitute a derivative

---

[6] H/E does not raise any genuine issue of material fact as to the 368 works since it makes no attempt to argue that any of them is not a derivative or noninfringing work.

work in *Eden Toys, Inc. v. Florelle Undergrarment Co.*, 697 F.2d 27 (2d Cir. 1982), and the

minor changes sufficient for derivative work status in the other authorities cited by The Phillies,

Pl. Br. at 8-9, but ignored by H/E.  No other mascot, costume, or puppet looks like P2 or has the

13 visual design elements that distinguish P2 from P1.  Thus, as a matter of law, P2 is subject to

the Derivative Works Exception and The Phillies can continue to utilize it.

      1.      H/E Fundamentally Misunderstands the Nature of Derivative Works.

Citing binding Second Circuit precedent, The Phillies' opening brief explained that "a

derivative work is by definition substantially similar to the underlying work and thus will always

be 'recognizable' as the underlying work."  Pl. Br. at 7-8, 20.  Yet H/E invites this Court to

commit legal error by arguing that because P2 is "instantly identifiable as an embodiment of the

Phanatic," it cannot be a derivative work.  H/E Br. at 33.  As the authorities and leading

copyright treatise author cited in The Phillies' brief at pages 7 and 20 make clear, a derivative

work is always "instantly identifiable" as the underlying work, just as the derivative work

versions of  Paddington and the Statue of Liberty were "instantly identifiable" as Paddington and

the Statue of Liberty.  For this very reason, the analysis of what constitutes a derivative work

does not focus on the *similarities* between the underlying work and the putative derivative, but

on the *differences*—specifically, whether the "revisions, annotations, elaborations, or other

modifications" contain the originality required to "***as a whole***, represent an original work of

authorship."  17 U.S.C. § 101; *see also Weissmann v. Freeman*, 868 F.2d 1313, 1322 (2d Cir.

1989) (emphasis added) (updated version of research paper was derivative work based on

examination of "additions and modifications" as compared to earlier version).  Put simply, if P2

were not "identifiable as the Phanatic," it could not be a derivative work at all.

To qualify as a derivative work, first, the changes must be original to The Phillies,

meaning that they were independently created and do "not consist of actual copying."  *Waldman*

*Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994); *Imperial Laces Inc. v. Westchester Lace Inc.*, 1998 WL 830630, at \*2 (S.D.N.Y. Nov. 30, 1998); *Godinger Silver Art Co., Ltd. v. Int'l Silver Co.*, 1995 WL 702357, at \*2 (S.D.N.Y. Nov. 28, 1995).  This standard is a "low threshold." *Waldman*, 43 F.3d at 782.  H/E does not, and cannot, seriously dispute that The Phillies independently created P2.  H/E's entire argument on this point comprises two sentences, without any citations to factual support, claiming that "not a single variation between P2 and the Phanatic is the product of independent creation" and that the variations are "artistically uninspired" (whatever that means).  H/E Br. at 33.  Such "unsupported assertions" do not create genuine issues of material fact.  *United States v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982).  The Phillies' witnesses all explained that the changes to P2 were motivated by a desire to make P2 "creative," "fun," or "funny," and not by copying.[7]  Pl. RSUF ¶ 91.  And The Phillies' 30(b)(6) designee testified unequivocally that each specific change he was asked about was made independently without copying, and there is nothing in the summary judgment record contradicting his testimony.  *Id.*  Indeed, neither H/E nor its "experts" point to any of the 13 new elements, much less their combination or even a combination of a subset of the 13, as appearing on any other work.  H/E does not even try to identify an existing mascot that looks like P2.  That is crucial because even if The Phillies had copied individual elements from other mascots, originality exists in the selection and arrangement of those elements.  *See Weissmann*, 868 F.2d

---

[7] H/E tries to skirt this lack of evidence by claiming The Phillies "looked at" other mascots.  Pl. RSUF ¶ 91.  But even if this is true, access to a work does not show copying.  Rather, copying must be shown by access to a specific work and a showing that the new work is substantially similar in some respect that is probative of copying.  *Hord v. Jackson*, 281 F. Supp. 3d 417, 423 (S.D.N.Y. 2017).  H/E's statement of facts does not even name any of the "variety" of mascots it claims The Phillies "looked at," much less try to show that any of the 13 changes in P2 is substantially similar to earlier mascots.  And while H/E's "expert" speculates about whether P2 "reflect[s] the use of prior artistic expression," PX 81 at 24, H/E presents no evidence that The Phillies copied from any of the sources Zung speculates about.

at 1322 (updated version of work was derivative work where selection of content from prior works and their rearrangement was the product of original authorship).  The modifications to P2 are thus, as a matter of law, the product of independent creation.

Second, to be a derivative work, the modifications must be non-trivial.  The more than 13 visual design changes to P1 are more distinct than the changes in visual artworks that the Second Circuit has previously found non-trivial.  Pl. Br. at 9-10.  Moreover, Bonnie Erickson testified extensively about the "significant" differences between mascots she had designed, which justified her claiming copyright protection separately for each of them as separate, independent works, all of which are of similar or lesser magnitude than those that appear in P2.  H/E is therefore forced to concede the substantiality of those elements in its statement of facts, agreeing for example that the "sloped and shaped" snout of H/E's "Duncan" mascot is a significant difference from the Phanatic's megaphone snout, as is the ring of "feathers" around the base of the Phanatic's snout, which Duncan does not have.  H/E RSUF ¶¶ 79-80.  If Duncan's snout is substantially different from P1, then P2's shorter, cylindrical snout with no base feathers is significantly different from P1's cone-shaped snout.  Likewise, if Erickson's flipping the egg-shaped eyes of P1 for Slyly was significant, as she concedes, then the change in shape, design, and positioning of P2's eyeballs cannot be considered insignificant.  H/E RSUF ¶ 82.

Ignoring binding Second Circuit precedent, H/E relies upon the Ninth Circuit's decision in *Entertainment Research Grp. Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211 (9th Cir. 1997).  But that case simply applied the rule that a mere change in ***medium*** is not *ipso facto* sufficient to create a derivative work.  It is therefore limited to instances in which the derivative work maker attempts to replicate the original work as closely as the new medium allows, such as the costumer in that case who used "detailed instructions" from its customer to "replicat[e] the[]

characters" as closely as possible in turning a cartoon into an inflatable costume.  The costumes differed from the cartoons only because of "functional considerations" or "trivial" differences in facial expression.  *Id.* at 1223.  Similarly, in *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980), the court denied derivative work status to a "mere reproduction of the Disney characters in plastic" that contained "no distinguishable variation from preexisting works, nothing recognizably the author's own contribution that sets Tomy's figures apart from the prototypical Mickey, Donald, and Pluto."  And in *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489 (2d Cir. 1976), a plastic reproduction of a public-domain metal Uncle Sam bank was not a derivative work because it was a "reproduction of the metal bank made as simply as possible for the purposes of manufacture" and contained "no elements of difference that amount to significant alteration or that had any purpose other than the functional one of making a more suitable (and probably less expensive) figure in the plastic medium."  In contrast, H/E admits repeatedly that The Phillies "deliberately" made numerous purposeful changes to create P2, including adding wings, differently designed arms and hands, new shoe designs, new leggings, a larger hat, new jersey, differently proportioned body and neck, cylindrical and shorter snout, star-inspired "eyelashes" in a different color, more shapeable and whispy powder blue eyebrows, a "duck butt," and a differently colored and shaped tail made from a different material.  Zung Decl. Ex. B at 24-74 (analyzing the 13 deliberate changes); H/E Br. at 32-33 (intentionally made design changes); H/E RSUF ¶ 95 (disputing only whether design changes are "significant relative to the overall design"—which is the incorrect legal standard).

H/E also claims that The Phillies "reference[d] numerous photographs and artwork depicting the Phanatic over time" in creating P2.  H/E Br. at 32.  But "referencing" (and even incorporating) most of the existing work is ***necessary*** to create a derivative work.  The film

version of *To Kill a Mockingbird* is no less derivative because it was created by "referencing" Harper Lee's novel—to the contrary, incorporation of the novel is what makes the film a derivative work.  The later Paddington drawings obviously "referenced"—and, indeed, copied— most aspects of the original.  *Eden Toys*, 697 F.2d at 31-32.  That P2 incorporates much of the look of the original Phanatic in other ways is simply proof that it is derived from the Phanatic.[8]

Moreover, to the extent H/E implies that the changes to P2 were "lawyer-driven" or made in response to termination, that is as irrelevant as it is incorrect.  H/E cites no case supporting its argument that a copyright assignee cannot purposefully create a derivative work, whether to take advantage of the Derivative Works Exception or otherwise.  If a party may "legitimately avoid infringement by intentionally making sufficient changes in a work" to render it non-infringing, *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir. 1982), then there is no reason it cannot intentionally make sufficient changes to create a derivative work.  In sum, the modifications to P2 have the requisite level of originality to make P2 a derivative work.[9]

---

[8] H/E also argues that declaring P2 a derivative work would "undoubtedly affect the scope of the copyright in the underlying Phanatic by giving The Phillies a "*de facto* copyright in the Phanatic."  H/E Br. at 33.  But under the Copyright Act, the copyright in a derivative work "extends only to the material contributed by the author of such work"—here the at least 13 changes between P2 and P1.  17 U.S.C. § 103(b).  The rule raised by H/E, drawn from the same change-of-medium cases cited above, is concerned only with "derivatives" that are almost exact reproductions of the original.  *Durham Indus.*, 630 F.2d at 911 (permitting copyright in plastic reproduction of Disney characters would risk harassment of licensees authorized to copy the character); *L. Batlin & Son*, 536 F.2d at 492 (permitting reproduction of public domain bank would allow maker to "appropriat[e] and monopoliz[e] public domain work").  Put simply, the rule applies where the derivative work is an attempt to reproduce the underlying work as closely as possible.  In such a situation, it is difficult to tell the difference between copies of the underlying work and the supposed "derivative."  That concern does not apply here; someone who copies P1 but does not copy any elements unique to P2—the cylindrical snout, the wings, the new eyebrows and lashes, the different shoe and leggings' designs—will not infringe the P2 copyright, and it will be clear that they copied P1, not P2.

[9] The Phillies also seeks summary judgment that certain ***artwork*** depicting P2 falls within the Derivative Works Exception.  Pl. Br. 15-17.  H/E does not address this argument, thereby waiving any argument separate from their arguments as to the P2 ***costume***.

2.      H/E's "Expert" Opinions Are Subjective, Conclusory, Arbitrary, and
Apply Incorrect Legal Standards.

The Phillies' opening brief pointed out that, first, to be admissible, an expert's

methodology must be reliable.  *Berk v. St. Vincents Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 350

(S.D.N.Y. 2005).  Second, the expert must apply the controlling legal standard correctly, and not

offer opinions inconsistent with it.  *Durkin v. Platz*, 920 F.Supp. 2d 1316, 1331-32 (N.D. Ga.

2013).  H/E fails adequately to address both of these flaws in Erickson's and Zung's opinions.  In

reality, Zung's and Erickson's "methodology" consists of arbitrarily appending pejorative

adjectives to P2, and laudatory adjectives to Ms. Erickson's and everyone else's works.

Zung repeatedly concludes that the P2 design changes are not "***creative***" (PX 81, Zung

Report at 2), not "***particularly*** creative" (*id.* at 40), "not an ***important*** creative decision" (*id.* at

45), or not creative "from an ***artistic*** point of view" (*id.* at 39), and other similarly subjective,

undefined value judgments.  *See, e.g.*, PX 81 at 2 (not a "***new creative*** work"); *id.* at 39 ("not any

sort of ***major*** creative decision"); *id.* at 58 ("color choice for P2's eyelashes was not the product

of ***new creative thought***"); *id.* at 59 ("***minor*** color modification appears to reflect a desire to

retain a prior, recognizable color, and not the product of ***new, creative thought***."); *id.* at 60 ("not

a ***major*** design or ***creative*** decision"); *id.* at 60 ("the changes are neither ***creative*** nor alter P2 in

such a way to make it a ***new work*** compared to P1"); *id.* ("do not reflect more than ***trivial artistic***

choice"); *id.* at 67 ("P2's eyelash shape is ***not*** creative ***at all***."); *id.* at 71 ("no ***real*** changes in

***artistic substance***"); *id.* at 71 ("lack of ***artistic originality***.  It is like putting lipstick on a pig.");

PX 82, Zung Suppl. Report at 4 ("not creative in any ***meaningful*** way"); *id.* at 5 ("no creative

***purpose***").  Ms. Erickson uses similar adjectives.  PX 80, Erickson Suppl. Disclosure ¶ 3

(changes to P1 evident in P2 are "of less than minimal ***artistic significance***").  Of course, when it

comes to P1, Zung concludes that it "is clearly an artistic design of significant creativity."  PX 81

at 23.  And Ms. Erickson wholeheartedly agrees.  PX 80 ¶ 1 (P1 is "significant creative work").[10]

But nowhere do Zung or Erickson articulate a methodology behind these arbitrary labels.  What is "creative"?  What is "artistic"?  What is a "*major* design or creative decision"?  What is creative in a *meaningful* way?  They never say.  Zung tries to splatter a patina of "scientific" method on his report (PX 81 at 28-29) by referencing "design hierarchies," but he does not apply them in applying the "good" adjectives to P1 and the "bad" adjectives to P2.

Zung's report is also flawed because he erroneously concludes that he can ignore most of the *appearance* of P2 in comparing it with P1, stripping P2 of its clothing and dismissing many of the design changes as "cosmetic."  PX 81 at 10 ("[T]he outfit that P1 wears is conceptually and artistically separate from P1.  *Underneath* each of these outfits, P1's design and signature characteristics remain the same.") (emphasis supplied); *id.* at 48 ("outfit choice is artistically a separate consideration from the costume design"); *id.* at 10 ("While different clothing may alter the *appearance* of P1, it does not alter its design."); *id.* (changes in uniform do "not constitute a creative alteration"); Zung Decl. ¶ 32 ("changes in P2's clothing do not constitute a design change to the Phanatic because the Phanatic was designed to wear different clothing . . . ."); PX 81 at 10 ("*cosmetic* updates . . . are not in my opinion creative from a *design perspective*"); *id.* at 4 ("minor *cosmetic* difference that is not *creative in any respect*"); *id.* at 74 ("the changes amount to little more than *cosmetic* surgery.  A pig wearing lipstick is still the same pig."); *id.* at 10 ("*Cosmetic* updates . . . are not in my opinion creative from a design perspective"); *id.* at 46 ("minor *cosmetic* difference"); *id.* at 13 ("minor *cosmetic* changes . . . not an *artistic* modification") (emphasis supplied).  P2's clothing is part of the design, and "cosmetic" means

---

[10] Appendix 1 attached hereto demonstrates the arbitrary, subjective, and inconsistent application of pejorative adjectives when it comes to P2 and laudatory ones for H/E and others' work.

"serving to add beauty," "adorning," "decorative," "ornamental."  Meriam-Webster Thesaurus, *available at* https://www.merriam-webster.com/ thesaurus/cosmetic.  Yet in Zung's world, one must ignore the clothing—using his X-ray vision to look "underneath"—and anything that "adds beauty," "adorns," or is "decorative" is not "creative."  This is precisely the opposite of how two visual works must be compared.  Pl. Br. at 9-10.

To return to first principles, The Phillies is seeking a declaratory judgment that it is not infringing by continuing to utilize P2 because P2 is a derivative work of P1.  H/E has sued The Phillies based on its 1979 registration of the "artistic sculpture."  The only relevant comparison in deciding whether P2 is a derivative work of P1, therefore, is to the deposit for P1, because H/E can only sue The Phillies based on its registration with the Copyright Office.  *See infra* Section III.B.  The P1 deposit, of course, has the Phanatic fully dressed, not naked.  So the Court must compare the work as registered—with jersey, leggings, shoes, and hat—with P2 as a whole.[11]  At the risk of being a bit indelicate, the Second Circuit did not peek "underneath each of [Paddington's] outfits" in deciding *Eden Toys*.  Indeed, the Second Circuit's derivative work decision was based almost entirely on differences in how his hat, coat, trousers, and shoes were drawn.  *Eden Toys*, 697 F.2d at 31, 34-35.  By conceptually removing clothing from his analysis and anything "adorning," "decorative," or "cosmetic," Zung ignores most of the appearance of P2, thereby applying a wildly incorrect legal standard.

Zung's and Erickson's pejorative, subjective labels are also applied inconsistently.  For example, in finding that P2's squat, cylindrical snout is ***not*** creative, but P1's longer, conical snout ***is*** creative, Zung deems P2's snout "arbitrary," and then proclaims the edict that "an

---

[11] For this reason as well, Zung's comparisons of P2 with post-1979 versions or artwork of the Phanatic invite legal error.  *See,e.g.*, PX 81 at 5 (2018 Phanatic), 24, 25, 42 (unregistered artwork); 69 (same).

arbitrary change is not in my opinion creative.  Instead, it appears the change is solely for the sake of change, without any real creative thought." PX 82 at 4.  But when considering Ms. Erickson's mascots, Zung applies the opposite rule that "more arbitrary" is more artistic:  "[T]he choice to use a common five-pointed star uses considerably less artistic interpretation than the more arbitrary and unique nature of the pointed eyelashes on these preexisting mascots." PX 81 at 67.  Likewise, he and Ms. Erickson use the pejorative words "slavish" and "knockoff" to describe P2—words that mean "counterfeit" or "fakes." Meriam-Webster Thesaurus, *available at* https://www.merriam-webster.com/thesaurus/ knockoff; PX 81 at 71 ("To further demonstrate how P2 stands to be a knock-off, rather than a creative reinterpretation . . ."); *id.* at 74 ("slavish and uninspired attempt at modifying P1"); *id.* at 24 ("The changes reflected in P2 are slavish."). Yet at the same time they fault The Phillies for ***deliberately*** making changes to P2 for legal reasons.  PX 81 at 24 ("[T]hese changes were sparked by this lawsuit, and were deliberately designed in what The Phillies hoped to be 'creative' changes to P1."); *id.* at 74 ("the changes amount to little more than cosmetic surgery."); PX 82 at 5 ("The design is working against itself."); H/E Br. at 29 ("lawyer-driven 'changes'").  And Zung spends ***fifty pages*** of his report (PX 81 at 24-74) analyzing each of the "insignificant" differences between P1 and P2, not counting his supplemental report and new declaration.  A counterfeit does not require fifty pages to analyze its "deliberate" differences from the original.

Finally, H/E and Zung double down on the mistaken thinking that if P2 is "recognizable as the Phanatic," it is not "creative."  Pl. Br. at 20; Zung Decl. ¶ 19 ("As I explained in my report, the variations in P2 exhibit less than trivial creativity because each variation from P1 is itself trivial and uninspired, and because the variations, as [a] whole do not alter the impression that P2 is still P1."); H/E Br. at 31, 33 (P2 is not a derivative work "because P2 is unquestionably

'instantly identifiable' as an embodiment of the Phanatic."). Again, the later drawings of Paddington did not alter the impression that they were Paddington.[12] Since a derivative work is always substantially similar to the underlying work, it will always be the case that the derivative work is "recognizable" as the underlying one and not an entirely "new work." No work would ever qualify as derivate under Erickson's and Zung's standard.[13]

### F. H/E's Argument About "New P2 Works Created . . . After Termination" is Unripe and Seeks an Advisory Opinion.

H/E also argues that The Phillies "may not develop any new derivative works that feature P2 or other derivative works." H/E Br. at 34. Rather than responding to The Phillies' motion, however, H/E seems to prematurely seek summary judgment on its infringement claim as to certain identified and unidentified uses of P2 when that claim is contemporaneously being briefed on a motion to dismiss—and on which the parties have not taken discovery.[14] *Cusamano v. Alexander*, 691 F. Supp. 2d 312, 321 (N.D.N.Y. 2009). Moreover, to the extent H/E requests a ruling that unidentified or not-yet-developed "derivatives of derivatives" are infringing, it seeks an advisory opinion on an unripe claim. *See Texas v. United States*, 523 U.S. 296, 300 (1998); *Re-Alco Indus. v. Nat'l Center for Health Educ.*, 812 F. Supp. 387, 395 (S.D.N.Y. 1993).

---

[12] At his deposition, Zung candidly admitted that, for his own analysis of what is and is not trivial to be correct, the Second Circuit's binding decision in *Eden Toys* must be wrong. PX 83, 7/21/2020 Zung Dep Tr. at 36:3-47:21. H/E's only response is to try to salvage Zung's opinion with a declaration claiming that the reproductions in *Eden Toys*, taken directly from the Court's opinion, are too "crude" for Zung to opine accurately. Zung Decl. at ¶¶ 21-25.

[13] In none of the cases cited by H/E does the court endorse the kind of subjective *ipse dixit* of Erickson and Zung. And almost none of the cases relate to visual art. H/E Br. at 40 n.26.

[14] The parties have not conducted discovery as to H/E's infringement claim (which does not even satisfy the pleading requirements) so H/E has no evidence regarding when the videos and photos were created or even that they were created by The Phillies. H/E cannot rely on YouTube links and screenshots of social media posts that have not been authenticated to prove these essential facts. *Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 2009 WL 1576467, at *8 (S.D.N.Y. June 2, 2009) (disregarding assertions based on hearsay), *aff'd*, 371 F. App'x 231 (2d Cir. 2010); *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, at *17 (S.D.N.Y. Sept. 30, 2015) (disregarding evidence that has not been authenticated).

If the Court nonetheless considers the merits of H/E's argument to the extent it relates to certain photos and videos of P2, its argument must be rejected.  P2 and the related artwork are derivative works prepared under authority of the 1984 Assignment and therefore can "continue to be utilized" by The Phillies under the terms of the 1984 Assignment.  The only limit to the Derivative Works Exception is that The Phillies may not prepare "other derivative works based upon the copyrighted work covered by the terminated grant."  17 U.S.C. § 203(b)(1).

H/E takes issue with ten videos on YouTube, H/E SUF ¶ 108, and a few photos posted on social media, DX 72 at Ex. A.  H/E's argument as to these pictures and videos highlights the meritless nature of its position as to the P2 costume.  H/E is forced to twist itself in pretzels, first arguing that P2 is such a "trivial" variation on the Phanatic as to not be a derivative work, before reversing course to claim that every photograph of P2 will necessarily be so creative as to be a new derivative work.  Both of those positions cannot be true, and yet H/E does not even try to resolve the tension in its own arguments.  More fundamentally, H/E does not grapple with the language of the statute, which provides that a pre-termination derivative work may "continue to be utilized *under the terms of the grant*"—here the 1984 Assignment.  The terms of the grant here are an assignment of all rights—including the rights to public performance of the work, to display the work, to reproduce the work, and to distribute the work to the public.  *See* 17 U.S.C. § 106; 3 Nimmer on Copyright § 11.02[C][1] (stating that the Derivative Works Exception permits reproduction and public display in order to permit the continued utilization of a work).  Utilization, then, encompasses all the rights of a copyright owner other than what is explicitly excepted: the right to create other derivative works based on the original work.

H/E does not directly dispute this analysis, but takes the position that the exception swallows the rule.  In H/E's view, any depiction of a derivative work will *necessarily* make an

"other derivative work based upon the copyright work covered by the terminated grant."  H/E Br.
36.  In H/E's view, for example, a movie producer who received an assignment of a novel and
created a film could not, after termination, use a screenshot from that film to market the film on
Netflix, could not play a clip in a trailer, and could not display a scene on a movie poster.  And
the owner of P2 could not photograph it, perform the costume at baseball games, or even display
it in the lobby of the baseball stadium, lest it create a prohibited "new" derivative work.  That
simply cannot be the right interpretation of "utilize."  *See* 3 Nimmer on Copyright § 11.02[C][1].

Not surprisingly, courts—including the ones H/E cites—have drawn a more sensible line
that is rooted in the statutory language.  First, Section 203(b)(1) permits utilization of the pre-
termination derivative work "under the terms of the grant"—which means to the extent of the
underlying grant.  Where the underlying grant is a license, as in *Fred Ahlert Music Corp. v.
Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir. 1998), the "utilization" must be
consistent with the license.  Thus, *Fred Ahlert* held that a using a derivative work in a soundtrack
was not "under the terms of the grant" where the "terms of the grant" under which the derivative
was created allowed only for sales of specific phonorecords.  *Id.* at 24.  Because the "terms of the
grant" here is an assignment of all rights, *Fred Ahlert* simply does not apply.

Second, Section 203(b)(1) only prohibits the creation of "other derivative works" to the
extent those works are "based upon the copyrighted work covered by the terminated grant."  As
courts and commentators have explained, where new material added to a pre-termination
derivative work is "wholly unrelated to the original work," the Derivative Works Exception
protects the creation and use of those derivatives.  *See Architettura, Inc. v. DBSI Cumberland at
Granbury LP*, 652 F. Supp. 2d 775, 784 (N.D. Tex. 2009); 3 Nimmer on Copyright
§ 11.02[C][1] (giving the example of a derivative work film where a musical score is added after

18

termination; the movie with music is a new derivative work, but is protected because the material added to make the new derivative is not "based on the underlying work"). Thus, even if a photo, video, or a product produced post-termination depicting P2 *were* considered a derivative work, it would continue to be protected, because the additional contribution is not "based on" the original Phanatic costume. Photographers, for example, do not own their subjects, and thus cannot claim to have added originality "based upon" the underlying work. *E.g.*, *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 382 F. Supp. 3d 312, 323 (S.D.N.Y. 2019). Instead, the original elements of a photo inhere in elements "wholly unrelated" to the subject itself— including posing, lighting, angles, and the like. *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992). Thus, even if photographic or video depictions of P2 are considered derivative works, they are not derivative works "based on the copyrighted work covered by the terminated grant"—here the original Phanatic. H/E notably does not claim that the photos or videos it identifies alter, recast, or otherwise modify P2—they simply depict P2. Accordingly, they are not "other derivative works based upon the copyrighted work covered by the terminated grant."

H/E's request for a ruling concerning "new" derivative works should be denied.

## II.     The Phillies' Opposition to H/E's Motion for Summary Judgment

### A.     H/E is not Entitled to Summary Judgment on The Phillies' Claim regarding H/E's Fraud on the Copyright Office.

There are genuine disputes of material fact as to The Phillies' Count II—which seeks a declaratory judgment that H/E cannot sue The Phillies for infringement because H/E engaged in fraud on the Copyright Office in obtaining its registration in 1979—and as to H/E's reciprocal Third Cause of Action. To assert an infringement claim, H/E must have a valid copyright registration for the work at issue. 17 U.S.C. § 411(a). A certificate of registration from the Copyright Office satisfies that requirement *unless* (A) "inaccurate information was included on

the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1).  The only issue currently before the Court is whether there is a genuine dispute of material fact as to whether any inaccurate information was included on H/E's application to register the Phanatic in 1979 with knowledge that it was inaccurate.[15] Because there is, H/E's motion for summary judgment on this issue must be denied.

In *Whimsicality, Inc. v. Rubie's Costume Co.*, the Second Circuit held that it was inaccurate for an application for copyright registration to describe a costume as a "soft sculpture," without using the word "costume" anywhere, because, at the time, the Copyright Office "consider[ed] costumes to be wearing apparel and consistently reject[ed] applications to register them." 891 F.2d 452, 454-56 (2d Cir. 1989).  Such a description was misleading— particularly where the deposit did not make clear that the works were costumes—because "[t]he word sculpture implies a relatively firm form representing a particular concept," whereas the costumes in question had "no such form" when not "worn by a person" or "carefully laid out on a flat surface." *Id.* at 456.  Because only the separable "pictorial, graphic and sculptural aspects of useful articles," like costumes, are copyrightable, an application to register costumes should have "acknowledged in its application that the articles in question were costumes, and have requested registration for only the features it claimed were separable." *Id.* at 455.

Under *Whimsicality*, H/E's application, which described the Phanatic as an "artistic sculpture" without describing any non-copyrightable, useful elements or mentioning the word

---

[15] H/E argues in its motion that there was no "material inaccuracy" in its application *and* that "any purported inaccuracy was immaterial." H/E Br. at 14-15.  This Court has already held, however, that it "*must* solicit the advice of the Copyright Office" regarding the materiality of the inaccuracy, but deferred doing so until after the finder of fact has had the opportunity to decide whether the application contained inaccurate information.  ECF No. 119 at 1-3.

"costume," was inaccurate.  Pl. CSF ¶ 1; H/E RSUF ¶ 14.  Moreover, if Ms. Erickson's 1979 affidavit was truthful—asserting that the single black-and-white photo in Exhibit 1(a) was the deposit (Pl. CSF ¶¶ 2-3; DX 63 at ¶ 2 & Exs. 1, 1A), then the deposit misleadingly concealed the fact that the work was a costume.  On that issue, there is a factual dispute.  H/E now claims that it submitted several color photos of the Phanatic in different poses, but that is obviously disputed given Ms. Erickson's 1979 affidavit.[16]  Pl. RSUF ¶ 44.

There is also an issue of material fact as to whether H/E knew that describing the costume as an "artistic sculpture" was inaccurate.  There is no intent to defraud requirement in Section 411(b), and the term "knowingly," as used in Section 411(b), does not refer to "a culpable state of mind or knowledge of the law."  *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1147-48 (9th Cir. 2019); *see also Palmer/kane LLC v. Gareth Stevens Publ'g*, 2016 WL 6238612, at *4 (S.D.N.Y. Oct. 24, 2016); *Bruhn NewTech, Inc. v. United States*, 144 Fed. Cl. 755, 802 (Fed. Cl. 2019).  H/E knew its description of the Phanatic costume as an "artistic sculpture" was inaccurate because it is a costume, not a sculpture.  H/E has not suggested that calling it an "artistic sculpture" was a mistake, and H/E did not describe the Phanatic that way outside its copyright application.  Pl. CSF ¶ 4.  It is reasonable to infer, therefore, that H/E knew that it was inaccurate to describe the Phanatic as an "artistic sculpture."

H/E's argument that *Whimsicality* is "not controlling" because it was "rendered moot on remand" is incorrect.  H/E Br. at 16.  Following the Second Circuit's decision, the district court

---

[16] Although, The Phillies has agreed to assume for purposes of its summary judgment motion regarding the Derivative Works Exception that the five color photos in PX 7 depict The Phanatic as it looked in 1978, The Phillies never agreed that those photos were in fact submitted to the Copyright Office.  If Ms. Erickson's 1979 affidavit is to be believed, only one of those photos was submitted.  The Phillies, therefore, most certainly does dispute H/E's assertion that the deposit included photos that Ms. Erickson omitted from her 1979 affidavit.

granted Whimsicality's Rule 60(b) motion to reopen the record to consider new evidence.

*Whimsicality, Inc. v. Rubie's Costume Co.*, 836 F. Supp. 112, 117 (E.D.N.Y. 1993). After the

appeal, Whimsicality had obtained an affidavit from the Copyright Office examiner who issued

the registrations at issue, who declared that he knew the works were costumes, and that he issued

registrations after finding separable artistic content in the works. *Id.* at 115. Based on that newly

submitted evidence, the district court held that the "soft sculpture" description was not material

given that the examiner understood the nature of the work. *Id.* at 120. In contrast, there is no

evidence that the Copyright Office here understood the nature of the work, and there *is* evidence

that they did not; the registration issued without any disclaimer as to the functional aspects of the

costume. PX 12. There is therefore an issue of fact as to the inaccuracy of the registration.[17]

> As for H/E's myriad of equitable defenses, none of them bars The Phillies' claim.

---

[17] H/E cites a number of cases in support of its argument that "any purported inaccuracy is immaterial," but the issue of materiality is not before the Court. And none of the cases support H/E's argument that its registration application was not inaccurate. In *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, the court distinguished *Whimsicality*, holding that, "here the Copyright Office recognized that Rasta sought to copyright a costume and initially refused to register a copyright *because* it was a costume." 931 F.3d 215, 222 (3d Cir. 2019). *Masquerade Novelty, Inc. v. Unique Indus., Inc.* involved nose masks resembling animal noses, which, unlike costumes, "have no utility that does not derive from their appearance." 912 F.2d 663, 670 (3d Cir. 1990). And the application in *Masquerade Novelty* **accurately** characterized the works as "nose masks." *Id.* at 668 n.6. To obtain registration for the costumes at issue in *Nat'l Theme Prods. v. Jerry B. Beck, Inc.*, the applicant disclosed that the articles in question were costumes and requested registration for only the features it claimed were separable. 696 F. Supp. 1348, 1352 (S.D. Cal. 1988); *see also Whimsicality*, 891 F.2d at 455 & n.5 (distinguishing *Nat'l Theme Prods., Inc.*). In *Prima Creations, Inc. v. Santa's Best Craft, L.L.C.*, the court held that an elf hat was accurately described in the application as "ELF HAT," with the nature of the work described as "ornamentation on hat." 2011 WL 2982777, at *2-3 (E.D. Pa. July 22, 2011). *Carell v. Shubert Org., Inc.* involved makeup designs for the characters in *Cats*—not costumes—and the copyright registration was not challenged. 104 F. Supp. 2d 236, 241-247 (S.D.N.Y. 2000). The court in *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.* held that it was "at least possible that *elements*" of the at-issue costumes were separable, and hence copyrightable—a proposition The Phillies does not dispute—but the court did not address any purported inaccuracy in an application for copyright registration. 413 F.3d 324, 329 (2d Cir. 2005).

*Equitable estoppel.*  For equitable estoppel to apply, H/E would have to prove that (1) The Phillies had knowledge of H/E's conduct; (2) The Phillies either (a) intended that H/E rely on The Phillies' inaction or (b) failed to act in such a manner that H/E had a right to believe it was intended to rely on The Phillies' inaction; (3) H/E was ignorant of the true facts; and (4) H/E relied on The Phillies' conduct to its detriment.  *DeClaro v. Archie comic Publications, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001), *aff'd*, 11 F. App'x 26 (2d Cir. 2001).  H/E has failed to prove any of these elements.  First, there is no evidence that The Phillies knew H/E's conduct constituted fraud on the copyright office before it raised the issue in 2018.  To the contrary, The Phillies reasonably relied on H/E's representations that H/E had obtained a valid copyright registration.  Pl. CSF ¶ 2; DX 63 ¶ 2; H/E SUF ¶ 57 ("H/E represented that the 'copyright [was] valid throughout the world'").  Second, because The Phillies did not know H/E's registration was fraudulent, it could not have intended for H/E to rely on its inaction.  Third, H/E was not ignorant of the true facts—here, that H/E made misrepresentations to the copyright office.  *Lego A/S v. Best-Lock Const. Toys, Inc.*, 874 F. Supp. 2d 75, 85-86 (D. Conn. 2012) ("true facts" refers to the underlying facts, not to the plaintiff's intent to assert a claim).  H/E knew that its costume was not an "artistic sculpture."  Pl. CSF ¶ 4.  Finally, H/E did not rely to its detriment on The Phillies' inaction.  H/E actually *benefitted* from it by, for example, obtaining an early settlement to the 1979 litigation, renegotiating the contract in 1984 for $215,000, and by making hundreds of thousands of dollars from The Phillies' continued business.  H/E RSUF ¶¶ 19, 26-28; H/E SUF ¶ 49.  Under these circumstances, equitable estoppel does not bar The Phillies' claim.  *Mohr v. Sci. & Eng'g Servs., Inc.*, 204 F. Supp. 3d 1281, 1297 (N.D. Ala. 2016).

*Unclean hands.*  "The unclean hands doctrine is a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the

controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent

defendant's tortious conduct."  *Sands v. CBS Interactive Inc.*, 2019 WL 1447014, at *4

(S.D.N.Y. Mar. 13, 2019) (quotation marks and citation omitted).  "The defense of unclean

hands in copyright actions is recognized only rarely, when the plaintiff's transgression is of

serious proportions and relates directly to the subject matter of the infringement action."  *Id.*  For

the same reasons discussed in the context of equitable estoppel, The Phillies' conduct is not of

such "serious proportions" that the doctrine of unclean hands should bar its claim.

*Judicial estoppel.*  A party invoking judicial estoppel must show that (1) the party against

whom estoppel is being asserted advanced an inconsistent factual position in a prior proceeding

and (2) the prior inconsistent position was adopted by the court.  *Bates v. Long Island R.R.*, 997

F.2d 1028, 1038 (2d Cir. 1993); *see also In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391,

400 (Bankr. E.D.N.Y. 1997) (party asserting judicial estoppel has a difficult burden to prove the

facts supporting the defense).  H/E argues that The Phillies asserted an inconsistent position in a

prior proceeding, pointing to an affidavit from Christine Legault-Long filed in 1987 in MLB

*Promotion Corp. v. Brofman, et al.*, No. 87-3894 (E.D. Pa.), which states that Ms. Long believed

at the time that H/E had obtained a copyright registration certificate for the Phanatic.  H/E Br. at

18-19 (citing DX 29 ¶ 2).  Pointing to a docket sheet, H/E contends that the court relied on Ms.

Long's statement "when it awarded [The Phillies] default judgment."  *Id.* at 19.  But the docket

sheet does not establish that the court adopted Ms. Long's statement.  The case involved

numerous plaintiffs, and it is unclear from the docket sheet what claims were asserted by which

plaintiffs against which defendants.  DX 75.  And the docket sheet states only that default

judgment was entered "in favor of Plff and against" certain defendants, without providing any

24

detail regarding the basis for the court's entry of judgment.[18]  The docket sheet therefore does

not prove that a prior inconsistent position taken by The Phillies was ***adopted*** by the court.  *See*

*Sheltry v. Unum Life Ins. Co. of Am.*, 247 F. Supp. 2d 169, 175 (D. Conn. 2003) ("nothing in the

record" indicated that statement was adopted where default judgment stated "that 'liability has

been conceded'"); *In re NC & VA Warranty Co., Inc.*, 554 B.R. 110, 123 (Bankr. M.D.N.C.

2016) (rejecting judicial estoppel claim where default judgment did not specify upon which

allegations court relied in entering judgment).  Moreover, judicial estoppel does not apply to

assertions regarding the validity of a copyright registration, because such an assertion "amounts

to a legal, rather than factual, position," as to which the doctrine does not apply.  *Cummings v.*

*Brookhaven Sci. Assocs., LLC*, 2011 WL 6371753, at *9 (E.D.N.Y. Dec. 20, 2011).

  ***Res judicata.***  For *res judicata* to apply, "it must first be determined that the second suit

involves the same 'claim' or—'nucleus of operative fact'—as the first suit."  *Channer v. Dep't of*

*Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008).  The Phillies' claim does not arise from the

same operative facts as those at issue in the 1979 litigation.  In the 1979 lawsuit, H/E claimed

that The Phillies exceeded the scope of the parties' 1978 licensing agreement by authorizing the

manufacture of certain Phanatic merchandise that H/E deemed to be of poor quality.  *See* DX 65.

In contrast, The Phillies' current claim is a defense to the anticipated (now asserted) copyright

infringement claim based on H/E's contention that The Phillies cannot continue to utilize

Phanatic-related works such as P2 (which did not exist in 1979) under the authority of the 1984

grant (which did not exist in 1979) pursuant to the Derivative Works Exception.  Complaint ¶

---

[18] It is apparent from Ms. Long's affidavit and the docket sheet that the case at least involved
both copyright and trademark claims.  DX 29 ¶ 12; DX 75.  The docket sheet provides no
information as to which copyrights or trademarks each defendant was alleged to have infringed,
whether there were any other claims asserted against them, or what facts and legal principles the
court relied upon in entering default judgment against any one defendant.

104; AC ¶¶ 58-64.  Because The Phillies' claim does not arise from the same nucleus of operative facts as the 1979 lawsuit, *res judicata* is inapplicable.[19]  *Dorchen/Martin Assocs., Inc. v. Brook of Boyne City, Inc.*, 2013 WL 2418175, at *6 (E.D. Mich. June 3, 2013) (*res judicata* did not apply to later infringement case because "facts relevant to the copying" in earlier case were "completely different").  Indeed, if they did, H/E's infringement claim would be barred.

    ***Statute of limitations.***  The Copyright Act's statute of limitations provides that "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  As discussed, The Phillies' declaratory judgment claim regarding the validity of H/E's copyright registration is a defense to the copyright infringement claim The Phillies anticipated H/E would file after June 15, 2020.  Complaint ¶¶ 103-106.  If the statute of limitations applies at all to the The Phillies' defensive declaratory judgment claim, the claim did not accrue until H/E served its termination notice in June 2018.  Since The Phillies sued within three years, its claim is timely.  *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163-64 (2d Cir. 2003); *Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006).

## B.    Genuine Issues of Fact Preclude Summary Judgment on Authorship

    1.    The Phillies is a Joint Author of the Costume.

    A "joint work" is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  Co-authorship requires that each co-author make independently copyrightable

---

[19]A similar situation was addressed in *Wolfe v. Nat'l Med. Care, Inc.*, where the defendant argued that *res judicata* barred the plaintiff's discovery requests related to the validity of defendant's copyright registration because the plaintiff did not argue defendant's copyright was invalid in a prior copyright infringement action brought by the defendant against the plaintiff. 616 F. Supp. 2d 596, 598-602, 604  (S.D.N. Va. 2009).  *Res judicata* did not apply, even though the plaintiff could have challenged the validity of the defendant's copyright in the prior action, because the claims arose from different sets of operative facts.  *Id.* at 604, *aff'd in part, set aside in part on other grounds*, 2009 WL 1755127, at *5 n.3  (S.D.W. Va. June 17, 2009).

contributions and intend to be a co-author. *Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991), *Baker v. Robert I. Lappin Charitable Foundation*, 415 F. Supp. 2d 473, 487 (S.D.N.Y. 2006). There is no requirement that joint authors work near each other, "in concert," or that their respective contributions "be equal either in quantity or quality." *Id.* The evidence here is sufficient for a jury to conclude that The Phillies is a joint author of the Phanatic costume.

First, a large percentage of the overall look of The Phanatic consists of its jersey, stirrups, and hat with its distinctive logo. Pl. RSUF ¶ 31. The parties' 1978 and 1979 agreements made it clear that the parties intended the clothing to be part of the design, and that The Phillies had IP rights to those designs. DX 28 at 1; DX 67 at 1 (acknowledging The Phillies' "trademark, service mark and **other property rights** in and to the Licensee's uniform design and insignia **which are included in the costume of the PHILLIE PHANATIC**"). H/E notably does not argue that these elements are not independently copyrightable. Second, The Phillies' Bill Giles provided his design specifications to H/E: that the mascot needed to be "fat," "green," "furry," and "big nosed," DX 4 at 24:12-19, 30:3-18, and "a feathery thing that looks funny, something like Sesame Street characters, but nothing that would be a copy," PX 85 at 2. The Phillies sent H/E a "rough sketch of kind of what we were looking for," Pl. CSF ¶¶ 5-6; PX 104 at HE009147-48, and when H/E sent back to Giles their preliminary design, he directed that it was "not fat enough" and the "nose isn't big enough," DX 4 at 29:21-30:2. H/E argues that Giles did not "interact" directly with H/E, but that is not required. *Baker*, 415 F. Supp. 2d at 487. H/E's attempts to attack Giles credibility merely highlight the material factual dispute.[20]

---

[20] H/E takes Giles' self-deprecating comment that he "may have 'brainwashed himself'" out of its context. Giles was affirming that it was *he* who picked the color green for the Phanatic: "Q: So is it fair to say you really do not have a clear recollection as to whether you are the one who chose the green color? A: I have been brainwashed by myself that I was the one that picked green, but, you know, I believe that I picked green."). DX 4 at 45:19-24.

H/E—while effectively conceding the copyrightability of The Phillies' jersey, stirrups, and logo—argues that Giles' contributions are insufficient because they consist of mere "ideas" and "color." H/E Br. 21. But "even though a particular color is not copyrightable, the author's choice in incorporating color with other elements may be copyrighted." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir. 2001). That is precisely the role Giles played. DX 4 at 30:14-23 ("I thought green would fit in with the green AstroTurf, and The Phillies' colors were red and they put the . . . red hat and the red uniform on . . . the big, fat, green thing, it would be cute."). Giles' contributions were much more substantial than co-author Wayde Harrison's,[21] and at least as substantial as those that courts have found sufficient to satisfy the joint authorship standard. *Membler.com LLC v. Barber*, 2013 WL 5348546, at *6 (S.D.N.Y. Sept. 23, 2013) (assistance in producing and recording songs, including contributions to lyrics and compositions sufficient to be joint author); *Huurman v. Foster*, 2010 WL 2545865, at *2, 13 (S.D.N.Y. June 21, 2010) (composition of single song in film and design of costume for one scene created issue of fact as to joint authorship); *Baker*, 415 F. Supp. 2d at 481 (jury "could only find" joint authorship where, although not writing screenplay, it was their "brainchild," they "commented on the script along the way," and the writer "incorporated their suggestions"); *Robinson v. Buy-Rite Costume Jewelry, Inc.*, 2004 WL 1878781, at *3 (S.D.N.Y. Aug 23, 2004) (posing of models, choosing jewelry, and input into photo shoot sufficient to make non-photographer joint author).

Second, the facts support the conclusion that The Phillies and H/E intended to be joint authors. Intent in the joint authorship context requires a "nuanced inquiry into factual indicia of ownership and authorship" that is accordingly ill-suited for summary judgment. *Huurman*, 2010

---

[21] At her deposition, Ms. Erickson could only identify the "party blower" in the Phanatic's snout as an idea contributed by Mr. Harrison, and she said she may have "discussed" the color with him (which had, in fact, already been chosen by Mr. Giles). PX 87 at 18:13-20:13.

WL 2545865, at *12.  Joint authorship requires only that the parties "entertain in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of that relationship." *Childress*, 945 F.2d at 508; *Huurman*, 2010 WL 2545865, at *12.  While H/E claims that it was "consistently billed" as the creators of the Phanatic, while The Phillies never were, H/E Br. 21, that gets the facts backwards.  In fact, the earliest evidence is that The Phillies and H/E gave ***The Phillies*** credit for substantial contributions to the Phanatic.  H/E produced in discovery a 1978 press release referring to the Phanatic as the "latest idea to be born in Bill Giles weekly staff meetings" and that The Phillies' "Dennis Lehman, Director of the Radio Network and the genius behind the stadium's entertaining scoreboard system, ***gets the credit for Phanatic Phil.***"  Pl. RSUF ¶¶ 20, 71.  And the release speaks to the collaboration between The Phillies and H/E: "'I wanted a feathery thing that looks funny, something like Sesame Street characters, but nothing that would be a copy,' recalled Giles. 'They (Harrison/Erickson of New York) sent us a design, we made a few changes and Phanatic Phil was underway.'" PX 85.  This is strong evidence that The Phillies and H/E always intended to be credited as co-authors of the Phanatic.

Subsequent evidence confirms this intent.  As noted, the parties' 1979 Settlement Agreement explicitly acknowledges The Phillies' contributions that were merged into the final costume, and that it therefore had "trademark, service mark and ***other property rights*** in and to the Licensee's uniform design and insignia ***which are included in the costume of the PHILLIE PHANATIC***."  DX 67 at 1.  And until this case, H/E never denied The Phillies' contributions. Giles wrote a book explaining how he and others at The Phillies conceived of significant design details of the Phanatic, and again H/E did not object.  PX 163 at 64:4-14; DX 30.  Giles appeared in an ESPN video in which he gave the same account that he gave at his deposition, and Ms. Erickson *appeared in the same video*, impliedly endorsing Mr. Giles' account.  Pl. CSF ¶¶ 7-9.

And Giles was not even cross-examined at the preliminary injunction hearing in 1979 on his testimony that The Phillies had sent H/E a sketch of what they wanted the Phanatic to look like. Pl. CSF ¶¶ 5-6.  In short, a jury would be entitled to find that The Phillies and H/E considered themselves to have jointly created the Phanatic costume design.

H/E ignores this evidence, and its own evidence is not persuasive—much less conclusive. Ignoring the 1979 settlement agreement, H/E argues that pre-1984 agreements "expressly acknowledged that the Phanatic was H/E's copyright" and provided H/E with certain control over portrayals of the Phanatic.  H/E Br. at 21, H/E SUF ¶¶ 12, 35-36, 38, 52, 56-57, 59.  But H/E confuses *ownership* with *authorship*—distinct concepts in copyright law.  That the parties agreed that H/E would own the Phanatic costume copyright before 1984 is not an agreement that H/E was the sole *author*.  *Gary Friedrich Enters. v. Marvel Characters, Inc.*, 716 F.3d 302, 308 (2d Cir. 2013) (Marvel copyright notice on comic book would not have conclusively demonstrated Marvel was author or otherwise had right to register renewal term); *Horror, Inc. v. Miller*, 335 F. Supp. 3d 273, 315 (D. Conn. 2018) (copyright notice is not indication of authorship, but rather, indication of ownership).  Likewise, control over portrayals of the completed costume are of little relevance; joint authorship focuses on control over ***creation of the work***, which lay with The Phillies—the party that commissioned the work, dictated the design specifications, contributed the design of its clothing, and controlled the final product.  *See Baker*, 415 F. Supp. 2d at 488 (parties intended to be joint authors where film was specially commissioned by party who intended to distribute it); Pl. RSUF ¶¶ 7, 9-10 (Phillies gave guidance to H/E and made changes to design).  H/E's motion for summary judgment should accordingly be denied.

30

2.      Genuine Issues of Material Fact Preclude Summary Judgment Regarding
The Phanatic Character.

Copyright law protects distinctive characters separate from specific underlying works in

which they appear.  *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015); *Warner Bros.*

*Inc. v. Am. Broadcasting Cos., Inc.*, 720 F.2d 231, 240 (2d Cir. 1983).  To qualify for protection,

a character must be "sufficiently delineated" and have "consistent, widely identifiable traits."

*DC Comics*, 802 F.3d at 1019.  "Consistently recognizable characters like Godzilla or James

Bond, whose physical characteristics may change over various iterations, but who maintain

consistent and identifiable character traits and attributes across various productions and

adaptations, meet the test."  *Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020); *DC*

*Comics*, 802 F.3d at 1020 (Batmobile copyrightable as character despite changing appearance of

the car); *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co., Inc.*, 900 F. Supp. 1287, 1296

(C.D. Cal. 1995) ("[B]ecause many actors can play Bond is a testament to the fact that Bond is a

unique character whose specific qualities remain constant despite the change in actors.").

Like the Batmobile or James Bond, the Phanatic has "distinctive character traits and

attributes" that comprise a unique and identifiable personality separate from the originally

designed 1978 costume.  *DC Comics*, 802 F.3d at 1020.  First, the name—coined by The

Phillies—has been consistently used.  *Compare Daniels*, 958 F.3d at 773 ("[T]he Batmobile in

Towle had a 'unique and highly recognizable name,' unlike each Moodster, which had three

entirely different names."); Pl. CSF ¶ 13.  Second, the Phanatic has always worn The Phillies'

jersey, leggings, and hat with The Phillies' distinctive insignia.  Pl. RSUF ¶ 31; DX 28 at 1; DX

67 at 1 (acknowledging The Phillies' "trademark, service mark and ***other property rights*** in and

to the Licensee's uniform design and insignia ***which are included in the costume of the***

***PHILLIE PHANATIC***").  Third, Bill Giles' original design specifications—that the mascot

31

needed to be "fat," "green," "furry," and "big nosed," DX 4 at 24:12-19, 29:21-30:18, and "a feathery thing that looks funny, something like Sesame Street characters, but nothing that would be a copy," PX 84—have always been part of the Phanatic.

Fourth, H/E admitted early on that Dave Raymond, the first Phanatic performer, created The Phanatic's personality and brought the costume to life.  Raymond debuted the Phanatic in April 1978, and that summer, in his business diary, Wayde Harrison admitted that Raymond had "developed a fun and sensitive character."  Pl. SUF ¶ 11.  Since Raymond had nothing to do with creating the design of the "artistic sculpture," Harrison was obviously referring to Raymond's creation of a "character" in the copyright sense: a personality with identifiable and distinctive attributes that is separable from a particular embodiment or appearance—separate from the particular costume that Raymond donned in April 1978.  *See also* PX 105 (H/E's Acme Mascot promotional material stating that "David Raymond created the personality that has been widely described as 'the best mascot in baseball.'").  Those attributes include the following:

- A passionate Philadelphia sports fan, and in particular a fan of the Phillies;
- Emotions that fluctuate wildly with the fortunes of The Phillies, and who wears its emotions on its sleeve;
- A frenetic and hyper demeanor, zigging and zagging about the stadium;
- Child-like enthusiasm with a short attention span;
- Mute;
- G-rated behavior;
- Loves to dance;
- Loves to taunt opposing teams and managers;
- Has a surprising athleticism in contrast to a round, fat body shape.

Pl. CSF ¶ 16.  Fifth, after struggling to explain to curious fans where the Phanatic had come from, Raymond and other Phillies employees came up with the Phanatic's backstory as a creature from the Galapagos Islands.  Pl. CSF ¶ 19.  This backstory has been consistently used, with The Phillies even sending the Phanatic to the Galapagos Islands.  PX 84 at 85:10-25.

The Phanatic's distinctive character is evidenced by numerous videos of skits and

routines, plus characteristic props, which were developed initially by Raymond and continue to be used to this day, and have been recorded on video on many occasions.  Pl. CSF ¶¶ 17-20. While H/E claims that the Phanatic's personality is merely an "extension of [Raymond's] personality" (which would not in any event disqualify it from being copyrightable), the Phanatic has been performed by numerous people, always with the same personality.  Raymond Decl. ¶ 22.  As for H/E's claim that the Phanatic's personality is inseparable from the original costume, that is belied by H/E's own claim that the P2 costume is "instantly identifiable as an embodiment of the Phanatic."  H/E Br. at 33.  H/E does not dispute that the Phanatic has undergone numerous changes over the years and worn innumerable costumes—yet it is always perceived, despite changes in appearance and performers—as "the Phanatic."  Pl. RSUF ¶ 25; DX at 68:14-24.  As noted above, a character copyright exists separate from physical appearance "even if the character does not maintain the same physical appearance in every context."  *DC Comics*, 802 F.3d at 1020.[22]  The Phanatic's character—wholly attributable to The Phillies—is copyrightable separate and apart from the particular costume that is being worn.

Aside from incorrectly arguing that a character cannot exist independently from underlying works, H/E relies upon instances in which the word "character" is occasionally used to mean "costume" (or "sculpture") as if this would be dispositive of the esoteric question of "character" in the copyright sense, and distortions of the record involving Bonnie Erickson's early "artistic control" of merchandise and later right to approve performers—arguments that only serve to prove that there are genuine issues of material fact.  For sure, some of the parties' agreements refer to "character," but not in the copyright sense.  The March 17, 1978 mascot

---

[22] Even if the Phanatic's character in the copyright sense is somehow not separable from the original 1978 costume design, at a minimum The Phillies are still a co-author of the "character."

agreement called for "the design and construction of a character," with the deliverables being "a design for The Phillie Fanatic (see sketch attached)" and "a costume built from the design to measurements provided by the Phillies."  PX 5 at 1.  No personality; no performer; no skits or routines.  The July 1978 merchandise agreement uses the word "copyrighted character" that is the subject of the March agreement—i.e., the "costume built from the design to measurements provided by the Phillies."  DX 47 at 1.  Then, when H/E applied to the Copyright Office for registration, it referred to the work as an immobile "artistic sculpture," depositing a picture of the Phanatic frozen in one position.  DX 63 at ¶ 2 & Exs. 1, 1A.  Again, no personality attributes, no performer, no skits or routines.  Then, the parties' 1979 settlement agreement refers to the subject matter as a "costume" and "sculpture."  PX 15 at 1 ("Licensor owns the copyright in the artistic sculpture"); *id.* at 2 ("Licensor grants to the Licensee . . . an exclusive license to use the PHILLIE PHANATIC in costume form, and in various reproductions of the costume . . .").  And the 1984 Assignment is similar.  PX 16 at 1 ("HE owns the copyright of the artistic sculpture presently known as the "Phillies Phanatic.").  In sum, it is clear when the parties used the word "character" to mean "costume" and when they used it to mean character in the copyright sense.  Harrison's note to himself says that Raymond had "created a fun and sensitive character" because he knew that Erickson had only built a costume, not breathed any life into it.[23]

As to H/E's claim of "creative control," H/E Br. at 3-4, 25, that was only for merchandise from the summer of 1978 until the 1984 assignment.  H/E never had any creative control— whether in practice or contractual—over Phanatic performances.  H/E had no role in selecting Raymond to be the first Phanatic performer in 1978.  Pl. RSUF ¶ 55; Raymond Decl. ¶ 4.  H/E

---

[23] Mr. Harrison's declaration on this point is just lawyer-drafted spin that, at best, presents a credibility question for the jury.  Harrison Decl. ¶ 6.

never provided any instruction, advice, or input on how Raymond or any other performer should behave, what character traits or attributes the Phanatic should have, what sort of skits the Phanatic should perform, or any other aspect of Phanatic performances.  Pl. CSF ¶¶ 14-15, 18.

H/E's argument notwithstanding, the contracts between the parties are not to the contrary—but even if H/E were correct, Mr. Raymond's testimony and declaration raise genuine issues of material fact.  The original contract for construction of the costume recognized that it was "for use as an entertainer during home baseball games" and would be "used on Phillies TV, Phillies commercials and personal appearances to promote the Phillies Baseball Team," ceding control of performances to The Phillies.  Pl. RSUF ¶ 56; PX 5 at 2 ("The character will be copywritten by Harrison/Erickson who reserve all rights of its use for purposes *other than expressly specified in writing.*").  The July 1978 agreement concerned only merchandise, and gave H/E no right to control or approve Phanatic performances.  Pl. RSUF ¶ 56; DX 47.  H/E tries to hide this fact by claiming that it provided that The Phillies would have "'no right to make any use of the Phillie Phanatic character' other than 'as expressly authorized' *in the July 1978 Agreement*."  H/E SUF ¶ 38.  But the agreement actually says that The Phillies has the right to make use of the Phanatic as "expressly authorized herein, *and in our agreement dated March 17, 1978*."  Pl. RSUF ¶ 38; DX 47 at 3.  Since the March 17 agreement acknowledges that The Phillies would use the costume "as an entertainer during home baseball games" and "on Phillies TV," and leaves control for such uses to The Phillies, the later agreements do not support H/E's position that H/E had any "creative control" over the Phanatic's performances or appearances. Pl. RSUF ¶ 56; PX 5.  Similarly, the November 1, 1979 Settlement Agreement gave H/E control over "reproductions," not performances.  PX 15 at 4 (H/E "shall have the sole and exclusive artistic control of the final details of the design and construction of the PHILLIE PHANATIC

costumes and all reproductions of the PHILLIE PHANATIC, including merchandise, audio visual and photographic reproductions."). In fact, the agreement provided The Phillies "the exclusive right, during the term of this agreement only, to use the costumes in conjunction with all PHILLIES baseball games and in such personal appearances as [The Phillies] may select to promote the PHILLIES BASEBALL CLUB." PX 15 at 6.

H/E fixates on H/E's right—not granted until November 1979—to "approve" the performer. H/E Br. 5, 23. That right is beside the point. First, Harrison himself says that Dave Raymond has "created a fun and sensitive character" in the summer of 1978. By November 1979, Raymond had been performing as the Phanatic for more than a year-and-a-half, and the Phanatic had had a "fully-formed personality" since about September 1978. Pl. CSF ¶ 16; DX 11 at 16:20-17:6. Second, "approval" does not speak to whether H/E provided any input into The Phanatic's character attributes. The person who would know that best—Dave Raymond— has stated repeatedly under oath that they did not. Pl. RSUF ¶ 29; Raymond Decl. ¶¶ 7-10. In fact, the Settlement Agreement made The Phillies "solely responsible for the employment of the performer," subject only to H/E's right to approve the performer in writing. PX 15 at 6.

Finally, H/E's claim that the Phanatic character consists of only "abstract, uncopyrightable traits" is off base. As with their approach to P2, H/E asks the Court to isolate each character attribute by itself, and then conclude that each on its own is too abstract to be protectable. But, as the Second Circuit has recognized, "[a] character is an aggregation of the particular talents and traits his creator has selected for him. That each one may be an idea does not diminish the expressive aspect of the combination." *Warner Bros., Inc.*, 720 F.2d at 243. H/E's approach, which involves dissecting characters into their most basic elements, "risks

elimination of any copyright protection for a character."[24]  *Id.*  The copyrightability of the

Phanatic's character must be judged as a whole.[25]

       3.       The Statute of Limitations Does Not Bar The Phillies' Claim.

H/E claims that The Phillies is barred from making a claim for authorship on statute of

limitations and equitable grounds.  The premise for each argument is the same: that The Phillies

"were aware from the moment of the Phanatic's creation that H/E claimed sole authorship in the

Phanatic."  H/E Br. 26.  For that reason, H/E claims, The Phillies was required to bring any

authorship claim within 3 years of when the Phanatic was first created in 1978, or be forever

barred from doing so, because copyright authorship claims accrue only once, when the potential

co-author makes an "express assertion of sole authorship or ownership."  *See Kwan v. Schlein*,

634 F.3d 224, 228 (2d Cir. 2011).  H/E is incorrect.  First, The Phillies' authorship claim is

raised as a *defense* to an infringement claim that did not arise until June 15, 2020—when H/E

purports to have terminated the 1984 Assignment.  H/E Br. at 58 (stating that H/E's infringement

---

[24] H/E's approach would, for example, dismiss James Bond as a mere unprotectable stock secret agent character who likes martinis, or Rocky as a generic hardscrabble boxer who rises to glory.
[25] H/E's cases are inapplicable here.  *KGB, Inc. v. Giannoulas*, 104 Cal. App. 3d 844 (1980), which concerned the "KGB Chicken" mascot, was not a copyright case, but rather was a case in which the performer's employer sought to restrain him from performing in any chicken costume after leaving his employment.  The court refused to do so based on California law relating to non-competes, but recognized that the performer had made the chicken role his own "by a combination of mannerisms, gestures, body language, and other behavior adding up in each case to a unique character."  *Id.* at 855.  The portion of the opinion H/E cites, stating that "the concept of parading as a mascot in an animal costume would seem to be in the public domain," was an explanation of why the court concluded that the chicken was not a ***trademark*** of the radio station.  In *Lesley v. Spike TV*, 241 Fed. Appx. 357, 358 (9th Cir. 2007), the court found that the actor's performance was not copyrightable because it was "commonplace"—hardly a word that could be used to describe the Phanatic.  *Fun with Phonics, LLC v. LeapFrog Enters., Inc.*, 2010 WL 11404474, at *5-6 (C.D. Cal. Sept. 10, 2010) merely stated the general rule that "lightly sketched" characters are not copyrightable, but the evidence here is that the Phanatic is especially distinctive and unique, with consistent traits that span decades.  Finally, H/E relies on *Alexander v. Haley*, 460 F. Supp. 40, 45-46 (S.D.N.Y. 1978) for the basic proposition that "scenes a faire" and material in the "public domain" are not copyrightable.

claim is "premised exclusively on conduct *after* June 15, 2020, the Effective Termination Date"). Such a defense is not a "civil action" within the meaning of 17 U.S.C. § 507(b), and a "defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." *Estate of Burne Hogarth*, 342 F.3d at 163-64. Accordingly, The Phillies co-authorship defense is not barred.

Second, even under the "express assertion" rule, The Phillies' claim is not barred by the statute of limitations because H/E has never repudiated The Phillies' authorship in a way that would trigger the statute of limitations.[26]  H/E's argument to the contrary fundamentally misunderstands the difference between copyright ownership and copyright authorship.  The Sixth Circuit's recent decision in *Everly v. Everly*, 958 F.3d 442 (6th Cir. 2020) shows why The Phillies' authorship claim is not barred.  The court recognized the distinction between authorship and ownership and held that "any authorship claim will not accrue until the putative author's status *as an author* is expressly repudiated; actions repudiating ownership are irrelevant to begin the statute of limitations for an authorship claim because repudiation of ownership is not adverse to the author's claim as such." *Id.* at 453.  There, Phil Everly brought a claim that he was a co-author of the song *Cathy's Clown* with his brother Don.  Like H/E here, Don relied on a contract in which Phil released any ownership rights in the song to Don. *Id.* at 457.  The court held that this release was *not* an unequivocal repudiation of co-authorship, because the "assignment itself cannot transfer authorship status." *Id.*  The same rationale applies here.  H/E's argument rests

---

[26] The Phillies' recognize that the Second Circuit's express assertion test is binding on the Court here, but that test is inconsistent with the Copyright Act and with recent Supreme Court law. The Copyright Act's statute of limitations requires civil actions to be "commenced within three years after the claim accrued," but the Second Circuit's express assertion rule potentially triggers the statute of limitations whether a party has any "claim" at all, much less whether one has accrued. *See Everly*, 958 F.3d at 465 (Murphy, J., concurring).  The Phillies therefore preserves the issue of the correctness of the express assertion rule for appeal.

upon the language of the parties' agreements between 1978 and 1984, but as in *Everly*, those agreements dealt with ownership, not authorship.[27]   H/E Br. at 26-27.   Indeed, it is precisely because The Phillies and H/E have contracts governing *ownership* of the copyright that they have never had a dispute as to *authorship*, much less a "repudiation" of authorship by H/E.   And while H/E faults The Phillies for not raising authorship in the 1979 litigation, authorship was irrelevant in that proceeding.   H/E owned the copyright by contractual assignment, and co-authorship would not have affected that one way or the other.   Pl. RSUF ¶ 48.

In fact, H/E has never challenged The Phillies' statements that The Phillies contributed to authorship of the Phanatic costume, and has consistently given The Phillies credit for the Phanatic character.   A 1978 press release produced by H/E called the Phanatic the "latest idea to be born in Bill Giles weekly staff meetings" and said that "Dennis Lehman, Director of the Radio Network and the genius behind the stadium's entertaining scoreboard system, ***gets the credit for Phanatic Phil.***"   Pl. RSUF ¶¶ 20, 71; PX 85.   Bill Giles testified in the 1979 litigation that The Phillies provided H/E "a kind of rough idea in a letter and a rough sketch of kind of what we were looking for, and that's the beginning of the whole Phillie – or the mascot costume," and he was not cross examined on that point.   Pl. RSUF ¶¶ 32, 71.   Mr. Giles later published a book identifying his contributions, including that he directed that the Phanatic be designed to be "fat, green, indefinable, and loveable."   Pl. RSUF ¶ 32; DX 30 at 114.   Giles

---

[27] H/E also points to language in the 1984 Assignment in which The Phillies agreed to "credit H/E as the creator" in "literature and publications" by The Phillies.   PX 16 at 2.   There is no evidence that this was intended to be a repudiation of The Phillies' authorship, or a declaration that H/E was the sole author.   In any event, the contract at issue in *Everly* contained much stronger language purporting to explicitly release all of Phil Everly's "claim as co-composer" as well as "every claim of every nature by [Phil] as to the compositions of said songs."   *Everly*, 958 F.3d at 457.   But the Sixth Circuit still held that an issue of fact existed as to whether this language was a repudiation of authorship or instead merely a "voluntary grant of the right to receive credit for *Cathy's Clown*."   *Id.*

likewise explained that H/E's "first rendition was not to my liking" and so he directed them to "make him fatter and make his nose bigger."  DX 30 at 114.  And both Ms. Erickson and Mr. Harrison appeared in an ESPN video with Mr. Giles in 2016 where he told the same story of his contributions—and H/E had no quibble with it.  Pl. RSUF ¶ 32; Raymond Decl. Ex. B (Pheel the Love video at 1:45-2:15).  And H/E themselves consistently gave Dave Raymond—and never themselves—the credit for creating the Phanatic's distinctive character.  Pl. RSUF ¶ 59.  H/E's claim that it somehow "repudiated" The Phillies' authorship of either the costume or the character is revisionary history invented for this litigation.  Accordingly, the Court should hold that there is a genuine issue of fact as to whether H/E has ever repudiated The Phillies' co-authorship of either the Phanatic costume or the separately copyrightable character.

### C.      H/E is not Entitled to Summary Judgment on the Trademark Claim.

The Phillies' Count VI seeks a declaratory judgment that H/E's licensing or sale of the Phanatic to another sports team or commercial entity would infringe and dilute The Phillies' trademarks in the Phanatic and an injunction preventing H/E from doing so.  This Court has subject matter jurisdiction over The Phillies' claim.  In the Second Circuit, in a declaratory judgment action involving trademarks, the defendant must have "engaged in a course of conduct evidencing a definite intent and apparent ability to commence use of the marks on the product." *Saleh v. Sulka Trading Ltd.*, 957 F.3d 348, 354 (2d Cir. 2020) (quotation marks and citation omitted).  "In addressing the 'immediate intention and apparent ability' test, a court's concern is not that the [allegedly infringing product] will never be produced, but rather that because of the relatively early stage of its development, the design [before the court] may not be the design which is ultimately produced and marketed."  *AARP v. 200 Kelsey Assocs., LLC*, 2009 WL 47499, at *6 (S.D.N.Y. Jan. 8, 2009) (quotation marks and citation omitted).  "In determining whether a controversy is justiciable, courts consider the totality of the circumstances." *Halo*

*Lifestyle LLC v. Halo Farm, Inc.*, 2019 WL 1620744, at *3 (S.D.N.Y. Apr. 16, 2019).

H/E has the immediate intention to commence use of The Phillies' trademarks. Ms. Erickson does not deny that she referred to making the Phanatic a free agent and selling it to another team. Erickson Decl. ¶¶ 32-33; *see also* Pl. CSF ¶¶ 24-26; Buck Decl. ¶¶ 3-8. And H/E alleges in this lawsuit that The Phillies' conduct "undermines [H/E's] own ability to exploit their works, [and] diminishes the perceived value of those works to [H/E's] potential licensees," AC ¶ 32, and that The Phillies' conduct "will result, and has resulted, in a substantial decline in revenue to which [H/E is] entitled," *id.* ¶ 34. These allegations make clear that H/E has the definite intention to commence use of The Phillies' marks.[28]  *Venugopal v. Sharadha Terry Prod., Ltd.*, 2009 WL 1468462, at *4 (W.D.N.Y. May 22, 2009) (defendant's "'wish[] to commercialize products' using the trademark" sufficient where factual and legal dimensions of dispute were well defined). H/E also has the apparent ability to construct a Phanatic costume. H/E is an experienced costume designer and manufacturer that has repaired and reconstructed the Phanatic costume multiple times over the past three decades. Pl. CSF ¶ 21. And H/E's former company, Acme Mascots, was in the business of renting out mascot performances. Raymond Decl. ¶¶ 25-26; PX 105. H/E therefore has the capability to immediately manufacture a Phanatic costume that could be licensed for use as a mascot. And H/E is claiming in this case that it has the right to monetize artwork riddled with The Phillies' incontestable trademarks. The fact that H/E does not currently have a licensing relationship is not dispositive. *AARP*, 2009 WL 47499, at *9 ("Plaintiff need not wait for defendants to actually secure [a licensing] partner before filing

---

[28] H/E's assertion that it is "awaiting the results of this lawsuit," H/E SUF ¶ 84, does not deprive this Court of subject matter jurisdiction. *See Lifeguard Licensing Corp. v. Kozak*, 371 F. Supp. 3d 114, 124 (S.D.N.Y. 2019) ("[A] party claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.").

suit.").[29]  Accordingly, the Court has subject matter jurisdiction.

H/E's sale or licensing of the Phanatic to another sports team, commercial entity, or third party for use as a mascot would cause consumer confusion and would dilute the distinctiveness of The Phillies' famous Phanatic marks, in violation of 15 U.S.C. § 1114(1) and § 1125(c).[30] While in most cases, "the question of consumer confusion is governed by reference to the nonexclusive list of factors identified by the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), . . . application of the factors is 'unnecessary' where use of an identical mark is at issue."  *Halo Optical Prod., Inc. v. Liberty Sport, Inc.*, 2017 WL 1082443, at *10 (N.D.N.Y. Mar. 22, 2017) (alterations and citations omitted).  Use of a mark that is identical or "substantially indistinguishable from" a registered mark is "inherently confusing" and "consumer confusion is presumed in such cases."  *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013); *see also Hectronic GmbH v. Hectronic USA Corp.*, 2020 WL 6947684, at *5 (S.D.N.Y. Nov. 24, 2020).  Similarly, "where a plaintiff who owns a famous senior mark can show the commercial use of an identical junior mark, such a showing constitutes circumstantial evidence of the actual-dilution element of an FTDA claim."  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 452 (2d Cir. 2004).[31]

H/E's use, licensing, or sale of the Phanatic—whose ***likeness*** is an incontestable, registered trademark of The Phillies' and the copyright registration for which contains The

---

[29] The circumstances here are unique. The very thing that constitutes The Phillies' trademarks—the Phanatic—is the infringing product at issue, and its only plausible commercial value would be if it was perceived as "the Phanatic," thereby implying that The Phillies was the source of the mascot or related merchandise.

[30] It is undisputed that the Phillies own trademark rights in the Phanatic.  H/E RSUF ¶¶ 29; Pl. CSF ¶ 22; PX 20 at 4-5 (Resps. to Nos. 15 & 23).

[31] For the purposes of this motion, H/E does not argue that The Phillies' marks are not famous or do not qualify for protection against dilution.  H/E Br. at 51 n.36 (stating that H/E "will challenge that assertion later if this claim survives").

Phillies' registered "P"—as a mascot or via merchandise sales would infringe and dilute The

Phillies' trademarks.[32]  Such use would be "inherently confusing," *C=Holdings*, 992 F. Supp. 2d

at 241, and would, in and of itself, dilute the value of The Phillies' famous marks, *Savin Corp.*,

391 F.3d at 452.  The Phillies is not required to introduce evidence of "consumer surveys or

expert testimony" to prove its claim, as H/E contends.  *Cf.* H/E Br. at 50.  H/E, therefore, is not

entitled to summary judgment on The Phillies' trademark infringement and dilution claim.[33]

### D.  Genuine Issues of Material Fact Preclude Summary Judgment on The Phillies' State Law Claims.

In the 1984 Assignment, H/E agreed to assign the copyright in the Phanatic artistic

sculpture to The Phillies "forever."  PX 16 at 1.  Now, H/E seeks to terminate that assignment

after less than 36 years—less than a third of the full term of the copyright that The Phillies paid

H/E for.  The Phillies' two state law claims, for unjust enrichment and breach of the covenant of

---

[32] As is evident from H/E's claim that The Phillies' use of P2 "undermines [H/E's] own ability to exploit their works, [and] diminishes the perceived value of those works to [H/E's] potential licensees," AC ¶ 32, H/E intends to use the Phanatic for commercial purposes *as a mascot*, not in connection with a "parody" or "expression of an idea" or for some other noncommercial use.  *Cf.* H/E Br. at 50-51.

[33] The Phillies is not attempting to use its trademark rights "as an end run around the copyright laws." H/E Br. at 51. The Phillies is attempting to prevent consumer confusion.  H/E knew when it created the Phanatic that it would be used by The Phillies as a mascot, which is—by definition—a source identifier.  Pl. CSF ¶ 23.  And H/E admits that the Phanatic has become a symbol of The Phillies.  H/E RSUF ¶ 29.  At the risk of understatement, nothing in the Copyright Act permits a grantor of ***copyright*** rights to terminate ***trademark*** rights, and H/E's attempt to have this Court rewrite the Lanham Act and the Copyright Act to that effect should not be countenanced.  *See* 17 U.S.C. § 203(b)(5) ("Termination of a grant under this section affects only those rights covered by the grants that ***arise under this title***, and in no way affects rights arising under any ***other*** Federal, State, or foreign laws.") (emphasis added).  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) is inapposite.  In that case, the Supreme Court addressed the meaning of "origin" in a claim for "false designation of origin."  *Id.* at 31-37.  The Supreme Court's "caution against misuse or over-extension" of trademark protections into areas protected by copyright related to its holding that "origin" in the Lanham Act refers to "the producer of the tangible goods that are offered for sale" and not to "the author of any idea, concept, or communication embodied in those goods."  *Id.* at 34, 37.  *Dastar* says nothing about a trademark owner's ability to enforce its rights under the circumstances here.

good faith and fair dealing, are based on the premise that, if the Copyright Act permits H/E to rescind the 1984 Assignment, H/E must return the portion of the assignment fee that represents the promised-but-ungranted assignment.  H/E is not entitled to summary judgment on this claim.

H/E argues that the Copyright Act preempts The Phillies' claims because being required to return a portion of the assignment fee would "fundamentally undermine H/E's federal termination rights."  H/E Br. 52.  H/E's argument relies on the provision in Section 203 that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."  17 U.S.C. § 203(a)(5).  But The Phillies' arguments do not conflict with the termination right—they are consistent with it. The termination right in Section 203 gives the grantor the right, under certain circumstances, to declare a copyright transfer void.  *See Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 & n.10 (S.D.N.Y. 2006) ("[C]opyright termination abrogates freedom of contract in two ways: it allows for the invalidation of the original contractual transfer, and it abrogates subsequent attempts to contract around the termination right it creates.").

While state law cannot *eliminate* the termination right, nothing in the termination provisions changes the contractual effect of declaring an agreement void.  Under New York law (which governs the 1984 Assignment), an election to terminate a voidable contract results in a rescission.  *Gould v. Board of Educ. of Sewanhaka Cent. High Sch. Dist.*, 81 N.Y.2d 446, 452 (1993).  Rescission requires "returning or tendering back the consideration received." *Kamerman v. Curtis*, 285 N.Y 221, 226 (1941); *see also Ladenburg Thalmann & Co., Inc. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2011) (holding that, where contract was voidable because of fraud, to "disaffirm the contract, the defrauded party must offer to return any consideration received").  Thus, because H/E has elected to rescind the 1984

Assignment, it must return the portion of the payment attributable to the unused term of the agreement.  In this case, The Phillies and H/E bargained for an assignment that would last at least 105 years, and received only about 35 years.[34]  Accordingly, The Phillies are entitled to restitution for unjust enrichment of approximately 2/3 of the consideration paid.[35]  *See United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed. Cir. 1986) (holding contract between contractor and government was rescinded based on illegality, and contractor could recover only the value of services actually rendered on equitable theory of quantum meruit).

H/E implies that requiring an assignor to return a portion of the funds received for a perpetual grant would burden the termination right, and so should not be allowed.  But the point of the termination right is to permit authors to reclaim rights in a work that has appreciated substantially since the initial transfer.  Being required to return the portion of the proceeds from the original grant that one never would have received if the correct term were contemplated by the parties is not unfair or a burden, and, in any event, that result is dictated by basic contract law governing the rescission of agreements.  And, of course, a grantor could simply indicate in the original grant that it is subject to the termination right rather than explicitly agreeing to a perpetual assignment—which H/E did not do.  In fact, it is H/E's position that would "undermine the assignability" of copyrights.  Under H/E's view, if an assignment called for a fixed yearly

---

[34] This is a conservative estimate, as the term of copyright protection is the life of the last surviving author plus 70 years, 17 U.S.C. § 302(b), and the authors are still alive.

[35] H/E claims that it would not be unjust for H/E to retain the full assignment price because "The Phillies have [*sic*] exploited the Phanatic copyrights for decades to their great financial benefit." H/E Br. at 53.  Not surprisingly, H/E cites no factual support for the claim that The Phillies has received a "great financial benefit" from the Phanatic.  Whatever financial benefit may have been received is because of The Phillies' own investment of millions of dollars in the Phanatic, not H/E's.  H/E was paid what it asked for in 1984—actually, overpaid, since The Phillies is only getting about 1/3 of the bargain.  Whether H/E's retention of the full assignment price is unjust is at most a disputed question of fact, and not a basis for summary judgment.

payments rather than a lump sum, the grantee could terminate the assignment but continue to demand yearly payments, lest the lost income "undermine" the incentive to terminate. That cannot be right, and yet the example is no different economically than H/E and The Phillies agreeing to an up-front payment rather than continuing payments. H/E's motion for summary judgment as to The Philles' state law claims should be denied.[36]

## III.   The Phillies' Reply in Support of its Motion to Dismiss

### A.   H/E's Infringement Claim is Not Adequately Pled.

H/E responds to The Phillies' argument that H/E has failed to adequately plead the alleged acts of infringement by attempting to focus the Court's attention on allegations that ***were not the subject of The Phillies' motion***. As set forth in The Phillies' opening brief, H/E's infringement claim does not satisfy the requirement that the complaint set out the "particular infringing acts . . . with some specificity," *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 n.3 (S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994), because it is impossible to discern from the allegations what "artwork" and "merchandise" H/E believes is infringing. *See* Pl. Br. at 35 (citing AC ¶¶ 17, 25, 26, 30, 61). This is particularly important in this case given H/E's concession that The Phillies may continue to utilize 368 designs, and can continue to create designs pursuant to the numerous post-1984 grants of implied licenses to H/E artwork. Without specificity, The Phillies is completely in the dark as to what H/E thinks The Phillies can and cannot do.

To create the appearance that the Amended Counterclaims did include some level of specificity, H/E lists a series of bullet points regarding its allegations. H/E's Br. at 56. But those

---

[36] The Phillies has decided not to proceed on Count I of its Complaint so it does not oppose entry of partial summary judgment on that claim. However, The Phillies maintains that H/E's notice of termination is not effective for the other reasons stated herein and in its opening brief. H/E, accordingly, is not entitled to summary judgment on its Fourth Cause of Action for the other reasons that the termination notice is not effective.

bullet points refer almost entirely to The Phillies' "exploitation" of the P2 costume, *see id.* (citing AC ¶¶ 22-25, 28 & Exhibit A), and do nothing to clarify what amorphous "artwork" and "merchandise" is the subject of H/E's infringement claim.  H/E's only discussion of its allegations regarding artwork and merchandise provides no clarity beyond repeating the sweeping, conclusory claim that The Phillies "continue[s] to sell and knowingly authorize, enable, encourage, and/or induce others to sell unauthorized merchandise featuring numerous pieces of the Phanatic Artwork listed on Exhibit B."  H/E Br. at 56 (citing AC ¶ 30).  H/E does not explain how that threadbare allegation could possibly provide The Phillies with sufficient notice regarding what artwork and/or merchandise is alleged to be infringing, as compared to the hundreds of designs H/E has conceded The Phillies may use.

    H/E's authorities on this subject do not support its theory because many of them quote the pleading standard from *Kelly*, and all of them require that the allegations describe the infringing acts with some specificity.  Moreover, the allegations pled in those cases actually met that standard, unlike H/E's allegations here.  *See Blagman v. Apple Inc.*, 2013 WL 2181709, at *1-3 (S.D.N.Y. May 20, 2013) (infringement adequately pled where plaintiff specifically identified the musical compositions for which defendants did not have licenses); *Software For Moving, Inc. v. Frid*, 2010 WL 2143670, at *1, 3 (S.D.N.Y. May 27, 2010) (infringement adequately pled as to specifically identified computer program); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 113, 121-23 (2d Cir. 2010) (same as to audio recordings); *Richard Feiner & Co. v. Larry Harmon Pictures Corp.*, 38 F. Supp. 2d 276, 277-80 (S.D.N.Y. 1999) (same as to movies); *Schneider v. Pearson Educ., Inc.*, 2013 WL 1386968, at *2-3 (S.D.N.Y. Apr. 5, 2013) (infringement adequately pled as to specifically identified works but ***not met*** as to others not identified); *Zuma Press, Inc. v. Getty Images (US), Inc.*, 2017 WL 2829517, at *1, 3 (S.D.N.Y.

June 29, 2017) (same as to 47,048 identified photos but ***not met*** as to photos not identified).[37]

As to The Phillies' argument that H/E fails to plead the time-period in which the infringement allegedly occurred with respect to the claims regarding ***artwork and merchandise***, H/E, again, points only to allegations regarding The Phillies' use of the P2 ***costume***.  H/E Br. at 58.  And if, as H/E asserts, its claims regarding artwork and merchandise are *not* based on future infringement, *cf.* AC ¶ 26 ("The Phillies have repeatedly admitted that they ***intend to*** create new merchandise featuring P2 after the Effective Termination Date."), H/E Br. at 58, then The Phillies is left to guess what merchandise H/E believes infringes and when H/E believes such merchandise was sold.  H/E's allegations are accordingly insufficient to state a claim.

### B.      H/E Cannot Base its Claims on Unregistered Artwork.

H/E mischaracterizes the holding in *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009) and The Phillies' explanation of that holding.  The Phillies' brief did not state—and *SimplexGrinnell* did not hold—that a lawsuit "can be maintained on unregistered derivative works to the extent that the copying of the unregistered derivative works infringes the registered work."  H/E Br. at 58-59.  To the contrary, as The Phillies explained, Pl. Br. at 37-39 & n.21, *SimplexGrinnell* held that a plaintiff ***cannot*** maintain

---

[37] H/E also incorrectly argues that *Kelly* contradicts The Phillies' position.  In *Kelly*, the plaintiff adequately pled the infringing acts as "the publishing and distribution of two songs, 'Mama Said Knock You Out' and 'Jingling Baby' in 1991," which is much more specific than that in the AC. *Kelly*, 145 F.R.D. at 36 n.3.  Further, *Kelly* cited favorably the holding in *Hartman v. Hallmark Cards, Inc.*, 639 F. Supp. 816, 820 (W.D. Mo. 1986), *aff'd*, 833 F.2d 117 (8th Cir. 1987) that the plaintiff's allegation that the defendant's "animated productions, paper products, dolls, toys, and any other merchandising and licensing products" infringed the plaintiff's copyrighted material— like H/E's allegations here—did not comply with Rule 8's requirement of pleading the specific acts that infringe so the defendant can adequately respond.  *See id.*  H/E attempts to distinguish The Phillies' cases, but H/E's allegations are far more analogous to the deficient claims asserted in those cases and lack the specificity required in the case law noted above.  *See Yamashita v. Scholastic, Inc.*, 2017 WL 74738, at *1 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 936 F.3d 98 (2d Cir. 2019); *Palmer Kane LLC v. Scholastic Corp.*, 2013 WL 709276, at *3 (S.D.N.Y. Feb. 27, 2013); *Cole v. John Wiley & Sons, Inc.*, 2012 WL 3133520, at *13-14 (S.D.N.Y. Aug. 1, 2012).

suit on "a claim of infringement in an unregistered derivative work, even if that claim is coupled with a claim of infringement in the validly registered original work."  642 F. Supp. 2d 208-09. On the other hand, *SimplexGrinnell* held that a copyright owner **can** bring suit for infringement of an original, **registered** work based on a defendant's unauthorized use of a **copy** of an unregistered derivative work.  *Id.* at 214-15.[38]  That holding is simply another way of framing the well-established rule that a plaintiff can maintain a claim for copyright infringement if the defendant's allegedly infringing work (which, under the circumstances in *SimplexGrinnell*, also happens to be the **same** as the plaintiff's **unregistered** derivative work) is substantially similar to the protected elements in the plaintiff's **registered** work.  As is always the case, the copyrighted work at issue must be registered and a substantial similarity determination is made by comparing the infringing work and the registered work.  *Id.*[39]

While H/E's claims are vaguely pled, it is apparent that H/E is **not** alleging that The Phillies was using **copies of the unregistered works in Exhibit B** without authorization, and then claiming that copying the unregistered works somehow infringed its copyright in the **registered** Phanatic costume.  To the contrary, H/E seems to allege that The Phillies infringed by using

---

[38] *SimplexGrinnell* involved infringement of plaintiff's fire alarm software.  624 F. Supp. 2d at 208.  The software was divided into "revisions" 8-12 and each revision was further subdivided into "versions," i.e. revision 10 also could be subdivided into versions 10.01, 10.50, 10.60, 10.61, etc.  *Id.*  Only "versions" 8.04, 9.02, 10.01 and 11.01 were registered with the Copyright Office.  *Id.* at 209.  Each different "version" was potentially a separate derivative work.  *Id.*  The plaintiff sought to enjoin the defendant's use of "revisions" 8-12, but the court held that the plaintiff could only sue for infringement of the registered versions: 8.02, 9.02, 10.01, and 11.01.  *Id.* at 209, 212.  The court held that a claim for infringement *of one of the registered versions* could be supported by the defendant's use of a copy of one of the unregistered versions if it could prove that—***by comparing the version used by the defendant to the registered version***—the defendant copied protected elements of the **registered** works.  *Id.* at 214-15.
[39] *See also, e.g.*, *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 562 (S.D.N.Y. 2009) (court must compare allegedly infringing work with registered work, not with unregistered manuscript); *Carmichael Lodge No. 2103 v. Leonard*, 2009 WL 2985476, at *6 (E.D. Cal. Sept. 16, 2009); *KnowledgeAZ, Inc. v. Jim Walters Res.*, 617 F. Supp. 2d 774, 789 (S.D. Ind. 2008).

some unidentified artwork or merchandise that bears some similarity to (but is not a copy of) one or more of the works in Exhibit B. *See, e.g.*, AC ¶ 30 (referring to merchandise "***featuring*** numerous pieces of the Phanatic Artwork listed on Exhibit B"), ¶ 61 (referring to merchandise that "unlawfully ***incorporates*** the Phanatic Artwork"). For example, H/E seems to assert a claim based on allegedly infringing works consisting of unidentified "new derivative works" that are based on the "P2 Style Guide," and the P2 Style Guide allegedly bears some similarities to the artwork in Exhibit B (which, in turn, shares some elements with the registered Phanatic costume). AC ¶ 27. If that is H/E's claim, the unregistered derivative works in Exhibit B have no relevance whatsoever; for H/E to state a claim, it must be based on infringement of the ***registered*** Phanatic costume, and the comparison in an infringement analysis must be between The Phillies' "new derivative works" and the registered Phanatic costume. Because H/E's reference to Exhibit B serves no purpose with respect to its infringement claim, the counterclaim must be dismissed to the extent it is based on the artwork in Exhibit B.[40]

## C.      The Phillies' Use of P2 is Non-Infringing.

H/E does not dispute that, if the Court determines P2 is a derivative work as a matter of law, its infringement claim with respect to The Phillies' utilization of P2 must be dismissed. H/E Br. at 59. The court can dismiss H/E's infringement claim at the 12(b)(6) stage because it is apparent from the face of the complaint and the related documents that The Phillies is permitted to continue to utilize P2 and therefore is not infringing, as a matter of law. *See supra* Section II.E; Pl. Br. at 38.

---

[40] H/E does not substantively address The Phillies' argument that H/E may not amend its counterclaims to add additional infringement claims if registrations are issued for the works in Exhibit B, Pl. Br. at 37, but simply reasserts its intention to do so. H/E Br. at 59 n.42.

Dated:  March 8, 2021                          DUANE MORRIS LLP

                                               By: */s/ David J. Wolfsohn*
                                                   David J. Wolfsohn (PA ID No. 57974)
                                                   djwolfsohn@duanemorris.com
                                                   *(admitted pro hac vice)*
                                                   Tyler R. Marandola (PA ID No. 313585)
                                                   tmarandola@duanemorris.com
                                                   *(admitted pro hac vice)*
                                                   Kendra C. Oxholm (NY ID No. 5267828)
                                                   kcoxholm@duanemorris.com
                                                   30 South 17th Street
                                                   Philadelphia, PA 19103
                                                   Tel:      (215) 979-1000
                                                   Fax:      (215) 979-1020

                                                   and

                                                   David T. McTaggart (NY ID 4097598)
                                                   dtmctaggart@duanemorris.com
                                                   DUANE MORRIS LLP
                                                   1540 Broadway
                                                   New York, NY 10036-4086
                                                   Tel:      (212) 692-1000
                                                   Fax:      (212) 202-4931

                                                   *Attorneys for Plaintiff, The Phillies*

## <u>CERTIFICATE OF SERVICE</u>

I, Tyler Marandola, hereby certify that on March 8, 2021, I caused to be served, via

CM/ECF, a true and correct copy of the foregoing document upon the following:

Paul D. Montclare, Esq.
pdm@msk.com
Elaine Nguyen, Esq.
eln@msk.com
Leo M. Lichtman, Esq.
lml@msk.com
Mitchell Silberberg & Knupp LLP
437 Madison Avenue, 25th Floor
New York, NY 10022

J. Matthew Williams, Esq.
mxw@msk.com
Mitchell Silberberg & Knupp LLP
1818 N Street NW, 7th Floor
Washington, DC 20036

*/s/ Tyler Marandola*
Tyler Marandola

# APPENDIX 1

| **Phillies** | **Not Phillies** |
|---|---|
| **When The Phillies display its logo on P2, it is not "creative"** | **When other teams display their logos on their mascots, it is "creative"** |
| <br><br>*Zung:* "**not . . . creative** from a design perspective" (PX 81, Rpt. at 10); "**cosmetic**" (*id.* at 10); "brand updates" are **not creative** (*id.* at 13). | <br><br>*Zung:* both show "**creative options**" (PX 81, Rpt. at 72); both are "**markedly distinguishable**" from the other (*id.*); both show "**significant variations**" (*id.* at 74); both are "**creative variants**" (Zung Decl. ¶ 17); Mets logo is "**prominently** displayed" (PX 81, Rpt. at 73); Braves logo is "**boldly** displayed" (*id.* at 74). |
| **When The Phillies display the first letter of its name on P2, it is "common" and not "artistic"** | **When other teams display the first letter of their names on their mascots, it is "distinctive" and "creative"** |
| ***P2's hat:***<br><br><br><br>*Zung:* Use of "P" is "**common** & **standard**" (PX 81, Rpt. at 13); Use of "P" is **not** "**artistic**" (PX 81, Rpt. at 13). | ***Cubs:***<br><br><br><br>*Zung:* "**distinctive** C" on jersey (PX 81, Rpt. at 73).<br>***Atlanta Braves:***<br><br>*Zung:* "**distinctive** cursive A emblazoned" on shoe (PX 81, Rpt. at 57).<br><br>*Zung:* "big white A **prominently** displayed" (PX 81, Rpt. at 74).<br>***Cubs & Braves: "creative** variants"* (Zung Decl. ¶ 15). |

| Phillies | Not Phillies |
|---|---|
| **Phillies' change from red & white stirrups to red, white, & blue stocking, is "conventional" & not "a creative change"** | **P1's stirrups (copied from Phillies' players' uniforms) & Reds' & Mets' single-color socks are "creative"** |

**P2's leggings:**



*Zung: **not** "a **creative** change"* (PX 81, Rpt. at 48); "does not constitute a design change from P1" & is a "***relatively conventional*** design element" (PX 81, Rpt. at 49); "the changes [of P2] amount to little more than ***cosmetic surgery***" and are "***slavish*** and ***uninspired***" (PX 81, Rpt. at 74).

**Phillies' stirrups on Steve Carlton circa 1975:**



**P1's stirrups (1978):**



*Zung:* P1's "design is ***unique***" & an "***artistic*** design of ***significant creativity***" (PX 81, Rpt. at 23).

***Reds'* leggings:**



***Mets'* leggings:**

*Zung:* Reds' & Mets' uniforms display "***creative*** variants" (Zung Decl. ¶ 15).

| Phillies | Not Phillies |
|---|---|
| **Phillies' redesign of P2's eyeballs—round, close together, & larger pupils—is "irrelevant" & "barely constitutes a difference"** | **P1's eyeballs—virtually the same as earlier Jim Henson designs—are part of a "creative" & "unique" design, as are Mr. Met's, Mr. Redleg's, & "Snap" from "Snap Crackle Pop"** |

| | |
|---|---|
| **P2's Eyeballs:** <br><br>  <br><br> *Zung:* P1's eyeballs compared to P2's "barely constitutes a difference" and the "change in eye shape is so small relative to the overall design as to be rendered ***irrelevant***" (PX 81, Rpt. at 57-58); <br> "the changes [to P2] amount to little more than ***cosmetic surgery***" and are "***slavish*** and ***uninspired***" (PX 81, Rpt. at 74). | **Jim Henson's Wontkins** (1955) (PX103): <br><br>  <br><br> **Jim Henson Workshop** (London ca. 1972-4) (PX 121): <br><br>  <br><br> **P1's eyeballs:** <br><br>  <br><br> *Zung:* P1 is an "***artistic*** design of significant creativity" (PX 81, Rpt. at 23); P1 "design is ***unique***" (PX 81, Rpt. at 23). |
| ***P2's Eyeballs:*** <br><br>  <br><br> *Zung*: Difference between P2 eye design and P1's egg shaped eyes is "***irrelevant***" and "barely constitutes a difference" (PX 81, Rpt. at 57-58); "The changes made to P2 are ***not creative***" (PX 81, Rpt. at 2). | ***Mr. Met's Eyeballs:*** <br><br>  <br><br> ***Mr. Redlegs' Eyeballs:*** <br><br>  <br><br> *Zung:* Both are "***markedly distinguishable***" (PX 81, Rpt. at 72); both are "***more distinctive***" than P2's eyeballs (PX 81, Rpt. at 57-58). |
| **P2's Eyeballs:** <br><br>  <br><br> *Zung*: Difference between P2 eye design and P1's egg shaped eyes is "***irrelevant***" and "barely constitutes a difference" (PX 81, Rpt. at 57-58); "The changes made to P2 are ***not creative***" (*id.* at 2). | **Evolution of Snap's eyes:** <br><br>  <br><br> *Zung:* Change in shape of eyeballs & pupils of Snap is a "***significant creative*** change" (PX 160, Zung Dep. at 93:8-21); (PX 81, Rpt. at 19-20). |

| **Phillies** | **Not Phillies** |
|---|---|
| **Phillies' redesign of P2's hands & arms is not "creative in any meaningful way," "not particularly distinctive," & "quite ridiculous"** | **Other teams' mascots with stylized wings are "distinctive" & show "far more artistic interpretation"** |

**P2's wings & arm design:**





*Zung:* The wings do not "evidence creativity from an **artistic** standpoint" (PX 81, Rpt. at 43); not "creative in any **meaningful** way"; "**weakly** addressed in an **uninspired** manner"; "not **particularly distinctive**" (*id.* at 4); decision of where to stitch fur on back of arm/hand is "**quite ridiculous**" and a "last-minute change" that is not "an **important** creative decision" (PX 82, Suppl. Rpt. at 5-6).



*Zung:* "**far more artistic** interpretation" (PX 81, Rpt. at 45

**St. Louis' Fredbird:**



*Zung:* "**distinctive**" & "**pronounced**" (PX 81, Rpt. at 45).

**St. John's Thunderbird:**



*Zung:* "**distinctive**" wing shapes & "color scheme" (PX 81, Rpt. at 45)

| **Phillies** | **Not Phillies** |
|---|---|
| **Phillies' redesign of P2's shoes is "not particularly creative" & "quite minimal"** | **Other teams' shoes are "markedly distinguishable from the others" and make good use of "creative options"** |
| ***P1's shoes:*** <br>  <br><br> ***P2's shoes:*** <br>  <br><br> *Zung:* Design changes from P1 shoes to P2 shoes "***not particularly*** creative" (PX 81, Rpt. at 51);  artistic input is "quite minimal" (*id.*); "does not reflect a change" (*id.*); no "***creative*** design choices" (PX 81, Rpt. at 57). | ***Braves:*** <br>  <br><br> ***Reds:*** <br>  <br><br> ***Mets:*** <br>  <br><br> *Zung:* Braves' shoes have "***distinctive*** cursive A" (PX 81, Rpt. at 57); all have "***distinguishable*** design details" (*id.* at 74), make use of "***creative*** options" (*id.* at 72), & are "***markedly distinguishable*** from the others" (*id.*); all demonstrate a "wide variety of ***creative*** choices" (Zung Decl. ¶ 34). |
| **P1's Clothing vs. P2's:** <br>  <br><br> *Zung:* "***cosmetic*** updates in The Phillies uniform are not in my opinion ***creative***" & changes in uniform "does not constitute a ***creative*** alteration of P1" (PX 81, Rpt.  at 10). | **Evolution of Pop from Snap, Crackle, Pop:** <br>  <br><br> *Zung:* Differences in clothing are "***creative***" and "***significant***." PX 160, Zung Dep. 92:23-93:19; PX 81, Rpt. at 19-20. |

| Phillies | Not Phillies |
|---|---|
| **Change in color of "eyelashes" & eyebrows from P1 to P2:**<br><br><br><br>**Eyelashes:** P1 (L) vs. P2 (R)<br><br>  <br><br>Pantone 247   Pantone 231<br><br>**Eyebrows:** P1 (L) vs. P2 (R):<br><br>  <br><br>Pantone 301   Pantone 284<br><br>*Zung:* Changes in both are not "more than [a] ***trivial*** creative choice" (PX 81, Rpt. at 58), "not the product of ***new creative*** thought" (*id.*), & "not a ***creative*** design alteration" (*id.* at 59).<br>**Eyelashes:** colors are "essentially the same" (PX 82, Suppl. Rpt. at 3).<br>**Eyebrows:** "a ***matter of degree***" & "quite ***minimal***" (PX 82, Suppl. Rpt. at 3). | **Evolution of Lucky Charms leprechaun:**<br><br><br><br><br><br>PMS 567 C   PMS 364 C  PMS 626 C<br><br>PMS 555 C<br><br>*Zung:* Changes in colors are "***significant*** and ***creative***" (PX 160, Zung Dep. at 97:13-22); change from medium to dark green is "***quite significant***" (PX 81, Rpt. at 20-21). |

| **Phillies** | **Not Phillies** |
|---|---|
| **P2's Eyelash Design is "insignificant" and not "more than trivial artistic choice"** | **When The Phillies make "arbitrary" design decisions, that's not creative; when Bonnie Erickson does, that's creative** |

**P2's Eyelashes:**



*Zung:* Change between P1 & P2's eyelashes "is **not creative**" & "**extremely insignificant**" (PX 81, Rpt. at 68); P2's "eyelash shape is **not creative** at all" (PX 81, Rpt. at 67).

P2's eyelashes are "**less artistic**" than Slyly's, Duncan's, and Sport's (PX 81, Rpt. at 67).

**P1's Eyelashes:**



*Zung:* P1 is an "artistic design of significant creativity" & P1 "design is unique" (PX 81, Rpt. at 23).

**Slyly's, Duncan's & Sport's eyelashes:**



*Zung:* "**unique**"; because they are more "**arbitrary**," they are more "**artistic**" (PX 81, Rpt. at 67).

| **Phillies** | **Not Phillies** |
|---|---|
| **Fur used on P1 compared to P2's fur is "unchanged"** | **Even though P1's fur and fur color is like Henson's earlier designs, P1 is "creative" and "unique"** |
| **P1's fur** (PX 81, Rpt. at 14):<br><br><br>**P2's fur** (PX 81, Rpt. at 31):<br><br><br>*Zung:* "green fur is unchanged" (PX 81, Rpt. at 32); P2 is a "***slavish*** copy of P1" (*id.* at 69); "the changes reflected in P2 are ***slavish***" (*id.* at 24). | **Jim Henson (Oscar the Grouch) (1975) (PX 118):**<br><br><br>**Jim Henson (IBM monster 1960s) (PX 113):**<br><br><br>**P1** (Rpt. at 14):<br><br><br>*Zung:* P1 is an "***artistic*** design of significant creativity" (PX 81, Rpt. at 23); P1 "design is ***unique***" (PX 81, Rpt. at 23). |

| **Phillies** | **Not Phillies** |
|---|---|
| **Duck Butt & Tail** | **Other Characters' "Artistic" Evolutions** |

| | |
|---|---|
| **P1's Butt & Tail**  **P2's Butt & Tail:**  *Zung:* body changes are not a "creative change to P1," "not unique," "trivial," & "the concept of enlarging the backside to resemble a 'duck butt' is not an original concept" (PX 81, Rpt. at 38); the tails of P1 & P2 "are relatively identical" (*id.* at 35). | **Changes to leprechaun's face shape:**  *Zung*: "most significantly, the face has undergone quite significant changes in shape and proportion" (PX 81, Rpt. at 20-21). **Bugs Bunny's Evolution:**  PX 81, Rpt. at 23: "Bugs Bunny is yet another example of how a character can artistically evolve." |

| **Phillies** | **Not Phillies** |
|---|---|
| **P2 socks:**<br><br>*Zung:* not a "***creative*** change" (PX 81, Rpt. at 48). | **P1 stirrups:**<br><br>*Zung:* P1 has "***unique*** design" & "***original*** thought" (PX 81, Rpt. at 4). |
| **P2 socks:**<br><br>*Zung:* not a "***creative*** change" (PX 81, Rpt. at 48). | **Reds leggings:**<br><br>*Zung:* "***creative*** options" (PX 81, Rpt. at 72); "***significant*** variations" (*id.* at 74): "***distinguishable*** design details" (*id.* at 74). |
| **P2 socks:**<br><br>*Zung:* not a "***creative*** change" (PX 81, Rpt. at 48). | **Mets leggings:**<br><br>*Zung*: "His legs sport blue leggings" (PX 81, Rpt. at 73); "***creative*** options" (*id.* at 72); "***significant*** variations" (*id.* at 74); "***distinguishable*** design details" (*id.* at 74). |

| **Phillies** | **Not Phillies** |
|---|---|
| **P2's shoes:**<br><br><br><br>*Zung:* Design change from P1 shoes to P2's is "not ***particularly creative***" & "does not reflect a change" & ***artistic*** input in P2 shoes is "***quite minimal***" (PX 81, Rpt. at 51); P2 design shows no "***creative***" design choices" (*id.* at 57).<br><br><br><br>*Zung:* Design changes from P1 shoes to P2 shoes "not ***particularly creative***" (PX 81, Rpt. at 51); artistic input in P2 shoes is "***quite minimal***" (*id.* at 51); P2 design shows no "***creative***" design choices" (*id.* at 57). | **P1's shoes:**<br><br><br><br>*Zung:* "***creative*** motifs" (PX 81, Rpt. at 54).<br>**Braves:**<br><br><br><br>*Zung:* "***distinctive*** cursive A" (PX 81, Rpt. at 57); "***creative***" options" (*id.* at 72); "***significant*** variations" (*id.* at 74): "***distinguishable*** design details" (*id.* at 74).<br><br><br><br>**Reds:**<br>*Zung:* "***creative***" options" (PX 81, Rpt. at 72); "***significant*** variations" (*id.* at 74): "***distinguishable*** design details" (*id.* at 74).<br>**Mets:**<br><br><br><br>*Zung:* "***distinguishable*** design details" (PX 81, Rpt. at 74); "***creative***" options" (*id.* at 72); "***significant*** variations" (*id.* at 74). |