# EXHIBIT 84

```
                                                               Page 1
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 2   _____

 3   THE PHILLIES, a                )
     Pennsylvania limited           )
 4   partnership,                   )
                                    )
 5              Plaintiff,          )
                                    )
 6        -vs-                      )  Civil Action No. 19-7239
                                    )
 7   HARRISON/ERICKSON,             )
     INCORPORATED, a New York       )
 8   corporation, HARRISON          )
     ERICKSON, a partnership,       )
 9   and WAYDE HARRISON and         )
     BONNIE ERICKSON,               )
10                                  )
                Defendants.         )
11   _____

12

13                    5 JAMISON CIRCLE
              WEST GROVE, PENNSYLVANIA  19390
14                    APRIL 14, 2020
                       10:26 A.M.
15

16

17              ****CONFIDENTIAL****
         VIDEOTAPED-TELEPHONIC DEPOSITION
18             TAKEN REMOTELY VIA
         VIDEOCONFERENCE AND TELECONFERENCE
19                      OF
                  DAVID G. RAYMOND
20

21

22

23   REPORTED BY:

24   DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

25   JOB NO. 179345
```

Page 2

                    April 14, 2020

    Videotaped-telephonic deposition, taken
remotely via videoconference and teleconference,
of David G. Raymond, located at 5 Jamison Circle,
West Grove, Pennsylvania  19390, by Debra Sapio
Lyons, a Registered Diplomat Reporter, a
Certified Realtime Reporter, a Certified Realtime
Captioner, a Certified LiveNote Reporter, an
Approved Reporter of the United States District
Court for the Eastern District of Pennsylvania, a
Certified Court Reporter of the State of New
Jersey, and a Notary Public of the States of New
Jersey, New York and the Commonwealth of
Pennsylvania.

Page 3

APPEARANCES:
        (All Counsel and Participants
    present via videoconference and
    teleconference due to COVID-19
    Restrictions.)
DUANE MORRIS
BY:  DAVID WOLFSOHN, ESQUIRE
     TYLER MARANDOLA, ESQUIRE
30 South 17th Street
Philadelphia, Pennsylvania 19103
Attorneys for Plaintiff


MITCHELL SILBERBERG & KNUPP
BY:  PAUL MONTCLARE, ESQUIRE
     ELAINE NGUYEN, ESQUIRE
     LEO LICHTMAN, ESQUIRE
437 Madison Avenue
New York, New York 10022




             AND
BY:  MATTHEW WILLIAMS, ESQUIRE
1818 N Street N.W.
Washington, DC 20036
Attorneys for Defendants


ALSO PRESENT:

   ROBERT RINKEWICH, VIDEOGRAPHER
   TSG REPORTING, INC.

Page 4

    Confidential - David G. Raymond
        THE VIDEOGRAPHER:  Good morning,
Counselors.  My name is Robert Rinkewich.
I am the legal videographer in association
with TSG Reporting, Inc.  Due to the
severity of the COVID-19 and following the
practice of social distancing, I will not
be in the same room with the witness, but
will record this videotaped deposition
remotely.
        The reporter, Debra Lyons, also will
not be in the same room and will swear in
the witness remotely.
        Do all parties stipulate to the
validity of this video recording and remote
swearing and that it will be admissible in
the courtroom as if it had been taken
following Rule 30 and other rules of the
Federal Rules of Civil Procedures?
        MR. MONTCLARE:  On behalf of the
Defendants, Paul Montclare, I agree,
stipulate.
        MR. WOLFSOHN:  And on behalf of The
Phillies, we agree.
        THE VIDEOGRAPHER:  Okay.  Thank you.

Page 5

    Confidential - David G. Raymond
        This is the start of Media Labeled
Number 1 of the video-recorded deposition
of David Raymond in the matter of The
Phillies, et al., versus Harrison/Erickson
Incorporated, et al. in the United States
District Court for the Southern District of
New York.
        This deposition is being taken
telephonically and streamed on April 14th,
2020 at approximately 10:27 a.m.
        My name is Robert Rinkewich.  I am
the legal video specialist from TSG
Reporting, Inc. headquartered at 747 Third
Avenue, New York, New York.  The court
reporter is Debra Lyons in association with
TSG Reporting.
        Counsel, please, introduce
yourselves.
        MR. MONTCLARE:  Yes.  My name is
Paul Montclare.  I represent Harrison
Erickson.
        MR. WOLFSOHN:  And this is David
Wolfsohn represent --
        MR. WILLIAMS:  Matthew Williams also

Page 54

Confidential - David G. Raymond

Q. I'm sorry.
A. It was 41 years ago. It was a long time, yes.
Q. Okay. Do you remember Harrison Erickson asking you to try the costume on and to -- and to move around in -- in it so you got used to how it feels when you're moving in it at this period of time between the first fitting and April 25th, 1978?
A. No. To -- to my first recollection, the first time I saw the costume and tried it on was in -- on the morning of the 25th of April.
Q. That's the best of your recollection?
A. Yes.
Q. Okay. Did -- did either -- I'll call them Bonnie and Wayde. Do you know who I'm talking about?
A. Yes, I do.
Q. Okay. Did either Bonnie or Wayde tell you what kind of a character it is that they wanted this mascot to be?
A. No.

Page 55

Confidential - David G. Raymond

MR. WOLFSOHN: Objection to form.
THE WITNESS: They did not.
BY MR. MONTCLARE:
Q. You don't -- and you don't recall anything being said about standing in front of a mirror or practicing or doing anything else?
MR. WOLFSOHN: Objection, compound.
THE WITNESS: I got --
Okay.
COURT REPORTER: Please repeat your answer.
BY MR. MONTCLARE:
Q. You can answer.
A. I got no direction at all from anyone other than Bill Giles.
Q. That -- you're not -- you have a clear recollection you were only there once and you had no other conversation with her, but, you know, take off your clothes and let me measure you?
A. That's my recollection. That is my testimony. That is my recollection.
Q. Is it possible you forgot something 40 -- that happened 41 years ago at

Page 56

Confidential - David G. Raymond

this meeting?
A. Maybe, but that's my recollection. On the record, that was my recollection.
Q. Okay.
MR. MONTCLARE: Okay. We're going to mark next is -- is a document that's been previously marked in the Burgoyne deposition as Burgoyne-6.
I would ask, Elaine, please put that up when she can.
MS. NGUYEN: Sure. One second.
MR. MONTCLARE: Thank you.
(Exhibit Burgoyne-6, multipage document titled Team Handbook bearing Bates Numbers PHAN0005543 through PHAN0005567, was previously marked for identification.)
MR. MONTCLARE: That's document Number 5 on your list, Elaine.
MS. NGUYEN: Yep. It's just loading.
MR. MONTCLARE: Okay. Is it ready for the witness, Elaine?
MS. NGUYEN: Yes, it is.
THE WITNESS: I can see it. I can

Page 57

Confidential - David G. Raymond

see it.
BY MR. MONTCLARE:
Q. Okay. Thank you. This document, it -- it has -- on the first page it says, "Team Handbook," and it has Harrison Erickson 95 Fifth Avenue. Do you see that?
A. Wait -- wait a minute. I just -- I -- hold on. Let me just slide the whole --
Q. On the very first -- okay.
A. Yeah, yeah.
Q. On the very first page.
A. Uh-huh.
Q. Okay. And I just want you to know that this is -- was marked in -- in Mr. Burgoyne's deposition back in February.
There's an address under Harrison Erickson, 95 Fifth Avenue. Do you see that?
A. I do.
Q. And is that the place where you went to see them?
A. I -- I -- I don't -- I don't know for sure. I -- I just know that I went to a studio when I went there.
Q. Okay. And you said that there

Page 82

1     Confidential - David G. Raymond
2  to probe a little bit of some of the things in
3  that very long answer which makes it difficult
4  to unpack. So I don't -- that's why we ask
5  questions and try to get answers in response
6  to questions.
7           But you -- you -- I believe you
8  said that you recounted this story numerous
9  times. How many times have you recounted this
10 story?
11      A.   An awful lot. It's in my book.
12      Q.   And when was the last -- it's your
13 in your book.
14           And that -- when did you write
15 that book?
16      A.   It was published about --
17 self-published about two years ago. A little,
18 little bit over two years, but I -- but I was
19 writing it for three or four years.
20      Q.   Okay. Other than in that book,
21 did you ever write this down anyplace else,
22 this story that you just told us?
23      A.   No, but I recounted it many times
24 in interviews over the years, dozens and
25 dozens --

Page 83

1     Confidential - David G. Raymond
2      Q.   To who?
3      A.   -- and dozens.
4      Q.   To who?
5      A.   To --
6      Q.   To who?
7      A.   -- CBS, NBC, ABC, Fox, podcasts,
8  The Washington Post, New York Times. And --
9  and whether they -- whether they would print
10 that or not, it was always part of the story.
11          Do a Google search. You'll find
12 those, Paul.
13     Q.   Yeah, I'm just trying to ask you
14 how many times you recounted that story. But
15 you said every time you have a -- an interview
16 you recounted this story about the Galapagos
17 Islands thing?
18     A.   Very, very frequently. The
19 discussion about the building the personality
20 and creating the personality, what were my
21 challenges; and that was one of my challenges
22 that I talked about frequently.
23     Q.   I'm just trying to focus on the
24 Galapagos Islands thing.
25     A.   That's -- that's what I'm saying.

Page 84

1     Confidential - David G. Raymond
2  That's what I'm saying, that that --
3      Q.   How many -- and -- okay. Sorry.
4  We can't -- I'm talking over you. I don't
5  mean to.
6           Are you finished?
7      A.   Yeah.
8      Q.   The -- do you recall outside of
9  giving these statements to various media
10 about -- did you tell this whole story to all
11 these different media groups about how you
12 were frustrated and how you felt like, you
13 know, you were something, a Darwin or
14 something and then somebody said in the
15 background, and you can't remember,
16 Galapagos -- the Galapagos?
17          Do you remember ever telling that
18 to any reporter anywhere?
19     A.   Oh, yes. Oh, yes. And I -- and I
20 should say that when you're -- when you're
21 interviewed, just like I was interviewed for
22 Real Sports up in New York, for HBO's Real
23 Sports, they interviewed me for three hours,
24 my segment was 15 minutes. So I can say with
25 great certainty that probably 75 percent of my

Page 85

1     Confidential - David G. Raymond
2  interviews I would talk about that story.
3  Now, whether they printed it or specifically
4  told the story the way I would tell them,
5  which in the media you're not in control, the
6  editors are, but I would say two-thirds of the
7  interviews that discussion about the Phanatic
8  being from the Galapagos, it -- it came up in
9  conversations.
10          Paul, we went to the Galapagos
11 Islands because of that backstory. And the
12 reason why The Phillies were -- were connected
13 by Lindblad Travel, which ran the Galapagos
14 Islands trip, they reached me because of an
15 article that was written about me in the
16 alumni magazine of William and Mary College
17 where I was working with their character. And
18 I told that story about the Phanatic being
19 from the Galapagos Islands and a -- and a
20 former graduate who worked for Lindblad Travel
21 contacted me and said, "I'm interested to hear
22 the Phanatic is from the Galapagos Islands
23 because I run Lindblad Travels and we'd like
24 to have a Phillies or Phanatic-themed trip to
25 the Galapagos Islands." So, yeah --

Page 86

Confidential - David G. Raymond

Q. Okay.
A. -- yes, all the time.
Q. All right.
A. I -- I consistently told the story ever since the beginning of the -- of the Phanatic's birth.
Q. Okay. Are there any other writings where you wrote this down?
A. Now, I'm -- I'm sure that I probably have written it somewhere, but I don't -- I can't tell you exactly where that would be. It was -- it was all -- all in these interviews, you know, from -- from -- from 1978 until today, I still get interviewed about this.
Q. Did you ever tell Chris Long that you invented this Galapagos Islands background?
A. I know that I told it in Phillies -- I mean, I'm -- I'm -- I'm friends with all the people at the Phillies still today, so I know I've mentioned it. It's possible that I told it to -- to Chrissy. I'm -- I'm -- I'm sure that in some way,

Page 87

Confidential - David G. Raymond

shape, or form it was discussed because the -- you know, they -- they -- they've leveraged that story for the Phanatic and his backstory.
Q. Did you tell it to Mr. Giles?
A. I -- I don't recall whether I specifically told Mr. Giles.
Q. Did you tell it to Mr. Sullivan?
A. I -- I most likely mentioned it to him, yes, because he -- he was -- he became my good friend and I -- I pretty much told him everything.
Q. Could it be that he mentioned it to you, the Galapagos Island?
A. No, no.
Q. Okay. Let's keep going. We've been going for about an hour and -- almost two hours -- I mean an hour and a half today. How are you doing?
A. I'm perfectly fine. I could get -- I could -- we -- we could take a quick break. I could use the -- the men's room and get some more water.
MR. MONTCLARE: All right. So why don't we come back at a quarter after. Is

Page 88

Confidential - David G. Raymond

that okay with you? It's about 20 minutes from now.
THE WITNESS: That's fine with me.
MR. MONTCLARE: All right. Thank you very much.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time is 11:55 a.m. This is the end of Media Number 1. We're off the record.
(A recess is held from 11:55 a.m. to 12:20 p.m.)
THE VIDEOGRAPHER: The time is 12:21 p.m. This is the start of Media Number 2. We're on the record.
BY MR. MONTCLARE:
Q. All right. Welcome back, Mr. Raymond.
A. Thank you.
MR. MONTCLARE: Just so -- a little housekeeping. I think what we'll do if everybody is okay with that, is -- is to go to 1 o'clock and then take a half-hour for lunch because we're not going to finish any time soon. I'm asking everybody else. I

Page 89

Confidential - David G. Raymond

just -- we can just -- just wanted to give everybody a heads up.
BY MR. MONTCLARE:
Q. You recognize that you're still under oath, correct, Mr. Raymond?
A. Yes.
Q. Okay. It was your understanding --
COURT REPORTER: This is the court reporter. I'm not hearing anything.
MR. WOLFSOHN: Yeah, I'm not hearing him either.
MR. MONTCLARE: Okay. You can't hear me? Okay. You can't hear me?
THE WITNESS: Now, we can.
MR. WOLFSOHN: Now, we can.
MR. MONTCLARE: Yeah, I don't know what that's all about. That was -- can you hear me now?
MR. WOLFSOHN: Yes.
COURT REPORTER: Yes, and I would ask you to keep the mic closer to you.
MR. MONTCLARE: Okay. All right. Did you hear my question?

Page 106

Confidential - David G. Raymond

Q. Okay. So just -- so you -- you looked to inspiration in comedy. I think you said it was a -- a mash up, but you mentioned slapstick. That's what -- that's how you would describe your act, slapstick?

A. I think it was a portion of the work was slapstick, yes.

Q. And sort of taking your inspiration from cartoon characters that you mentioned and The Three Stooges?

A. That's correct, as well -- yeah, as well as live performance.

Q. Did you ever record any of your routines in 1978?

A. If they were recorded by -- by some outlets and I didn't -- and I didn't do specific routines, I was -- not in the early going until we started having fun with the ground crew, but there -- there are -- there's video, you know, you can go on YouTube and I found an old video from -- from the -- probably '79, maybe '80 of the Phanatic running around the bases with the ground crew, so there had been recordings.

Page 107

Confidential - David G. Raymond

I didn't start looking at my recordings until I was doing commercials for The Phillies. And then I -- I was asked by a director if I could -- if I wanted to see the videotape because this was back in, you know, the -- the late '70s, early '80s when no one had, you know, videos just in their hands. So I started watching videos of myself probably within the next couple of years when I was doing commercials for The Phillies and I had an opportunity to do the work and then sit down and watch it on videotape. And I recognized that that was very, very helpful for me to do and I tried as much as I could to watch myself on videotape after that.

Q. Let me ask you: Did you ever have someone tape something for you specifically?

A. Eventually in my career, sure.

Q. When was the first time?

A. I think the first time was when I did commercials and -- and I found out that they specifically were allowing me to look at my work. So I would do a particular scene and then they would say, "Do you want to see it,

Page 108

Confidential - David G. Raymond

what it looks like?" And that was probably the first time.

And then from then on, I'm sure that --

Q. When was that? Just give me a date.

A. I'm guessing it was probably 1980, '81. That -- that's my guess. It could have been sooner, but I'm not certain.

Q. Did you ever register a copyright for anything that you wrote down or had filmed?

A. No.

Q. Did you have any agreements with The Phillies?

A. No.

I'd just -- I'd like to add one thing that I thought. I had -- eventually I had a written agreement with The Phillies for my employment, but I -- I didn't have any copyright or any routines that were copyrighted and -- none of that.

Q. When did you have that written agreement with The Phillies?

Page 109

Confidential - David G. Raymond

A. It was prob -- the first one was probably in -- in the early to mid-'80s.

Q. Do you have that on your -- do you have that anywhere in your files, sir?

A. No, I -- I never -- I never had those and kept them. I -- you know, it was something that was drawn up by Dave Montgomery.

Q. Do you remember the terms of that agreement in general?

A. Yeah, in general they were approximately three years in length and they included a salary that was benefit -- and -- and it included benefits.

Q. Okay. And how long were you employed by The Phillies?

A. I -- well, from intern in '76 until early in '94. I was -- I was still retained as a -- as a consultant to help the transition between me as the main performer and Tom Burgoyne.

Q. Were you under a -- you had an agreement to be a consultant sometime towards the end of 1994?

Page 178
Confidential - David G. Raymond
the Phanatic. They -- they -- you know, it would be a Phanatic with changes, not -- and that we -- we discussed the three options could be. We -- this was just -- I threw this out as a discussion topic to get everybody talking. I go, "We could create a brand new character. We could create a unicorn that was going to be The Phillies new mascot or we could create a drastically different Phanatic or we could create a Phanatic that had changes." And -- and then that's when I said, "What don't you want to do?"

And everyone said, "Well, we don't want a unicorn." And -- and that term was specifically used. There was a lot of discussion to be clear that what we wanted was, you know, perpetual look of surprise and -- and a rotund, roly-poly Phanatic with changes.

So -- so just to be clear, I wanted to know where we were going. And then we -- we started talking about backstory pieces. And, you know, and -- and, you know, tried to come up with our -- our -- our -- our

Page 179
Confidential - David G. Raymond
options for backstories that people liked.

And then we clearly defined three guiding principles as some of our goals that the changes that we were to make needed to be creative, fun, or funny. We needed to be able to build them so they would last. And, finally, we didn't want it to be a liability on the performer.

So as a -- as a silly exercise I said, "If we said, okay, we want the Phanatic to fly, we're going to build him a rocket pack and that would be very expensive and -- and we could invest in that, but it would be incredibly expensive because rocket fuel is expensive." I used this as an illustration. And everybody -- and so people understood, okay. And that's what got us into the discussion about what we didn't want and the criteria that we were going to impose upon the changes that we would make, and the backstory was the first step in that process.

Q. Were there's -- was there any discussion in that meeting related to this litigation that you're testifying in?

Page 180
Confidential - David G. Raymond
A. There wasn't --
MR. WOLFSOHN: Objection. The litigation wasn't even filed then, so...
THE WITNESS: We -- we all said we didn't want to be there. No one was really excited about the work. And I tried to get everybody's attitude, like, well, this will be fun. You know, let's give it a whirl. Let's have some fun with it.
BY MR. MONTCLARE:
Q. I'm sorry. I missed your answer. Nobody really wanted to do what? I -- I didn't hear you.
A. No one really wanted to be there. We -- it -- it -- it would be to everybody's interest that we would just have the Phanatic as the Phanatic as we knew the Phanatic, that would be nice, but it didn't look like we were going to -- we would need to prepare for the possibility that we couldn't have the Phanatic. So I needed to kind of rally them up and say, "Look, we'll have some fun. Let's have some fun. Let's enjoy our work together and not worry about, you know, whether we have

Page 181
Confidential - David G. Raymond
to do this or not. Let's just -- let's just do the work."
Q. And what was your compensation for your work?
A. I'd have to look. I think it was 19,000 and it included all of our time and all of the design work and -- and -- and then the -- and then the -- the build would be separate once we got to the build. And that included my management of the build as well, where I would have to manage Randy as opposed to just turning Randy over to The Phillies to do the work because it's my experience, and Randy agrees, that we work better together in that form. So from start to finish it was $19,000.00.
Q. And -- and Randy is Mr. Carfagno?
A. Yeah.
Q. And did it include Mr. Sapp's work as well?
A. It did.
Q. Was there a -- a next step part of this meeting, who would do what next?
A. Yeah, we -- they -- I wanted them

```
                                           Page 234                                                Page 235
 1          Confidential - David G. Raymond             1          Confidential - David G. Raymond
 2  BY MR. MONTCLARE:                                   2          THE WITNESS:  Yeah, it was -- it
 3       Q.   Okay.  Let's deal with the                3       was --
 4  face-to-face meeting.  Where was that meeting       4          MR. MONTCLARE:  That's hours of
 5  and who was at it?                                   5       testimony.
 6       A.   I believe it was at Citizens Bank          6          THE WITNESS:  It -- it was about
 7  Park, and it was with myself and Tom Burgoyne.      7       the, you know, the -- the lawsuit and
 8       Q.   And when was that?                         8       the -- and the fight and what we were doing
 9       A.   I -- I'm not certain.  It was --           9       to prepare for that fight; and in those
10  it was in 2019, but I can't tell you exactly        10       terms, that's what we discussed.  And it
11  when it was.  It was -- it was earlier in the      11       was -- it was the only time that I met face
12  process than later.                                 12       to face with Mr. Wolfsohn.
13       Q.   Was there anyone else at this             13  BY MR. MONTCLARE:
14  meeting besides the three of you?                   14       Q.   Did you consider his lawyer -- him
15       A.   No.                                       15  as your lawyer at that time?
16       Q.   And what was the subject of that,         16          MR. WOLFSOHN:  In connection --
17  that meeting?                                       17          THE WITNESS:  I just considered --
18       A.   It was just about, you know, P2           18          MR. WOLFSOHN:  -- with preparation
19  and how we were doing --                            19       for the deposition?
20          MR. WOLFSOHN:  You can discuss it --        20          THE WITNESS:  Yeah, I mean, he
21       you can discuss -- you can discuss it at a    21       was -- he was a lawyer that was working on
22       high level.  That was a meeting to prepare   22       this case.  That's the way I saw it.
23       for the depositions of both of you, but you  23  BY MR. MONTCLARE:
24       can describe the general subject matter      24       Q.   Did you consider him your lawyer
25       without going into detail.                   25  at this meeting?

                                           Page 236                                                Page 237
 1          Confidential - David G. Raymond             1          Confidential - David G. Raymond
 2       A.   I -- I know that The Phillies             2  retainer or -- or give you the terms of a
 3  had a -- had an attorney that was working on       3  retainer orally, did he?
 4  this and I was involved in the case, so I --       4       A.   No, I don't -- don't have that
 5  to that regard, I'm -- I'm assuming he's my        5  documentation, no.
 6  lawyer.  He's my lawyer here today, so it was      6       Q.   Did you consider him your lawyer
 7  in that capacity I'm -- yes.                        7  or The Phillies' lawyer at this meeting?
 8       Q.   So he was preparing two witnesses         8       A.   I considered -- I considered him a
 9  at the same time in the same room?                  9  lawyer that The Phillies had retained to -- to
10       A.   I -- I -- I don't know -- we were       10  be the attorney for this matter, of which I
11  just discussing the -- the work with the, you     11  was a part.
12  know, with the --                                  12       Q.   Did you -- aside from preparing
13          MR. WOLFSOHN:  Don't go into the          13  for depositions, did you discuss the work that
14       details.                                      14  you were doing in connection with the design
15          THE WITNESS:  -- the lawsuit.             15  of P2?
16  BY MR. MONTCLARE:                                  16       A.   No.  I -- I was certainly aware
17       Q.   And this was sometime in 2019 you       17  that lawyers were on the -- on the other side
18  said?                                              18  of it, but I -- we were not consulting lawyers
19       A.   I believe so.                            19  during our work, no.
20       Q.   And just so I'm clear, there was        20       Q.   And at that time you had already
21  never any written retainer agreement that you     21  been retained by The Phillies as an outside
22  had with Mr. Wolfsohn, is there?                   22  consultant?
23       A.   I -- I do not.  I don't have a          23       A.   I believe so.  During the same
24  documentation, no.                                 24  time, I believe it was a similar time frame,
25       Q.   And he never asked you to sign a        25  yes.  I can't be certain, but I -- I believe
```