UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

THE PHILLIES,

                                    Plaintiff,                    19-CV-7239 (VM) (SN)

                    -against-                                     **REPORT AND
                                                                 RECOMMENDATION**
HARRISON/ERICKSON, et al.,

                                    Defendants.

----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE VICTOR MARRERO:

        In 1978, Harrison/Erickson Inc., Bonnie Erickson, and Wayde Harrison (collectively,

"H/E") designed the "Phillie Phanatic" mascot costume for The Phillies, Philadelphia's Major

League Baseball team. In 1984, H/E assigned the Phillie Phanatic copyright to The Phillies for a

term of "forever."

        This case is about H/E's 2020 termination of that copyright assignment. In response to

H/E's Notice of Termination, The Phillies redesigned the Phillie Phanatic mascot costume,

which they debuted in 2020, and proactively sued H/E, seeking a series of declaratory judgments

challenging the authorship and validity of the Phillie Phanatic's copyright, as well as other

claims stemming from the termination of the 1984 assignment. H/E countersued, seeking a

declaration that The Phillies's 2020 redesign infringes on the original Phanatic's copyright, and

various other claims.

The Phillies moves for partial summary judgment and to dismiss H/E's Amended Counterclaim Complaint in part. H/E cross-move for summary judgment. See ECF Nos. 124, 134. I recommend GRANTING in PART and DENYING in PART the parties' motions.

## BACKGROUND

### I.   Factual Background[1]

In support of their motions, the parties submitted a substantial amount of evidence and lengthy statements, counterstatements—and even a reply-counter statement—of undisputed facts. Although the parties did manage to agree on several facts, most facts are disputed in whole or in part.

#### A.  Development of the Phanatic Mascot

The Phillies is a Major League Baseball team and limited partnership based in Philadelphia, Pennsylvania. Compl. ¶ 22 (ECF No. 1); P's Response to HE's R. 56.1 Stmt. ("Counter-HESUF") ¶ 4 (ECF No. 153). In February 1978, The Phillies's then-Executive Vice President, Bill Giles, decided to develop a new mascot for the team. P's R. 56.1 Stmt. ("PSUF") ¶ 1 (ECF No. 126); HE R. 56.1 Stmt. ("HESUF") ¶ 6 (ECF No. 135).[2] The team reached out to puppeteer Jim Henson, who recommended artist and designer Bonnie Erickson, with whom he had previously worked designing Muppets.[3] PSUF ¶¶ 2, 3; HESUF ¶¶ 1, 2, 7, 8.[4] Erickson had

---

[1] Unless otherwise indicated, the facts recited below are undisputed. "Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence." Ferdman v. CBS Interactive Inc., 342 F. Supp. 3d 515, 521 n.1 (S.D.N.Y. 2018) (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).

[2] See Giles Feb. 18, 2020 Dep. at 8:10-14, 24:12-25:1, 77:9-78:14 (ECF No. 136, Ex. 4).

[3] "Muppets"—a portmanteau of the words "marionette" and "puppet"—are a series of characters originally created by Jim Henson. See generally Studio 360, It's Not Easy Being Evergreen: An Oral History of the Muppets, Slate.com (May 29, 2018, 7:33 AM), https://slate.com/culture/2018/05/listen-to-studio-360s-muppet-regime.html.

[4] See Erickson Feb. 7, 2020 Dep. at 261:3-15 (ECF No. 127, Ex. 2); Erickson June 23, 2020 Dep. at 17:13-16, 17:19-24, 37:20-38:21 (ECF No. 127, Ex. 3); 1979 Erickson Aff. at ¶ 3 (ECF No. 127, Ex. 10);

founded a creative design firm, Harrison/Erickson, in partnership with her husband, Wayde
Harrison. PSUF ¶ 2; HESUF ¶ 3.[5]

On March 17, 1978, The Phillies and H/E entered into a written agreement (the "March
1978 Agreement") for "the design and construction of a character to be known as The Phillie
Fanatic for use as an entertainer during home baseball games." PSUF ¶ 4; HESUF ¶¶ 11–12;
March 1978 Agreement (ECF No. 136, Ex. 28). Pursuant to that agreement, H/E agreed to
provide: "(1) a design for The Phillie Fanatic (see sketch attached), (2) a costume built from the
design to measurements provided by the Phillies, and (3) delivery on or before April 30, 1978."
March 1978 Agreement. In turn, The Phillies agreed to provide: "(1) measurements for the
wearer of the costume as required by forms sent March 14, 1978, (2) five yards of material used
in the uniform shirt, an extra large shirt, a pair of extra large baseball stockings and a large
Phillie logo 'P.'" Id. Under the agreement, "[t]he character will be copywritten by
Harrison/Erickson who reserve all rights of its use for purposes other than expressly specified in
writing," with the acknowledgement that "[t]his costume will be used on Phillies TV, Phillies
commercials and personal appearances to promote the Phillies Baseball Team." Id. The Phillies
agreed to pay H/E a fee of $3,900. Id.

Although Bill Giles did not speak directly with H/E, the parties dispute how much
direction The Phillies—and specifically, Giles—provided to H/E regarding the mascot's design.
See HESUF ¶ 32; Counter-HESUF ¶ 32. The parties do not dispute that Erickson made a number
of "significant creative choices" in designing the original Phanatic costume, but disagree about
who determined many of the original elements of the Phanatic, such as its color and the shape of

---

Giles Feb. 18, 2020 Dep. at 30:19-24 (ECF No. 136, Ex. 4); Raymond May 7, 2020 Dep. at 32:9-15 (ECF
No. 136, Ex. 11).
[5] See Erickson Feb. 7, 2020 Dep. at 20:25-21:3 (ECF No. 127, Ex. 2); 1979 Erickson Aff. at ¶ 3 (ECF No.
127, Ex. 10).

its snout. PSUF ¶ 7; HESUF ¶¶ 15; D's Response to Phillies's R. 56.1 Stmt. ("Counter-PSUF")
¶ 7 (ECF No. 140); Counter-HESUF ¶ 15.

In April 1978, H/E delivered the Phanatic costume to The Phillies, and the new mascot
was debuted at a home game later that month. PSUF ¶¶ 8, 10; HESUF ¶¶ 19, 21.[6] The costume
was worn by The Phillies's Dave Raymond, who drew on multiple sources as well as his own
personality to inform his performance as the Phanatic—a performance he only performed
"within the Phanatic costume." HESUF ¶¶ 21, 22, 25.[7] Subsequent Phanatic performers followed
his style, so as to avoid the crowd knowing who was in the costume at any given time. HESUF
¶ 26.[8]

The Phanatic became very popular, and The Phillies produced a significant amount of
merchandise bearing the Phanatic's image. PSUF ¶¶ 12, 29, 33.[9] The parties do not dispute that
H/E produced many of the drawings and illustrations that appeared on such merchandise. PSUF
¶ 38.

### B.  Copyright Registration, 1979 Litigation, and Subsequent Agreement

On July 15, 1978, H/E and The Phillies entered into an agreement (the "July 1978
Agreement") which stated, in relevant part:

> 1. We [H/E] hereby grant to you the exclusive rights through all of
> the territories of the world for the term of this agreement only, to
> make reproductions of our copyrighted character presently known
> as "Phillie Phanatic" the subject of the agreement between us dated
> March 17, 1978, in and as part of various souvenir items such as
> keychains, decals, tee-shirts and dolls. [("Licensed Articles")]

---

[6] See also Harrison Feb. 10, 2020 Dep. at 34:18-37:12 (ECF No. 127, Ex. 4); ECF No. 127, Ex. 6 at 6;
Raymond Apr. 14, 2020 Dep. at 53:5-9 (ECF No. 127, Ex. 9).
[7] See also Raymond May 7, 2020 Dep. at 14:18-17:6 (ECF No. 136, Ex. 11); Raymond May 8, 2020 Dep.
at 96:20-97:11, 112:6-114:9, 123:23-124:2 (ECF No. 136, Ex. 12).
[8] See Burgoyne Feb. 13, 2020 Dep. at 84:12-85:3 (ECF No. 136, Ex. 3); Giles Feb. 18, 2020 Dep. at 84:8-
85:2 (ECF No. 136, Ex. 4).
[9] See Erickson Feb. 7, 2020 Dep. at 30:3-31:3, 202:14-17 (ECF No. 127, Ex. 2); 1979 Erickson Aff. at ¶ 5
(ECF No. 127, Ex. 10).

2. As an express condition precedent to your right to make reproductions, each proposed Licensed Article shall be submitted to us in the form in which you intend to manufacture it. For a period of ten working days following receipt by us of each proposed Licensed Article, we shall have the right in our sole discretion to determine whether the proposed reproduction satisfies our personal quality standards. You shall not manufacture any Licensed Article of any kind unless (a) you have first submitted to us the proposed Licensed Article and (b) we do not object to the quality within the ten working day period. Any subsequent modifications must first be approved by us in the same manner, before you incorporate the changes in the Licensed Article. Our approval of any proposed reproduction or modification shall not be unreasonably withheld.

3. Copies of all Licensed Articles made by you, or presently in your possession or control, shall bear copyright notice in our name in the proper location as follows: "©1978 Harrison Erickson."

[. . .]

6. Except as expressly authorized herein, and in our agreement dated March 17, 1978, you shall have no right to make any use of the Phillie Phanatic character.

July 1978 Agreement (ECF No. 136, Ex. 47).

H/E filed a registration application with the Copyright Office, describing the work as an "artistic sculpture" called the "Phillie Phanatic," and on May 4, 1979, the Copyright Office granted copyright registration. PSUF ¶ 14; HESUF ¶ 42; Phanatic Copyright Registration (ECF No. 127, Ex. 12).[10] Bonnie Erickson and Wayde Harrison are listed as co-authors of the Phanatic copyright; The Phillies is not listed anywhere on the copyright registration. Phanatic Copyright Registration.

Within a year, H/E filed a lawsuit in the Southern District of New York against The Phillies for copyright infringement of the Phanatic, breach of the March and July 1978 Agreements, and violation of the Lanham Act. PSUF ¶ 13; HESUF ¶ 45; May 18, 1979 Compl.

---

[10] See also Erickson July 2, 2020 Dep. at 238:23-240:12, 255:24-256:5 (ECF No. 127, Ex. 13).

(ECF No. 127, Ex. 11). In their 1979 Answer and Counterclaims, The Phillies did not claim any authorship interest in the Phanatic and did not challenge the validity of the Phanatic's copyright registration. HESUF ¶ 48; ECF No. 136, Ex. 51. The parties quickly settled the 1979 lawsuit on November 1, 1979, and entered into a licensing agreement ("1979 Agreement"). PSUF ¶ 16; HESUF ¶ 49; 1979 Agreement (ECF No. 136, Ex. 69).[11] The 1979 Agreement stated that (1) "the Licensee," The Phillies, "acknowledge[d] that the Licensor," H/E, "owns the copyright in the artistic sculpture presently identified as the 'PHILLIE PHANATIC,'" (2) The Phillies had "valuable trademark, service mark and other property rights in and to [The Phillies'] uniform design and insignia which are included in the costume of the PHILLIE PHANATIC and in and to the phrase 'PHILLIE PHANATIC,'" and (3) H/E granted The Phillies "an exclusive license to use the PHILLIE PHANATIC in costume form and in various reproductions of the costume, to promote the PHILLIES BASEBALL CLUB," subject to the terms of the Agreement. 1979 Agreement at 1 & ¶ 1 (ECF No. 127, Ex. 15).[12] Under the 1979 Agreement, H/E retained "sole and exclusive artistic control of the final details of the design and construction of the PHILLIE PHANATIC costumes and all reproductions of the PHILLIE PHANATIC, including merchandise, audio visual and photographic reproductions." Id. at ¶ 4. A November 26, 1979 letter from Bill Giles to H/E confirmed that H/E agreed to "waive and release" all claims asserted in the 1979 lawsuit, and agreed to have Dave Raymond continue to "perform as the Phillie Phanatic." HESUF ¶¶ 54–55; ECF No. 136, Ex. 68. In exchange, The Phillies made a lump sum payment of $115,000. ECF No. 136, Ex. 68.

---

[11] See Erickson June 23, 2020 Dep. at 199:2-199:6, 201:18-202:6 (ECF No. 127, Ex. 3).
[12] Unless otherwise indicated, the page numbers refer to the page number on the document, not the ECF-stamped page number.

### C.  The 1984 Agreement and Copyright Assignment

On October 31, 1984, The Phillies and H/E entered into a new agreement (the "1984 Agreement"). PSUF ¶ 19; HESUF ¶ 57; 1984 Agreement (ECF No. 127, Ex. 16). The 1984 Agreement stated, in part:

> WHEREAS, HE owns the copyright of the artistic sculpture presently known as the "Phillies Phanatic" (hereinafter referred to as the "MASCOT"); and
>
> WHEREAS, HE and the PHILLIES entered into a written agreement dated November 1, 1979 for the use and reproduction of the MASCOT (hereinafter referred to as the "EXISTING AGREEMENT"); and
>
> WHEREAS, the PHILLIES desire to purchase the copyright and all other rights of HE in the MASCOT and to terminate the EXISTING AGREEMENT;
>
> NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, it is agreed:
>
> 1. Subject to the terms of this agreement only, HE hereby sells, transfers and assigns to the PHILLIES all of HE's rights, title and interest in and to the MASCOT and in and to all reproductions and portrayals of all or part of the MASCOT in any medium whatsoever, everywhere and forever, including all copyrights therein throughout the world, free and clear of any adverse claims and interests. HE warrants that it alone owns the copyright to and all other rights in the MASCOT . . . and that the copyright is valid throughout the world . . . . HE shall not create any other artistic sculpture in the form of MASCOT or substantially similar to MASCOT.

1984 Agreement at 1 & ¶ 1 (ECF No. 127, Ex. 16). The 1984 Agreement accordingly assigned all of H/E's rights in the Phanatic copyright to The Phillies, though the parties dispute which rights were, and indeed could, be transferred. Counter-PSUF at ¶ 21 (ECF No. 140) (asserting that H/E "did not assign any works other than the registered Phanatic"). A "Short Form Assignment" was appended to the 1984 Agreement and signed by both parties, and stated:

Title of Work: PHILLIE PHANATIC

Registration No. VA23-748, May 4, 1979

ASSIGNMENT made this 31st day of October 1984, by and between HARRISON ERICKSON . . . and THE PHILLIES . . . . HE, for good and valuable consideration . . . hereby sells, assigns, and transfers to the PHILLIES, its successors and assigns, all of HE's right, title and interest in and to (a) the copyright in the artistic sculpture identified above, and all renewals and extensions thereof and (b) any and all causes of action heretofore accrued in HE's favor for infringement of said copyright.

1984 Agreement at 5.[13]

The 1984 Agreement provided that "this writing constitutes the entire agreement between the parties, and none of the provisions herein contained shall be waived, modified or otherwise altered or discharged except by an instrument in writing signed by both HE and the Phillies." Id. at ¶ 10. The 1984 assignment was duly recorded with the Copyright Office. HESUF ¶ 62; ECF No. 136, Ex. 70. In consideration for the assignment of the Phanatic copyright, The Phillies paid H/E $215,000. 1984 Agreement at ¶ 2.[14]

After the 1984 Agreement was executed, The Phillies sought to use some of Erickson's pre-1984 artwork of the Phanatic for promotions and merchandise. PSUF ¶ 40; Christine Legault-Long Decl. at ¶ 4 (ECF No. 128). H/E compiled Erickson's Phanatic illustrations designed between 1978 and 1984 into an "Original Phillie Phanatic Style Guide," and Erickson

---

[13] Another assignment form attached to the 1984 Agreement, again signed by both parties, stated: "THAT, for an consideration of the agreement made October 31, 1984, between the undersigned (hereinafter referred to as the "Grantor") and THE PHILLIES (hereinafter referred to as the "Grantee") and other good and valuable consideration, receipt whereof is hereby acknowledged, the Grantor hereby transfers, grants, assigns and sets over to the Grantee, its successors and assigns . . . all rights, title and interests whatsoever, in and to the artistic sculpture identified as PHILLIE PHANATIC, VA 23-748, May 4, 1979, under any and all copyrights therein, throughout the world, and all renewals and extensions, including among all other things and without limitation, all existing causes of action and all rights and interests whatsoever now or hereafter known or existing in and to all of the foregoing." 1984 Agreement (ECF No. 127, Ex. 16).

[14] See also Erickson Feb. 7, 2020 Dep. at 14:13-21 (ECF No. 127, Ex. 2); Harrison Feb. 10, 2020 Dep. at 89:19-22 (ECF No. 127, Ex. 4).

understood that such a "style guide" would be provided to licensees and vendors as a model or template for designing new products, renditions, or reproductions of the Phanatic. PSUF ¶¶ 43–45; ECF No. 127, Ex. 28.[15]

Since 1984, The Phillies has paid "at least" $789,627 to H/E for H/E's creation of new artwork, updating of old artwork, and costume repair related to the Phanatic, not counting the $215,000 assignment fee. PSUF ¶¶ 27–28; HESUF ¶¶ 64–68.[16] The Phillies has also commissioned H/E to design new costumes, designs, and products over the past 35 years. PSUF ¶ 46[17]; see, e.g., PSUF ¶¶ 50–52.[18] For example, in 2007, The Phillies paid H/E $5,000 to design 12 Phanatic illustrations for use in a style guide for Major League Baseball and its licensees. PSUF ¶ 59; Counter-PSUF ¶ 59; HESUF ¶ 68.[19] Among those illustrations created for the MLB Style Guide in 2007 was a "3D Mascot Turnaround," which is used by licensees in designing 3D products such as plush dolls and bobbleheads:

---

[15] See Erickson June 23, 2020 Dep. at 121:9-122:11, 138:12-17, 140:9-141:9 (ECF No. 127, Ex. 3); Erickson Feb. 7, 2020 Dep. at 124:13-125:19, 181:19-182:11 (ECF No. 127, Ex. 2).

[16] See Erickson Decl. at ¶¶ 14–22 (ECF No. 137); Brandreth Feb. 28, 2020 Dep. at 129:12-130:16; 135:12-22 (ECF No. 136, Ex. 5); Erickson June 23, 2020 Dep. at 163:20-164:10 (ECF 136, Ex. 14); Erickson Expert Disclosure ¶ 2 (ECF No. 137, Ex. 9); ECF No. 127, Ex. 17; Erickson June 23, 2020 Dep. at 86:5-87:15 (ECF No. 127, Ex. 3); see, e.g., Brandreth May 7, 2020 Dep. at 29:8-32:24 (ECF No. 136, Ex. 10); Erickson Feb. 7, 2020 Dep. at 134:6-135:9; 162:19-163:3; 169:24-170:8, 177:23-178:15; 179:3-12 (ECF No. 136, Ex. 1); ECF No. 136, Ex. 71.

[17] See also Erickson Feb. 7, 2020 Dep. at 130:15-132:2, 133:5-17, 134:6-13, 135:16-23 (ECF No. 127, Ex. 2); ECF Nos. 33–34; Feb. 7, 2020 Dep. at (ECF No. 127, Ex. 2).

[18] As another example, in 1999, The Phillies paid H/E $15,000 to design and construct the "Phred" costume, which is a "baby version" of the Phanatic costume. PSUF ¶ 54; ECF No. 127, Ex. 35; Erickson Feb. 7, 2020 Dep. at 158:19-160:6 (ECF No. 127, Ex. 2).

[19] See Erickson Feb. 7, 2020 Dep. at 115:5-16, 122:5-8, 122:24-123:19 (ECF No. 127, Ex. 2); ECF No. 127, Exs. 41–45; Brandreth Feb. 28, 2020 Dep. at 133:14-136:23 (ECF No. 127, Ex. 19).



Fig. 1 – 3D Mascot Turnaround of "P1"[20] by H/E

PSUF ¶¶ 61, 62; ECF No. 127, Exs. 41–42.[21] In these and other Phanatic illustrations provided to

The Phillies by H/E after 1984, H/E affixed a copyright notice that said "©The Phillies" (not

"©Harrison Erickson"). PSUF ¶ 75; Erickson June 23, 2020 Dep. at 149:22-150:10 (ECF No.

127, Ex. 3).

### D.  Termination of the Copyright Grant

On June 1, 2018, H/E's attorneys sent a letter to The Phillies, which included a Notice of

Termination of the 1984 assignment (the "Termination Notice"). PSUF ¶ 84; Termination Notice

(ECF No. 127, Ex. 65). The Termination applied to the:

> Grant of transfer of copyright executed by Wade Harrison & Bonnie
> Erickson, the co-authors of the "Phillie Phanatic"—including two
> and three dimensional drawings of the work consisting of a shaggy
> creature wearing tennis shoes, tights and a baseball shirt while
> carrying a pennant. Subject to termination pursuant to Section 203
> of U.S. Copyright Act (17 U.S.C. § 203). The October 31, 1984
> grant was recorded with the Copyright Office (June 24, 1987).

---

[20] The parties refer to the original Phanatic as "P1."
[21] See also Brandreth May 7, 2020 Dep. at 116:10-16, 131:18-132:7 (ECF No. 127, Ex. 25); Brandreth
Feb. 28, 2020 Dep. at 134:4-8 (ECF No. 127, Ex. 19); Erickson Feb. 7, 2020 Dep. at 180:17-181:11 (ECF
No. 127, Ex. 2).

Termination Notice at ¶ 4 (ECF No. 127, Ex. 65). The effective date of the termination listed on the Termination Notice was June 15, 2020. Id. at ¶ 5. After H/E issued the Termination Notice, the parties engaged in negotiations regarding an extension of the grant but did not reach an agreement. PSUF ¶ 89, Buck Apr. 23, 2020 Dep. at 51:15-23 (ECF No. 127, Ex. 18).

### E.   Redesign of the Phanatic into "P2"

In response to the Termination Notice, The Phillies hired artist Tom Sapp to make alterations and modifications to H/E's Phanatic design, with the express intent of creating a derivative work, resulting in the mascot costume design known as "P2." PSUF ¶¶ 91, 93.[22] On January 29, 2020, Sapp delivered P2 turnaround artwork to The Phillies, with in-house Phillies personnel preparing additional artwork of P2 in different poses. See Figure 2, below; PSUF ¶¶ 93–94, 101.[23]



Fig. 2 – P2 Turnaround Artwork

---

[22] See also Buck Apr. 23, 2020 Dep. at 124:11-17, 129:7-25 (ECF No. 127, Ex. 18); Raymond Apr. 14, 2020 Dep. at 137:16-140:18, 154:6-155:20, 163:8-12 (ECF No. 127, Ex. 9).

[23] See ECF No. 127, Ex. 67; Dec. 2020 Brandreth Decl., Ex. B (ECF No. 129, Ex. 2). While The Phillies contends that the P2 artwork attached as Exhibit B to the December 2020 Brandreth Declaration was "prepared and delivered to The Phillies" before June 15, 2020," H/E asserts four of those images were not prepared before June 15, 2020. Dec. 2020 Brandreth Decl. at ¶ 5 (ECF No. 129); Counter-PSUF ¶ 102.

The Phillies identifies several changes between H/E's original Phanatic design (P1) and its own P2 design: (1) the hat (P2's is bigger), (2) eyebrows (P2's are lighter powder blue and made with a different fabric), (3) eyelashes (P2's are star-shaped and lighter pink), (4) eyes (P2 has round eyes with oval pupils, rather than P1's oval eyes with round pupils), (5) head shape (P2's is wider and bigger), (6) snout (P2's is shorter and cylindrical, with no ring of feathers at base, while P1's is more conical), (7) hands (P2's are operable and not connected to the "wing tips"), (8) wings (P2 added wing tips), (9) "duck butt" (P2's is larger and differently shaped), (10) tail (P2's is lighter "powder blue" and shapeable), (11) stockings (P2 wears the 1948 season's style), (12) shoes (P2's are red, with no shoelaces, and with the Liberty Bell logo), and (13) Phillies uniform (P2 wears the current version of The Phillies's jersey). PSUF ¶ 95.

The P2 costume made its debut (with Tom Burgoyne of The Phillies inside) in February 2020 at The Phillies's spring training facility in Florida. PSUF ¶ 100.[24]

## II.   Procedural History

On August 2, 2019, The Phillies filed the Complaint, raising seven claims against H/E and seeking declaratory judgments on six of the seven claims:

First, The Phillies asserts that H/E did not have the right to terminate the 1984 Agreement under Section 203 of the Copyright Act because H/E had twice previously negotiated the license or assignment of the Phanatic's copyright rights with The Phillies. Compl. ¶¶ 14, 81–93. The Phillies seeks a declaratory judgment finding that the "June 1, 2018 notice of termination is null and void and that H/E's purported termination is ineffective as to the 1984 Assignment." Id. at ¶ 93.

---

[24] See ECF No. 127, Ex. 70; Buck Apr. 23, 2020 Dep. at 127:14-128:7 (ECF No. 127, Ex. 18).

Second, The Phillies claims that H/E cannot enforce its copyright in the Phanatic because H/E's original copyright for the Phanatic was "fraudulently obtained" because it was represented to the Copyright Office as an "artistic sculpture," not a costume. Id. at ¶¶ 15, 94–106.

Third, The Phillies claims that it is a "co-author of the Phanatic costume because it contributed" to the Phanatic's design and—as a co-author—its rights to the Phanatic cannot be extinguished by H/E's termination of the 1984 Agreement. Id. at ¶¶ 16, 107–14.

Fourth, The Phillies claims that it is "the author of the Phanatic *character*," given that it "brought to life" the Phanatic costume and therefore H/E cannot terminate The Phillies's rights to the Phanatic character. Id. at ¶¶ 17, 115–22 (emphasis added).

Fifth, The Phillies asserts that even if H/E could terminate the 1984 Agreement under 17 U.S.C. § 203, "the rights that would revert to H/E are highly limited," given the quantity of derivative works The Phillies created before the effective date of the termination (June 15, 2020), pursuant to the Derivative Works Exception in 17 U.S.C. § 203(b)(1). Id. at ¶¶ 18, 123–29.

Sixth, The Phillies seeks a declaratory judgment as well as a permanent injunction "barring H/E from selling purported rights in the Phanatic to any sports team or commercial entity and from selling any Phanatic-related merchandise." Id. at ¶¶ 142–43. This claim stems from H/E's alleged threat to make the Phanatic "a free agent" if the 1984 Agreement was not renegotiated. Id. at ¶¶ 12, 136. The Phillies asserts that H/E would violate Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), if H/E carried out this threat because of The Phillies's ownership of federal trademarks in the Phanatic and the good will and association established by The Phillies in the Phanatic. Id. at ¶¶ 19, 130–43.

Lastly, The Phillies claims unjust enrichment and breach of the implied covenant of good faith and fair dealing. Id. at ¶¶ 144–55. These claims are based on H/E's termination of The

Phillies's rights to use the Phanatic, when The Phillies had understood the assignment to be "forever" and had paid what it deemed to be an appropriate price for an assignment for the full term of the copyright. Id. at ¶ 147. It therefore claims that H/E will be unjustly enriched at The Phillies's expense by the termination of the 1984 assignment, and that The Phillies "has or will suffer damages" due to H/E's violation of the duty of good faith and fair dealing in negotiating the 1984 Agreement. Id. at ¶¶ 153–55.

H/E's Amended Answer and Counterclaim Complaint ("AACC") raises 24 defenses and five counterclaims. See ECF No. 118. As their first counterclaim, H/E asserts that *they* are the sole authors of the Phanatic, and they request a declaration on that point. AACC ¶¶ 36–40. Second, they argue that under the Copyright Act's three-year statute of limitations, The Phillies's time to contest the authorship of the Phanatic has now run. Id. at 43. H/E seek a "judicial declaration that the Copyright Act's statute of limitations" and other equitable doctrines prevent The Phillies from claiming any authorship of the Phanatic. Id. at ¶¶ 46. Their third and fourth claims request that the Court declare that the Phanatic's copyright registration and the June 18, 2018 Notice of Termination are valid. Id. at ¶¶ 47–57.

Finally, in their Fifth Cause of Action, H/E assert that The Phillies has engaged in copyright infringement by continuing to use the Phanatic—more precisely, The Phillies's "P2" design and additional derivative works—after the termination date. Id. at ¶¶ 58–64. They seek injunctive relief preventing The Phillies from further infringing on their copyright of the Phanatic. Id. at ¶ 64. In addition to declaratory relief, they seek statutory damages under 17 U.S.C. § 504(c), based on The Phillies's infringement of their copyright, costs and attorney's fees, pre- and post-judgment interest on any monetary award, and such equitable relief the Court deems proper. Id. at ¶ 65.

The Phillies moved for partial summary judgment and to dismiss H/E's copyright infringement claim. See generally ECF No. 125. The Phillies seeks partial summary judgment on its claim that the Copyright Act's Derivative Works Exception allows it to continue to use (1) the redesigned Phanatic costume, or "P2," and (2) two-dimensional artwork of P2. See 17 U.S.C. § 203(b)(1); ECF No. 125 at 1. The Phillies also seeks partial summary judgment on its claim that even if the June 2018 Notice of Termination of the 1984 Assignment was proper, the licenses and subsequent artwork granted and produced by H/E were not covered by the Termination Notice. Id. Lastly, The Phillies moves to dismiss H/E's claim for copyright infringement pursuant to Federal Rule of Civil Procedure 12(b)(6). Id.

H/E opposed The Phillies's motions for partial summary judgment and for dismissal of their copyright infringement claim, and simultaneously sought summary judgment on H/E's first four counterclaims and dismissal of all eight counts of The Phillies's Complaint. See generally ECF No. 141. Judge Marrero referred those motions to me for a report and recommendation. ECF No. 142.

## DISCUSSION

### I.   Summary Judgment

The parties raise a host of challenges to each other's claims. H/E seek summary judgment on and dismissal of every single one of The Phillies's claims. The Phillies seeks partial summary judgment on its claims regarding whether the redesigned Phanatic ("P2") is a derivative work of the original Phanatic design and subject to the Derivative Works Exception.

Many of the claims depart from the essential premise that the Phanatic's copyright is indeed *valid*, which the parties hotly contest. Because the Copyright Act mandates that suits concerning copyright infringement cannot precede the registration of a copyright, the Court

15

addresses the validity questions first. See 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made" with the Copyright Office); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.16[A] (2021).

### A. Legal Standard

A "[c]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing SCR JointVenture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material when it might affect the outcome of the suit under governing law." Gorham-DiMaggio v. Countrywide Home Loans, Inc., 421 F. App'x 97, 101 (2d Cir. 2011) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)). Thus, the Court's role here is to determine whether there are any disputed issues of material fact. Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).

The moving party bears the burden of demonstrating that there is no genuine factual dispute. Celotex Corp., 477 U.S. at 322–23. "Where the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a

genuine dispute of material fact." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir.

2010) (cleaned up). In order to overcome summary judgment, the opposing party must do more

than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at

586, and "may not rely on conclusory allegations or unsubstantiated speculation," Great Am. Ins.

Co., 607 F.3d at 292. "A party asserting that a fact cannot be or is genuinely disputed must

support the assertion" either by "citing to particular parts of materials in the record" or by

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1). When considering a motion for summary judgment, a court "is required to construe the

evidence in the light most favorable to the non-moving party and to draw all reasonable

inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003).

When a court must decide cross-motions for summary judgment, it must analyze each

party's motion "on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." Morales v. Quintel Ent., Inc., 249 F.3d

115, 121 (2d Cir. 2001) (citation omitted).

Lastly, a court may "properly address the merits of a declaratory judgment action through

a motion for summary judgment." Middlesex Ins. Co. v. Mara, 699 F. Supp. 2d 439, 444 (D.

Conn. 2010); accord Peter Mayer Publishers Inc. v. Shilovskaya, 11 F. Supp. 3d 421, 424

(S.D.N.Y. 2014).

### B. Validity of H/E's Copyright Registration of the Phanatic Mascot

H/E seek summary judgment on their Third Cause of Action. They request a declaratory

judgment stating that the Phanatic's 1979 copyright registration is valid. AACC ¶¶ 47–51.

Relatedly, H/E move to dismiss The Phillies's Count II, which contends that H/E obtained the

Phanatic's copyright registration by fraud on the Copyright Office when they represented that the Phanatic is an "artistic sculpture," rather than a costume. See Compl. ¶¶ 94–106. H/E assert that their registration of the Phanatic as an "artistic sculpture" was not a fraud; moreover, they contend that The Phillies's claim is barred by equitable estoppel, judicial estoppel, res judicata, the relevant statute of limitations, and the doctrine of unclean hands.

I recommend that the Court find that (1) the 1979 registration was not procured by fraud and is valid. In the alternative, I further find that (2) The Phillies is barred by the doctrine of res judicata from challenging the validity of the copyright registration. For purposes of completeness, I consider H/E's other defenses to The Phillies's validity challenge and find the defenses of equitable estoppel, judicial estoppel, statute of limitations, and the doctrine of unclean hands to be without merit.

### 1. Fraud on the Copyright Office

The Phillies's Count II seeks a declaratory judgment that the Phanatic copyright is invalid because it was obtained through fraud on the Copyright Office. It claims that H/E's application for copyright registration was fraudulent because the Phanatic was registered as an "artistic sculpture," when it is a costume. The Phillies further contends that H/E knowingly submitted inaccurate information to the Copyright Office, which would have otherwise rejected registration of a costume. Id. at ¶ 96. H/E move to dismiss The Phillies's Count II and for summary judgment on their Third Cause of Action because (1) the Phanatic registration does not contain inaccurate information, and (2) The Phillies has not shown that H/E knowingly provided misleading information. See ECF No. 141 at 14–17.

A certificate of copyright registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and

of the facts stated in the certificate." 17 U.S.C. § 410(c). Under § 411(b)(1), that certificate of

registration establishes the validity of a copyright, "regardless of whether the certificate contains

any inaccurate information, *unless* -- (A) the inaccurate information was included on the

application for copyright registration with knowledge that it was inaccurate; and (B) the

inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse

registration." (emphasis added). In other words, "[t]he standard is whether the applicant

*knowingly* included inaccurate information on its application that could have led the Copyright

Office to refuse registration." Palmer/Kane LLC v. Rosen Book Works LLC, 188 F. Supp. 3d

347, 352 (S.D.N.Y. 2016) (emphasis added). Before a court can declare a registration invalid, it

must seek the advice of the Register of Copyrights. 17 U.S.C. § 411(b)(2). The Court has

previously denied the parties' request for referral to the Copyright Office, finding that the

statutory conditions had not been yet been satisfied. See ECF No. 119.

The Phillies argues that a genuine dispute of material fact precludes the Court from

deciding validity by dismissing its Count II and granting H/E judgment on their Third Cause of

Action. "A party seeking to establish a fraud on the Copyright Office, and thereby rebut the

presumption of copyright validity, bears a heavy burden." Lennon v. Seaman, 84 F. Supp. 2d

522, 525 (S.D.N.Y. 2000) (citing 2 Nimmer on Copyright § 7.20[B] at 7–207 (1997)). A party

"must establish that the application for copyright registration is factually inaccurate, that the

inaccuracies were willful or deliberate, and that the Copyright Office relied on those

misrepresentations." Id. (citations omitted). I find that The Phillies has not created a genuine

dispute of material fact as to the validity of the copyright.

The Phanatic was registered as an "artistic sculpture" by Bonnie Erickson and Wayde

Harrison on May 4, 1979. HESUF ¶ 42; Phanatic Copyright Registration (ECF No. 136, Ex. 54).

Whether a baseball mascot costume qualifies as an artistic sculpture is not immediately apparent.

Therefore, the Court looks to the statutory language first, which defines a "sculptural work" as

including:

> two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101; see also U.S. Copyright Office, Compendium of Copyright Office Practices, 2-

297 (1st Ed. 1973) (ECF No. 136, Ex. 94) ("In all cases, registration must be based upon those

copyrightable features such as an artistic sculpture . . . which can be identified separately and are

capable as existing independently as a work of art . . . ."). A "useful article," in turn, is defined as

"an article having an intrinsic utilitarian function that is not merely to portray the appearance of

the article or to convey information. An article that is normally a part of a useful article is

considered a 'useful article.'" 17 U.S.C. § 101.

In 1991, the Copyright Office "clarif[ied]" its position as to costumes, explaining that

"[c]ostumes will be treated as useful articles, and will be registrable only upon a finding of

separable artistic authorship." Registrability of Costume Designs, 56 Fed. Reg. 56,530-02 (Nov.

5, 1991). The Copyright Office noted that Congress, through the 1976 Copyright Act, intended to

"draw as clear a line as possible between copyrightable works of applied art and uncopyrightable

works of industrial design," such that a "two-dimensional painting, drawing, or graphic work is

still capable of being identified as such when it is printed on or applied to utilitarian articles such

as textile fabrics, wallpaper, containers, and the like." Id. at 56 Fed. Reg. 56,530–31 (quoting H.R. Rep. No. 1476, 94th Cong. 2d Sess. 55 (1976)). The Office observed that it had "generally refused to register claims to copyright three-dimensional aspects of clothing or costume design on the ground that articles of clothing and costumes are useful articles that ordinarily contain no artistic authorship separable from their overall utilitarian shape." Id. at 56,531. The Copyright Office noted, however, that "[o]ver the last few years . . . [it] registered a few narrowly drawn claims in certain three-dimensional fanciful or animal-shaped items that can be worn." Id. (footnote omitted). Accordingly, the Office determined that "[f]or purposes of copyright registration, fanciful costumes will be treated as useful articles. Costumes serve a dual purpose of clothing the body and portraying their appearance. Since clothing the body serves as a useful function, costumes fall within the literal definition of useful article." Id. at 56,532. In reaching this conclusion, the Office noted that "the case law consistently treats costumes as useful articles, and a Copyright Office decision to differ substantially from these court decisions would appear difficult to justify." Id.

As the Copyright Office noted, various courts around the country have concluded that costumes may be copyrightable, despite being useful articles, if they had separable components of artistic authorship. See e.g., Masquerade Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 664, 668 (3d Cir. 1990) (finding masquerade masks subject to copyright protection and "fail[ing] to see how the Copyright Office could have been misled" as to the work's purpose when they were identified as "nose masks"); Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc., 931 F.3d 215, 220–21 (3d Cir. 2019) (finding that the banana costume was a "useful article," and that the "artistic features of the costume, in combination, prove both separable and capable of independent existence as a copyrightable work: a sculpture"); see generally Ent. Rsch. Grp., Inc.

v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1221 (9th Cir. 1997) ("Although the category of costumes has rarely been dealt with in the copyright context, it seems clear that for copyright purposes, costumes would fall under the category of 'pictorial, graphic and sculptural works' and would be treated as sculptural works.").

The Phillies heavily relies on Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452 (2d Cir. 1989). In that case, the Court of Appeals concluded that the registrations for certain children's Halloween costumes were procured by fraud because they were registered as "soft sculptures." Id. at 454. The court's umbrage was primarily that the costumes held no "firm form" and therefore could not constitute sculptures. Id. at 456. It further concluded that the registrant acted in bad faith because it knew that a registration for costumes would have been rejected as merely useful articles. Id. at 455–56. The court also distinguished the registration in that case from another "sculpture" registration involving bear paw slippers, finding that the photo submitted in that registration made clear—and therefore was not deceptive—that the item was a slipper. Id. at 456; see Animal Fair, Inc. v. Amfesco Indus., Inc., 620 F. Supp. 175 (D. Minn. 1985), aff'd mem., 794 F.2d 678 (8th Cir. 1986).

Interestingly, on remand in the Whimsicality case, the plaintiff filed an affidavit from the Copyright Office Examiner stating that he knew the items were children's costumes when he granted the copyright, that the use of the term "soft sculpture" was "within the practice routinely allowed by the Copyright Office, and that he decided to issue the registrations after finding separable artistic content in the works." Whimsicality, Inc. v. Rubie's Costume Co., 836 F. Supp. 112, 115 (S.D.N.Y. 1993).

The Phillies has not created a disputed fact regarding the accuracy of the registration. The Phanatic's copyright registration identifies it as a "sculpture," but the Copyright Office's record

22

describes the item as a "shaggy *creature* wearing tennis shoes, tights, and baseball shirt while carrying a pennant." ECF No. 127, Ex. 14 (emphasis added). The Court of Appeals' "firm form" test is certainly satisfied as, at a minimum, the head and tail of The Phanatic would retain its form when unworn.

In addition, at least one photo was submitted with the registration application, which makes clear that the work for which copyright registration was sought is a mascot, a "creature" that is more than a set of clothes or even a costume. The Phillies argues that there is a factual dispute regarding the photograph(s) appended to the Phanatic's copyright registration. According to Erickson's 1979 affidavit in the 1979 infringement litigation between the two parties, a copy of the Phanatic's copyright registration was appended to her affidavit, along with "a copy of *a* photograph of the Phanatic deposited with the registration," which is reproduced below:



Fig. 3 – Phillie Phanatic Photograph from 1979 Copyright Application

1979 Erickson Aff. at ¶ 2 & Exs. 1, 1A (ECF No. 136, Ex. 63) (emphasis added); Phanatic

Copyright Registration (ECF No. 136, Ex. 54). H/E contend that they "provided the Copyright

Office with numerous color images depicting the Phanatic in a variety of poses, including facing

forward, backward, to the side, and holding a pennant." HESUF ¶ 44; ECF No. 136, Ex. 62.

Those photographs include the following:



Fig. 4 – Phillie Phanatic Color Photographs from 1979

ECF No. 136, Ex. 62; see also Erickson Feb. 7, 2020 Dep. at 25:11-25 (ECF No. 136, Ex. 1)

(unclear questioning regarding whether the black-and-white photo was "a" or "the" photos

submitted with the copyright application); Erickson July 2, 2020 Dep. at 249:9-250:9 (ECF No.

136, Ex. 15) (stating that H/E had "done submission of copyright photos, front, back, side").[25]

---

[25] The parties additionally dispute whether The Phillies has waived this argument. H/E point to The
Phillies's July 27, 2020 pre-motion letter, in which it states that "Defendants contend that the five color
photos in Exhibit B comprise the deposit. For purposes of a summary judgment motion only, The Phillies
is willing to assume *arguendo* that that was the case." ECF No. 99 at 1. The Phillies later asserts that
though it "agreed to assume for purposes of its summary judgment motion regarding the Derivative

The Court need not resolve this dispute as it is immaterial to a finding that registering the Phanatic as a sculpture was not inaccurate under copyright law. Even assuming a single photo was submitted, the Phanatic's image and purpose are plain.

The Court also takes judicial notice of the Phanatic's Copyright Registration that is publicly available on the Copyright Office's Public Records System.[26] The Copyright Registration includes a "Message Note to Staff" that reads: "*There's no way to determine whether or not this is a real stuffed sculpture, or actually a costume design with a person wearing it*." This strongly suggests that the Copyright Office, at a minimum, recognized the ambiguity in the Phanatic's copyright application, yet nevertheless issued the registration.

In light of these undisputed facts, the Court concludes that there is no dispute of material fact from which a reasonable juror could find that the Phanatic copyright is invalid. The undisputed facts do not suggest that it was inaccurate to refer to the Phanatic mascot as an "artistic sculpture," given all of the information included in the application and the Copyright Office's own interpretation of "artistic sculptures," which indicates that certain costumes would fall under the category of "pictorial, graphic, and sculptural works" and would be treated as

---

Works Exception that the five color photos in PX 7 depict The Phanatic as it looked in 1978, The Phillies never agreed that those photos were in fact submitted to the Copyright Office." ECF No. 148 at 21 n.16.

[26] Phillie Phanatic, Public Records System, U.S. Copyright Office, https://publicrecords.copyright.gov/detailed-record/18598078?query=Phillie%20Phanatic&records_per_page=10&page_number=0&start_date=Mon%20Jan%2001%201979%2000:00:00%20GMT-0500%20(Eastern%20Standard%20Time)&end_date=Tue%20Jan%2001%201980%2000:00:00%20GMT-0500%20(Eastern%20Standard%20Time) (last visited August 8, 2021). A "court may judicially notice a fact that is not subject to reasonable dispute" where it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Thus, public government records are readily susceptible to judicial notice. See Allianz Glob. Invs. GmbH v. Bank of Am. Corp., 457 F. Supp. 3d 401, 410 n.3 (S.D.N.Y. 2020), reconsideration denied, No. 18-cv-10364 (LGS), 2020 WL 2538394 (S.D.N.Y. May 19, 2020). Moreover, "the Court takes judicial notice of th[is] document[] but does not rely on their contents for the truth of the matter asserted." Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't, 486 F. Supp. 3d 669, 685 n.2 (S.D.N.Y. 2020) (citing Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008)).

sculptural works. <u>See</u> 17 U.S.C. §§ 101, 102. Indeed, a number of H/E's other mascot designs were also copyrighted (albeit after the Phanatic) as "artistic sculptures." HESUF ¶ 43; <u>see, e.g.</u>, ECF No. 136, Exs. 55–61. The Copyright Office acknowledged as much in its 1991 clarification. <u>See</u> Registrability of Costume Designs, 56 Fed. Reg. 56,530-02.

Finally, even assuming that there was a question of fact whether registering the Phanatic as an artistic sculpture was "inaccurate," there is no genuine dispute as to whether H/E "knew" of that "inaccuracy." <u>See</u> 17 U.S.C. § 411(b). H/E knew the Phanatic was registered as an artistic sculpture, and the undisputed evidence reflects Erickson's and Harrison's belief that this was correct. <u>Cf.</u> <u>Palmer/kane LLC v. Gareth Stevens Publ'g</u>, No. 25-cv-07404 (GHW), 2016 WL 6238612, at *4 (S.D.N.Y. Oct. 24, 2016). Erickson's testimony indicates that she believes that identifying the Phanatic as an "artistic sculpture" is accurate, and Harrison referred to "artistic sculpture" as a "legal term." Erickson July 2, 2020 Dep. at 240:9-241:2, 242:19-243:2, 244:15-17 (ECF No. 136, Ex. 15); Harrison Feb. 10, 2020 Dep. at 79:3-80:11 (ECF No. 136, Ex. 2).

Therefore, I recommend that the Court dismiss Count II of The Phillies's Complaint and grant H/E summary judgment on their Third Cause of Action.

### 2. Bars on Challenging the Validity of the Copyright Under Res Judicata, Equitable Estoppel, Judicial Estoppel, the Statute of Limitations, and Unclean Hands

Should the Court decline to find that the Phanatic's registration is valid as a matter of law, I recommend that the Court conclude that The Phillies is barred from challenging the validity of the Phanatic's copyright on res judicata grounds.

### a. Res judicata

H/E seek to preclude The Phillies's validity challenge on the basis of res judicata. "Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been raised in that action." EDP Med. Comput. Sys., Inc. v. United States, 480 F.3d 621, 624 (2d Cir. 2007) (cleaned up). Res judicata applies when a party shows that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 499 (2d Cir. 2014) (quoting Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)); see also Nevada v. United States, 463 U.S. 110, 129–30 (1983) (describing the doctrine as "a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose" (quoting Cromwell v. County of Sac, 94 U.S. 351, 352 (1876))). For the preclusion to take effect, the claims must "arise from the same set of operative facts as a previous claim between the same parties which has been resolved by a final judgment on the merits." Runaway Dev. Grp. v. Pentagen Techs. Int'l Ltd., 396 F. Supp. 2d 471, 475 (S.D.N.Y. 2005) (citations omitted). Like many of the other equitable remedies, res judicata is a "drastic remedy," which would "forclos[e] a party from litigating an essential issue." Flaherty v. Lang, 199 F.3d 607, 616 (2d Cir. 1999) (quoting McNellis v. First Fed. Sav. & Loan Ass'n of Rochester, 364 F.2d 251, 257 (2d Cir. 1966)).

H/E invoke res judicata based on the 1979 copyright infringement lawsuit that they brought against The Phillies in this district and the subsequent settlement agreement between the parties to resolve that litigation. H/E argue that The Phillies could have—but did not—raise a challenge to the validity of the Phanatic's copyright in response to H/E's lawsuit; instead, The Phillies settled the action.

The first two elements are easily established here: the parties' 1979 settlement agreement adjudicated the merits of the 1979 litigation, and The Phillies and H/E are parties to both lawsuits. See HESUF ¶¶ 45, 49; 1979 Compl. (ECF No. 136, Ex. 65); 1979 Agreement (ECF No. 136, Ex. 67); see also TechnoMarine, 758 F.3d at 499 n.4 (a settlement agreement that resolved the earlier litigation between the same two parties satisfied the first two elements (citing Greenberg v. Bd. of Governors of the Fed. Rsrv. Sys., 968 F.2d 164, 168–70 (2d Cir. 1992))).

The third factor—whether the "claims asserted in [this] action were, or could have been, raised in the prior action"—is established, too. TechnoMarine, 758 F.3d at 499 (internal quotation marks omitted). Res judicata applies when "the second suit involves the same 'claim'—or 'nucleus of operative fact'—as the first suit." Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 108 (2d Cir. 2000) (quoting Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir. 1997)). To determine if a claim that was not raised in the prior action "could have been raised therein," courts consider "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." TechnoMarine, 758 F.3d at 499 (quoting Woods v. Dunlop Tire Corp., 972 F.2d 36, 38 (2d Cir. 1992)).

The underlying facts of the two lawsuits are such that "facts essential to the second [lawsuit] were present in the first." Interoceanica Corp., 107 F.3d at 91 (quoting S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1464 (2d Cir. 1996)). Although the 1979 lawsuit related to the scope of the parties' 1978 licensing agreement involving the use of the Phanatic, H/E *also* brought a claim for copyright infringement. See 1979 Compl. (ECF No. 136, Ex. 65); see also Woods, 972 F.2d at 39 ("It is this identity of facts surrounding the occurrence which constitutes the cause of action, not the legal theory upon which [plaintiff] chose to frame her complaint.").

An essential element of a copyright infringement claim is a valid copyright, and so the validity of the Phanatic's copyright was squarely at issue in 1979. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) (a plaintiff must demonstrate ownership of a valid copyright to prevail on a copyright infringement claim). The Phillies's current claim relates to its continued use of the Phanatic's alleged derivatives following the termination of the 1984 Assignment, wherein a "nucleus of operative fact" is the Phanatic's copyright.

Nothing regarding the validity of the Phanatic's copyright has changed since 1979, and The Phillies most certainly could have raised the question of the copyright's validity when it was sued by H/E for infringement in 1979. There are no facts relating to the copyright validity claim "that have accumulated after the first action" and which "are enough on their own to sustain the second action." Storey v. Cello Holdings, L.L.C., 357 F.3d 370, 384 (2d Cir. 2004).

Thus, if the Court does not find that the copyright registration is valid as a matter of law, I recommend that it grant H/E's motion for summary judgment on the alternative ground that res judicata bars The Phillies from disputing the validity of the Phanatic copyright.

**b. Equitable Estoppel**

H/E claim The Phillies is equitably estopped from asserting fraud on the Copyright Office because doing so "contradicts their own course of conduct over decades." ECF No. 141 at 17. Summary judgment on this ground is not appropriate.

"Equitable estoppel applies in both law and equity to deny a litigant 'the right to plead or prove an otherwise important fact because of something he has done or omitted to do.'" DeCarlo v. Archie Comic Publ'ns, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y.) (quoting Broad. Music, Inc. v. Hearst/ABC Viacom Ent. Servs., 746 F. Supp. 320, 329 (S.D.N.Y. 1990)), aff'd, 11 F. App'x 26 (2d Cir. 2001).

29

To claim equitable estoppel, a party must show that:

> (1) plaintiff had knowledge of defendant's conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

DeCarlo, 127 F. Supp. 2d at 509. "Silence may in some cases be sufficient to establish a misrepresentation . . . but a defendant cannot rely on silence '[i]n the absence of a duty to speak.'" George Nelson Found. v. Modernica, Inc., 12 F. Supp. 3d 635, 656 (S.D.N.Y. 2014) (quoting Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 566 (S.D.N.Y. 2013)) (alteration in original). "Whether equitable estoppel applies in a given case is ultimately a question of fact." Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001) (citing Bennett v. U.S. Lines, Inc., 64 F.3d 62, 65 (2d Cir. 1995)). Then-District Judge Denny Chin noted, however, that equitable estoppel, as an equitable defense, may "be decided by the court and not a jury, and the court is fully empowered to grant summary judgment if there are no triable fact issues and the court concludes equitable relief is warranted." Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., No. 07-cv-02373 (DC), 2008 WL 5049744, at *5 (S.D.N.Y. Nov. 26, 2008) (citation omitted), aff'd, 605 F.3d 1305 (Fed. Cir. 2010).

The record is clear as to the first two elements. The Phillies knew that the Phanatic was registered as an "artistic sculpture" since *at least* November 1, 1979, when The Phillies and H/E signed the settlement agreement to conclude the 1979 litigation, which "acknowledge[d] that the Licensor [H/E] *owns the copyright in the artistic sculpture* presently identified as the 'Phillie Phanatic.'" 1979 Agreement (ECF No. 136, Ex. 67) (emphasis added); HESUF ¶ 49. And The Phillies conducted itself in a manner that gave H/E the right to believe they could rely on The Phillies's acceptance of the validity of the Phanatic copyright. The Phillies has acknowledged

30

H/E as owners of a valid Phanatic copyright repeatedly since 1979, including in the November 1979 settlement agreement, as well as in the 1984 Assignment, which stated that "HE owns the copyright of the artistic sculpture presently known as the 'Phillie Phanatic,'" that "the PHILLIES desire to purchase the copyright," and that H/E "warrants . . . that the copyright is valid throughout the world." HESUF ¶¶ 49, 57; 1984 Agreement (ECF No. 136, Ex. 69).[27] The Phillies conducted itself in a manner that gave H/E the right to believe that they could rely on The Phillies's "acquiescence in its actions." DeCarlo, 127 F. Supp. 3d at 510. There is no indication anywhere in the record that The Phillies had concerns regarding the validity of the Phanatic's copyright, let alone an affirmative expression of its apparent belief that the copyright was invalid.

The factual record also demonstrates that H/E was ignorant of the facts The Phillies now alleges—that the Phanatic copyright is invalid. As noted above, Erickson testified in her Rule 30(b)(6) deposition (as H/E's designee) that H/E sought registration of the Phanatic as an "artistic sculpture" based on "advice from [their] attorneys who were filing [it]," and that doing so "seemed to make sense." Erickson July 2, 2020 Dep. at 240:9-241:21 (ECF No. 136, Ex. 15); see also id. at 241:21-243:2 (stating that it was "common knowledge that" similar designs by Jim Henson were registered as sculptures), 244:15-17 ("I've always referred to my work as sculptures. I mean, it's been said to many people.").[28] Harrison, for his part, described "artistic sculpture" as "a legal term that [H/E's] lawyer used." Harrison Feb. 10, 2020 Dep. at 79:3-21 (ECF No. 136, Ex. 2).

---

[27] H/E also point to the July 1978 Agreement, which referred to the "copyrighted character presently known as 'Phillie Phanatic,'" but that agreement was signed *before* the Phanatic was registered with the Copyright Office on May 4, 1979. July 1978 Agreement (ECF No. 136, Ex. 47); Phanatic Copyright Registration (ECF No. 136, Ex. 54).

[28] See also Erickson Feb. 7, 2020 Dep. at 27:10-15 (ECF No. 126, Ex. 1).

Questions of fact remain, however, as to whether H/E relied on The Phillies's position to their detriment. See DeCarlo, 127 F. Supp. 2d at 511. H/E settled the 1979 litigation with The Phillies, assigned their rights in the Phanatic to The Phillies in 1984, and continued doing business with The Phillies. See 1979 Agreement (ECF No. 136, Ex. 67); 1984 Agreement (ECF No. 136, Ex. 69). While H/E assert these are examples of detriment, it is not clear how H/E were harmed by these agreements, nor is it established that H/E continued to do business with The Phillies at "discounted rates." See Counter-HESUF ¶ 64.

Accordingly, if the Court were to reject my earlier recommendations, I would recommend that it deny summary judgment to H/E on the basis of equitable estoppel.

### c.  Judicial Estoppel

H/E also argue that The Phillies is "judicially estopped from asserting fraud on the Copyright Office." ECF No. 141 at 18. Specifically, H/E assert that because The Phillies filed an affidavit in a separate copyright enforcement lawsuit that attested to the validity of the Phanatic's copyright, it cannot now claim that the same copyright is invalid. Id. at 19. Summary judgment should not be granted on this ground either.

The remedy of judicial estoppel is intended to "prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." Wight v. BankAmerica Corp., 219 F.3d 79, 89 (2d Cir. 2000) (citing Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037–38 (2d Cir. 1993)). Accordingly, the doctrine "prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding," and a party that invokes judicial estoppel "must show that (1) another party advanced an inconsistent position in another proceeding[,] and (2) the first tribunal adopted that position in some manner." Troll Co.

v. Uneeda Doll Co., 483 F.3d 150, 155 n.7 (2d Cir. 2007) (first quoting, and then citing Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)). Given the equitable nature of this remedy, one final consideration is warranted: for the doctrine to apply, "the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." In re Adelphia Recovery Tr., 634 F.3d 678, 695–96 (2d Cir. 2011) (citations omitted).

H/E have established the first prong: The Phillies asserted the validity of the Phanatic copyright by way of then-Assistant Director of Promotions Christine Legault-Long's affidavit in Major League Baseball Promotion Corp. v. Brofman, No. 87-3894 (E.D. Pa. 1987). See HESUF ¶ 73; 1987 Legault-Long Aff. (ECF No. 136, Ex. 29). Ms. Legault-Long had stated that The Phillies had all rights in the Phanatic by virtue of the assignment and that "Harrison and Erickson and The Phillies have duly complied in all respects with the United States Copyright Act and all other laws governing copyright including obtaining a copyright registration certificate, and recordation of the assignment." 1987 Legault-Long Aff. at ¶ 2. There is little question that The Phillies's later position—that the Phanatic copyright is invalid due to fraud—is inconsistent with its earlier position in the 1987 lawsuit that it *was* valid. See In re Adelphia Recovery Trust, 634 F.3d at 696.

H/E's success, however, does not hold through to the second prong. H/E have not shown that the Eastern District of Pennsylvania adopted The Phillies's position; all that is presented is a docket sheet that indicates that default judgments were issued against individual defendants in that case. Counter-HESUF ¶ 73; ECF No. 136, Ex. 75. Nor can it be said, on this record, that The Phillies would derive an "unfair advantage against" H/E due to its earlier submission in the Eastern District of Pennsylvania litigation. DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103

(2d Cir. 2010) (citation omitted). Such evidence does not support a finding of summary judgment.

Accordingly, if the Court were to reject my earlier recommendations, I would recommend that it deny summary judgment to H/E on the basis of judicial estoppel.

### d. Statute of Limitations

H/E also assert that The Phillies's fraud claim is barred by the Copyright Act's three-year statute of limitations. They assert that The Phillies's opportunity to challenge the validity of the registration expired in 1982, or three years after the 1979 registration, because The Phillies "had full knowledge of the registration since 1979." ECF No. 141 at 19. The Phillies counters that because it raises H/E's fraud solely as an anticipatory defense—not as an affirmative claim—the statute of limitations does not apply. I recommend finding that the statute of limitations would not otherwise bar The Phillies's challenge.

The Copyright Act states that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A claim "accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised." Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2d Cir. 2003) (quoting Merchant v. Levy, 92 F.3d 51, 56 (2d Cir. 1996)). "The purpose of statutes of limitations is to bar untimely suits, but the underlying right that can no longer be pursued affirmatively is not strictly extinguished and, when a suit is otherwise timely, it may still be asserted as a defense." Disney Enter., Inc. v. Ent. Theatre Grp., No. 13-cv-5570 (JLS), 2014 WL 5483487, at *6 (E.D. Pa. Oct. 30, 2014) (citing United States v. W. Pac. R.R. Co., 352 U.S. 59, 72 (1956)).

In Estate of Burne Hogarth, the Court of Appeals concluded that the plaintiff's statute of limitations argument did not apply to the defendant because the defendant had not made a "claim" for the purposes of the statute of limitations accrual and "a defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." 342 F.3d at 163 (citations omitted); see also W. Pac. R.R. Co., 352 U.S. at 72 ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); Luckenbach S.S. Co. v. United States, 312 F.2d 545, 549 n.3 (2d Cir. 1963) ("The law is well settled that limitations do not normally run against a defense."); 133–24 Sanford Ave. Realty Corp. v. Cisneros, 940 F. Supp. 83, 85 (S.D.N.Y. 1996) ("It is well established that statutes of limitations run against affirmative claims for relief, but not against defenses."). In that vein, "potential defendants are not required to seek at the earliest opportunity a declaration that a defense to a claim not yet brought is valid." Est. of Burne Hogarth, 342 F.3d at 164.

The Phillies argues that it raised its copyright validity claim *defensively*—even though it did so in an *affirmative* posture in its first-filed complaint—in anticipation of H/E's copyright infringement claim. Therefore, it contends, it is that "potential defendant" that did not have to "seek at the earliest opportunity a declaration that a defense to a claim not yet brought is valid." Est. of Burne Hogarth, 342 F.3d at 164. H/E counters that The Phillies's invalidity claim "accrued when [The Phillies] had notice of the contents of the copyright registration certificate[] identifying" the Phanatic as an artistic sculpture. Id. (citation omitted).

"Potential defendants are not required to seek" clarification under the Declaratory Judgment Act before a claim is brought against them. Id. As such, the Court will not now "cut off the consideration of a particular defense in the case" simply because The Phillies raised this

claim anticipating H/E's infringement claim. W. Pac. R.R. Co., 352 U.S. at 72. Just as "[a]

defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a

plaintiff's claim is not barred by a statute of limitations," The Phillies, seeking relief in the form

of declaratory judgments to defend against H/E's anticipated—and now realized—counterclaims,

is not barred by the statute of limitations. Est. of Burne Hogarth, 342 F.3d at 164 (citing W. Pac.

R.R. Co., 352 U.S. at 72). Accordingly, if the Court were to reject my earlier recommendations, I

would otherwise find that the statute of limitations does not bar The Phillies's defense that H/E's

copyright is invalid, and recommend the Court deny summary judgment to H/E on this ground.

### e.   Unclean Hands

Lastly, H/E invoke the doctrine of unclean hands, arguing that it would be "highly

inequitable" to permit The Phillies to challenge the Phanatic's copyright when it has

acknowledged and benefitted from that copyright since its registration. ECF No. 141 at 19.

The doctrine of unclean hands "is a limited device, invoked by a court only when a

plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar

that the public interest in punishing the plaintiff outweighs the need to prevent defendant's

tortious conduct." Broad. Music, Inc., 746 F. Supp. at 329 (quoting Playboy Enters., Inc. v.

Chuckleberry Publ'g, 486 F. Supp. 414, 435 (S.D.N.Y. 1980)). "The defense of unclean hands in

copyright actions is 'recognized only rarely, when the plaintiff's transgression is of serious

proportions and relates directly to the subject matter of the infringement action.'" Id. (quoting 3

Nimmer on Copyright § 13.09[B] at 13–145 (1988)).

The Court cannot conclude that The Phillies comes before this Court with unclean hands.

The Phillies's conduct does not rise to the level required for this extreme remedy, and

36

accordingly I recommend that summary judgment on the validity of the Phanatic copyright be denied on this basis.

### 3.   Summary on Copyright Validity Claim

In conclusion, I recommend that the Court dismiss The Phillies's Count II and grant summary judgment in favor of H/E's Third Cause of Action, finding either that the Phanatic's copyright is valid as a matter of law or, in the alternative, that The Phillies is barred from challenging its validity on res judicata grounds.

### C.  Authorship of the Phanatic and Its Character

The Phillies argues that it is a co-author of the Phanatic costume and character and, therefore, H/E cannot unilaterally terminate its rights in the Phanatic. H/E seek summary judgment on their claim as sole authors of both. I recommend that the Court grant H/E summary judgment on their First and Second Causes of Action and dismiss The Phillies's Counts III and IV. See Compl. ¶¶ 108–22; AACC ¶¶ 37–46.

### 1.   The Phillies's Joint Authorship Claim to the Phanatic Costume

"The determination of whether to recognize joint authorship in a particular case requires a sensitive accommodation of competing demands advanced by at least two persons, both of whom have normally contributed in some way to the creation of a work of value." Childress v. Taylor, 945 F.2d 500, 504 (2d Cir. 1991). A "joint work" is a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101; see 1 Nimmer on Copyright § 6.01 (noting that the definition of joint work is more accurately a definition of a work of joint *authorship*). "A work that is the product of joint authorship is a 'joint work,' which means that each contributor

automatically acquires an undivided ownership in the entire work, including all of the contributions contained therein." 1 <u>Nimmer on Copyright</u> § 6.03. As Nimmer further explains,

> the essence of joint authorship is a joint laboring in furtherance of a preconcerted common design. Without such a preconcerted common design the resulting combination should not be regarded as a joint work. This does not mean, however, that the several authors must necessarily work in physical propinquity, or in concert, nor that the respective contributions made by each joint author must be equal either in quantity or quality. Neither is an express "collaboration agreement" necessary to create a joint-author relationship.

<u>Id.</u> In other words, "[t]he touchstone of the statutory definition [of joint authorship] 'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'" <u>Thomson v. Larson</u>, 147 F.3d 195, 199 (2d Cir. 1998) (quoting H.R. Rep. No. 1476, 94th Cong. 120, 121 (1976), <u>as reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5735).

"A co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." <u>Id.</u> at 200 (citing <u>Childress</u>, 945 F.2d at 507–08). These two steps serve to "ensure that true collaborators in the creative process are accorded the perquisites of co-authorship and to guard against the risk that a sole author is denied exclusive authorship status simply because another person rendered some form of assistance." <u>Childress</u>, 945 F.2d at 504.

### a.  Independently Copyrightable Contributions

"A contribution to a work is copyrightable if it (1) is independently created by the author and (2) possesses at least some minimal degree of creativity." <u>Maxwood Music Ltd. v. Malakian</u>, 713 F. Supp. 2d 327, 343 (S.D.N.Y. 2010) (citing <u>Feist Publ'ns</u>, 499 U.S. at 345). "The requisite level of creativity is extremely low," so a contribution can cross this low threshold as long "as [it] possess[es] some creative spark, 'no matter how crude humble or obvious' it might be." <u>Maurizio v. Goldsmith</u>, 84 F. Supp. 2d 455, 466–67 (S.D.N.Y. 2000) (quoting <u>Feist Publ'ns</u>, 499

U.S. at 345), aff'd, 230 F.3d 518 (2d Cir. 2000). "[E]quality in quantity of contribution is not required," but an "author must provide more than merely an idea for the joint work." Baker v. Robert I. Lappin Charitable Found., 415 F. Supp. 2d 473, 487 (S.D.N.Y. 2006); Huurman v. Foster, No. 07-cv-09326 (MHD), 2010 WL 2545865, at *12 (S.D.N.Y. June 21, 2010) (citations omitted). "Copyright protection extends to 'original works of authorship fixed in any tangible medium of expression.'" Maurizio, 84 F. Supp. 2d at 466 (quoting 17 U.S.C. § 102(a)).

The Phillies asserts it made independently copyrightable contributions to the Phanatic costume that satisfy the first prong of the Childress test. It points first to elements of the Phanatic's "costume": its jersey, stirrups, and hat with its distinctive logo. ECF No. 148 at 27. Second, it asserts that Bill Giles's selection of the color and general "look" of the Phanatic—a "big, fat, green thing"—also constitutes an independently copyrightable contribution. Id. at 28; see Giles Feb. 18, 2020 Dep. at 30:14-18 (ECF No. 136, Ex. 4). H/E assert that these contributions, to the extent they occurred, do not rise to the requisite level. ECF No. 141 at 20–21.

Turning first to the Phanatic's clothing, the Court does not consider these items to be independently copyrightable. Clothing for a mascot falls into an ambiguous space: it is not clothing meant for a person, *per se*, but it is also not clothing meant for a completely inanimate object. Although clothing has typically been viewed as a "useful article," and thus excluded from copyright protection, one court considered the clothing on a teddy bear to qualify for copyright protection. Boyds Collection, Ltd. v. Bearington Collection, Inc., 360 F. Supp. 2d 655, 661 (M.D. Pa.) (citing 17 U.S.C. §§ 101, 102(a)(5)), reconsideration denied by 365 F. Supp. 2d 612 (M.D. Pa. 2005).[29] The Court explained:

---

[29] The court's decision conflicted with the Copyright Office's determination to deny copyright certification. Boyds Collection, 360 F. Supp. 2d at 661. The court acknowledged that the Copyright

> The clothing on a teddy bear obviously has no utilitarian function. It is not intended to cover embarrassing anatomical aspects or to protect the bear from exterior elements. Rather, it is intended and serves only to modify the appearance of the bear, to give the doll a different "look and feel" from others. Clothing on a bear replicates the form but not the function of clothing on a person. It does not constitute a "useful article" excluded from copyright protection.

Id. (citations and footnote omitted). In this view, then, the clothing items for the Phanatic could qualify as copyrightable materials. The Supreme Court's recent decision in Star Athletica, L.L.C. v. Varsity Brands, Inc. confirms this view, as it instructs that a feature "incorporated into the design of a useful article" can be eligible for copyright protection only if it:

> (1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic, or sculptural work—either on its own or fixed in some other tangible medium of expression—if it were imagined separately from the useful article into which it is incorporated.

137 S. Ct. 1002, 1007 (2017).

Assuming that The Phillies's uniform for the Phanatic is independently copyrightable, the Court next considers whether The Phillies's uniform and team-related materials (the jersey, leggings, logo, and cap) were intended to be part of the Phanatic. This is an essential component of co-authorship because each author must "intend his or her contribution, *at the time it is created*, to become part of a unitary work." Weissmann v. Freeman, 868 F.2d 1313, 1319 (2d Cir.), cert. denied, 493 U.S. 883 (1989) (emphasis added).

The agreements between the parties regarding the development of the Phanatic contemplate The Phillies's uniform and related materials as being an essential component of the

---

Office's interpretation was "entitled to respect as persuasive authority," but, finding no "indicia of a reasoned decision-making process" in the Office's letters, deemed them to be of little persuasive authority. Id. at 661–62 (citations omitted).

original Phanatic. See March 1978 Agreement at 1 (ECF No. 136, Ex. 28).[30] But The Phillies did

not design a completely new uniform for the Phanatic to wear—the Phanatic is "dressed" in The

Phillies's team uniform. See Phanatic Copyright Registration (ECF No. 136, Ex. 54); ECF No.

136, Ex. 62 (images of the Phanatic in uniform). The Phillies's uniform "pre-exist[ed] and [is]

separable from the Phanatic's design"—it is worn by the team, and jerseys are worn by fans—so

the "outfit" could not have been created with the intention it "be merged into inseparable or

interdependent parts of a unitary whole." ECF No. 159 at 9; Weissman, 868 F.2d at 1317–18

(quoting 17 U.S.C. § 101). The Phillies therefore cannot rely on the Phanatic's outfit to establish

an independent copyrightable contribution.

The Court also considers whether the asserted direction of The Phillies's former director

Bill Giles could constitute an independently copyrightable contribution. The Phillies asserts that

Giles's contributions as to the design of the Phanatic, including that it should be an "indefinable"

creature, "fat" and "green," and have a big nose, are independently copyrightable contributions.

Compl. ¶¶ 1, 108. H/E maintain that Giles's assertions as to his involvement are discredited by

his deposition testimony.[31] ECF No. 141 at 20; HESUF ¶¶ 10, 32–33.

But whether Giles did or did not direct the Phanatic to be a big green creature is not

material because such contribution is not independently copyrightable. Giles's "contributions"

are merely ideas. It is axiomatic in copyright law that ideas are not copyrightable. See Mazer v.

Stein, 347 U.S. 201, 217 (1954). It is similarly well-recognized that the choice of a color is not

copyrightable, although "[a]n original combination or arrangement of colors should be regarded

---

[30] See also Erickson July 2, 2020 Dep. at 245:23-247:15, 266:14-23, 267:24-268:11 (ECF No. 149, Ex. 78).

[31] The exchange occurred during Giles's deposition as follows: "Q: So is it fair to say you really do not have a clear recollection as to whether you are the one who chose the green color? A: I have been brainwashed by myself that I was the one that picked green, but, you know, I believe that I picked green." Giles Feb. 18, 2020 Dep. at 45:19-24 (ECF No. 136, Ex. 4).

as an artistic creation capable of copyright protection." Boisson v. Banian, Ltd, 273 F.3d 262,

271 (2d Cir. 2001) (first citing 37 C.F.R. § 202.1(a); and then citing 1 Nimmer on Copyright

§ 2.14, at 2-178.4 (2001)) (alteration in original); see also Daniels v. Walt Disney Co., 958 F.3d

767, 772 (9th Cir. 2020) ("[C]olors themselves are not generally copyrightable." (citation

omitted)), cert. denied sub nom., Moodsters Co. v. Walt Disney Co., 141 S. Ct. 1050 (Mem.)

(2021). Even taken together, "*suggestions* of idea[s] for themes, trims or colors" do not "rise to

the requisite level to qualify as a joint author." Design Options, Inc. v. BellePointe, Inc., 940 F.

Supp. 86, 90 (S.D.N.Y. 1996) (emphasis added). Thus, The Phillies cannot establish an

independent copyrightable contribution to the Phanatic. H/E are therefore entitled to summary

judgment on their claim regarding authorship of the Phanatic.

### b.  Intent to Be Co-Authors

In the alternative, the Court could grant H/E summary judgment because there is no

evidence of the parties' intent to be co-authors. To establish this element, "at the time each

author makes his contribution," he must intend "that it shall be an integrated part of a greater

work with supplementary contributions to be made by one or more other authors." 1 Nimmer on

Copyright § 6.03; see Baker, 415 F. Supp. 2d at 487 ("The key is the intent of the parties at the

time the work is done." (citing Thomson, 147 F.3d at 199)). The parties must "entertain in their

minds the concept of joint authorship." Childress, 945 F.2d at 508. "This requirement of mutual

intent recognizes that, since coauthors are afforded equal rights in the co-authored work, the

'equal sharing of rights should be reserved for relationships in which all participants fully intend

to be joint authors.'" Thomson, 147 F.3d at 201 (quoting Childress, 945 F.2d at 509). A test for

the intent of putative co-authors is whether each "participant *intended* that all would be identified

as co-authors." Childress, 945 F.2d at 508 (emphasis added). But courts also consider "a more

nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts." Thomson, 147 F.3d at 201 (citing Childress, 945 F.2d at 508–09); see also 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 260 (2d Cir. 2015) (identifying the "factual indicia of ownership and authorship" as including "decisionmaking authority, billing, and written agreements with third parties").

"Focusing on whether the putative joint authors regarded themselves as joint authors is especially important in circumstances . . . where one person [ ] is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another [ ] are joint authors." Childress, 945 F.2d at 508. H/E—the artists and physical creators of the Phanatic—are without question the dominant author. See Maurizio, 84 F. Supp. 2d at 465–66.

Based on the undisputed facts, no reasonable jury could find that the parties intended The Phillies to be co-authors of the Phanatic. Rather, the evidence consistently reflects that neither party intended nor recognized anyone other than H/E to be the authors of the Phanatic. See 16 Casa Duse, 791 F.3d at 255–56 (concluding that even if putative co-author had made independently copyrightable contributions, neither party intended the defendant to be a co-author). H/E retained sole decision-making authority over the design and implementation of the Phanatic mascot and related works, as well as with third parties. HESUF ¶¶ 12, 35, 38, 52; see July 1978 Agreement at ¶ 2 (ECF No. 136, Ex. 47) (outlining process by which H/E approved reproductions of the Phanatic); 1979 Agreement ¶ 4 (ECF No. 136, Ex. 67) (identifying H/E as having "the sole and exclusive artistic control of the final details of the design and construction of the" Phanatic). And each agreement between H/E and The Phillies recognized that "the Phanatic was H/E's copyright." HESUF ¶¶ 36, 50, 57, 59; see 1984 Agreement at ¶ 6 (ECF No.

43

136, Ex. 69) (The Phillies agreed that "H/E shall have the right . . . to refer to the MASCOT as *the original work of* HE, made for the PHILLIES" and to "use its best efforts to credit [H/E] as the creator of the [Phanatic]"); see also ECF No. 159 at 12.

The Phillies had acknowledged that the Phanatic would be "copywritten by H/E" (before the 1984 Assignment), and it strains credulity that, if The Phillies viewed itself as a co-author, it would later seek the *assignment* of the Phanatic's copyright. See Thomson, 147 F.3d at 199 (co-authors are entitled "to equal undivided interests in the whole work," meaning that "each joint author has the right to use or to license the work as he or she wishes"); March 1978 Agreement at 2 (ECF No. 136, Ex. 28); see also Gilliam v. Am. Broad. Cos., Inc., 538 F.2d 14, 22 (2d Cir. 1976) (agreement whereby one party was to retain all rights in work suggested that the other party did not consider itself a joint author).

The Phillies points to instances where the parties credited The Phillies for substantial contributions to the Phanatic, such as contemporary press releases that referred to the Phanatic as the "latest idea to be born in Bill Giles weekly staff meetings," and a video discussing The Phillies's role in the development of the Phanatic. Counter-HESUF ¶¶ 7–9, 20, 71; see ECF No. 149, Ex. 2. The Phillies also point to the 1979 Settlement Agreement, which acknowledges The Phillies's contributions that were merged into the final costume, and that The Phillies had "trademark, service mark *and other property rights* in and to the Licensee's uniform design and insignia which are included in the costume of the PHILLIE PHANATIC." 1979 Agreement at 1 (ECF No. 136, Ex. 67) (emphasis added). But the recognition of certain contributions and essential elements to the team's mascot—namely, the team's uniform—do not establish either party's intent to be a co-author under copyright law. See 16 Casa Duse, 791 F.3d at 260–61.

44

Because a "specific finding of mutual intent" is required for co-authorship, and The Phillies fails to raise questions of fact as to whether H/E did intend to share authorship with it, summary judgment is warranted to H/E. See Thomson, 147 F.3d at 202; Childress, 945 F.2d at 509. Accordingly, I recommend that H/E's motion for summary judgment on the question of the authorship of the Phanatic be granted, and The Phillies's Count III for a declaratory judgment on its co-authorship be dismissed.

### 2.  The Phillies's Authorship Claim to the Phanatic Character

As part of their motion for summary judgment on the question of the Phanatic's authorship, H/E also seeks dismissal of The Phillies's separate claim that it is the author of the Phanatic *character*. See Compl. ¶¶ 116–22. On this claim, I again recommend granting summary judgment in H/E's favor.

The prevailing view across circuits is that characters are entitled to copyright protection. 1 Nimmer on Copyright § 2.12[A][2]; see Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), cert. denied, 282 U.S. 902 (1931). Characters receive copyright protection "when they are embodied in original works of authorship that are themselves protected by the law of copyright." Vacchi v. E*TRADE Fin. Corp., No. 19-cv-03505 (DLC), 2019 WL 4392794, at *4 (S.D.N.Y. Sept. 13, 2019) (citation omitted), appeal withdrawn, No. 19-3350, 2020 WL 1873303 (2d Cir. Mar. 19, 2020); Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 235 (2d Cir. 1983) ("Plaintiffs own the copyrights in various works embodying the character Superman and have thereby acquired copyright protection for the character itself." (citing Detective Comics, Inc. v. Bruns Publications, Inc., 111 F.2d 432 (2d Cir. 1940)); Burroughs v. Metro-Goldwyn-Mayer, Inc., 519 F. Supp. 388, 391 (S.D.N.Y. 1981) ("[C]haracters that are well-delineated in the Tarzan

works of Edgar Rice Burroughs are protected from infringement by the copyright in the work itself."), aff'd, 683 F.2d 610 (2d Cir. 1982).

A character is only protectable, however, if it is "sufficiently delineated." See Silverman v. CBS Inc., 870 F.2d 40, 50 (2d Cir. 1989); Titan Sports, Inc. v. Turner Broad. Sys., Inc., 981 F. Supp. 65, 68 & n.1 (D. Conn. 1997); Burroughs, 519 F. Supp. at 391; Penguin Random House LLC v. Colting, 270 F. Supp. 3d 736, 746 (S.D.N.Y. 2017) ("[C]opyright law does protect characters who are sufficiently delineated to be original"). This "'delineation' inquiry essentially asks whether it can fairly be said that the author fixed in a tangible medium of expression the abstract concept that is a character." Conan Props. Int'l LLC v. Sanchez, No. 17-cv-00162 (FB) (RLM), 2018 WL 4522099, at *10 (E.D.N.Y. June 8, 2018), report and recommendation adopted as modified, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018). As part of this analysis, "courts consider whether, through text or graphics or both, the author sufficiently described a character's conceptual as well as physical qualities." Id. Requiring a set delineation of a character "effectively ensures that the author defined the metes and bounds of a character." Id. "A character's conceptual qualities include his age, name, 'speech, movement, demeanor, and other personality traits,'" while his "physical qualities include any of his visual characteristics, such as his clothing and facial features." Id. (citing Warner Bros. Ent. v. X One X Prods., 644 F.3d 584, 598 (8th Cir. 2011)).

The Phillies's claim of authorship in the Phanatic character faces two significant hurdles. First, a copyrightable character must exist in a copyrightable work of authorship. See 17 U.S.C. § 102(a) ("Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the

aid of a machine or device."); 1 Nimmer on Copyright § 2.12[A][2] ("[I]n cases recognizing such protection, the character appropriated is distinctively delineated in the plaintiff's work . . . ."). Meaning, in the plainest terms, that the character of Superman, for example, can be copyrighted because his characteristics and traits have been well-delineated over the course of a variety of written works and films—that is, copyrightable materials.[32] See Warner Bros., 720 F.2d at 235–36. It follows that "the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." Williams v. Crichton, 84 F.3d 581, 589 (2d Cir. 1996) (quoting Nichols, 45 F.2d at 121). The challenge for The Phillies, of course, is that the Phanatic is not a comic book character or film character—it is a mascot. And The Phillies is hard-pressed to find any copyrightable work of authorship that contains the necessary delineations of the Phanatic character.

Putting to the side the question of whether and how much of Dave Raymond's performances of the Phanatic were subject to H/E's creative control, The Phillies claim it "brought [the Phanatic] to life, transforming it" from a "lifeless costume" into a "beloved character." Compl. ¶ 17. But to establish the baseline argument for the Phanatic character's copyrightability, The Phillies must point to a tangible work of authorship in which the Phanatic character is delineated. The Phillies's inability to do so is fatal. It may be that the "character" of the Phanatic has had a consistent name and look, has been portrayed with particular attributes of its "personality," and has a backstory. But a key question is *where* those characteristics are defined. The Phillies avers that Dave Raymond's "performances as the Phanatic were recorded

---

[32] Thus, the fact that Dave Raymond formed the Phanatic's traits in his head does not lend itself to the copyrightability of the Phanatic's character. See Downing v. Abercrombie & Fitch, 265 F.3d 994, 1003–04 (9th Cir. 2001) ("A persona can hardly be said to constitute a 'writing' of an 'author' within the meaning of the copyright clause of the Constitution. A fortiori it is not a 'work of authorship' under the Act." (quoting 1 Nimmer on Copyright § 1.01[B][1][c] at 1–23 (1999))).

on countless occasions" and submits two videos available on YouTube and two videos held by The Phillies. Counter-HESUF ¶ 20; <u>see</u> ECF Nos. 150, 151.

The Federal Rules of Civil Procedure require evidence relating to motions for summary judgment to be admissible in evidence. Fed. R. Civ. P. 56(c); <u>Frank v. Plaza Const. Corp.</u>, 186 F. Supp. 2d 420, 425 n.11 (S.D.N.Y. 2002). The Court first considers the Declaration of Scott Brandreth, to which two videos of the Phanatic are appended. <u>See</u> ECF No. 150 & Exs. A, B. The vague statements therein do not suffice to authenticate those documents because the declaration does not certify when the videos were made or who made them. If a declaration cannot "certify[] that it was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters," it is not properly authenticated. <u>See</u> <u>Hamad v. Cook</u>, No. 13-cv-03222 (MHD), 2014 WL 3507340, at *7 (S.D.N.Y. June 30, 2014). Nor could those videos, undated and of unknown origin, pass muster under the hearsay rules. Fed. R. Evid. 803; <u>see</u> <u>Hamad</u>, 2014 WL 3507340, at *7. The YouTube videos attached as exhibits to Dave Raymond's Declaration fall prey to the same fate. ECF No. 151, Exs. A, B.[33] Although Raymond himself is in those videos, he does not hold himself out to be the creator of the videos and therefore provides no foundation for their authenticity. But even more critically, they do not serve to establish that principal requirement for a copyrightable character—a work of authorship of The Phillies's creation that depicts the Phanatic character. <u>See</u> <u>Warner Bros.</u>, 720 F.2d at 235. Being unable to clear first base, The Phillies cannot claim authorship of a copyrightable character.

Second, assuming that The Phillies was able to provide a work of authorship (which includes a video recording) containing the Phanatic character, the Court considers whether The

---

[33] Available at <u>https://www.youtube.com/watch?v=Jvw4liTidgk&t=263s</u> and <u>https://www.youtube.com/watch?v=4QGgidQLXLg&t=413s</u>, respectively.

Phillies has demonstrated that the Phanatic character is "sufficiently delineated." See id. at 240. It has not.

"In determining whether a character deserves copyright protection, courts look at the many elements of the character—visual depictions, name, dialogue, relationships with other characters, actions and conduct, personality traits, and written descriptions—to determine whether it is sufficiently delineated such that it is a unique expression." Fun With Phonics, LLC v. LeapFrog Enters., Inc., No. 09-cv-00916 (GHK), 2010 WL 11404474, at *5 (C.D. Cal. Sept. 10, 2010) (citing Funky Films, Inc. v. Time Warner Ent. Co., L.P., 462 F.3d 1072, 1078–79 (9th Cir. 2006), overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051 (2020)).

The Phillies defines the Phanatic character's personality attributes as: (1) "A passionate Philadelphia sports fan, and in particular a fan of the Phillies"; (2) "Emotions that fluctuate wildly with the fortunes of The Phillies, and who wears its emotions on its sleeve"; (3) "A frenetic and hyper demeanor, zigging and zagging about the stadium"; (4) "Child-like enthusiasm with a short attention span"; (5) "Mute"; (6) "G-rated behavior"; (7) "Loves to dance"; (8) "Loves to taunt opposing teams and managers"; and (9) "Has a surprising athleticism in contrast to a round, fat body shape." See ECF No. 151 at ¶¶ 12–13; Counter-HESUF ¶ 16.

These personality traits, taken together with the Phanatic's name, actions and conduct, do not delineate a character of sufficient unique expression to warrant copyright protectability. See, e.g., KGB, Inc. v. Giannoulas, 104 Cal. App. 3d 844, 857 (Cal. Ct. App. 1980) ("The concept of parading as a mascot in an animal costume would seem to be in the public domain."); Lesley v. Spike TV, 241 F. App'x 357, 358 (9th Cir. 2007) (improvised performances of television personality on a gameshow were not copyrightable); Alexander v. Haley, 460 F. Supp. 40, 45–46

(S.D.N.Y. 1978) (material from common sources, *scenes a faire* characters or settings, stock

ideas, and basic themes, are not copyrightable); SOFA Ent., Inc. v. Dodger Prods., Inc., 709 F.3d

1273, 1279 (9th Cir. 2013) ("It is [Ed] Sullivan's charismatic personality that [plaintiff] seeks to

protect. Charisma, however, is not copyrightable."); Alexander v. Murdoch, No. 10-cv-05613

(PAC) (JCF), 2011 WL 2802899, at *8 (S.D.N.Y. May 27, 2011) ("[A]ct[ing] in childish ways is

a basic character type that is not in itself copyrightable."), report and recommendation adopted,

2011 WL 2802923 (S.D.N.Y. July 14, 2011), aff'd, 502 F. App'x 107 (2d Cir. 2012), as

amended (Nov. 16, 2012); Lewinson v. Henry Holt & Co. LLC, 659 F. Supp. 2d 547, 567

(S.D.N.Y. 2009) ("If a [stock character such as a] drunken old bum were a copyrightable

character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-

breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels,

[and] a masked magician . . . ." (first alteration in original)). The Phanatic's character is more

akin to a "lightly sketched" character, where "whatever insight into their characters may be

derived from their dialogue and action" and which is not entitled to independent protection. Fun

With Phonics, 2010 WL 11404474, at *6 (quoting Olson v. Nat'l Broad. Co., Inc., 855 F.2d

1446, 1452–53 (9th Cir. 1988)); compare Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor

Corp., 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) (identifying the James Bond character as

delineated with "cold-bloodedness; his overt sexuality; his love of martinis 'shaken, not stirred';

his marksmanship; his 'license to kill' and use of guns; his physical strength; [and] his

sophistication"), with Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003) (holding that

magician who wore standard magician garb, revealed magic tricks, and was not the focus of the

story was not protected under copyright), overruled on other grounds by Skidmore as Tr. for

Randy Craig Wolfe Tr., 952 F.3d 1051.

Thus, I recommend granting summary judgment to H/E on their claim regarding authorship of the Phanatic character and dismissing Count IV of The Phillies's Complaint.

### 3. Bars on Challenging the Authorship of the Copyright Under the Statute of Limitations, Res Judicata, Equitable Estoppel, Judicial Estoppel, and Unclean Hands

As with the question of the copyright's validity, H/E raise bars to The Phillies's authorship claims. While I recommend that the Court grant H/E summary judgment on the merits, in the alternative, the Court may bar The Phillies from challenging authorship on statute of limitation and res judicata grounds.

#### a. Statute of Limitations

The Copyright Act's three-year statute of limitations applies to claims of authorship as well. See 17 U.S.C. § 507(b). In a dispute that "'involves who wrote [the work],' . . . a person claiming authorship must file their lawsuit within three years from when the dispute over authorship arose. Otherwise, § 507 bars their claims." Charles v. Seinfeld, No. 18-cv-01196 (AJN), 2021 WL 761851, at *2 (S.D.N.Y. Feb. 26, 2021); see also Price v. Fox Ent. Grp., Inc., 473 F. Supp. 2d 446, 457 (S.D.N.Y. 2007) (finding that an individual's claim as co-author of a screenplay "accrued when [the plaintiff] made an 'express assertion of sole authorship'").

"An ownership claim accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'" Kwan v. Schlein, 634 F.3d 224, 228 (2d Cir. 2011) (quoting Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992)). This notice typically occurs "once there has been an 'express repudiation' of ownership" or an "express assertion of sole authorship or ownership," at which point the claim begins to accrue. Mahan v. Roc Nation, LLC, 634 F. App'x 329, 331 (2d Cir. 2016) (citing Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 317 (2d Cir. 2013)); Kwan, 634 F.3d at 228 (quoting Netzer v.

Continuity Graphic Assocs., Inc., 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997)); see 3 Nimmer on

Copyright § 12.05[C][1] (describing "express repudiation" as the touchstone to determine when

claims accrue). Express repudiation (or "express assertion") of sole authorship claims can occur

when "a book is published without the alleged co-author's name on it" or "alleged co-owners

learn they are entitled to royalties that they are not receiving." Mahan, 634 F. App'x at 331

(quoting Gary Friedrich Enter., 716 F.3d at 317).

H/E argue that The Phillies's authorship claims are beyond the statute of limitations and

cannot be raised here. The Phillies makes the same statute of limitations argument it did with

regard to copyright's validity: because its authorship claim is raised as a *defense* to H/E's

anticipated infringement action, the statute of limitations does not bar the claim. See ECF No.

148 at 37.

Although The Phillies's authorship claim is raised defensively, the Court of Appeals is

very clear as to when an authorship claim begins to accrue. See Kwan, 634 F.3d at 228. The

Phillies has known for many years "of the injury upon which" its authorship claims are

premised: The Phillies knew H/E claimed sole authorship of the Phanatic by knowing the

Phanatic's copyright registration listed only Erickson and Harrison as authors, and by repeatedly

signing agreements that acknowledged H/E's sole authorship of the Phanatic. DeCarlo, 127 F.

Supp. 3d at 507 (citation omitted); see HESUF ¶¶ 36, 50; 1979 Agreement (ECF No. 136, Ex.

67); July 1978 Agreement ¶ 3 (ECF No. 136, Ex. 47) (agreeing that all licensed articles must

bear the copyright notice of "©Harrison Erickson"); Phanatic Copyright Registration (ECF No.

136, Ex. 54). H/E have made these "express assertion[s] of sole authorship" since 1979, thereby

triggering the accrual of The Phillies's authorship claim in 1979. See Kwan, 634, F.3d at 228

(quoting Netzer, 963 F. Supp. at 1315); Thomson, 147 F.3d at 203 ("[A] writer's attribution of

the work to herself alone is 'persuasive proof . . . that she intended this particular piece to represent her own individual authorship' and is '*prima facie* proof that [the] work was not intended to be joint.'" (quoting Weissmann, 868 F.2d at 1320)).

The Phillies acknowledges that the "Second Circuit's express assertion test is binding on the Court," but asserts that "the test is inconsistent with the Copyright Act and with recent Supreme Court law," and preserve "the issue of the correctness of the express assertion rule for appeal." ECF No. 148 at 38 n.26. Nevertheless, The Phillies also asserts that Everly v. Everly, 958 F.3d 442 (6th Cir. 2020), applies the express repudiation test differently to ownership and authorship claims, and under the Everly application, its authorship claim is not barred. ECF No. 148 at 38.

Everly was decided by a divided panel of the Sixth Circuit Court of Appeals. Everly, 958 F.3d 442. In that case, the party asserting a co-authorship claim had released his ownership rights to the copyrighted song to the purported co-author, and thus made his "authorship claim without a corresponding ownership claim." Id. at 453. The court determined that claims to ownership of a copyright were distinct from claims of authorship, such that "an authorship claim will not accrue until the putative author's status *as an author* is expressly repudiated; actions repudiating ownership are irrelevant to begin the statute of limitations for an authorship claim because repudiation of ownership is not adverse to the author's claim as such." Id. (first citing Wilson v. Dynatone Publ'g Co., 892 F.3d 112, 117 (2d Cir. 2018); and then citing Gary Friedrich Enters., 716 F.3d at 317–18). Referring extensively to Second Circuit precedent, the Everly Court held that "the express repudiation test should apply to such a claim for a declaration of authorship rights as it does in the ownership context," so that a party asserting sole authorship "can repudiate the plaintiff's authorship (1) privately in direct communication with the plaintiff; (2)

publicly by asserting sole authorship to the world and the plaintiff, including the listed credit on

the published work; or (3) implicitly by receiving remuneration for the work to which the

plaintiff is entitled." Id. at 453 (citations omitted).

Everly does not save The Phillies's co-authorship claim from the statute of limitations

because H/E have spent years expressly repudiating The Phillies's *authorship*, not ownership.

While H/E repeatedly asserted that the Phanatic was their copyrighted character—which could

be construed as claims of sole ownership as well as authorship—H/E's registering of the

Phanatic copyright listing *only Erickson and Harrison* as *authors* and then suing The Phillies for

infringing on that copyright in 1979 are the clearest examples of H/E's express repudiation of

The Phillies's claim to co-authorship. See ECF No. 136, Exs. 54, 65. Of course, H/E's

registration of the Phanatic's copyright, standing alone, is not an express repudiation of The

Phillies's co-authorship claims, but H/E's immediate enforcement of their rights according to

that registration is. See Wilson, 892 F.3d at 119 ("If mere registration of a copyright without

more sufficed to trigger the accrual of an ownership claim, then rightful owners would be forced

to maintain constant vigil over new registrations."). And while the 1984 Agreement contains an

express repudiation of The Phillies's *ownership* in the Phanatic ("HE owns the copyright of the

artistic sculpture presently known as the 'Phillies Phanatic"), it also contains an express

repudiation of The Phillies's co-authorship claim, stating that:

> At all times hereafter, HE shall have the right, so long as HE
> expressly recognizes the Phillies ownership and copyright, to refer
> to the [Phanatic] as *the original creation of HE*, made for the
> PHILLIES . . . . [And w]herever reasonably possible, the Phillies
> shall use its best efforts to credit HE *as the creator of the* [Phanatic]
> . . . .

ECF No. 136, Ex. 69 at 1 & ¶ 6 (emphases added).

Thus, The Phillies's claim began to accrue in 1979 and has long since expired. "Allowing authors to sleep on their rights even after they have been repudiated would inject instability into an area of copyright law that calls out for certainty." Everly, 958 F.3d at 453. I therefore recommend that if the Court does not grant summary judgment on the merits of the authorship claims, that summary judgment be granted in H/E's favor because The Phillies is barred under the statute of limitations from challenging authorship.

### b.  Res Judicata

The Phillies is also barred under the doctrine of res judicata from challenging authorship, just as it is barred from challenging validity. The first two elements are easily established here: the parties' 1979 settlement agreement adjudicated the merits of the 1979 litigation, and The Phillies and H/E are parties to both lawsuits. See TechnoMarine, 758 F.3d at 499. H/E's 1979 lawsuit included a claim for copyright infringement, and because "co-authors cannot be liable to one another for copyright infringement," the question of The Phillies's authorship of the Phanatic was squarely at issue in the 1979 litigation. Newsome v. Brown, 209 F. App'x 11, 12–13 (2d Cir. 2006) (citing Thomson, 147 F.3d at 199); 1979 Compl. (ECF No. 136, Ex. 65); see 1 Nimmer on Copyright § 6.10[A][1][a] ("One joint owner cannot be liable for copyright infringement to another joint owner, given the baseline proposition that one cannot infringe his own copyright.").

Accordingly, the Court may also grant H/E's motion for summary judgment on the alternative basis that res judicata bars The Phillies from disputing the authorship of the Phanatic.

### c.  Other Equitable Defenses

The Phillies fails to oppose H/E's other equitable defenses. "Where one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned." Rohn Padmore, Inc. v. LC Play Inc., 679 F.

Supp. 2d 454, 459 (S.D.N.Y. 2010) (quoting M'Baye v. World Boxing Assoc., Nos. 05-cv-09581 (DC), 06-cv-03439 (DC), 2009 WL 2245105, at *9 (S.D.N.Y. July 28, 2009) (Chin, J.)). I address these defenses briefly, however, and find that they would not create an independent ground to grant summary judgment in H/E's favor.

### i.  Equitable Estoppel

H/E can establish the first three elements for equitable estoppel but cannot establish their detrimental reliance. DeCarlo, 127 F. Supp. 2d at 509. The Phillies knew H/E claimed sole authorship because of the parties' repeated agreements over the years, explicitly stating that the Phanatic was an "original creation of HE." See 1984 Agreement at ¶ 6 (ECF No. 136, Ex. 69). The Phillies also conducted itself in a way that led H/E to believe they could rely on The Phillies's apparent understanding that H/E were the sole authors of the Phanatic, seeking assignment of the Phanatic's copyright (which it would not have needed to do if it was a co-author) and never asserting authorship of the Phanatic. See 1984 Agreement. And H/E were ignorant of The Phillies's assertion of co-authorship. But because there remain questions as to the detriment H/E suffered, summary judgment is not proper on equitable estoppel grounds.

### ii.  Unclean Hands

The Court again does not find that The Phillies's conduct rises to the level required for the extreme remedy of unclean hands. The Phillies's claim to authorship of the Phanatic, even at this late juncture, cannot qualify as a wrongdoing "of serious proportions." Dynamic Sols., Inc. v. Planning & Control, Inc., 646 F. Supp. 1329, 1342 (S.D.N.Y. 1986) (quoting 3 Nimmer on Copyright § 13.09[B] at 13-145 (1985)). I would therefore deny H/E's claim for summary judgment on the issue of the authorship of the Phanatic under the doctrine of unclean hands.

### 4. Summary on Copyright Authorship Claims

In conclusion, I recommend that the Court dismiss The Phillies's Counts III and IV and grant summary judgment in favor of H/E's First and Second Causes of Action, finding either that The Phillies is not a co-author on the merits or, in the alternative, that The Phillies is barred from challenging authorship on statute of limitations and res judicata grounds.

### D. Claims Relating to Derivative Works

Whether P2 is a derivative work is the heart of this case. Both parties seek summary judgment relating to "P2" and The Phillies's alleged derivative works. The Phillies seeks partial summary judgment on two claims relating to derivative works and works created after the 1984 Agreement; H/E seek summary judgment in their favor.

### 1. P2

The Phillies asserts that "P2," the "redesigned" version of the Phanatic that debuted to the public on February 23, 2020, is a derivative work of the 1979 Phanatic, and therefore subject to the Derivative Works Exception to H/E's termination of their 1984 assignment. Section 203(b)(1) of the Copyright Act of 1976 ("the Derivative Works Exception") would allow The Phillies to continue to use derivative works of the Phanatic that were prepared before the assignment termination on June 15, 2020. 17 U.S.C. § 203(b)(1).

A derivative work is "a work based upon one or more preexisting works . . . . A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. See also Underwood v. Lastrada Ent. Co., Ltd., No. 16-cv-09058 (DLC), 2020 WL 3640532, at *7 (S.D.N.Y. July 6, 2020) ("A derivative work is one that is 'substantially copied from a prior work.'" (quoting 1 Nimmer on Copyright § 3.01)).

A work must be independently copyrightable to qualify as a derivative work. <u>Woods v. Bourne Co.</u>, 60 F.3d 978, 990 (2d Cir. 1995) (citing <u>Weissmann</u>, 868 F.2d at 1320–21). "The basis for copyright protection contained in both the Constitution and the Copyright Act is originality of authorship." <u>Woods</u>, 60 F.3d at 990 (citing <u>L. Batlin & Son, Inc. v. Snyder</u>, 536 F.2d 486, 490 (2d Cir.) (en banc), <u>cert. denied</u>, 429 U.S. 857 (1976)). Accordingly, a derivative work must "contain [ ] some substantial, not merely trivial, originality . . . ." <u>Durham Indus., Inc. v. Tomy Corp.</u>, 630 F.2d 905, 910 (2d Cir. 1980) (quoting <u>Chamberlin v. Uris Sales Corp.</u>, 150 F.2d 512, 513 (2d Cir. 1945)) (alteration in original).

The touchstone is "originality." <u>See</u> <u>id.</u> For a work to be copyrightable, it must have an element of independent creation; but "novelty, uniqueness and ingenuity are not required." <u>Id.</u> (citing <u>Batlin</u>, 536 F.2d at 490). "Independent creation, in turn, means that a work must not consist of actual copying." <u>Id.</u> (citing <u>Batlin</u>, 536 F.2d at 490). A derivative work, therefore, "transform[s] an original work into a new mode of presentation," and "take[s] expression for purposes that are not 'transformative.'" <u>Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.</u>, 150 F.3d 132, 143 (2d Cir. 1998). Naturally, "if the secondary work sufficiently transforms the expression of the original work such that the two works cease to be substantially similar, then the secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original work." <u>Id.</u> at 143 n.9 (citation omitted).

Derivative works "make[] non-trivial contributions to an existing" work and "retain[] the 'same aesthetic appeal' as the original work, [which] render the holder liable for infringement of the original copyright *if* the derivative work were to be published without permission from the owner of the original copyright." <u>Eden Toys, Inc. v. Florelee Undergarment Co.</u>, 697 F.2d 27, 34 (2d Cir. 1982) (emphasis added) (the "Paddington Bear case"), <u>superseded on other grounds by</u>

Fed. R. Civ. P. 52(a) as stated in Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd., 726 F.3d 62, 84 (2d Cir. 2013); accord 1 Nimmer on Copyright § 3.01. Copyright law protects individual elements as well as "the creative choices made in selecting and arranging even uncopyrightable elements." Keeling v. Hars, 809 F.3d 43, 50 (2d Cir. 2015), cert. denied, 136 S. Ct. 2519 (2016). Thus, compilations of uncopyrightable elements that contain a "minimal degree" of creativity, "no matter how crude, humble or obvious," can be copyrighted. Feist Publ'ns, 499 U.S. at 345 (quoting 1 Nimmer on Copyright § 1.08[C][1] (1990)). As courts in this District and Circuit have repeatedly stated, the test of originality is a "modest" one, with a low threshold. Durham Indus., 630 F.2d at 910 (collecting cases).

A derivative work is entitled to copyright protection if, "[f]irst, the original aspects of a derivative work [are] more than trivial. Second, the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material and [does] not in any way affect the scope of any copyright protection in that preexisting material." TCA Television Corp. v. McCollum, 151 F. Supp. 3d 419, 430–31 (S.D.N.Y. 2015) (quoting Tempo Music, Inc. v. Famous Music Corp., 838 F. Supp. 162, 167–68 (S.D.N.Y. 1993)) (first alteration in original), aff'd on other grounds by, 839 F.3d 168 (2d Cir. 2016); accord Durham Indus., 630 F.2d at 909. "Paradigmatic examples of derivative works include the translation of a novel into another language, the adaptation of a novel into a movie or a play, or the recasting of a novel as an e-book or an audiobook." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 95 (2d Cir. 2014).

### a.  A Visual Assessment

The Court first looks to images of P1 and P2. See Eden Toys, 697 F.2d at 35 ("[T]he factual question [ ] depends entirely on visual comparison of exhibits").



Fig. 5 – 3D Mascot Turnaround of "P1" by H/E

PSUF ¶¶ 61; ECF No. 127, Ex. 41.



Fig. 6 – 3D Mascot Turnaround of "P2" by The Phillies

PSUF ¶¶ 93–94; ECF No. 127, Ex. 67.

The Phillies points to a number of changes in P2 from the 1979 Phanatic ("P1") that, it

asserts, are non-trivial, original aspects of P2, including: (1) the shape of P2's snout (from P1's

conical, longer "megaphone snout" to P2's squat, cylindrical snout); (2) P2's "wing tips," which

60

extend past its operable, separate hands (which P1 lacked), with "feathers" on the bottom of P2's arms (which P1 also lacked); (3) P2's fingers (from P1's "mitten-shaped hands" to P2's articulated fingers); (4) P2's lighter "powder blue" tail (compared to P1's "dark blue ostrich feather tail"); (5) P2's "duck butt" (which is "longer, bigger, and angles up"); (6) P2's "wispier" powder blue eyebrows; (7) P2's star-shaped, lighter pink eyelashes (from P1's "scalloped" eyelashes); (8) P2's cap (which is wider, has a larger head, and is "oversized"); (9) P2's eyes (from P1's egg-shaped eyes with round pupils to P2's round eyes with oval-shaped pupils); (10) P2's jersey; (11) P2's stockings; and (12) P2's shoes. See PSUF ¶ 95. For their part, H/E contend P2 is merely a "reproduction of the registered P1," and not, as the statute defines, a "recast[ing], transform[ation], or adapt[ation] of the Phanatic." ECF No. 141 at 28. A profile, front, and back comparison are below:

 

Fig. 7 – Side-by-side comparison of the profile of P1 and P2

 

Fig. 8 – Side-by-side comparison of the front of P1 and P2

 

Fig. 9 – Side-by-side comparison of the back of P1 and P2

ECF No. 127, Ex. 69.

The statute guides the Court's analysis: "A work consisting of editorial revisions, annotations, elaborations, or other modifications which, *as a whole*, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101 (emphasis added). The Second Circuit "has

disavowed any notion that we are required to dissect the works into their separate components, and compare only those elements which are in themselves copyrightable." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010) (Katzmann, C.J.) (quoting Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1003 (2d Cir. 1995)) (cleaned up). Thus, the Court does not look to each individual modification in P2 in isolation to determine whether it contains sufficient originality to render P2 a derivative work. Instead, the changes in P2 are taken "as a whole." And in that view, the Court concludes that P2 is indeed a derivative work of P1.

The Court, like others before it, considers "the mute testimony of the costumes themselves, which—although not identical—are obviously very similar." Harrison/Erickson, Inc. v. Chicago Bulls Ltd. P'ship, No. 91-cv-01585 (PKL), 1991 WL 51118, at *5 (S.D.N.Y. Apr. 3, 1991). P2 has pink star-shaped eyelashes, light blue eyebrows, round eyes, oval pupils, a cylindrical snout (that is, one that is the same diameter the whole way across), "wing tips" on its arms, and a blue-tipped "duck butt." See PSUF ¶ 95; ECF No. 127, Ex. 67. P1, for its part, has scalloped-shaped eyelashes, dark blue eyebrows, oval or egg-shaped eyes, a "megaphone"-shaped snout, no wing tips, and a dark blue tail that comes to a smaller point. See PSUF ¶ 95; ECF No. 127, Ex. 7. Of course, the changes to a copyrighted work must demonstrate more than a modicum of originality. Considering primarily the "structural" changes to the Phanatic's body, the changes identified by the parties and observed by the Court are "distinguishable variation[s] that [are] more than merely trivial." Waldman Pub'lg Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994) (citation omitted); see Batlin, 536 F.2d at 490 (explaining that the work must "contain some substantial, not merely trivial originality" (quotation omitted)); accord We Shall

Overcome Found. v. The Richmond Org., Inc., No. 16-cv-02725 (DLC), 2017 WL 3981311, at

*13 (S.D.N.Y. Sept. 8, 2017).

　　　　This assessment is consistent with the authority in our Circuit. In the Paddington Bear

case, the Court of Appeals determined that the changes made to a subsequent work, including

> the changed proportions of the hat, the elimination of individualized
> fingers and toes, the overall smoothing of lines—*combine* to give
> the Eden/Gibson drawing a different, cleaner 'look' than the Ivor
> Wood sketch on which it is based. Such a contribution satisfies the
> minimal requirements of originality for registration under the
> Copyright Act.

Eden Toys, 697 F.2d at 35 (citing Durham Indus., 630 F.2d at 910) (emphasis added).

　　　　H/E argue that P2 is not original because it is the "same old Phanatic" or a "slavish copy"

of P1. But a derivative work is supposed to "retain[] the 'same aesthetic appeal' as the original

work." Id. at 34. Indeed, if the derivative work of Paddington Bear was not recognizable as

Paddington Bear, then it would not be *derivative*—it would be an entirely new creation. If The

Phillies had designed something so dissimilar from the Phanatic that it would no longer be

recognizable as the Phanatic, then, by extension, it would not be a derivative of the Phanatic, and

instead would be a completely different mascot. To be sure, the changes to the structural shape of

the Phanatic are no great strokes of brilliance, but as the Supreme Court has already noted, a

compilation of minimally creative elements, "no matter how crude, humble or obvious," can

render a work a derivative. Feist Publ'ns, 499 U.S. at 345.

　　　　Because P2 contains sufficiently original, non-trivial elements, "the scope of protection

afforded a derivative work [ ] reflect[s] the degree to which it relies on preexisting material and

[does] not in any way affect the scope of any copyright protection in that preexisting material."

Durham Indus., 630 F.2d at 909. As in Durham, the Court's concern is with "carrying out the

statutory command that protection of a derivative work not affect the scope of copyright

protection in an underlying work." Id. at 910–11. P2 is not "virtually identical" to P1, and H/E are not "effectively . . . prevented from permitting others to copy" their work. Ent. Rsch. Grp., 122 F.3d at 1220; see also Batlin, 536 F.2d at 492 (requiring more than "minuscule variations" in order to protect against the risk of putting "a weapon . . . in the hands of mischievous copiers").

Accordingly, I would find that P2 is entitled to protection as a derivative work.

### b. Expert Testimony

H/E urge the Court not to limit its analysis to a visual comparison and offer Bonnie Erickson and David Zung as expert witnesses to assist in the analysis. See generally Woods, 60 F.3d at 992 (in addition to side-by-side comparison, court relied on expert testimony on whether differences were "substantial variations" reflecting deliberate aesthetic choices or merely "trivial" changes). Broadly speaking, H/E's experts would testify that the changes to P2 were not creative or were trivial. See generally Expert Report of David Zung ("Zung Report") (ECF No. 139, Ex. 2); Supp. Expert Report of David Zung (ECF No. 139, Ex. 3). Although The Phillies does not move to exclude the witnesses under Federal Rule of Evidence 702, it argues that the opinion testimony is flawed and unreliable. I recommend that the Court find that P2 is sufficiently original to qualify as a derivative work based on the Court's own assessment. Should the Court consider H/E's experts' opinion evidence, I find that only minimal weight should be afforded to it.

A district court may "determine the admissibility of scientific evidence and [ ] rely only on admissible evidence in ruling on summary judgment." Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), aff'd, 552 U.S. 312 (2008). But "an expert's report is not a talisman against summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). To be admissible, an expert opinion must include "some explanation as to how the expert came to his

conclusion and what methodologies or evidence substantiate that conclusion." <u>Riegel</u>, 451 F.3d at 104 (citing Fed. R. Evid. 702).

Evaluation of the reliability of an expert's testimony requires a court to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002). The district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." <u>Id.</u> at 266. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." <u>Major League Baseball Props., Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 311 (2d Cir. 2008). It is also necessary for the court to determine whether the proposed testimony will assist the trier of fact. <u>In re Rezulin Prods. Liab. Litig.</u>, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004).

The Phillies broadly challenges H/E's expert witnesses and their opinions. Principally, it argues that Zung and Erickson (1) offer no more than "legal opinion[s]"; (2) do not apply the correct standard for determining whether a work is derivative or not; and (3) do not "reliably apply the principles and methods to the facts of the case." ECF No. 125 at 21–22; <u>see</u> Fed. R. Evid. 702. The Court agrees.

First, both Zung and Erickson appear to offer legal opinions that are reserved for the court. While "[e]xperts may testify on questions of fact as well as mixed questions of fact and law," they are "not permitted to present testimony in the form of legal conclusions." <u>Fiataruolo v. United States</u>, 8 F.3d 930, 941 (2d Cir. 1993); <u>Densberger v. United Techs. Corp.</u>, 297 F.3d 66,

74 (2d Cir. 2002) (quotation omitted). "Testimony in the form of legal conclusions is improper because it 'usurp[s] the roles of judge and jury.'" Sanders v. Mount Sinai Sch. of Med., 418 F. Supp. 2d 339, 341–42 (S.D.N.Y. 2005) (quoting United States v. Russo, 74 F.3d 1383, 1395 (2d Cir. 1996)) (alteration in original).

When presented with an alleged derivative work, the court must engage in a mixed factual and legal analysis to determine whether the "original aspects of a derivative work [are] more than trivial." TCA Television Corp., 151 F. Supp. 3d at 430. Both Zung and Erickson repeatedly proffer their quasi-legal opinions that changes to P2 "do[] not represent any *new artistic value* or interpretation to the original design of P1," are "trivial" and "not particularly original." Zung Report at 32, 39, 41 (ECF No. 139, Ex. 2) (referring to P2's "duck butt," snout, and feathers on arms).

More problematically, however, neither Zung nor Erickson offer a methodology that can be tested. An admissible expert opinion must include "some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." Riegel, 451 F.3d at 127. It is unclear what methodology Zung and Erickson used to evaluate the differences between P1 and P2. There is no apparent rationale or testable methodology behind labeling changes to P2 as not artistic or creative, and the decisions in crafting P1 as "artistic" and of "significant creativity." Compare, e.g., Zung Report at 2, 39, 40, 45, 58, 59, 60, 71 (ECF No. 139, Ex. 2), and Erickson Supp. Disclosure at ¶ 3 (ECF No. 127, Ex. 80) (changes made in design of P2 are "of less than minimal artistic significance"); with Zung Report at 23 ("P1 is clearly an artistic design of significant creativity"), and Erickson Supp. Disclosure at ¶ 1 (P1 is "significant creative work"). For example, Zung asserted that the redesigns of "Snap, Crackle, and Pop" were "creative and significant," but changes to P2 were not. Zung Report at 19. He

employed no guiding principles in reaching these opinions. See also Zung July 21, 2020 Dep. at 93:8-14 (ECF No. 127, Ex. 83). Moreover, Zung's references to the "five design hierarchies" are not a testable methodology; they are used as covers for what are subjective analyses of different features of P1 and P2. See Zung Report at 28–29; see, e.g. id. at 59–60 (explaining that "[u]nder the harmony design hierarchy, one asks if the design elements are consistent with one another. Do the colors go together? What are the ratios of shapes and colors relative to other parts?" but then comparing the color distribution in P1 versus P2 and concluding that because the ratios appear the same between the two, the changes are not significant).

Finally, Zung and Erickson apply the wrong standard. Both experts conclude that because P2 is still recognizable as the Phanatic, then the changes to P2 are too insubstantial and it is not a derivative work. See Zung Report at 28; Erickson July 15, 2020 Dep. at 118:23-119:8, 120:3-11; 154:9-157:12 (ECF No. 127, Ex. 8) ("I think the character is still perceived as the Phanatic and I think that if you had done any creative changes, you wouldn't perceive it that way."); see also Zung Report at 2 (determining that "because the changes made to P2 are not creative, and the differences between P1 and P2 are too insignificant to set P2 apart as a new creative work, whether in a marketplace or from an artistic point of view," P2 cannot be a derivative work); Zung Decl. at ¶ 19 (ECF No. 139) ("As I explained in my report, the variations in P2 exhibit less than trivial creativity because each variation from P1 is itself trivial and uninspired, and because the variations, as [a] whole do not alter the impression that P2 is still P1.") As the Court already observed, the concept of a derivative work anticipates that the second work will "retain[] the 'same aesthetic appeal' as the original work." Eden Toys, Inc., 697 F.2d at 34.

Thus, even if the Court were to consider Erickson's and Zung's expert opinions, I would still recommend that the Court conclude that P2 is a derivative work.

### c.  Summary of P2 Derivative Status

"A derivative work prepared under authority of the grant before its termination *may continue to be utilized under the terms of the grant after its termination*." 17 U.S.C. § 203(b)(1) (emphasis added). The exception does not apply to "the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." Id. It is undisputed that P2 was developed before the date of termination, June 15, 2020. The Phillies enlisted artist Tom Sapp to redesign the Phanatic and create "P2," and he delivered the final P2 design to Dave Raymond on January 29, 2020. PSUF ¶¶ 93–94; ECF No. 127, Ex. 67. The P2 costume was built shortly thereafter, in February 2020, and debuted to the public on February 23, 2020. PSUF ¶¶ 96, 100. Thus, under the plain language of the statute, P2 qualifies as a derivative work because it was "prepared under authority of the grant before its termination." 17 U.S.C. § 304(c)(6)(A); see Woods, 60 F.3d at 986.

### 2.  P2-Related Artwork

The Phillies also argues that it is entitled to continue utilizing artistic renderings of P2 that are also covered under the Derivative Works Exception. See ECF No. 125 at 15–17. The Phillies asserts that it may lawfully use (1) the P2 artwork depicted in Exhibit B to the Declaration of Scott Brandreth, created by Tom Sapp and in-house Phillies artists (ECF No. 129, Ex. 2), (2) the P2 3-D Turnaround" illustration created by Tom Sapp (ECF No. 127, Ex. 67), and (3) the 2007 3-D Turnaround created by H/E for MLB Style Guide (ECF No. 127, Ex. 41). Id.

The Phillies argues that H/E has conceded this argument due to their failure to address arguments specifically related to P2 *artwork*. ECF No. 148 at 11 n.9. H/E attempt to rebuff this argument in their reply in support of their motion for summary judgment, asserting that "H/E's expert discusses at length how the artwork was transparently intended to be nearly identical to

existing P1 artwork. . . . And whether such artwork falls within the Derivative Works Exception is ultimately of little consequence if the P2 design itself falls outside the exception." ECF No. 159 at 21 n.23.

H/E cannot respond to The Phillies's motion in a reply brief in support of their own motion. Moreover, "arguments not made in opposition to a motion for summary judgment are deemed abandoned." Plahutnik v. Daikin Am., Inc., 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012); see also Moore v. Metro. Transp. Auth., 999 F. Supp. 2d 482, 494 n.6 (S.D.N.Y. 2013) (deeming claims abandoned when the plaintiff did not address argument raised in defendant's summary judgment motion). Therefore, the Court concludes that H/E have waived arguments relating to the P2 artwork identified above.

The Court is unclear, however, why The Phillies asserts it is entitled to continue to utilize the 2007 3-D Turnaround as a derivative work subject to the Derivative Works Exception. See ECF No. 136, Ex. 41 (depicting the 2007 3-D Turnaround). The Phillies admits that the 2007 3-D Turnaround was *created by H/E* in 2007 (or before). PSUF ¶ 59; Counter-PSUF ¶ 59. The 2007 3-D Turnaround also depicts P1, *not* P2. The Phillies therefore cannot claim any right to the 2007 3-D Turnaround as authors of a derivative work. Accordingly, whether The Phillies has a right to continue to use the 2007 3-D Turnaround is a question of the scope of the 2018 Notice of Termination, *not* its status as a derivative work.

**E.  The June 2018 Termination**

But first, the seventh-inning stretch.

On June 1, 2018, H/E's attorneys sent The Phillies the Termination Notice, with an effective date of June 15, 2020. In Count I, The Phillies seeks a declaration that this Notice is invalid. In Count V, The Phillies seeks a declaration that even if H/E could validly terminate the

grant of rights under the 1984 Agreement, the scope of that termination did not include other validly exercised rights. H/E's Fourth Cause of Action seeks a declaration that the Termination Notice is valid and that "all copyright interests" revert to H/E. Both parties seek summary judgment on these claims.

### 1. Validity of the June 2018 Termination Notice

H/E move for summary judgment on their claim that the June 1, 2018 Notice of Termination was valid, which would correspondingly dismiss The Phillies's Count I. See Compl. ¶¶ 14, 82–93; AACC ¶¶ 52–57. In its omnibus reply/opposition brief, The Phillies concedes this point, indicating that it has "decided not to proceed on Count I of its Complaint," and "does not oppose entry of partial summary judgment on that claim." ECF No. 148 at 46 n.36.

The Copyright Act provides that "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination" pursuant to certain conditions listed in the statue. 17 U.S.C. § 203(a). The author of the work has the right to terminate the grant, and "[t]ermination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant." 17 U.S.C. § 203(a)(1), (3). Because The Phillies concedes that termination as to its continuing rights to use the copyrighted material was valid, I recommend granting H/E summary judgment in part on its Fourth Cause of Action, and dismissing in its entirety The Phillies's Count I.

### 2. The Scope of the June 2018 Termination Notice

Even accepting the validity of the Termination Notice, the parties contest its scope. The Court first considers the terms of the grant and the terms of the termination.

After years of disputes, litigation, and negotiations over The Phillies's rights, the parties entered into the 1984 Agreement. That agreement granted The Phillies all "rights, title and interest in and to the MASCOT and in and to all reproductions and portrayals of all or part of the MASCOT in any medium whatsoever, everywhere and forever, including all copyrights therein." 1984 Agreement at ¶ 1 (ECF No. 127, Ex. 16). Thereafter, The Phillies paid H/E for additional works, but there was never any dispute over The Phillies's right to exploit the copyright in any medium. The June 2018 Termination Notice identified the date of the grant to be terminated as "October 31, 1984," and identified the scope of the grant to be terminated as including the "transfer of copyright . . . of 'Phillie Phanatic' – including two and three dimensional drawings of the work." Termination Notice at ¶¶ 2, 4 (ECF No. 127, Ex. 65).

H/E argue that as a matter of contract interpretation, the 2018 Termination Notice terminated *all rights* that had been granted in 1984. The Phillies argues that the Notice must be read more narrowly to comport with copyright law and under an implied license theory. In addition, The Phillies contends that even if the 2018 Termination Notice is broadly interpreted, it must exclude any works validly within the Derivative Works Exception.

A Section 203 termination notice must specify (1) the "date of execution of the grant being terminated," (2) a "brief statement reasonably identifying the grant to which the notice of termination applies," and (3) "the title of the work and the name of the author . . . and, if possible and practicable, the original copyright registration number." 37 C.F.R. § 201.10(b)(2). The Phillies argues that termination must be narrowly interpreted to include only the rights in the copyrighted Phanatic because that is the listed "title of the work" and the "copyright registration number," and because it did not list any subsequent licensed material, the Termination Notice excludes anything other than use of the mascot. I disagree.

Issues of contract interpretation ordinarily present questions of law for the court to decide. Briarwood Towers 85th Co. v. Guterman, 136 A.D.2d 456, 458 (1st Dep't 1988). Where the terms of a contract are clear and unambiguous, "and reasonable people could not disagree as to the meaning of the text, the contract's interpretation is a question of law to be answered by the [c]ourt." Sage Realty Corp. v. Jugobanka, D.D., No. 95-cv-00323 (RJW), 1998 WL 702272, *4 (S.D.N.Y. Oct. 8, 1998) (first citing Rothenberg v. Lincoln Farm Camp., Inc., 755 F.2d 1017, 1019 (2d Cir. 1985); and then citing Phibro Energy, Inc. v. Empresa de Polimeros de Sines Sarl, 720 F. Supp. 312, 321 (S.D.N.Y. 1989)). Moreover, where, as here, a contract is unambiguous, "courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993).

The 1984 Agreement plainly granted The Phillies rights to use the copyright "in any medium whatsoever." 1984 Agreement at ¶ 1. That right was explicitly extinguished by the Notice of Termination, which identified the date of the grant and included that the termination applied not just to the mascot but to "two and three dimensional drawings of the work." Termination Notice at ¶ 4. The Phillies's argument that it retains the right to use material delivered pursuant to implied licenses is without merit. The Phillies did not need—and there is no evidence it intended to obtain—a license to use the copyrighted material because it already had that right under the 1984 Agreement. The fact that The Phillies paid H/E to design additional material that used *The Phillies's* copyright is immaterial.

The Phillies also challenges the Termination Notice for lack of specificity. "[O]nly the works specified in a termination notice are terminated, even where the notice purports to terminate a grant including more works than actually listed in the notice." Music Sales Corp. v.

Morris, 73 F. Supp. 2d 364, 380 (S.D.N.Y. 1999) (citing Burroughs, 683 F.2d 610). The Phillies

relies on Burroughs, which held that a notice of termination did not terminate a grantee's interest

in five books that were not listed in the notice of termination, even if the omission was

"inadvertent." 683 F.2d at 622. But unlike in Burroughs, the Termination Notice listed all the

rights that had been granted by identifying the granting date and including "two and three

dimensional drawings of the work." Termination Notice at ¶ 4. Accordingly, there was no need,

as The Phillies contends, to list every cap, pennant, or tee-shirt that The Phillies created pursuant

to the 1984 Agreement. In any event, many courts have held that Burroughs should be subject to

a harmless error standard. See e.g., Waite v. UMG Recordings, Inc., 450 F. Supp. 3d 430, 440

(S.D.N.Y. 2020) (finding defects in termination notice to be harmless where defendant has

sufficient notice); Mtume v. Sony Music Ent., 408 F. Supp. 3d 471, 476 (S.D.N.Y. 2019) (same).

Even if the Notice suffered from a lack of specificity, that error was harmless. The Phillies had

adequate notice of the scope of H/E's termination.

This analysis does not hold for works created before 1984. After the 1984 Agreement

was executed, The Phillies and H/E negotiated for the artwork that H/E had created before 1984.

See PSUF ¶ 40. At that time, H/E were clear that the 1984 Agreement did not include H/E's 2-D

artwork that had been created before 1984. See PSUF ¶¶ 41–43. Accordingly, when H/E

authorized the use of work created before the 1984 Agreement, it did so by implied license. "[A]

nonexclusive license to use copyrighted work may be implied from conduct." Jose Luis Pelaez,

Inc. v. McGraw-Hill Glob. Educ. Holdings LLC, 399 F. Supp. 3d 120, 141 (S.D.N.Y. 2019)

(citing 3 Nimmer on Copyright § 10.03[7] (2019)). This implied license would be a separate

grant of rights, which would be subject to a separate notice of termination. Accordingly, I would

find that the 2018 Termination Notice did not cover works created before 1984 that were subject to an implied license to use.

Finally, The Phillies argues that any works that fall within the Derivative Works Exception would not subject to the Termination Notice. This is true by definition. Thus, I would find that continued use of the mascot P2 is not subject to the Termination Notice. The parties dispute what other works might qualify as derivative works but fail to adequately present this issue to the Court. During discovery, The Phillies offered a chart of 399 purported derivative works and H/E concluded that "at least" 31 items were *not* derivative. See PSUF ¶ 33; ECF No. 127, Ex. 22 (H/E's interrogatory response); ECF No. 127, Ex. 23 (chart listing 399 works). The Phillies claims it is entitled to summary judgment on the remaining 368 items because H/E did not challenge their derivative status during discovery. In opposing the motion, H/E challenge the admissibility of The Phillies's chart. The Court need not wade into the questions of admissibility regarding either H/E's interrogatory response or The Phillies's chart. The parties have not adequately conducted a derivative works analysis to items beyond P2, and the Court should not have to do this heavy lift for them. Accordingly, I would deny summary judgment with respect to the scope of the termination of any derivative works beyond P2.

### 3. Summary of Notice of Termination Claims

In conclusion, I recommend that the Court dismiss The Phillies's Count I and grant in part H/E's Fourth Cause of Action limited to the validity of the 2018 Termination Notice. I further recommend that the Court grant in part and deny in part The Phillies's Count V and H/E's Fourth Cause of Action, finding that the Termination Notice validly terminated The Phillies's rights to use all works created after 1984 but did not terminate rights in works created before 1984. Any valid derivative works, including P2, would also not be subject to the

Termination Notice, though, on this record, the Court should not decide what other works might fall within this category.

### F.  The Phillies's Claim Concerning Phanatic-Related Trademarks

The Phillies's Count VI seeks a declaration that "the use of the Phanatic by another sports team or commercial entity for any similar goods or services to those for which The Phillies's trademarks related to the Phanatic are registered violates" Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)." Compl. ¶ 142; see PSUF ¶ 31; ECF No. 127, Ex. 75 (Trademark Registration). In response to H/E's alleged "threat" to make the Phanatic "a free agent" if the 1984 Agreement was not renegotiated, The Phillies also seeks a "permanent injunction barring H/E from selling purported rights in the Phanatic to any sports team or commercial entity and from selling any Phanatic-related merchandise." Id. at ¶ 143. H/E move for summary judgment on this claim, asserting that the Court lacks subject matter jurisdiction over this claim. ECF No. 141 at 49. I agree.

A court may issue a declaratory judgment pursuant to 28 U.S.C. § 2201 when there is "a case of actual controversy within its jurisdiction." A "case of actual controversy" is one in which there is a "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Halo Lifestyle LLC v. Halo Farm, Inc., No. 18-cv-09459 (PAE), 2019 WL 1620744, at *3 (S.D.N.Y. Apr. 16, 2019) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)); see Nike, Inc. v. Already, LLC, 663 F.3d 89, 96 (2d Cir. 2011), aff'd, 568 U.S. 85 (2013) (applying the MedImmune declaratory judgment principles in a trademark case). The dispute between the parties must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of

facts." MedImmune, 549 U.S. at 127 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937)); accord Saleh v. Sulka Trading Ltd., 957 F.3d 348, 353–54 (2d Cir. 2020).

A court will consider the totality of the circumstances when "determining whether a controversy is justiciable." Halo Lifestyle LLC, 2019 WL 1620744, at *3 (citation omitted). The "threat of future litigation [is] relevant in determining whether an actual controversy exists," such that "simply holding litigation in abeyance, where a party could forestall litigation indefinitely by paying licensing fees, does not eliminate the case or controversy." Nike, Inc., 663 F.3d at 96. To establish that the case-or-controversy requirement is satisfied in the trademark context, a plaintiff must "adequately allege that [the infringer] 'has engaged in a course of conduct evidencing a definite intent and apparent ability to commence use of the marks on the product.'" Saleh, 957 F.3d at 354 (quoting Starter Corp. v. Converse, Inc., 84 F.3d 592, 595–96 (2d Cir. 1996), abrogated on other grounds by MedImmune, 549 U.S. 118).

The Phillies has not established, as is its burden, that the Court has subject matter jurisdiction over this claim. See Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). The Phillies claims controversy based, first, on Erickson's statement during a settlement negotiation that H/E would make the Phanatic a "free agent." Compl. ¶ 134; see HESUF ¶ 82; Erickson Decl. at ¶¶ 32–33 (ECF No. 137); Buck Decl. at ¶¶ 5–6 (ECF No. 152). Second, The Phillies points to H/E's selling of the rights to Youppi!, who had been the Montreal Expos mascot, to a different sports team. Compl. ¶ 137; see Erickson Decl. at ¶ 34. The parties do not contest the former fact; but H/E contend that The Phillies has it wrong with the latter. Erickson clarifies that "H/E sold its rights in and to Youppi! to the Montreal Expos," and that H/E was not involved in any later sale of the mascot from the Montreal Expos to the Montreal Canadiens. Erickson Decl. at ¶ 34.

Regardless of the circumstances of the sale of Youppi!, the Court agrees with H/E that The Phillies has failed to demonstrate that there is a "substantial controversy . . . of sufficient immediacy and reality," as required under the Declaratory Judgment Act. Halo Lifestyles LLC, 2019 WL 1620744, at *3. Under a totality of the circumstances, The Phillies has not shown that H/E have "engaged in a course of conduct evidencing a definite intent and apparent ability to commence use of the marks on the product." Saleh, 957 F.3d at 354 (quotation omitted). A single statement made during confidential settlement negotiations and H/E's prior sale of its rights in another mascot under unknown circumstances, without any demonstrable "tangible steps to effectuate . . . plans" to infringe on The Phillies's trademarks, do not create a "definite and concrete dispute." Saleh, 957 F.3d at 355 (quoting MedImmune, 549 U.S. at 127). Just because H/E may be in a worse position now following the termination of the Phanatic's copyright assignment does not make clear H/E's definite intent to infringe on The Phillies's trademarks; nor does H/E's ability to construct a Phanatic costume, standing alone, establish H/E's "apparent ability to commence use of the marks on the product." Saleh, 957 F.3d at 354 (quotation omitted).

Whereas the plaintiff seeking a declaratory judgment in Sketchworks Industrial Strength Comedy, Inc. v. Jacobs "proffered sufficient facts to show that its intentions to exploit . . . [were] not merely hypothetical," such that its "desire to schedule additional performances" of the allegedly infringing play were "sufficiently definite and concrete," The Phillies has not shown that H/E have taken "substantial, tangible steps to effectuate its plan" to exploit The Phillies's trademarks, let alone any desire to do so. No. 19-cv-07470 (LTS) (DCF), 2021 WL 1226955, at *4 (S.D.N.Y. Mar. 31, 2021) (quotations omitted). In Sketchworks, the court found that the plaintiff's creation and prior performance of an allegedly infringing play, scheduling of a

performance of the play, taking tangible steps to perform the play in New York (which was only halted by the defendant's cease and desist letter), and continuing its relationship with "at least one theatre," under a totality of the circumstances, rendered the plaintiff's "'desire' to schedule additional performances . . . sufficiently definite and concrete so as to present an actual controversy." Id. (citing MedImmune, 549 U.S. at 129). By contrast, The Phillies cannot demonstrate that H/E have taken any similar, concrete steps. I therefore recommend granting H/E's motion for summary judgment on The Phillies's Count VI.

### G.  The Phillies's State Law Claims

H/E move for summary judgment on Counts VII and VIII of The Phillies's complaint, which assert state law claims for unjust enrichment and breach of the covenant of good faith and fair dealing based on H/E's termination of the 1984 assignment. See Compl. ¶¶ 145–55.

### 1.  Preemption of State Law Claims

First, H/E assert that The Phillies's state law claims are preempted by the federal statutory scheme for copyright law because those claims are at "odds" with the federal copyright scheme, which provides authors with "an inalienable termination right." Stewart v. Abend, 495 U.S. 207, 230 (1990) (citing 17 U.S.C. § 203(a)(5)). I disagree.

Under the Supremacy Clause of Article VI of the United States Constitution, federal law can preempt state law in three different ways: (1) expressly, when Congress in "express terms declare[s] its intention to preclude state regulation in a given area"; (2) impliedly, "when the federal law is 'sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementing state regulation'"; and (3) in instances of conflict preemption, when state law "actually conflicts with a valid federal statute," such that "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." Darling v. Mobil Oil Corp., 864 F.2d 981, 985–86 (2d Cir. 1989). Preemption is not to be lightly inferred. Int'l Paper Co. v. Quellette, 479 U.S. 481, 491 (1987). The question here is one of conflict preemption.

"Section 301 of the Copyright Act preempts state law actions that seek to vindicate rights equivalent to those protected under the Copyright Act." Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 453 (S.D.N.Y. 2014); see 17 U.S.C. § 301(a). The Court of Appeals has adopted a two-prong analysis to determine if claims are preempted under Section 301. State law claims are preempted if: (1) "the work at issue comes within the subject matter of copyright," and (2) "the right being asserted is equivalent to any of the exclusive rights within the general scope of copyright." Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 429 (2d Cir. 2012); accord Saint-Amour v. Richmond Org., Inc., 388 F. Supp. 3d 277, 290 (S.D.N.Y. 2019).

The Phanatic is a copyrightable work, and so The Phillies's state law claims apply "to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). Thus, the preemption subject matter requirement is met.

But neither claim asserts rights that are "equivalent to a right protected by the Copyright Act," and therefore the general scope requirement is not satisfied. Saint-Amour, 388 F. Supp. 3d at 290 (citing Briarpatch, 373 F.3d at 305). The Phillies's unjust enrichment and contractual good faith and fair dealing claims do not focus on the use of the copyrighted material, but rather on the terms of the 1984 Agreement. See Paramount Pictures Corp. v. Puzo, No. 12-cv-01268 (AJN), 2012 WL 4465574, at *6–7 (S.D.N.Y. Sept. 26, 2012) (breach of contract claim is not

preempted because the plaintiff had to comply with a separate contractual obligation—"*i.e.*, not to engage in conduct violative of the implied covenant of good faith and fair dealing"—beyond honoring any "exclusive rights under the Copyright Act"); Levine v. Landy, 832 F. Supp. 2d 176, 188 (N.D.N.Y. 2011) (unjust enrichment claim related to failure to pay for authorized distribution of copyrighted material is not preempted); cf. Weber v. Geffen Records, Inc., 63 F. Supp. 2d 458, 462 (S.D.N.Y. 1999) ("[U]njust enrichment claims relating to the *use* of copyrighted material are generally preempted." (emphasis added)).

Additionally, these claims are not incompatible with an author's termination rights under 17 U.S.C. § 203. An unqualified right to terminate a contract may still subject the party to damages. See also Morris v. Putnam Berkley, Inc., 259 A.D.2d 425 (1st Dep't 1999) ("Plaintiff's breach of contract claim is not preempted since implied promise constitutes extra element removing claim from ambit of Federal copyright act." (citations omitted)); Forest Park Pictures, 683 F.3d at 430 ("[I]f an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display . . . there is no preemption." (citations omitted)).

Finally, The Phillies's state law claims seek to vindicate rights it holds against only H/E: "A copyright is a right against the world. Contracts, by contrast, generally affect only their parties." ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1454 (7th Cir. 1996) (quoted with approval in Forest Park Pictures, 683 F.3d at 431); see Paramount Pictures Corp., 2012 WL 4465574, at *7. Accordingly, The Phillies's Counts VII and VIII are not preempted.

## 2. The Merits of the State Law Claims

New York law governs the analysis of the 1984 Agreement per the contract's terms. See 1984 Agreement at ¶ 9 (ECF No. 136, Ex. 69). In New York, a successful unjust enrichment

claim must establish "that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch, 373 F.3d at 306 (citing Clark v. Daby, 300 A.D.2d 732, 732 (3d Dep't 2002)). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" Transcience Corp., 50 F. Supp. 3d at 453 (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)).

The Phillies asserts that H/E were unjustly enriched because The Phillies paid H/E $215,000 in 1984 for the assignment of the Phanatic's copyright for a term of "forever," yet H/E terminated the assignment 35 years later. Whether equity and good conscience preclude H/E from retaining the full assignment fee is a question of fact. I recommend denying H/E's motion to dismiss Count VII.

Under New York law, "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (citing Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995)). The covenant "encompasses any promises that a reasonable promisee would understand to be included." Spinelli v. Nat'l Football League, 903 F.3d 185, 205 (2d Cir. 2018) (quoting N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (1995)). Under the covenant, "'neither party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract,' or to violate the party's 'presumed intentions or reasonable expectations.'" Id. (quoting M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)). Because "there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." Tractebel Energy, 487 F.3d at 98 (quoting 23

Willston on Contracts § 63:22 (4th ed. 2006)). A court examining whether there has been a breach of the covenant of good faith and fair dealing "must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." Id. (quotation omitted). Accordingly, the question of "whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case." Id.

H/E argue that the 1984 Agreement implicitly contained an unqualified termination right by operation of copyright law. Thus, they contend, exercising that implied contractual right could not interfere with the duty of good faith and fair dealing. Although a closer call, given the factual inquiry required to assess whether the lawful termination had the effect of "destroying or injuring" The Phillies's rights, I recommend that the Court also deny H/E's motion to dismiss Count VIII. See M/A–COM, 904 F.2d at 136 ("[W]here a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated").

## II.    The Phillies's Motion to Dismiss

We have reached the bottom of the ninth inning.

The Phillies moves to dismiss H/E's Fifth Cause of Action, which claims copyright infringement. H/E assert that they own and control all rights, title, and interest to the Phanatic mascot design as of June 15, 2020, following the termination of the 1984 Agreement. H/E's copyright infringement claim can be divided in two parts: first, they assert that The Phillies's continued use of the P1 artwork identified in Exhibit B of its Amended Counterclaim Complaint constitutes infringement, see ECF No. 118, Ex. 2 ("AACC Exhibit B"); second, they assert that

(a) P2 and (b) adaptations and reproduction of P2 created after the termination date constitute copyright infringement. H/E seek damages and an injunction to prevent further harm. Because I find that P2 qualifies as a derivative work, which would be excepted from the Notice of Termination, any claim for infringement based on P2 should be dismissed. And because H/E has failed to allege with sufficient specificity claims relating to merchandise depicting certain P1 images, that claim should also be dismissed. But I recommend denying in part The Phillies's motion to dismiss H/E's Fifth Cause of Action as to P2 adaptations and reproductions created after June 15, 2020.

### A.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A facially-plausible claim is one in which the pleaded factual content allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. At this stage, the Court accepts all factual claims in the complaint as true, and all reasonable inferences are drawn in the non-movant's favor. Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd., 753 F.3d 395, 403 (2d Cir. 2014); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). However, the complaint must assert more than "labels and conclusions"; legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Instead, the factual allegations in the complaint must make the claim plausible, that is, "enough to raise a right to relief above the speculative level." Arista Recs. LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (cleaned up).

### B. Merits of the Motion to Dismiss

To state a plausible claim for copyright infringement, a plaintiff must allege "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." Kelly v. L.L. Cool J., 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd mem., 23 F.3d 398 (2d Cir. 1994), cert. denied, 515 U.S. 950 (1994). To make a *prima facie* case for infringement, "a plaintiff must first show that his work was actually copied . . . [and] then must show that the copying amounts to an improper or unlawful appropriation." Laureyssens v. Idea Grp., Inc., 964 F.2d 131, 139–40 (2d Cir. 1992) (quotation marks and citations omitted). When the copyright infringement claim is based on the production of an unauthorized derivative of a copyrighted work, a plaintiff must show "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993) (citations omitted), cert. denied, 510 U.S. 1112 (1994).

### 1. The Time Period of Infringement

H/E's counterclaim complaint sufficiently identifies the time period of infringement. Although a plaintiff must show "during what time defendant has infringed the copyright," taking the facts alleged in the complaint as true, H/E have "alleged a continuing violation," starting after the date of termination, June 15, 2020, "which fulfills the pleading requirements for a copyright claim." Franklin Elec. Publishers, Inc. v. Unisonic Prods. Corp., 763 F. Supp. 1, 4 (S.D.N.Y. 1991); Maverick Recording Co. v. Goldshteyn, No. 05-cv-04523 (DGT), 2006 WL 2166870, at *4 (E.D.N.Y. July 31, 2006); see also Home & Nature Inc. v. Sherman Specialty Co., Inc., 322 F. Supp. 2d 260, 266 (E.D.N.Y. 2004) (complaint adequately pleaded a time

period of infringement by indicating that defendant had "since December 2000, consistently infringed and continues to infringe"); see AACC ¶ 10.

### 2.  Alleged Infringement of P1 Artwork

The Phillies asserts that H/E's copyright infringement claim as to the P1 artwork in AACC Exhibit B fails because of issues with registration and specificity.

### a.  Pleading Copyright Registration

The Phillies asserts that H/E's counterclaim for infringement must be dismissed because the P1 artwork in AACC Exhibit B is unregistered, and "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made . . . ." 17 U.S.C. § 411(a). H/E concede that the artwork in Exhibit B is pending registration, but they assert that the Phanatic's 1979 copyright registration sufficiently supports their copyright infringement claim because the artwork in AACC Exhibit B "repeats content verbatim from the original copyrighted Phanatic mascot design." ECF No. 141 at 58–59.

An action for infringement based on an unregistered derivative work could be maintained if the unregistered works "incorporate[d] protectable elements of a registered" work, and *those elements* were copied in an unauthorized manner. SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 206, 214 (S.D.N.Y. 2009). In other words, "the infringement of the underlying work, through the unauthorized copying of the derivative works," is enough to satisfy the statutory requirement. Id.; see also 2 Nimmer on Copyright § 7.16[B] [2][b] (2008).

H/E have sufficiently alleged registration by alleging that certain works infringe on the registered copyright of P1. H/E have averred that "[t]he Phanatic Artwork listed on Exhibit B repeats content verbatim from the original copyrighted Phanatic mascot design, and

Counterclaim Plaintiffs rely upon their copyright registration for the underlying mascot design." AACC ¶ 60. At the motion to dismiss stage, that is sufficient.

### b. Pleading Acts of Infringement with the Requisite Specificity

The Phillies also argues that it cannot tell from H/E's Amended Counterclaim Complaint what "merchandise" H/E believe is infringing. See ECF No. 148 at 46. The Phillies principally rely on Palmer Kane LLC v. Scholastic Corp., in which the court concluded that the complaint did not appropriately "specify which works [were] at issue in the case." No. 12-cv-03890 (TPG), 2013 WL 709276, at *3 (S.D.N.Y. Feb. 27, 2013). The Court agrees. While H/E's Amended Counterclaim Complaint focuses on specific instances of infringing acts due to The Phillies's *use of P2*, there is no such support for H/E's assertion that The Phillies "continu[es] to exploit *merchandise* that unlawfully incorporates the Phanatic Artwork" identified in AACC Exhibit B. AACC ¶ 61; see id. at ¶ 30 (alleging that "The Phillies also continue to sell and knowingly authorize, enable, encourage, and/or induce others to sell unauthorized merchandise featuring numerous pieces of the Phanatic Artwork listed on Exhibit B"). The Court cannot conclude that such statements give adequate notice to The Phillies regarding its allegedly infringing acts.

H/E's Amended Counterclaim Complaint "does not need detailed factual allegations," but it must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (internal quotation marks and citation omitted). H/E have failed to provide any indication of merchandise used by The Phillies that infringe on H/E's original artwork included in AACC Exhibit B. Because H/E's complaint provides no indication of what "merchandise" is allegedly infringing on the artwork in AACC Exhibit B, the Court concludes that The Phillies has not been given fair notice of the grounds upon which H/E's infringement claim as to merchandise rests. Cf. Lefkowitz v. McGraw-Hill Glob. Educ.

Holdings, LLC, 23 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (finding the complaint sufficiently asserted the bases for the plaintiff's infringement claim, which included a chart that identified "a number of" the defendant's allegedly infringing publications).

Therefore, because of H/E's failure to state with specificity what, if any, merchandise created by The Phillies is infringing on the P1 artwork in AACC Exhibit B, I would grant in part The Phillies's motion to dismiss H/E's Fifth Cause of Action as it relates to the P1 artwork identified in AACC Exhibit B.

### 3. Alleged Infringement by P2

The primary focus of H/E's copyright infringement claim relates to works involving P2. Because this Court has determined that P2 and certain P2 artwork are derivative works within the Derivative Works Exception, as a matter of law, H/E's copyright infringement claim cannot survive against those works. See 17 U.S.C. § 203(b)(1). I therefore recommend granting The Phillies's motion to dismiss H/E's Fifth Cause of Action as it relates to P2 and the P2 artwork addressed in Section I.D.2.[34]

But that determination does not apply to *all* works involving P2: the Derivative Works Exception applies *only* to works created before the date of termination. 17 U.S.C. § 203(b)(1); see Cooley v. Penguin Grp. (USA) Inc., 31 F. Supp. 3d 599, 608–09 (S.D.N.Y. 2014) (explaining that rights in a derivative work "does not confer the unfettered—let alone exclusive—right to reproduce the derivative work in a manner that would infringe rights of the holder of the copyright in the underlying work absent a license to reproduce or otherwise use the underlying work" (footnote omitted)), as corrected (July 14, 2014).

---

[34] This includes (1) the artwork depicted in Exhibit B to the Declaration of Scott Brandreth, and (2) the P2 3-D Turnaround" illustration.

H/E allege copyright infringement as to additional works depicting P2 that were created after June 15, 2020, including a subset of those works in Exhibit A of its AACC. See ECF No. 118, Ex. A. Thus, this component of their claim does not suffer from the specificity deficiencies that afflict the claims regarding P1 artwork. The Phillies asserts this is "a non-exhaustive list" because H/E allege that "The Phillies seemingly produce new works that unlawfully incorporate the Phanatic every week, each of which constitutes a new and separate instance of infringement." AACC ¶ 25. The allegations in the Amended Counterclaim Complaint, coupled with the instances identified in Exhibit A of the AACC, are sufficient to give The Phillies the requisite "fair notice." See, e.g., Arista Records, 604 F.3d at 120 (2d Cir. 2010); Zuma Press, Inc. v. Getty Images (US), Inc., No. 16-cv-06110 (AKH), 2017 WL 2829517, at *3 (S.D.N.Y. June 29, 2017); Warren v. John Wiley & Sons, Inc., 952 F. Supp. 2d 610, 617, 637 (S.D.N.Y. 2013) ("The inclusion of a list of additional photographs in Exhibit One does not create any ambiguity as to the alleged infringement at issue.").

### 4. Summary of Infringement Claims

In conclusion, I recommend granting The Phillies's motion to dismiss H/E's Fifth Cause of Action as it relates to "merchandise" depicting the P1 artwork identified in AACC Exhibit B that was allegedly created between the date of termination (June 15, 2020), and the filing of the AACC. I also recommend granting the motion to dismiss as it relates to H/E's claims regarding P2 and certain P2-related artwork that this Court has determined fall within the Derivative Works Exception. And I recommend denying The Phillies's motion as to additional depictions of P2 created after the date of termination.

### CONCLUSION

The Court reviews the final score.

Regarding validity of the Phanatic copyright, I recommend that the Court dismiss The Phillies's Count II and GRANT summary judgment in favor of H/E's Third Cause of Action, either on the merits of H/E's claim or, in the alternative, because The Phillies is barred from challenging the copyright's validity on res judicata grounds.

Regarding the parties' authorship claims, I recommend that the Court dismiss The Phillies's Counts III and IV and GRANT summary judgment in favor of H/E's First and Second Causes of Action, either on the merits of H/E's claims or, in the alternative, because The Phillies is barred from challenging authorship on statute of limitations and res judicata grounds.

Regarding P2 and related P2 artwork, I recommend that the Court GRANT summary judgment in favor of The Phillies, and DENY summary judgment to H/E, on the basis that P2 and the specified P2 artwork fall within the Derivative Works Exception.

Regarding the parties' claims relating to the validity and scope of the 2018 Termination Notice, I recommend that the Court dismiss The Phillies's Count I and GRANT in part summary judgment on H/E's Fourth Cause of Action limited to the validity of the 2018 Termination Notice. I also recommend that the Court GRANT in part and DENY in part the parties' summary judgment motions on The Phillies's Count V and H/E's Fourth Cause of Action, finding that the Termination Notice validly terminates The Phillies's rights to use all works created after 1984 but did not terminate works created before 1984. Any valid derivative works, including P2, would not be subject to the Termination Notice.

Regarding The Phillies's trademark infringement claim, I recommend the Court dismiss The Phillies's Count VI and GRANT summary judgment in H/E's favor.

Regarding The Phillies's state law claims, I recommend the Court DENY H/E's motion for summary judgment on The Phillies's Counts VII and VIII.

Finally, regarding H/E's copyright infringement claim, I recommend the Court DENY in part and GRANT in part The Phillies's motion to dismiss.

The Phillies's motion for leave to file a sur-reply is denied as moot, and the Clerk of Court is respectfully directed to deny the motion at ECF No. 163.

DATED:     August 10, 2021
           New York, New York

SARAH NETBURN
United States Magistrate Judge

\*              \*              \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Marrero. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).